No. 26-1136

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

Theresa Sweet, *et al.*,

*Plaintiffs-Appellees,*

v.

Linda McMahon, in her official capacity as Secretary of the United States Department of Education, and the United States Department of Education,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
## FOR STAY PENDING APPEAL BY MARCH 26, 2026

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

MICHAEL S. RAAB
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*202-514-3388*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

STATEMENT .......................................................................................3

ARGUMENT ..................................................................................... 14

    A.    The Equities Overwhelmingly Favor Extending the Post-Class Deadline.........................................................................................15

    B.    The District Court's Additional Reasons for Concluding to the Contrary Do Not Withstand Scrutiny .......................................21

CONCLUSION .................................................................................. 23

CERTIFICATE OF COMPLIANCE

APPENDIX

## INTRODUCTION

In 2022, the Department of Education entered a settlement with a class of student-loan borrowers who assert that they were defrauded by their schools and who had administrative applications for student-loan relief pending. Since then, the Department has almost entirely implemented its settlement obligations with respect to the class members, providing $12 billion in discharges and refunds to nearly 300,000 borrowers.

In addition, the Department agreed to resolve, by January 28, 2026, additional applications submitted by non-class members—who are not plaintiffs in this case, are not bound by the settlement, and have not waived any claims through the settlement—between the settlement's execution and approval. But more than 250,000 applications were submitted, which was an order of magnitude more than in any other comparable period. As a result, the Department was able to meet its January 2026 deadline only for approximately 60,000 applicants. Thus, under the agreement, the Department would be required to provide more than $11 billion in automatic refunds and discharges to the remaining applicants.

To avert that substantial windfall at taxpayer expense, in November 2025, the Department requested that the district court extend the deadline by 18 months. The Department explained that resource constraints prevented it from meeting the original deadline, but that Congress had recently appropriated additional funds to the Department. Armed with that appropriation, the Department had developed a plan to

1

hire hundreds of permanent and contract attorneys, allowing the Department to complete all 250,000 individualized adjudications by July 2027. And in the interim, the borrowers' relevant loans would remain in forbearance, ensuring that they are not required to make any payments.

The district court refused to grant the Department relief in substantial part. Although the court recognized that it had power to modify the deadline, it concluded that the harm to the government and the public from providing $11 billion in automatic relief did not justify the requested modification. That decision was erroneous on all levels. Most importantly, it improperly elevated the interests of the non-class member beneficiaries over the interests of the parties and the public in ensuring that funds are not disbursed to applicants who do not deserve them on the merits. And beyond that, the court's equitable balancing rested on a series of unsupported assumptions—including, for example, the court's belief that the 40 attorneys employed in the relevant office could complete 170,000 individualized adjudications in six weeks if only the attorneys were sufficiently industrious and willing to work on Christmas and New Year's Day.

Given the substantial errors in the district court's approach—and the billions of dollars in taxpayer funds at stake—the Department is likely to succeed in demonstrating that it was entitled to a reasonable extension of the deadline. And a stay of that deadline pending appeal is necessary to preserve the Department's ability to seek effective appellate review. Unless that deadline is stayed, the Department will

2

be required to provide notice to applicants by March 30 that they will receive full refunds and discharges. And the Department will be required to begin discharging loans in tranches nearly immediately to avoid breaching settlement deadlines. Once the Department takes those steps, there is no assurance that the Department will be able to reverse course by reinstating discharged loans or recouping refunded payments if it ultimately prevails on appeal.

## STATEMENT

**1.** "Congress has allowed for the cancellation of federal student loans in certain cases of school misconduct" pursuant to a process known as borrower defense. *In re U.S. Dep't of Educ.*, 25 F.4th 692, 695 (9th Cir. 2022). Borrowers may claim entitlement to relief if their institution engaged in actionable misconduct, such as by providing prospective students with materially false information to induce their attendance.

At a high level of generality, the process usually works as follows: To raise a claim, a borrower submits an administrative application. In adjudicating that application, the Department is generally required first to determine whether the borrower has established that the institution engaged in actionable misconduct. If so, the Department determines what relief is appropriate. Such relief may include forgiving outstanding loan balances and reimbursing the borrower for loan payments already made. *See generally, e.g.*, 34 C.F.R. § 685.222 (July 1, 2020 edition).

**2.** Before 2015, the borrower-defense process was "rarely used." 81 Fed. Reg. 39,330, 39,330 (June 16, 2016). That year, following the bankruptcy of Corinthian

3

Colleges, Inc., the Department saw a "flood" of borrower-defense claims. *See id.* at 39,330-31, 39,335. An unprecedented surge in borrower-defense requests followed, overwhelming the Department. *See U.S. Dep't of Educ.*, 25 F.4th at 695-96.

By the time this suit was filed in June 2019, the Department's backlog had grown to more than 210,000 pending applications. *See U.S. Dep't of Educ.*, 25 F.4th at 696. Plaintiffs—a class of borrowers with pending applications—alleged that the Department had unlawfully withheld, or was unreasonably delaying, adjudications.

In June 2022, the parties reached a settlement, which provides a framework for comprehensively addressing the backlog of hundreds of thousands of borrower-defense applications by breaking up applicants into different groups. First, the settlement explains that the relevant "plaintiff class" is those who meet the district court's certified class definition (a definition that, as relevant here, generally encompasses those with pending borrower-defense applications) "as of the Execution Date"—that is, the date that the parties signed the agreement. *See* App.155-56; *see also* App.153.

The settlement divided these class members into two different groups. Group One comprised approximately 196,000 class members who received federal student loans to attend one of the 151 specific schools, referred to as "Exhibit C" schools. *See* App.156. Under the settlement, these class members were entitled to both a discharge of their remaining student loans associated with the school as well as a refund of amounts already paid to the Department toward those loans. *See* App.156-57.

4

Group Two comprised the remaining approximately 100,000 class members who did not attend Exhibit C schools. The settlement provided that those class members would receive a streamlined adjudication with certain presumptions in the borrower's favor, and the settlement required the Department to issue decisions on those adjudications in accordance with a rolling series of deadlines between July 2023 and July 2025. *See* App.157-61. The Department has substantially complied with its obligations with respect to both sets of class members, and their claims are not at issue here.

In addition, the settlement provided relief to additional borrowers who "submit[ted] a borrower defense application after the Execution Date (*i.e.*, the date the class closes), but before the Final Approval Date" (that is, the date that the settlement was approved by the district court). *See* App.161. It is this portion of the settlement that is at issue here.

The settlement agreement is clear that these borrowers—referred to as "post-class applicants" or as "Group Three"—are not class members, are not bound by the settlement, and did not waive any claims through the settlement. *See* App.153, 155-56, 161, 171. Nonetheless, as part of the settlement, the Department agreed to provide them some limited relief. Specifically, the Department agreed to issue a decision on each post-class application no later than January 28, 2026. *See* App.161. And the Department agreed that, in evaluating those applications, it would "apply the

5

standards in the borrower defense regulations published by the Department on November 1, 2016." *Id.*

To receive relief under those standards, an applicant is generally required to establish that the school he attended "made a substantial misrepresentation" that "the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school." 81 Fed. Reg. 75,926, 76,083 (Nov. 1, 2016). Or the applicant may establish that he has obtained "a nondefault, favorable contested judgment" against the school that meets certain criteria or that the school breached a contract with the student. *See id.*

In addition, an applicant who establishes that he is entitled to relief is not necessarily entitled to a full discharge and refund. Instead, the Department is required to "determine[] the appropriate amount of relief." 81 Fed. Reg. at 76,086. For example, for claims based on a substantial misrepresentation, the Department will presumptively award full relief but may reduce the relief based on various considerations, including "the borrower's cost of attendance to attend the school," the "value of the education the borrower received, the value of the education that a reasonable borrower in the borrower's circumstances would have received," the "value of the education the borrower should have expected given the information provided by the institution," and "any other relevant factors." *Id.*; *see also* App.110.

Under the settlement, if the Department fails to issue "a timely decision" to any post-class applicant, the Department must provide a full discharge and refund.

6

App.161. The settlement requires that the Department provide any "affected Post-Class Applicant with notice that the applicant will receive this relief within 60 calendar days following the expiration of the applicable deadline"—that is, by March 30, 2026—and that the Department "effectuate relief" within one year after providing notice. *Id.*

**3.** In November 2022, the district court approved the parties' settlement agreement, as required under Federal Rule of Civil Procedure 23, and entered final judgment. *See* App.125. As part of the judgment, the court "retain[ed] jurisdiction to monitor and oversee implementation of the settlement." *Id.* Between the time the parties entered into the agreement in June and the court's approval in November, approximately 251,000 post-class claims were submitted—a submission rate that far exceeded the Department's expectations or the rate experienced in any other similar five-month period. App.103-04. Under the terms of the settlement as originally entered into, the Department was required to issue final decisions on those claims by January 28, 2026.

After the settlement was finalized, the Department began implementing it. The Department's ability to quickly work through its settlement obligations was substantially constrained, however, by resource limitations. As of the district court's final approval, the Department employed only 33 attorneys in the borrower-defense branch. App.105. After the settlement, the Department repeatedly requested that Congress appropriate millions of dollars in additional funds to allow the Department

to hire the staff necessary to meet the settlement's deadlines. *Id.* But Congress rejected those requests for Fiscal Years 2024 and 2025. *See id.* As a result, although the Department was able to hire some additional attorneys in 2023 and 2024—and secure some attorneys on temporary detail from another agency—the Department "was unable to increase the number of attorneys adjudicating borrower defense applications to the extent needed to meet the deadlines." App.105-06.

Faced with these resource constraints, the Department initially "prioritized putting processes into place to meet the settlement deadlines" for the nearly 300,000 class members entitled to relief as parts of Group One and Group Two. App.111; *see also* App.113-16 (describing the substantial work required to meet the Department's obligations with respect to that relief). Today, the Department has substantially met its obligations to provide those class members relief due under the settlement. *See* Dkt. No. 505, at 1 (reporting that, as of December 1, 2025, the Department had provided complete relief to between 97.9% and 99.7% of class members entitled to such relief whose deadlines had passed).

While it was working to provide relief to hundreds of thousands of class members, the Department also began using the limited additional resources available to start the process of adjudicating post-class applications. At first, the Department was required to "develop new policies and procedures for adjudicating the post-class applications" and to "train[] staff on post-class adjudications." App.112. But by August 2023, the Department began resolving post-class applications. *Id.*

8

The Department's ability to issue a large volume of decisions was, however, seriously undermined by the resource-intensive nature of the adjudication process. In applying the 2016 regulations, the Department must first engage in a "fact-finding" process for each school, through which the Department evaluates any evidence submitted by borrowers in their applications, "any responses the school submits to the Department," any other records that the Department possesses, and "any additional information or arguments that may be obtained by the Department official (such as accreditor records, documentation from the school, court records, or information obtained from law enforcement partners)." App.108. That process may take a substantial amount of time, both because of the sheer volume of information involved that the Department must collect and review and because the Department's ability to complete its fact-finding may rely on schools' and third parties' producing information in a timely fashion. *See* App.108-09.

After the Department concludes its fact-finding process with respect to a particular school, the Department then must "adjudicate[] independently on [the] merits" each application associated with that school. App.109. This individualized process requires the Department to review "the individual claims made by the applicant as well as the evidence gathered during fact-finding to determine whether the" applicant has established an entitlement to relief. *Id.* And if the applicant is entitled to relief, the Department then engages in another individualized analysis to determine the appropriate degree of relief. *See* App.109-10.

9

**4.** Notwithstanding its resource limitations and the resource-intense nature of the post-class adjudications, by January 2025, the Department had achieved "a steady pace of approximately 1,500 post-class adjudications per month," App.112. The Department managed to maintain that steady pace throughout 2025. App.117.

Although that pace reflected the Department's diligent efforts, it would have left the Department able to adjudicate only approximately 60,000 of the 250,000 post-class applications before the deadline. *See* App.117-18. And the Department understood that it was unlikely to receive the many-years-long extension of the January 2026 deadline from the district court that would have been necessary to allow it to adjudicate all 250,000 post-class applications, at least as constrained by the then-existing resource limitations.

The Department's limitations changed, however, in July 2025, when Congress "appropriated an additional $1 billion for" the Department's Federal Student Aid office. App.119. That substantial appropriation freed up resources that the Department intended to use to hire hundreds of additional contract and permanent attorneys "to adjudicate the post-class applications" and thereby markedly increase the Department's pace of adjudications. *See* App.119-21. But the Department quickly ran into a significant problem: because the process of awarding such a contract and then onboarding and training the contract attorneys would take months, the Department did not believe that it could begin using that increased capacity before the January 2026 deadline. *See* App.120-21. Instead, the Department estimated that "the new

10

attorneys could begin adjudicating applications" by approximately July 2026 and that the Department could adjudicate all 200,000 outstanding post-class applications by July 2027. *See id.*

**5.** Against that backdrop, in November 2025, the Department moved for partial relief from the judgment under Federal Rule of Civil Procedure 60(b); that motion requested that the district court extend the deadline for post-class applications until July 28, 2027. *See* Dkt. No. 492, at 1. The Department explained that because the court had retained jurisdiction to enforce the settlement agreement as part of its final judgment, the court retained equitable authority to modify the settlement as like any other court order. *See id.* at 9-10.

Moreover, the Department explained that the equities warranted modification of the deadline. Although the Department had worked diligently in the face of severe resource constraints to process hundreds of thousands of class member and post-class applications—and had provided substantially all of the relief required to hundreds of thousands of class members—the Department estimated that it would only adjudicate approximately 60,000 of the 250,000 post-class applications before the deadline. *See* Dkt. No. 492, at 17-18. And, the Department explained, the drain on the public fisc of the failure to adjudicate the remaining applications was staggering: the Department estimated that providing full relief would entail forgiving $11.8 billion in outstanding student-loan balances and providing $640 million in refunds, all without any determination that the applicants were entitled to relief. *See id.* at 18; *see also* App.118.

11

Conversely, the Department explained, because of Congress's recent additional appropriation, the Department had developed a plan to hire hundreds of additional attorneys on a permanent or contract basis and thereby finish adjudicating the post-class applications by July 2027. Dkt. No. 492, at 20-21. And although that modified deadline did not comport with the settlement agreement's original deadline, it would still ensure a relatively timely decision on the merits for each post-class applicant—and, in the meantime, those applicants' relevant student loans would remain in forbearance such that the applicants did not have to make payments. *See id.* at 21.

The district court largely denied the motion. Although the court agreed that it had equitable authority to modify the deadline and although the court recognized the harm to the public and the taxpayers that would ensue if the Department were forced to provide relief to applicants who were not entitled to it on the merits, the court believed that there was a "huge equity working in favor of the class" in having the applications adjudicated by the settlement's deadline. *See* App.86. In addition, the court suggested its belief that the Department could have implemented a process for adjudicating the full group of post-class applicants within the timeframe provided in the settlement and that, if the Department believed that infeasible, it could have "raised this problem" with the court "a long time ago." App.81-86. In addition, the court said that it believed that the Department could adjudicate most of the remaining 200,000 applications—those related to students who attended so-called "Exhibit C" schools (that is, the schools whose students were originally entitled to automatic relief

12

if they were class members)—in the six weeks before the deadline. App.86-87. The court did, however, extend the settlement deadline to April 15, 2026, for the remaining (approximately 19,000) post-class applicants. *See* App.89; *see also* App.97.

The Department moved again for relief under Rule 60(b) or for reconsideration of the district court's denial. *See* Dkt. No. 514, at 1. In that motion, the Department focused on two primary errors in the court's denial. First, the Department explained that the court had erred in treating post-class applicants as class members—and that, in fact, the post-class applicants are not parties to the suit, were not bound by the judgment, and are not properly given full weight in the equitable balancing. *See id.* at 14-17; *cf. Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Second, the Department explained that the court had erred in concluding, without support in the record, that the Department's approximately 40 attorneys could adjudicate 170,000 applications in six weeks. *See* Dkt. No. 514, at 17-21.

The district court denied the Department's second motion.[1] The court concluded that although the settlement expressly carved post-class applicants out of the plaintiff class, those applicants were properly treated as plaintiffs for purposes of the equitable analysis because, in approving the settlement, the court had considered the post-class applicants as part of the Rule 23 analysis. *See* App.5. And the court

---

[1] At the end of 2025, the district court who was originally assigned to this case retired; the case was reassigned to a new district court after resolution of the first Rule 60(b) motion and before the second. *See* App.3-4.

13

generally emphasized its belief that, for many of the same reasons given in the previous order denying the first Rule 60(b) motion, it would not be equitable to grant the requested extension. *See id.* at 5-7.

## ARGUMENT

As the district court properly did not dispute, courts retain authority following the entry of final judgment to modify the judgment, including if applying it "prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). That rule "codifies the courts' traditional authority, inherent in the jurisdiction of the chancery, to modify or vacate the prospective effect of their decrees." *California ex rel. Becerra v. U.S. EPA*, 978 F.3d 708, 713 (9th Cir. 2020) (quotation omitted). And as the court also properly did not dispute, that authority permits the court to modify terms in a settlement that has been approved by the court and incorporated into the final judgment, as happened here. *See Kelly v. Wengler*, 822 F.3d 1085, 1094-98 (9th Cir. 2016). Such modification authority is particularly important in the context of settlement agreements with public officials, who "sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law" and "may thereby improperly deprive future officials of their designated legislative and executive powers." *Horne v. Flores*, 557 U.S. 433, 448-49 (2009) (quotation omitted).

Nonetheless, the district court largely declined to exercise its authority to extend the post-class application deadline, because the court believed that the equities did not support such an extension. That decision was wrong on all levels, and all four

14

relevant factors favor staying the post-class applicant deadline pending appeal. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

Absent modification, enforcing the deadline will work a substantial harm on the government and the public by requiring the government to provide billions of dollars in relief to applicants who may not be entitled to that relief on the merits. And conversely, neither the parties to this case—which do not, properly construed, include the post-class applicants—nor the post-class applicants have sufficient countervailing equities in strict enforcement of the deadline to overcome that harm. The district court only committed further error by speculating that the Department could resolve nearly 200,000 applications in six weeks and by faulting the Department for waiting to request relief until it received the additional funding from Congress that made the requested extension feasible. Finally, those same equitable considerations support staying the post-class application deadline pending appeal, because the Department will soon be forced to notify post-class applicants of their entitlement to full relief and to begin providing that relief.

## A. The Equities Overwhelmingly Favor Extending the Post-Class Deadline

**1.** The harm to the government and the public from enforcement of the January 2026 post-class deadline is manifest. As of that deadline, the Department had adjudicated approximately 60,000 of the post-class applications, but nearly 170,000 remained unadjudicated (not counting the small minority for which the district court

extended the deadline to April). *See* App.92; *see also* App.117-18. The Department estimates that providing full relief under the settlement for those 170,000 applications would entail the provision of more than $11 billion in discharges and refunds. App.92.

Each applicant would receive that relief even though no determination has been made that the applicant has facially stated a claim for relief—much less that the applicant has provided evidence sufficient to support the claim or that the applicant would be entitled to full, rather than partial relief, even if the claim were proven. That multi-billion-dollar potential windfall to post-class applicants at taxpayer expense plainly harms the government and the public. And the harm of the strict enforcement of the settlement's deadline is particularly evident given that Congress has recently appropriated substantial additional funds to the Department that will allow the Department to complete within a reasonable timeframe the individualized adjudications necessary to ensure that relief only flows to applicants who have proven their claims.

**2.** Conversely, the parties' interests weighing against modification of the deadline are minimal. As explained, the class members—as defined by the settlement agreement—have already received nearly all the relief to which they are entitled. All that is at issue here is the deadline for providing relief to post-class applicants. But as the settlement agreement makes plain, the post-class applicants are not class members in this suit and the court's equitable balancing does not properly take account of their particular interests.

16

It is plain from the face of the settlement agreement that the post-class applicants are not class members and are therefore not plaintiffs in this suit. The settlement makes clear that the "Class is closed as of the Execution Date" (that is, before the post-class applicants submitted borrower-defense applications). App.156. In discussing treatment of post-class applications, the settlement reiterates that post-class applications are those submitted "after the Execution Date (*i.e.*, the date the class closes)," App.161—and, thus, that post-class applicants are not members of the class even if the Department has agreed to provide them relief under the settlement. And consistent with post-class applicants' status as third-party beneficiaries, rather than parties to the settlement, the agreement further provides only that "the Class Members"—not the post-class applicants—"waive, release, and forever discharge Defendants" from covered claims. App.171.

Because post-class applicants are not class members, the district court's exercise of its equitable authority to modify the settlement was not properly concerned with their interests. As the Supreme Court has recently explained, a federal court's "equitable authority is not freewheeling" but is instead constrained by the "sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (quotation omitted). One important limitation on that equitable authority is that "suits in equity" are "brought by and against individual parties," and such "party-specific principles" "permeate our understanding of equity." *Id.* at 842, 844. Thus, "courts generally may administer

complete relief *between the parties*" but may not extend relief beyond what is necessary to "offer complete relief *to the plaintiffs before the court.*" *Id.* at 851-52 (quotation omitted). In light of those principles, the district court was required to grant the Department's requested modification, because the government's and public's interest in avoiding the disbursement of billions of dollars in automatic relief outweighs any interest that the actual plaintiffs in this suit—who, again, do not include the post-class applicants—have in ensuring that third parties receive that relief.

Indeed, the district court's erroneous approach to the post-class applicants as parties to this case runs deeper than denying the Department's motion to modify the deadline. In general, settlement agreements are contracts and any breach of those agreements is subject to ordinary contractual remedies, *see Knudsen v. Commissioner*, 793 F.3d 1030, 1035 (9th Cir. 2015)—which, in the case of contracts with the government, generally does not include an action for specific performance in district court, *see North Side Lumber Co. v. Block*, 753 F.2d 1482, 1484-86 (9th Cir. 1985). But here, the court purported to retain jurisdiction to enforce the settlement agreement in its entirety, allowing the parties to effectively seek a specific-performance injunction notwithstanding those ordinary limitations. Whatever the permissibility of that mechanism as it regards plaintiffs who may assert an entitlement to an injunction on their underlying claims, it cannot be permissible with respect to non-parties like the post-class applicants. As *CASA* makes clear, a district court may not properly exercise its equitable authority to provide such non-parties relief. Thus, any right that the post-

18

class applicants may have to adjudications by the agreement's deadline necessarily flows from the agreement. It is thus a contractual right that is not properly subject to enforcement in court.

In response, the district court did not dispute that equitable principles would not support denying the government's motion if the post-class applicants are not parties. Nor did the court dispute that the settlement agreement plainly reflects the parties' intent to close the class as of the date of the settlement and thereby exclude the post-class applicants from the class. Instead, the court held that the parties' agreed upon class limitation was "rejected" by the court in its approval of the settlement, because the court considered the post-class applicants in assessing the fairness of the settlement to the class. *See* App.5; *see also* App.146-47 (noting that the class definition adopted by the district court at the outset of the case did not have a temporal cutoff).

That was erroneous. Although the class was temporally open-ended when it was originally certified, the parties' settlement agreement expressly modifies the scope of the certified class by closing the class as of the date that the settlement was executed. That agreement was then incorporated in the final judgment, thereby superseding the preliminary certification—consistent with this Court's recognition that class certification orders are "inherently tentative" and "may be altered or amended before final judgment." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018) (quotation omitted); *see also* Fed. R. Civ. P. 23(c)(1)(C) (permitting such amendments). Notwithstanding the court's desire to ensure that the post-class

19

applicants were treated fairly by the settlement, the court did not (and cited no authority to support the idea that the court could) override the parties' agreement in this respect.

**3.** Even if the post-class applicants' interests were entitled to full weight in the equitable balancing, their interests in avoiding the modest extension requested by the Department could not outweigh the government's and public's interests in avoiding a multi-billion-dollar windfall. For one, even under the extension requested, post-class applicants will receive decisions in a relatively timely fashion. By definition, the post-class applicants did not file their administrative claims until after the parties executed the settlement in June 2022, and it is not inherently unreasonable for the Department to require five years to adjudicate more than 250,000 applications, particularly given the substantial individualized analysis that each application requires and the extreme backlog that existed as of 2022. Indeed, plaintiffs have not identified any statutory or regulatory requirement that the Department act on the applications in any particular time (much less within the few years that the January 2026 deadline required).

In addition, as explained, the Department has already resolved nearly 25% of the post-class applications and, even under the requested extension, post-class applicants will continue to receive determinations on a rolling basis, with all post-class applicants entitled to receive a decision in the relatively near future. And in the interim, the post-class applicants' loans would remain in forbearance—a status that the post-class applicants have already benefitted from for years—ensuring that the

applicants are not required to make payments pending adjudication of their applications. Finally, because the post-class applicants have not waived any claims as part of the settlement, those applicants need not rely on the settlement to protect their interests; instead, they may be entitled to pursue their own claims in their own suit if they believe that they have a statutory or regulatory right to a decision on a faster timeline.

## B. The District Court's Additional Reasons for Concluding to the Contrary Do Not Withstand Scrutiny

In addition to its erroneous balancing of the relevant equities, the district court compounded its errors by relying on additional justifications that are not supported by the record.

First, in denying the Department's original motion to modify the deadline, the district court relied on its belief that the Department could—in the "six weeks" between the hearing and the deadline—adjudicate approximately 170,000 remaining post-class applications. App.86; *see also* App.86-87 ("I think it can be done. Don't tell me holidays. . . . You can take Christmas off, maybe New Year's Day off. But Government employees should work. When I worked for the Government, I worked on Christmas Day and New Year's Day. So it's possible to get this job done[.]").

But that belief finds no support in the record. As explained, at the time of the hearing, the borrower-defense branch had fewer than 40 attorneys. And evaluating each application requires multiple levels of individualized analysis—including

collecting evidence from a variety of sources about the school in question, reviewing that evidence along with the allegations and evidence in the application, weighing the relevant evidence, making a determination about entitlement to relief, and making an additional individualized determination about the appropriate extent of any relief. It is inconceivable—and certainly not a conclusion supported by the record—to think that 40 attorneys could produce 170,000 individualized decisions in six weeks, regardless whether the attorneys worked on Christmas and New Year's Day. And to the extent that the district court's conclusion was premised on the belief that such a result was possible, that conclusion was erroneous.

Second, the district court emphasized its belief that the Department improperly delayed in moving for relief. *See* App.82-83; *see also* App.6. But that belief fails to appreciate the relevance of Congress's July 2025 appropriation of additional funds. As explained, before that appropriation, the Department understood that it would be unable to meet its obligations to the post-class applicants, even with a reasonable extension of the deadline. But that substantial new funding has allowed the Department to develop a plan to hire hundreds of additional attorneys, which will permit the Department to resolve the post-class applications within a reasonable timeframe. As a result, the Department requires only an 18-month extension, rather than the 10-year extension that would have been required to accommodate the Department's previous pace. The court can hardly fault the Department for waiting until Congress appropriated those resources—and a reasonable extension became

22

feasible—to make its request. And, in any event, given the substantial resource constraints that the Department has labored under for years, the court failed to identify any way in which any delay in the Department's motion prejudiced the post-class applicants or otherwise necessitated denying relief.

## CONCLUSION

For the foregoing reasons, the Court should grant a stay of the post-class application deadline pending appeal. The government respectfully requests that the Court grant that relief—or, at the least, an administrative stay pending consideration of this request—by March 26 so that the Department will not be forced to notify post-class applicants of their entitlement to relief and begin the process of providing relief before the Court rules on this motion.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*
MICHAEL S. RAAB

*/s/ Sean R. Janda*
SEAN R. JANDA
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7260*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-3388*

February 2026

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5563 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Sean R. Janda*
SEAN R. JANDA

# APPENDIX

# TABLE OF CONTENTS

**Page**

District Court Order (Feb. 24, 2026), Dkt. No. 529....................................................App.1

Transcript and Oral Ruling  (Dec. 11, 2025)..................................................................App.8

Supplemental Declaration of Richard Lucas (Feb. 12, 2026),
    Dkt. No. 527-1 ............................................................................................................App.91

Declaration of Richard Lucas (Jan. 22, 2026), Dkt. No. 514-1 ..............................App.94

Declaration of James Bergeron (Nov. 6, 2026), Dkt. No. 492-1 ..........................App.100

Final Judgment (Nov. 16, 2022), Dkt. No. 346 ........................................................App.125

Order Granting Final Settlement Approval (Nov. 16, 2022),
    Dkt. No. 345............................................................................................................App.126

Settlement Agreement (June 22, 2022), Dkt. No. 246-1 .........................................App.151

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>THERESA SWEET, et al.,<br><br>            Plaintiffs,<br><br>v.<br><br>MIGUEL CARDONA, et al.,<br><br>            Defendants.</td><td>Case No. 19-cv-03674-HSG<br><br>**ORDER DENYING DEFENDANTS'<br>MOTION FOR RELIEF UNDER FED.<br>R. CIV. P. 60(B)**<br><br>Re: Dkt. No. 514</td></tr>
</table>

Pending before the Court is the second Motion for Relief Under Federal Rule of Civil Procedure 60(b) ("Defendant' Second Rule 60(b) Motion" or "Motion") brought by Defendants United States Department of Education (the "Department") and Miguel Cardona, in his official capacity as the Secretary of the United States Department of Education. Dkt. No. 514. For the reasons detailed below, the Court **DENIES** Defendants' motion.

## I.    BACKGROUND

This long-running and extensively litigated case filed almost seven years ago concerns a class of federal student loan borrowers who exercised their right under the Higher Education Act to apply to the Department for borrower defense to repayment. The borrowers' applications explain how the schools they attended had misled them into enrolling and taking out loans, using deceptive tactics such as inflated graduation and job placement rates, and misleading estimates of the cost of a degree. *See* Compl., Dkt. No. 1, ¶¶ 243, 263, 283, 304, 323, 339, 360. In May 2019, Plaintiffs filed this action, alleging that that the Department had failed to adjudicate their borrower-defense applications in violation of the Administrative Procedure Act. *See generally id.*

In October 2019, District Judge Alsup, to whom this case was then assigned, certified the following class of plaintiffs (*see* Class Certification Order, Dkt. No. 46, at 14):

United States District Court
Northern District of California

United States District Court
Northern District of California

All people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to the U.S. Department of Education, whose borrower defense has not been granted or denied on the merits, and who is not a class member in *Calvillo Manriquez v. DeVos*, No. 17-7106 (N.D. Cal.).

In June 2022, the parties submitted a final, executed settlement agreement and filed a joint motion seeking preliminary approval of that agreement. *See* Dkt. No. 247; Settlement Agreement (the "Settlement"), Dkt. No. 246-1. As relevant here, the agreement defined the class as "members of the class that has been certified by this Court." Settlement at 3.

In November 2022, Judge Alsup granted final approval of the class settlement, and entered final judgment. Final Approval Order, Dkt. No. 345; Final Judgment, Dkt. No. 346. In that order, Judge Alsup rejected the parties' position that the "post-class applicant" group for whom the parties had agreed to provide relief (*see* Settlement at 11) was not a part of the class for purposes of a Rule 23 analysis. *See* Final Approval Order at 21-22. That group is composed of individuals who filed a borrower-defense application in between execution of the settlement on June 22, 2022 and final approval. *See id.* Judge Alsup found that "the class certification order set no cut-off date for membership, so the class definition as recited in that order clearly encompasses all of these borrowers." *Id.* at 22. Judge Alsup then ordered that the post-class group would "receive relief under the agreement, namely their applications will be decided with streamlined procedures within three years on pain of automatic discharge of the loans." *Id.*

The parties have engaged in significant post-judgment motion practice in this case, primarily due to the Department's repeated failures to meet other deadlines for providing relief to the rest of the class. *See* Defs' Response to Pltfs' Mot. to Enforce, Dkt. No. 403; Minute Order, Dkt. No. 434. Throughout 2025, Plaintiffs queried whether the Department was on track to meet the three-year decision deadline for the "post-class applicant" group. Plaintiffs' Opposition to Defendants' Second Rule 60(b) Motion ("Opposition"), Dkt. No. 525, at 5. At a March 13, 2025 hearing, the Department assured Judge Alsup that it was "committed to providing full settlement relief." Tr. of Mar. 13, 2025 Hr'g at 9:20-21, Dkt. No. 466. When Judge Alsup asked whether the Department was confident that it would honor the settlement agreement, the Department's attorney responded: "The Department fully understands its obligations under the settlement

1    agreement . . . [T]he Department is committed to honoring the settlement agreement." *Id.* at

2    25:21-26:17.  At an April 15, 2025 hearing, the Department's attorney assured the Court that "if

3    the Department doesn't issue decisions by [the deadline for the post-class applicants], then the

4    borrower is entitled to full settlement relief." Tr. of Apr. 15, 2025 Hr'g at 15:3-5, Dkt. No. 472.

5    And at a June 26, 2025 hearing, the Department's attorney represented that "[i]f we don't [make

6    the deadline for the post-class applicants], everyone who has not received a decision will be

7    entitled to full settlement relief." Tr. of June 26, 2025 Hr'g, Dkt. No. 479, at 13:10-13.  The

8    Department did not represent to the contrary at a hearing on August 28, 2025.  *See* Tr. of Aug. 28,

9    2025 Hr'g, Dkt. No. 488.

10   Then, on November 6, 2025, the Department moved under Federal Rule of Civil Procedure

11   60(b)(5) for relief from its deadline to adjudicate all post-class applications.  *See* Dkt. No. 492.

12   Specifically, the Department sought an additional 18 months.  *See id.*  Plaintiffs strenuously

13   opposed.  *See* Plaintiffs' Opposition to Defendants' First Rule 60(b) Motion, Dkt. No. 500;

14   Plaintiffs' Motion to Strike Defendants' First Rule 60(b) Motion, Dkt. No. 502.  In a status report

15   filed December 9, 2025, the Department reported that 79% of the post-class applications remained

16   pending.  Joint Status Report, Dkt. No. 505.

17   On December 11, 2025, Judge Alsup said that an "18-month delay" was "just totally

18   unacceptable." Tr. of Dec. 11, 2025 Hr'g, Dkt. No. 512, at 78:18-19.  The Court then granted the

19   following relief to the Department:  all post-class applicants who attended one of the 151 schools

20   listed on Exhibit C to the settlement would need to have their applications adjudicated by the

21   "original deadline of the 28th of January," as those were "the schools that the attorney generals in

22   various states have already singled out as fraudulent." *Id.* at 79:19-80:8.  All other post-class

23   applications filed by students who attended schools not on Exhibit C were required to be

24   adjudicated by April 15, 2026.  *Id.* at 80:13-17.  Judge Alsup opined that given his impending

25   retirement, if the Department could demonstrate "good progress" "made in great good faith"

26   before April 15, he recommended that "the next judge give the Government more slack to finish

27   the job." *Id.* at 80:19-25.

28   On January 8, 2026, this case was reassigned to the undersigned judge.  Order Reassigning

**App.3**    3

1  Case, Dkt. No. 511.  Two weeks later, the Department filed another Rule 60(b) motion, this time

2  for "time sensitive" relief.  *See* Motion, Dkt. No. 514, at 1, 23.  The next week, the Department

3  filed two motions for administrative relief:  first, for a ruling on its second Rule 60(b) motion

4  without a hearing, to be issued before March 2, 2026; and second, for a 30-day extension of its

5  time to file a notice of appeal, from February 9, 2026 to March 11, 2026.  *See* Administrative

6  Motion for Ruling Without Hearing, Dkt. No. 517; Administrative Motion for Extension of Time

7  to File Notice of Appeal, Dkt. No. 518.  The Court granted in part the Department's request for an

8  extension of the time to appeal, giving the Department until February 23, 2026.  *See* Dkt. No. 526.

9  The Court then extended the deadline again, to February 25, 2026.  Dkt. No. 528.  As of the date

10  of this Order, no appeal has yet been filed.

## II.    LEGAL STANDARD

12         Federal Rule of Civil Procedure 60(b) provides, in relevant part, that "the court may relieve

13  a party or its legal representative from a final judgment, order, or proceeding" when "the judgment

14  has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed

15  or vacated; or applying it prospectively is no longer equitable."  Rule 60(b)(5).  Whether to grant

16  relief under Rule 60(b) is a matter of the Court's discretion.  *Fantasyland Video, Inc. v. Cnty. of*

17  *San Diego*, 505 F.3d 996, 1001 (9th Cir. 2007).  However, "Rule 60(b) relief should be granted

18  'sparingly' to avoid 'manifest injustice' and 'only where extraordinary circumstances prevented a

19  party from taking timely action to prevent or correct an erroneous judgment.'"  *Navajo Nation v.*

20  *Dep't of the Interior*, 876 F.3d 1144, 1173 (9th Cir. 20217) (citation omitted).

21         Rule 60(b) also permits a party to seek relief from a final judgment for any reason that

22  justifies relief.  *See* Fed. R. Civ. P. 60(b)(6).  Rule 60(b)(6) is a "catchall provision" that applies

23  only when the reason for granting relief is not covered by any of the enumerated reasons set forth

24  in Rule 60(b).  Those reasons include, along with the reasons listed in Rule 60(b)(5):  "mistake,

25  inadvertence, surprise, or excusable neglect" (Rule 60(b)(1)), "newly discovered evidence" (Rule

26  60(b)(2)), "fraud . . . or misconduct by an opposing party" (Rule 60(b)(3)), and a "void" judgment

27  (Rule 60(b)(4)).  "A movant seeking relief under Rule 60(b)(6) is required 'to show "extraordinary

28  circumstances" justifying the reopening of a final judgment.'"  *Martinez v. Shinn*, 33 F.4th 1254,

4

United States District Court
Northern District of California

1262 (9th Cir. 2022) (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005)). "Rule 60(b)(6)

relief normally will not be granted unless the moving party is able to show both injury and that

circumstances beyond its control prevented timely action to protect its interests." *Id.* (citation

omitted); *see also U.S. v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993)

("such relief is available only where extraordinary circumstances prevented a litigant from seeking

earlier, more timely relief"); Fed. R. Civ. P. 60(c)(1) ("[a] motion under Rule 60(b) must be made

within a reasonable time").

### III.   DISCUSSION

Defendants essentially renew their previously rejected Rule 60(b) motion in its entirety,

and ask the Court to allow them until July 28, 2027—an additional eighteen months—to

adjudicate the post-class applications as required by the Settlement. Defendants argue that this

Court should "reconsider" Judge Alsup's decision because it was "premised on manifest legal

error" (Motion at 13-17) and "premised on manifest errors of fact" (Motion at 17-21), and because

the Department is "continuing in good faith" to hire needed staff and to adjudicate as many post-

class applications as possible with existing resources (Motion at 22-23). Specifically, Defendants

argue that Judge Alsup erred because he improperly treated the post-class applicants as members

of the class when balancing the equities to determine if applying the judgment prospectively

remains equitable. Motion at 15. But as explained above, that argument was already fully

considered and rejected. *See* Final Approval Order at 21-22 (opining that "the class definition as

recited in [the class certification order] clearly encompasses all of these borrowers").

Setting aside whether the prior decision was "premised on manifest legal error" or "clearly

erroneous findings," or whether the Department is conducting itself "in good faith," the standard

for Rule 60(b)(5) relief requires that the moving party show "the judgment has been satisfied,

released or discharged; it is based on an earlier judgment that has been reversed or vacated; or

applying it prospectively is no longer equitable." Defendants have not met their burden to show

that application of the *Settlement*'s terms is no longer equitable by pointing to perceived errors

committed by the court in adjudicating Defendants' first Rule 60(b) motion.

Defendants also seek relief under Rule 60(b)(6)'s catchall provision, but the Court denies

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Defendants' motion for the simple reason that the record amply reflects that Defendants have not

2   shown (and indeed, cannot show) that any extraordinary circumstances beyond their control

3   prevented timely action to protect their interests.  *See Martinez*, 33 F.4th at 1262 (Rule 60(b)(6)

4   relief denied where movants had "ample opportunity" to seek the leave now sought); *Alpine Land*

5   *& Reservoir Co.*, 984 F.2d at 1049.  As of September 20, 2022, the approximate size of the post-

6   class applicant group was 179,000 borrowers—a fact the Department knew when it jointly filed a

7   motion for final settlement approval in tandem with Plaintiffs two days later.  *See* Joint Motion for

8   Final Settlement Approval, Dkt. No. 323, at 14.  At the latest, the Department knew by February

9   27, 2023—*almost three years ago*—that the post-class applicant group totaled 205,448 people.

10  *See* Department of Education's Initial Report, Dkt. No. 492-2.

11      Moreover, as detailed above, at no point before November 2025 did the Department signal

12  that it would have any trouble meeting its deadline to adjudicate all post-class applications.

13  Rather, the Department waited until the eleventh hour, not even three months before the January

14  28, 2026 deadline, to seek the relief now requested.  The Court agrees with Plaintiffs that to justify

15  such relief, "a party must show 'extraordinary circumstances' suggesting that the party is faultless

16  in the delay." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 393 (1993).

17  Defendants have shown no such circumstances.

18      The Court observes that Judge Alsup recommended that if the Department could

19  demonstrate "good progress" "made in great good faith" before April 15, the next judge should

20  consider giving Defendants "more slack to finish the job." Tr. of Dec. 11, 2025 Hr'g, at 80:19-25.

21  But Defendants have not made such meaningful progress to date.  Defendants attest that in the five

22  weeks between December 11, 2025 hearing and when Defendants filed their second Rule 60(b)

23  motion on January 22, 2026, the Department adjudicated approximately 1,390 post-class

24  applications from the tranche required to be adjudicated by January, with approximately 169,900

25  cases left to be adjudicated within that group.  Declaration of Richard Lucas ("Lucas Decl."), Dkt.

26  No. 514-1, ¶¶ 8-9.  Defendants also attest that during that timeframe, the Department adjudicated

27  approximately 640 post-class applications from the tranche required to be adjudicated by April,

28  with approximately 18,080 left to be adjudicated within that group.  Lucas Decl., ¶ 9.  And just as

**App.6**    6

was the case at the time of the last hearing before Judge Alsup, Defendants represent that the first group of contract attorneys they plan to hire to work through the pending applications "*could be onboarded by March 1, 2026 and sufficiently trained to begin adjudicating cases by late March or early April, 2026.*" *Id.* at ¶ 11 (referencing November 14, 2025 declaration) (emphasis added). In the Court's view, therefore, nothing about the record developed since the denial of the original Rule 60(b) motion supports Defendants' request for the lengthy extension they again request.

## IV.     CONCLUSION

The Court **DENIES** Defendants' second motion for relief under Rule 60(b). Dkt. No. 514. No further Rule 60(b) motions will be entertained.

**IT IS SO ORDERED.**

Dated:  2/24/2026

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

```
                                    Pages 1 - 83

                  UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

THERESA SWEET, CHENELLE ARCHIBALD,   )
DANIEL DEEGAN, SAMUEL HOOD, TRESA    )
APODACA, ALICIA DAVIS, and JESSICA   )
JACOBSON, on behalf of themselves    )
and all others similarly situated,   )
                                     )
              Plaintiffs,            )
                                     )
    VS.                              )   NO. 19-CV-03674 WHA
                                     )
LINDA McMAHON, in her official       )
capacity as Secretary of the United  )
States Department of Education, and  )
THE UNITED STATES DEPARTMENT OF      )
EDUCATION,                           )
                                     )
              Defendants.            )
_____ )
```

San Francisco, California
Thursday, December 11, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

      PROJECT ON PREDATORY STUDENT LENDING
      769 Centre Street, Suite 166
      Jamaica Plain, Massachusetts 02130-2557
   BY: **REBECCA C. ELLIS, ATTORNEY AT LAW**
     **NOAH ZINNER, ATTORNEY AT LAW**
     **EILEEN M. CONNOR, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
      CSR No. 7445, Official United States Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendants:
                         UNITED STATES DEPARTMENT OF JUSTICE
 3                       Civil Division, Federal Programs Branch
                         1100 L Street NW
 4                       Washington, D.C. 20530
                 BY:   LIAM C. HOLLAND, TRIAL ATTORNEY
 5
                         UNITED STATES DEPARTMENT OF EDUCATION
 6                       OFFICE OF THE GENERAL COUNSEL
                         400 Maryland Avenue South
 7                       Washington, D.C. 20202-0001
                 BY:   KAREN S. KARAS, SENIOR COUNSEL
 8                     JOHN HUSTON, DEPUTY GENERAL COUNSEL

 9
     For Non-Party Servicer Maximus Education, LLC d/b/a/ Aidvantage
10   and Maximus Federal Services, Inc.:
                         HUSCH BLACKWELL LLP
11                       1999 Harrison Street, Suite 1300
                         Oakland, California 94612-4709
12               BY:   GILLIAM F. STEWART, ATTORNEY AT LAW

13   For Non-Party Servicer Nelnet:
                         BROWNSTEIN HYATT FARBER SCHRECK, LLP
14                       2029 Century Park East, Suite 950
                         Los Angeles, California 90067-2918
15               BY:   JONATHAN C. SANDLER, ATTORNEY AT LAW

16   For Non-Party Servicer MOHELA:
                         THOMPSON COBURN LLP
17                       10100 Santa Monica Boulevard, Suite 500
                         Los Angeles, California 90067-4121
18               BY:   LUKAS SOSNICKI, ATTORNEY AT LAW

19   For Non-Party Servicer Edfinancial Services:
                         TUCKER ELLIS LLP
20                       201 Mission Street, Suite 2310
                         San Francisco, California 94105-1831
21               BY:   VASUDHSIRI T. SATHIENMARS
                       ATTORNEY AT LAW
22

23   Also Present:

24                       Theresa Sweet, Lead Plaintiff

25                       Alicia Davis, Plaintiff
```

App.9

```
 1    Thursday - December 11, 2025                    8:05 a.m.

 2                    P R O C E E D I N G S

 3                          ---o0o---

 4         THE COURTROOM DEPUTY:  These proceedings are being

 5    recorded by this Court.  Any other recording, including

 6    screenshots, audio, or video, are strictly prohibited.

 7         Calling Civil Action 19-3674, Sweet, et al. versus

 8    Cardona, et al.

 9         Counsel, please approach the podium and state your

10    appearances for the record, beginning with counsel for

11    plaintiffs.

12         MS. ELLIS:  Good morning, Your Honor.  Rebecca Ellis

13    from the Project On Predatory Student Lending for the

14    plaintiffs.  With me are my colleagues Noah Zinner and Eileen

15    Connor and two of our class representatives, Alicia Davis and

16    Theresa Sweet.

17         THE COURT:  Welcome.

18         And?

19         MR. HOLLAND:  Good morning, Your Honor.  Liam Holland

20    from the Department of Justice representing the Department of

21    Education, and with me at counsel table I have Karen Karas and

22    John Huston of the Department of Education's Office of General

23    Counsel.

24         THE COURT:  Okay.  Both of those two are from DOE?

25         MR. HOLLAND:  From their Office of General Counsel,
```

```
1    correct, Your Honor.
2             THE COURT:  All right.  Thank you.
3         And our servicers, please?
4             MR. SANDLER:  Good morning, Your Honor.  Jonathan
5    Sandler for Nelnet.
6             THE COURT:  Jonathan?
7             MR. SANDLER:  Sandler.
8             THE COURT:  Sandler.
9             MR. SANDLER:  Thank you.
10            THE COURT:  Now, where is your daughter today?
11            MR. SANDLER:  Hopefully, in school.
12            THE COURT:  Well, I enjoyed meeting her a couple of
13   times ago.  So thank you --
14            MR. SANDLER:  Thank you, Your Honor.
15            THE COURT:  -- for bringing her that day.
16        Okay.  Next?
17            MR. SATHIENMARS:  Good morning, Your Honor.
18   V. Sathienmars for EdFinancial Services.
19            THE COURT:  Thank you.
20            MR. SATHIENMARS:  Thank you.
21            THE COURT:  And?
22            MR. SOSNICKI:  Good morning, Your Honor.  Luke
23   Sosnicki for MOHELA.
24            THE COURT:  Got it.  Okay.
25            MR. STEWART:  And good morning, Your Honor.  Gilliam
```

1  Stewart for Aidvantage and Maximus Federal.

2      **THE COURT:**  Thank you.

3      All right.  We're here on at least two motions.

4  The Government can go first.  Please go ahead.

5      Go ahead.

6      **MR. HOLLAND:**  Okay.  Your Honor, the Court should

7  modify the judgment and permit the Department to adjudicate

8  outstanding post-class applications on a timetable that is

9  achievable considering Congress's --

10     **THE COURT:**  Please speak more into the microphone so

11  everyone back there can hear you, and it'll -- pull it closer

12  to your voice.

13     **MR. HOLLAND:**  Okay.  Sorry about that.

14     Is this better, Your Honor?

15     **THE COURT:**  That is better.  Thank you.

16     **MR. HOLLAND:**  Okay.  The Court should modify the

17  judgment to permit the Department to adjudicate outstanding

18  post-class applications on a timetable that is achievable

19  considering Congress's post-judgment funding decisions.

20     The post-class applicant pool is enormous.  It's over

21  250,000 applications, a 523 percent increase over any

22  comparable five-month time period before or since.  I encourage

23  the Court to look at Table 2 of the Bergeron declaration, which

24  we've attached to our motion, which lays out all the five-month

25  periods and shows what an enormous group of applications that

 1   this is.

 2       The Department had no way to know it was agreeing to

 3   adjudicate such an enormous number of applications by January

 4   when it executed the agreement.  Nonetheless --

 5           **THE COURT:**  But you did know by the time of the

 6   approval of the agreement, which was back in -- what? -- 2022?

 7           **MR. HOLLAND:**  That's correct.  In November 2022 --

 8           **THE COURT:**  So you knew then.  So you've known for

 9   three years what the size of that group is.

10           **MR. HOLLAND:**  The Department was required by the terms

11   of the agreement to submit it to the Court for approval as --

12   as it was executed, and the Department followed its obligations

13   under the agreement to do just that.

14       It's true that the Department could have sought

15   modification of the judgment immediately.  Instead, in good

16   faith, the Department chose to go to Congress, and it went to

17   Congress to seek the necessary funding resources that were

18   needed to adjudicate that enormous post-class.

19       First, immediately in the spring of 2023, Congress [sic]

20   requested $21 million for fiscal year 2024 that it told

21   Congress explicitly -- and we cite those funding requests in

22   our brief -- that the money was needed to adjudicate the

23   post-class applica- -- or at least the Sweet -- to achieve the

24   Sweet settlement's deadlines.  Congress did not fulfill that

25   request.

1    So instead, in 2024 the Department again went back to

2  Congress and sought $56 million in funds for fiscal year 2025

3  to hire 300 attorneys to be able to get this all processed by

4  January 2026, and Congress again declined to provide the

5  funding that was needed.

6    It was not until July of this year that Congress finally

7  provided funds that makes a plan for processing these

8  applications on any kind of reasonable time frame possible.

9    You know, if the Department had come back at any time

10  before July and sought a modification of the judgment, it's

11  not -- in order to extend this deadline, it's not clear what

12  we'd even be asking you for, Your Honor.  You know, before they

13  got the funding resources from Congress, the processing rate

14  has been and is 1500 post-class applications a month.  So for

15  250,000 applications, it would have taken 14 years to process

16  all of those.  So there was no way we could have come here any

17  time earlier than after Congress finally provided the funding

18  necessary to do this, which was just in July.

19    So considering all of those post-judgment funding

20  decisions by Congress, we think that it's consistent with the

21  case law in this area, including, for example, *Philadelphia*

22  *Welfare Rights Organization*, to modify the judgment in order to

23  account for the achievability of the original deadline and to

24  account for all of these post-judgment decisions by Congress.

25    In fact, the Department's plan, based on the new funds in

1    July, is already in motion.  Immediately after the funds came

2    in, the Department met with the Office of Management and Budget

3    in order to come up with a plan for spending those funds.

4    Again, that plan is in motion.  The Department has posted bids

5    just earlier this month, on December 1st, I believe, to obtain

6    attorneys via contract in order to process all of the

7    post-class applications in the --

8              **THE COURT:**  How many are you going to hire?

9              **MR. HOLLAND:**  450 attorneys, Your Honor.  This is laid

10   out in the Bergeron declarations.

11             **THE COURT:**  Now, is that for sure?

12             **MR. HOLLAND:**  So the Department --

13             **THE COURT:**  Or is there -- is there even a 1 percent

14   chance that the Department of Education would say, "Well,

15   you know, we've decided we're closing down," or whatever.

16   "We're going to scale back, and we're not going to use all

17   those people for this project after all"?

18             **MR. HOLLAND:**  The plan is already in motion.  The bids

19   have been posted.  There's already been four quotes that have

20   come back on December 4th to fulfill the contracts.

21        You know, look, as we point out in our reply brief -- and,

22   again, I think it's helpful to look at the *Philadelphia Welfare*

23   *Rights Organization* case, you know, which says that, like, any

24   prediction of future events is to some degree speculative, but

25   this is the --

1          **THE COURT:**  Is what?

2          **MR. HOLLAND:**  Is to some degree --

3          **THE COURT:**  See, whenever a lawyer says that --

4          **MR. HOLLAND:**  -- speculative.

5          **THE COURT:**  -- that tells me that they're holding out

6    the possibility that they will renege on what they're telling

7    me now.

8          **MR. HOLLAND:**  I --

9          **THE COURT:**  And then you'll say, "Well, that wasn't

10   our intention.  Yeah, Judge, we did intend to do it; but

11   whenever we got into it, other priorities," blah-blah-blah,

12   "and we're not going to do it anymore.  We're going to scale

13   back."

14       So it would help your case if you gave me an ironclad

15   hell-or-high-water promise from you personally and from their

16   personal --

17         **MR. HOLLAND:**  Yeah.

18         **THE COURT:**  -- hell-or-high-water pledge.

19         **MR. HOLLAND:**  I have --

20         **THE COURT:**  Do you know what "hell or high water"

21   means?

22                      (Laughter.)

23         **THE COURT:**  It means it better happen.

24         **MR. HOLLAND:**  Your Honor, I --

25         **THE COURT:**  Now, you aren't saying that.  You're not

1  going that far.

2      **MR. HOLLAND:**  I have been told -- I have been told as

3  much by the Department.

4      **THE COURT:**  Well --

5      **MR. HOLLAND:**  You know, and, look, I am a trial

6  attorney.

7      **THE COURT:**  But that's not under oath.

8      **MR. HOLLAND:**  I can only tell you what they tell me.

9      **THE COURT:**  That's not under oath.  That's not under

10  oath, and by its unknown -- that doesn't count for much.

11      But you're here.  It would mean something to me if you

12  gave me that pledge.

13      **MR. HOLLAND:**  Your Honor, we have submitted several

14  declarations from high-ranking officials of the Department of

15  Justice, including -- I'm sorry -- from the Department of

16  Education, including not just Mr. Bergeron, but Mr. Kent.  And

17  they both, I think, essentially have made that pledge in

18  their -- in their declarations.

19      I mean, the Kent declaration --

20      **THE COURT:**  I read that.  Yeah, I read it.  But it

21  still has a little bit of loosey-goosey room in there that

22  maybe circumstances will change, other priorities will invade

23  that 450 lawyers, so it will turn out that maybe all of them,

24  but some portion of them will be taken away to do something

25  else.

1    **MR. HOLLAND:** Here's what I can say, Your Honor. My

2    understanding is the Department is fully committed to this

3    plan. It's a plan that's already in motion. And we have no

4    intention of coming back to this Court for another 18-month or

5    any extension after 18 months if the Court were to grant this

6    extension.

7        And, in addition, we can, you know, promise to provide --

8    in the very much unanticipated and not expected event that

9    there is some wrinkle or problem and the Department does not go

10   through with the plan, we can come back and notify the Court

11   immediately and the Department can, again, modify the judgment

12   in order to rectify that issue.

13       So -- and, frankly, Your Honor, I think that's the proper

14   role of the Court in this area considering these kinds of

15   issues. And, again, I would point the Court to the example, to

16   *Philadelphia Welfare Rights Organization*, a case that the

17   Supreme Court has relied on twice, in both *Rufo* and in *Frew*, as

18   examples of how courts should deal with similar circumstances

19   when there's a negotiated settlement with a public official

20   defendant that imposes forward-looking deadlines based on a

21   financial incentive and it turns out that it was just not

22   achievable based on the resources that were available.

23       It's the Court's -- the Court has an obligation to

24   consider the defendants' argument that we now have a plan for

25   achieving this based on change in circumstances and to,

1  you know, amend the judgment to account for that.

2        THE COURT:  Under your plan, when would the four- --

3  when would any of the 450 be hired?

4        MR. HOLLAND:  So I believe the initial 250 will be

5  hired by March, and then the rest will be onboarded on a weekly

6  basis.

7            THE COURT:  By when?  March?  What date in March?

8        MR. HOLLAND:  I'd have to look at the Bergeron

9  declaration.

10           THE COURT:  Is that March 31 or March 1?

11        MR. HOLLAND:  I'm not sure that we submitted a precise

12  date, but it is in March.

13           THE COURT:  The end of March.  Okay.

14     (Record read as follows:

15          "But it is in March.")

16           THE COURT:  Oh, it is in March.  Okay.

17     Well, let's see if you know the date.  These would be

18  hired and trained?  Hired and not trained?  What would that be?

19        MR. HOLLAND:  I'm sorry, Your Honor?

20        THE COURT:  250 hired and trained and doing the work?

21  Or...

22        MR. HOLLAND:  I think they would be onboard in March

23  and trained -- I mean, this is why we requested 18 months.

24  I think the 18 months reflects the time period necessary in

25  order to, you know, have all the training occur, to get -- to

1  get folks up to speed --

2      **THE COURT:**  See, this is --

3      **MR. HOLLAND:**  -- with how to process these

4  applications.

5      **THE COURT:**  When would they actually be working -- the

6  250, when would they be working, going through files?

7      **MR. HOLLAND:**  You know, the thing is, there are

8  already folks at the Department that are working on these

9  issues.  You know, I think --

10     **THE COURT:**  I know that.

11     **MR. HOLLAND:**  -- in the supplemental --

12     **THE COURT:**  And another one of my questions is:  Are

13  they all -- I think there were 36 or 37 that have survived to

14  this point.  37.  And are they, all 37, working on these

15  applications?

16     **MR. HOLLAND:**  In addition to all of the other tasks

17  that they're tasked with involving the Sweet class and other

18  requirements for the Borrower Defense Program in general, yes.

19     Your Honor, there are decisions --

20     **THE COURT:**  So they're working only on the Sweet case,

21  these 37?

22     **MR. HOLLAND:**  No.  This is -- I believe it's the

23  entire Borrower Defense Branch of the Department of Education.

24     Am I...

25     **THE COURT:**  What does that mean?  They're not on the

1   Sweet case?

2      **MR. HOLLAND:**  So the Sweet case takes up a vast

3   percentage of issues that, you know, are borrower

4   defense-related issues, but there are other borrower defense

5   issues --

6      **THE COURT:**  Well, of the 37, what percentage of that

7   resource is working on the Sweet case now?

8      **MR. HOLLAND:**  I would have to speculate as to the

9   exact percentage, Your Honor.  I assume it's a substantial

10   percentage.  We have weekly meetings with the plaintiffs'

11   counsel, with the Ombuds Office, but monthly meetings with the

12   Borrower Defense Branch.

13      There's consistently all kinds of -- in addition to just

14   processing applications, there's all kinds of information

15   requests that are demanded.  There's all kinds of reporting

16   requirements that have to be completed.  All of that is the

17   Sweet case largely as well.

18      There's also a Manriquez case as well that's related to

19   this one.  There's other cases going on.

20      You know, look, I am not a manager at the Department of

21   Education.  I'm trying to convey the Department's managerial

22   decision-making to Your Honor.

23      But I don't think it's reasonable to expect that we're

24   going to be able to kind of manage the Department through,

25   you know, my representations as a trial attorney.

```
 1          So, you know, I think what the Department has been up to

 2     is a good faith effort to achieve all of its obligations with

 3     the limited resources that it has had over the past several

 4     years.  And it's been approaching Congress to get the resources

 5     adequate to -- to -- to do what it needs to do; and, finally,

 6     in July there has been, for the first time, some movement on

 7     that -- in that area.

 8          I'd also just like to go back to Your Honor's earlier

 9     question about when folks would be onboarded.  The Bergeron

10     supplemental declaration, paragraph 6 on page 4, says early

11     March.

12               THE COURT:  Early?

13               MR. HOLLAND:  Yes, Your Honor.

14               THE COURT:  Okay.  And when would they be working on

15     the applications --

16               MR. HOLLAND:  You know --

17               THE COURT:  -- the 250?

18               MR. HOLLAND:  -- I don't have enough information from

19     the declarations to know exactly, like, what day that will

20     happen.

21          I can try to get more information, Your Honor, and report

22     back to you immediately about that.  But, you know, they have

23     to be trained.

24               THE COURT:  Do either of your colleagues know the

25     answer?
```

```
 1         MR. HOLLAND:  I can confer with them.  Thank you,
 2    Your Honor.
 3              (Co-counsel confer off the record.)
 4         MR. HOLLAND:  The contract attorneys will just be
 5    working on the Sweet class.  It'll take several weeks to train
 6    them.  But then once they're trained, they will only be working
 7    on the Sweet class materials.
 8       They're also going to be supervised --
 9         THE COURT:  Does "several" --
10         MR. HOLLAND:  -- by Borrower Defense Branch.
11         THE COURT:  Does "several" mean three?
12         MR. HOLLAND:  "Several" means -- Your Honor, sorry.
13              (Co-counsel confer off the record.)
14         MR. HOLLAND:  I'm told they're going to start
15    adjudicating claims by late March or early April.
16       Oh, and that's in the supplemental Bergeron declaration.
17         THE COURT:  All right.  Late March, early April,
18    adjudicating.
19       Okay.  Now, does -- now, you've got money for 450, but
20    you're only hiring 250.  Why don't you hire 450?
21         MR. HOLLAND:  We are hiring 450.  They're being
22    onboarded on a weekly basis after that.
23       My understanding, it has -- the issue has to do with the
24    capacity of the existing Borrower Defense Unit to train the
25    number of attorneys involved.  They believe that at their
```

1  current capacity, they can only handle 250 immediately.  And

2  considering the fact that they will need to be overseeing all

3  of the work of these folks -- because we cannot have

4  contractors actually adjudicate the claims; they can only make

5  recommendations -- they will need to -- you know, there will

6  need to be an onboarding process after that.

7      But there will be up to 450 -- there will be 450 hired, is

8  my understanding.

9          **THE COURT:**  Up to?

10         **MR. HOLLAND:**  No.  The declarations say 450.  That's

11  what --

12         **THE COURT:**  Okay.  And the other -- so why couldn't

13  you start training the others -- as soon as the 250 are

14  trained, why couldn't you immediately start training the next

15  group?

16         **MR. HOLLAND:**  I -- my understanding of the resource

17  issue has to do with the fact that the Borrower Defense Unit,

18  who would be training the attorneys, are also simultaneously

19  going to be then reviewing and approving the recommendations

20  from those contractors with respect to each borrower defense

21  application.  So there becomes a constraint with respect to how

22  much they can simultaneously train attorneys while also getting

23  applications out and processed.

24         **THE COURT:**  Well, then by that rationale, they would

25  never be able to train the next group.

1    **MR. HOLLAND:** I think that there -- you know, look,
2    I think they're being trained in a process over -- after the
3    initial 250 are onboarded.
4        **THE COURT:** When would the rest of the 450 be fully
5    trained and adjudicating cases?
6        **MR. HOLLAND:** I'm not sure that we have a number for
7    that in our --
8        **THE COURT:** Does somebody here know the answer?
9        **MR. HOLLAND:** Do we know the answer?
10    I don't have testimony on that -- on that -- on that issue
11    at this time.
12        **THE COURT:** So maybe that part is a gimmick and those
13    other 200 are going to be diverted to something else, since
14    there's no plan under oath.
15        **MR. HOLLAND:** Your Honor, we're only asking for an
16    18-month extension in order to adjudicate 193,000 applications.
17    I don't understand what Your Honor's basing that --
18        **THE COURT:** Which you've known about --
19        **MR. HOLLAND:** -- assertion on.
20        **THE COURT:** -- for three years.
21    Which you've known about for three years and --
22        **MR. HOLLAND:** Congress only provided the funding for
23    these folks in July of this year, Your Honor.  The Department
24    has known about this for three years and has went to Congress
25    each and every year and asked for this money, and Congress said

1    no.

2        We could not have come to the Court and sought a 14-year

3    extension.

4        **THE COURT:**  Well, you could have reassigned people

5    from other divisions or made another interagency agreement,

6    like you did, and brought in people to do the job.

7        **MR. HOLLAND:**  The plaintiffs have not shown that there

8    were --

9        **THE COURT:**  You made an agreement, Counsel.  Your

10    agency made an agreement --

11        **MR. HOLLAND:**  Your Honor, under the case law --

12        **THE COURT:**  -- with deadlines.

13    And so doesn't the word of the Department of Education

14    count for something in this problem?

15        **MR. HOLLAND:**  The Department made that agreement with

16    the understanding that there would be a normal amount of

17    applicants, as there had been in each year before -- in each

18    five-month period beforehand.  The Department had no way to

19    know there would be 250,000 applications.  It does not have the

20    resources to --

21        **THE COURT:**  But you did know that three years ago.

22        **MR. HOLLAND:**  -- adjudicate that.

23    And so each year, Your Honor, it went to Congress and it

24    sought the funding necessary to adjudicate those applications.

25        **THE COURT:**  And also each year you could have gone to

1  other agencies and said, "Bail us out."

2         **MR. HOLLAND:**  Your Honor, the Court --

3         **THE COURT:**  You did do that in part.

4         **MR. HOLLAND:**  Under cases like *In Re Barr Labs*,

5  the Court is required to presume that the agencies were acting

6  in good faith and that the other folks at the agency were not

7  just twiddling their thumbs, but were working on other

8  statutory duties and statutory obligations and statutorily

9  mandated issues.

10      So, you know, my friends on the other side have not shown

11  that there were some group of attorneys around that, you know,

12  in the last administration or whatnot, were available in order

13  to do this.

14         **THE COURT:**  Well, but it's your burden, isn't it, to

15  prove that there weren't?

16         **MR. HOLLAND:**  No, Your Honor.  Under the equitable

17  balancing test, as in, for example, *In Re Barr Labs*, the Court

18  is required to presume that agency officials not working on

19  this were working -- were not twiddling their thumbs.

20      You know, we have shown, I think, by in good faith going

21  to Congress repeatedly in the last administration and this

22  administration and seeking funding to do this, that the funds

23  were necessary.  This is not some new, convoluted thing.  This

24  has been the Department's plan since 2023 when it asked

25  Congress for funding.

1    **THE COURT:**  How have we done on the first five groups,

2  the decision groups?

3    **MR. HOLLAND:**  Your Honor, we submitted a joint status

4  report that shows the status on the --

5    **THE COURT:**  My notes here say 99 percent, 98 percent,

6  97 percent, 98 percent, 91 percent.

7  And then Decision Group 5 is "To be determined."  So what

8  is the percentage on the Decision Group 5?

9    **MR. HOLLAND:**  You mean in the --

10   **THE COURT:**  July 28 was the deadline there.  My memory

11 is that it was pretty good, but --

12   **MR. HOLLAND:**  Yeah.

13   **THE COURT:**  -- I think it's "To be determined."

14   **MR. HOLLAND:**  You know, I'd have to confer with my

15 colleagues about that.

16   **THE COURT:**  All right.  Okay.

17   **MR. HOLLAND:**  I'm not even sure where you see that.

18 Are we talking about --

19   **THE COURT:**  Okay.  I'm going to give you a rebuttal in

20 due course, but right now is a good time to hear from the other

21 side.  So please have a seat.

22   **MR. HOLLAND:**  Thank you, Your Honor.

23   **THE COURT:**  You'll get another shot.

24   **MS. ELLIS:**  Thank you, Your Honor.

25 I think I can answer your last question first.  The

1    Decision Group 5 decision deadline was July 28th, and for

2    people in that group who got a Revise and Resubmit Notice, they

3    have until January 28th to file their revised application.  So

4    I believe the outstanding numbers on Decision Group 5 are

5    waiting to see how many people file a Revise and Resubmit.

6            **THE COURT:**  Well, okay.  Is there a way to estimate

7    what you think the number is going to be?

8            **MS. ELLIS:**  Let me grab the report.

9                          (Pause in proceedings.)

10           **MS. ELLIS:**  I'm looking at the table on page 2 of the

11   joint status report.  It looks like 87.3 percent of

12   Decision Group 5 got approvals.  So roughly 13 percent of

13   people would have gotten a Revise and Resubmit Notice.  So some

14   percentage of that 13 percent are probably going to submit a

15   revised application.

16           **THE COURT:**  All right.  So most likely that

17   number will be over 90 percent?

18           **MS. ELLIS:**  I believe so.

19           **THE COURT:**  Okay.

20       All right.  So what's your main point?  Not just your

21   main, but everything you'd like to say.  Please go ahead.

22           **MS. ELLIS:**  Yes.  I do have a few points, Your Honor.

23       I want to start with my colleague's statement that the

24   Department of Education is fully committed to this plan.

25       Until six weeks ago, the Department was fully committed to

1  the plan of meeting the January 28th, 2026, deadline.  We can

2  look back at the transcripts of status conferences that we've

3  had in this case throughout the past year.  On April 15th,

4  the Court asked the DOJ attorney whether the Department was

5  going to meet its deadlines.  He responded [as read]:

6          "We understand that those are our obligations."

7      Two months later, at our hearing in June, the Department,

8  again, stated [as read]:

9          "We have every incentive to make the deadline.

10     I think as both plaintiffs' counsel and you have

11     said, if we don't, everyone who has not received a

12     decision will be entitled to full settlement relief."

13     So they were just as committed to that deadline until they

14 weren't.  There is no reason to believe, Your Honor, that this

15 plan is going to work.  They don't actually know where any of

16 these supposed contract attorneys are going to come from.

17 They've put out bids, but that doesn't mean anyone's taking

18 them up on it.

19     We don't know -- we don't know how these attorneys are

20 going to be overseen, considering that in the past year, the

21 Department fired its entire Vendor Oversight Unit, and now

22 they're saying they're going to contract out for all these new

23 vendors.  We don't know what's going to happen to the money.

24     I have a few points, actually, on this argument that the

25 One Big Bill is the important factor here.  I mean, as

1    Your Honor already pointed out, the Department has known the

2    size of the post-class for quite a long time.

3        They knew in 2023 that the Department was getting flat

4    funded.  They didn't say a word to us or to the Court.

5        They knew in 2024 that the Department was getting flat

6    funded.  They did not say a word --

7        **THE COURT:**  They were getting -- I don't know that

8    term.  Flat what?

9        **MS. ELLIS:**  Flat funded, that there would be no

10   additional money going to the Department of Education --

11       **THE COURT:**  I see.  Okay.

12       **MS. ELLIS:**  -- over prior years' budget.

13   So they knew they weren't getting that extra money.  They

14   knew it in 2023.  They knew it in 2024.

15   Counsel asks:  What could we have done then?  They could

16   have approached plaintiffs, under Section V(D)(5) of the

17   settlement agreement, which was designed for exactly this

18   purpose.  It says that when the Department becomes aware that

19   it is not going to be able to make a deadline, it has 14 days

20   to notify the plaintiffs of that fact and begin a meet and

21   confer process.  They did not do that.

22       Appropriations are a red herring.  But even if we look at

23   the appropriations themselves, that $1 billion -- $1 billion

24   allocated to Federal Student Aid in the Big Bill is for

25   administrative costs, including the costs of servicing the

1  direct student loan programs.  That's from Section 82005 of the

2  bill.  That subsection appears in the section of the bill that

3  concerns changes to income-driven repayment plans.  So

4  contextually, it's quite clear that the intent of that money

5  was to fund the servicing switchover from past versions of

6  income-driven repayment to the new versions that were mandated

7  by the bill.

8       The Department isn't telling us --

9       **THE COURT:**  Please wait.  Wait, wait.  I want to

10  understand this better.

11       Payment -- the difference in payments, a new payment --

12  explain that to me.

13       **MS. ELLIS:**  So, Your Honor, over the years, there have

14  been multiple different versions of income-driven repayment

15  plans where borrowers can request to adjust their monthly

16  payments to their income.  There were at least four, I believe,

17  versions of income-driven repayment created by previous

18  legislation.

19       The One Big Bill created yet a new form of income-driven

20  repayment and a plan to sunset three of the other versions that

21  had existed before.  And it's going to take quite a bit of

22  resources to make that change, which is beginning in July 2026

23  and will proceed over two years from there, to my

24  understanding.

25       **THE COURT:**  Is this -- what's it called?  What's the

1  new plan called?

2      **MS. ELLIS:**  I -- the acronym is RAP.  Repayment

3  Assistance Program, I believe.

4      **THE COURT:**  All right.  And was this Congress's idea

5  or the Department of Education's idea which was then proposed

6  to Congress?  How did it come into the bill?

7      **MS. ELLIS:**  I do not know exactly the legislative

8  history.  I believe this was Congress's idea, although there

9  may have been people at the Department who advised Congress

10  members on it.  I just don't know the details of that.

11      **THE COURT:**  So what is the connection between the new

12  plan and our settlement?

13      **MS. ELLIS:**  My point, Your Honor, is that to suggest

14  that that $1 billion was aimed at completing this settlement is

15  inaccurate.  That money was for direct loan servicing.  Maybe

16  they're going to use some of it to hire these contract

17  attorneys.  They haven't said how much.  They haven't said how

18  that works.  This is the first we've heard of this supposed OMB

19  plan.

20      I would also note, Your Honor, that the fiscal year 2026

21  budget that's currently under consideration in the U.S. House

22  would cut FSA funding by $1 billion compared to 2025 levels.

23  So it's entirely possible that billion dollars goes poof with

24  the next budget.

25      There is a reason why nothing in the settlement says that

1    any of this is contingent on congressional funding.  That is a

2    risk that the Department assumed when they signed this

3    contract.

4        And I also want to shift the focus a bit, Your Honor.

5    We've talked a lot about --

6        **THE COURT:**  Wait, wait.  Go back to the -- so in the

7    Big Beautiful Bill, was that the stopgap thing that was just

8    passed a few weeks ago or was that back in July?

9        **MS. ELLIS:**  That was the July bill, the Big Beautiful

10   Bill.

11       **THE COURT:**  All right.  So that covered what time

12   period?

13       **MS. ELLIS:**  That covered fiscal year 2025, is my

14   understanding.

15       **THE COURT:**  Which ends when?

16       **MS. ELLIS:**  You're testing my legislative knowledge.

17       **THE COURT:**  Well, roughly.  Is it summer to summer?

18       **MS. ELLIS:**  I believe it is because the departments

19   submit their budget proposals usually in March or April of a

20   given year.  So...

21       **THE COURT:**  So if it's summer to summer, how could it

22   be taken away in January?

23       **MS. ELLIS:**  I believe because -- because the budget

24   bills are separate from the legislation.  So the Big Bill was

25   not a budget.  It was a bill that appropriated money.

1     I hope I'm not embarrassing myself with my attempt to

2    summarize what Congress is doing.

3     But all of the -- the continuing resolutions, the

4    shutdown, I believe those are all around the fiscal year budget

5    for this --

6       **THE COURT:**  Well, but, I mean, it sounds like you were

7    making an important point but now you're waffling.  The

8    important point I thought you were making is that the money

9    that I was told a moment ago was available to hire these 450

10   people, lawyers, could be illusory because there's -- I thought

11   you said there was a bill pending to take that money away.

12      **MS. ELLIS:**  It is to decrease the amount of money

13   available -- the amount of money available to Federal

14   Student Aid going forward.

15    The one -- the Big Bill --

16      **THE COURT:**  Is that starting next July, or is that to

17   take away the $1 billion that the Big Beautiful Bill gave to --

18      **MS. ELLIS:**  The $1 billion in the Big Bill exists

19   currently.  They can spend that money.  But if the budget is

20   cut by a billion dollars for fiscal 2026, they're not going to

21   have --

22      **THE COURT:**  I see.

23      **MS. ELLIS:**  -- the same level of money available going

24   forward.

25      **THE COURT:**  Okay.  So the plan could have the knees

1  chopped off come July of next year.  Yeah, of 2026.

2          **MS. ELLIS:**  Yes.

3          **THE COURT:**  I think that's what you're saying.

4      And the plan turns on the money being -- continuing to be

5  available.

6          **MS. ELLIS:**  Yes, Your Honor, that is what I'm saying.

7          **THE COURT:**  All right.  I understand that point.

8      Okay.  Please continue.

9          **MS. ELLIS:**  Yes.  Your Honor, I want to talk about the

10 equities because, fundamentally, the Government is trying to

11 say it is no longer equitable to enforce the settlement as

12 written.

13     We've talked extensively about timeliness, and that's the

14 issue under Federal Rule 60(c)(1).  A motion arguing that it's

15 no longer equitable has to be made timely.  We've talked

16 extensively about why this motion is not timely; but more

17 importantly -- I would say perhaps equally as importantly, this

18 motion is not equitable.

19     The Department doesn't address the effect that this has on

20 the post-class, the people who have the most at stake here.

21 They say, "Oh, well, forbearance is available."  That's all

22 they say.  And having forbearance be available is only the

23 beginning of the story.

24     As we explained in our brief, the vast majority of

25 remaining post-class applications are associated with Exhibit C

1    schools.  It was the Department's own approach that caused this

2    to happen.  They started by adjudicating applications from

3    schools with fewer applications and less evidence of

4    misconduct.  So they pushed these huge tranches of applications

5    from Exhibit C schools to the end of the process.

6         All borrower defense applications are signed under penalty

7    of perjury.  Each post-class member who submitted an

8    application has sworn that these schools lied to them and that

9    they falsely induced them to take out these loans.  For the

10   Exhibit C schools, we know that there's at least some -- and,

11   in many cases, quite a lot -- of extrinsic evidence as well

12   that these fraudulent practices occurred.

13        But when the Department says that they do not have to take

14   allegations in the BD applications as true, what they're saying

15   is that they believe, with zero evidence to back it up, that

16   tens of thousands of class members lied under oath.  The only

17   way that they could achieve the kind of savings they say they

18   hope to achieve with this delay is by telling all these people,

19   "We think you're lying."  And they're not lying, Your Honor.

20        This is --

21             **THE COURT:**  Well, people say things to the Government

22   all the time under oath and it turns out to be exaggerated or

23   not true.  And doesn't the Government have a duty to check, to

24   see if it checks out and then -- even if it is under oath?

25             **MS. ELLIS:**  Well, one question about that is:  What

1    exactly are they doing?  And if this Court does allow any

2    extension, we would request formal discovery into the policies

3    and procedures that the Department is following in order to

4    adjudicate these applications and the policies that they're

5    going to be training the contract attorneys on, because I would

6    take this Court back to 2020.

7        At that time, the Department said, in the first settlement

8    in this case, that they would decide all the pending BD

9    applications within 18 months, and then they hired a bunch of

10   contract attorneys to review those applications.  And that was

11   exactly when they implemented what we called in our

12   supplemental complaint the presumption of denial policy -- that

13   policy involved not believing allegations in the BD

14   applications, even when hundreds or thousands of people were

15   making basically the same allegations -- and a number of other

16   policies that essentially led to the mass denials.

17       Any delay here is going to expose post-class members to an

18   unreasonable risk of the exact same type of wrongful conduct

19   that we have already litigated in this case.

20       And my colleague from the Department of Justice pointed

21   the Court to the *Philadelphia Welfare Rights Organization* case.

22   That's 602 F.2d 1114.  The Third Circuit, in that case, noted

23   that, quote [as read]:

24            "The court has the power to modify a decree when

25        the danger which the decree sought to prevent has

1     been attenuated to a shadow."

2         That is not the case here.  In *Philadelphia Welfare*

3   *Rights*, the city of Philadelphia, under the terms of the

4   consent decree in that case, had improved its child Medicaid

5   policies to become one of the best Medicaid programs in the

6   entire country.  And it was in that context that the Court

7   said, "Okay.  We can ease some of these penalties because of

8   the extraordinary progress that you've made."  That is

9   obviously not the case here.  It's the opposite here.

10        Something that's important to understand, Your Honor, is

11  that, obviously, borrower defense applications did not stop

12  when the post-class closed.  So, yes, we have 250,000

13  applications in the post-class; but according to the most

14  recent publicly available data from the Department, there's

15  another roughly 250,000 applications that have come in since

16  November 2022, so people who are not covered at all by the

17  Sweet litigation.

18        Under this plan, they would take another 18 months to

19  adjudicate the post-class, if they're even able to do so; and

20  there's many, many reasons for skepticism for all the reasons

21  that Your Honor was covering earlier.  But that means anyone

22  who applied after the post-class, no one is even going to think

23  of looking at those applications until August 2027 at the

24  earliest, at which point those people will already have been

25  waiting for four and a half years.  We're right back where we

```
 1    started.
 2         One of the purposes of this settlement was to give the
 3    Department three years to right its ship and create a workable
 4    borrower defense process, one that, frankly, had not existed or
 5    had only begun to exist for a short time in 2016 and then
 6    almost immediately got kneecapped.
 7         Instead of capitalized -- instead of capitalizing on that
 8    opportunity, the Department is here today asking to create an
 9    even bigger backlog.  They are asking to re-create the exact
10    situation that led to this lawsuit in the first place.
11         We cannot let this go backward.  The entire point of the
12    settlement was to allow class members who had been left in
13    limbo to move forward with their lives.  We heard from 20,000
14    post-class members when we asked for reactions to
15    the Government's proposal.  And overwhelmingly, they said:
16    This is going to cause us grievous harm -- the harm of having
17    fraudulent loans still on your credit report so you can't
18    qualify for housing, for car loans.
19         We have a post-class member here in the courtroom today
20    who was not able to take out a low-interest loan to pay for her
21    father's funeral because of these loans on her credit report.
22             THE COURT:  Who is that person?
23         Raise your hand a little higher.
24                       (A hand is raised.)
25             THE COURT:  Okay.  I see you now.
```

1          And her name?

2                MS. ELLIS:  Alice Zafiris, Your Honor.

3                THE COURT:  Thank you.  Okay.

4                MS. ELLIS:  She submitted a declaration that's

5     attached to our brief.

6                THE COURT:  Okay.  Yeah, there are about 20, I think.

7          All right.  Okay.  Keep going.  What do you say to

8     the Government's argument that it will be many billions of

9     dollars of taxpayer money -- and we're all taxpayers -- that if

10    the Government is not given an extension, then under the

11    agreement, the Government will have to pay money that maybe it

12    doesn't have to -- it shouldn't have to pay?

13               MS. ELLIS:  Your Honor, I would first say that the

14    post-class are taxpayers too, and they are taxpayers who have

15    asked the Government for help that has not been provided.

16               THE COURT:  That's true.  All right.

17               MS. ELLIS:  They've depended on the Government's word

18    that they're trying not to keep.

19               THE COURT:  But their percentage is a small, tiny

20    fraction of the $12 billion.

21               MS. ELLIS:  Fair enough.

22               THE COURT:  It would be a -- it would be a significant

23    sum.  So then the newspapers would be saying, "Judge Alsup,

24    look at him.  He's making the Government pay out money to

25    people who don't deserve it."  That's the way --

1        **MS. ELLIS:** Well, Your Honor --

2        **THE COURT:** -- it would be -- that's the way it would

3 be pitched.

4        **MS. ELLIS:** Your Honor --

5        **THE COURT:** No one would be pointing the finger at

6 you. They would be saying, "Look at that crazy judge in

7 San Francisco."

8                 (Laughter.)

9        **THE COURT:** So, and $12 billion is a significant sum.

10 Let's say half of it is deserving and half of it's not. That

11 seems to be the ratio up to -- on the 50,000 so far in the

12 post-class. Still, 6 billion is a lot of money.

13        **MS. ELLIS:** Well, Your Honor, I think, as we explain

14 in our brief and as I have alluded to earlier, the fact that

15 the Government started with the applications that had the least

16 evidence means that 50 percent is essentially a gerrymandered

17 percentage. The post-class --

18        **THE COURT:** You mean even on the post-class, they

19 started with the smallest schools?

20        **MS. ELLIS:** Yes, Your Honor. That's in the Bergeron

21 declaration.

22        **THE COURT:** Did they do that on the decision groups?

23        **MS. ELLIS:** The decision groups, we don't know how

24 they approached the timeline within each six-month tranche.

25      But Mr. Bergeron specifically said they started with the

1  applications that had the least number from each school and
2  where the schools did not have evidence.
3       In the post-class, overall, more than 80 percent of the
4  applications come from Exhibit C schools, so schools where
5  there is known evidence of misconduct already.  And because
6  they started with the little schools that, you know,
7  mathematically, would lead you to believe that probably 85,
8  maybe 90 percent of the outstanding applications that are left
9  are Exhibit C applications, if those applications are subjected
10  to a fair process, we would expect a much, much, much higher
11  approval rate than 50 percent.  So for that reason, the
12  11 billion number is, we think, illusory if the Government
13  plans to run a fair process.
14       The other thing I would say and we explained --
15       **THE COURT:**  I appreciate that.  I misunderstood.  I
16  thought that going all the way back to the Decision Group 1,
17  they had been using the smaller schools first.
18       And now that it's explained to me, it does seem like you'd
19  want to start the other way around, with the bigger schools.
20  You'd get more cases decided.  It might be a difference on time
21  period.  I could see that.
22       But you're telling me that at least you understand it to
23  be that it's only on the post-class group where they started
24  with the smaller schools.
25       **MS. ELLIS:**  That is my understanding of the Bergeron

 1    declaration, Your Honor, because the -- in -- the people before

 2    the post-class, the settlement class, all of the Exhibit C

 3    applications were in Exhibit C.  Right?  They were the

 4    automatic relief group.  So the decision groups in the rest of

 5    the class were necessarily not from those bigger, more

 6    numerous, more heavily investigated schools.

 7         So my understanding of the Bergeron declaration is that

 8    for the post-class specifically, they started with the small

 9    schools, which means the people left are going to be from the

10    Exhibit C schools where we know that there's evidence of

11    misconduct occurring, in addition to the thousands of

12    applications that are all making similar allegations of

13    people's experiences with those schools.

14         I'd also like to point out, Your Honor, that the face

15    value of a student loan balance does not represent money that

16    the Government is necessarily going to be paid.  We explained

17    this in our brief as well.

18         So you've got people whose applications should be approved

19    under a fair process.  You've got about 32,000 people in the

20    post-class who already overlap with discharged schools, the

21    eight schools that the Government has said all of the loans

22    from that school should be canceled because of all its

23    misconduct.  They're definitely getting discharged.

24              **THE COURT:**  Wait.  Is that a subset of the Exhibit C

25    schools?

1    **MS. ELLIS:**  It is, yes.

2    **THE COURT:**  How many are in that group?

3    **MS. ELLIS:**  We believe, based on the data we have,

4  about 32,000.

5    **THE COURT:**  All right.  Of the post-class?

6    **MS. ELLIS:**  Of the post-class, yes.

7    **THE COURT:**  And how many schools are represented in

8  the worst of the worst?

9    **MS. ELLIS:**  Eight school groups, which some include

10  brands.  There's the three Corinthian schools:  Heald, WyoTech,

11  and Everest; ITT Tech; the Art Institutes; Westwood; Marinello

12  Schools of Beauty; the Center for Excellence in Higher

13  Education schools, which are four brands; Drake College of

14  Business; and Ashford University are the group discharged

15  schools.

16    **THE COURT:**  Now, I thought Corinthian was excluded on

17  account of other litigation from our class.  But is it in the

18  post-class?

19    **MS. ELLIS:**  It is complicated, the interaction between

20  the Corinthian group discharge, the Calvillo Manriquez case,

21  and the Sweet case.  But there are people who went to

22  Corinthian schools who filed borrower defense applications

23  within the post-class period, and that would make them

24  post-class members.

25    **THE COURT:**  All right.  So 32,000 of the 250,000.

1    **MS. ELLIS:** Right. So there's those people.

2  There's people whose --

3    **THE COURT:** And they have not been adjudicated yet?

4    **MS. ELLIS:** They're people who have not been

5  adjudicated yet; that's right.

6    And so you have -- in addition to those group discharged

7  people, you've got everyone else in the post-class who went to

8  Exhibit C schools who we think their applications are very

9  likely to be approved, even with a delay.

10   You have people who will -- even if their loans remain

11 outstanding now, people who will eventually qualify for public

12 service loan forgiveness, for total and permanent disability

13 discharge, for other types of administrative discharge. So

14 that money will not be paid back.

15   The math --

16    **THE COURT:** Well, one point --

17    **MS. ELLIS:** -- that's been done on this --

18    **THE COURT:** Wait. One point you were making -- I want

19 to make sure I got it right -- is that this 50 percent hit

20 ratio for the post-class group is based on 50,000 or so

21 adjudicated so far in which the discharge rate has been

22 50 percent approximately. And you -- but you say that

23 number is misleading because if you started with the big

24 schools, where there are more applications involved, they

25 overlap heavily with the Exhibit C schools. And there, you

1  think the approval rate would be much higher than 50 percent so
2  that less harm would be done to taxpayers by denying the
3  motion.  That's your point, I think.
4        **MS. ELLIS:**  Yes, Your Honor.
5        **THE COURT:**  Okay.  I'm going to ask the Government
6  about that -- I hadn't thought about that point -- as I see
7  some merit in that point.
8        But let's continue on.  What else would you like to say?
9        **MS. ELLIS:**  Yeah.  My second point, Your Honor, just
10 to sort of put a cap on it, was that federal student loans
11 overall are a money-losing endeavor, between the balances that
12 never get paid back due to discharge and the costs of
13 servicing.  So to say $11.8 billion in balances is not the same
14 as $11.8 billion that the Government would collect.  In an
15 absolute best-case scenario, they collect some small fraction
16 of whatever is left after the adjudications over the course of
17 decades.  It's a much smaller number than that top line is
18 trying to make it out to be.
19       My final point, Your Honor, is what I was starting to say
20 earlier, which is that this proposal is a huge step backwards.
21 It's a step backwards that's going to cause grievous harm to
22 post-class applicants.
23       The post-class applicants have been counting on this date
24 for three years.  They have been tuning into these hearings.
25 They have heard the Government representing that they will have

1  finality on that date.  They have planned their lives around

2  that date.  Even if they didn't get approved, they at least

3  would know.

4      We can't keep doing the same thing over and over and

5  expecting different results.  That's exactly what

6  the Government is asking here today.  They're asking to pull

7  the same trick that they did in 2020, and we will just be right

8  back here litigating again.

9          **THE COURT:**  What was that trick again?  That was the

10  form denials?

11          **MS. ELLIS:**  Yes.  To say --

12          **THE COURT:**  Well, how do you know that they're going

13  to do that?  I mean, they did it back then, but maybe this

14  time -- so far, they've done a good job on the decision groups.

15          **MS. ELLIS:**  That's true, Your Honor.

16      The Bergeron declaration, in my view, has red flags.

17  There's the red flag of saying, "We don't have to believe

18  anything that borrowers say."  There's the red flag of saying,

19  "Even for schools where we have evidence of misconduct, oh, we

20  actually need to do a bunch more research to make sure that

21  there was misconduct."

22      If someone experienced misconduct in an oral conversation

23  with a for-profit school recruiter, they're not going to find a

24  record of that.  But it still happened.  It still mattered to

25  that person.  So what exactly is it that they're researching?

1    What exactly are these policies and procedures that

2  reportedly took them two years to develop?  That's why I asked,

3  Your Honor, that if there is any delay allowed, that we be

4  permitted discovery into all of these practices and procedures.

5    Overall, though, what we saw in 2020 is that the only way

6  that they could hurry up the decisions to an 18-month timeline

7  was to hire contract attorneys who would deny applications.

8    **THE COURT:**  Say that last sentence again.

9    **MS. ELLIS:**  I said that in 2020, what we saw was that

10  when they tried -- when they said, "We're going to clear the

11  backlog in 18 months," the way that they did that was to hire

12  contract attorneys and deny a bunch of meritorious

13  applications.

14    The risk is simply too great.  Maybe they don't have the

15  exact same policies in place as in 2020.  I certainly hope not.

16  But the risk is too great to the post-class.

17    **THE COURT:**  Let's say, for the sake of argument, that

18  the Court agrees with you for a moment.  Then wouldn't the

19  Department appeal or take a writ to the Court of Appeals?  That

20  would take some time.  And then let's say the Court of Appeals

21  thought that relief was warranted.  So then we would come back

22  down.

23    And what would concern me about that scenario is that the

24  class members would go away today thinking, "Oh, okay.  The

25  lawyers won," meaning you, "and now I'm going to get my loan

1  discharged." But then the Court of Appeals might disagree with

2  what I did, and then they would have to be -- the loans would

3  be reinstated or my order stayed in some fashion.

4      So is there a risk on your side that if I rule in your

5  favor, that the Court of Appeals might intervene? And how big

6  is that risk? And it might screw up the whole thing and make

7  it even longer before the class members could get relief.

8      So please address that.

9      **MS. ELLIS:** I hear your concern, Your Honor. I find

10 it difficult to predict the likelihood or the timeline of that

11 scenario. I agree it is a potential scenario.

12     If there's going to be a delay, if we're going to look for

13 a compromise approach today, then I would submit an appropriate

14 approach would be for all pending post-class applications

15 associated with an Exhibit C school to receive their discharge

16 on January 28th, 2026, and to give the Department a short

17 extension to decide the remaining non-Exhibit C post-class

18 applications.

19     The settlement, Your Honor --

20     **THE COURT:** How many would that -- that would be --

21 what percentage of the remaining would the Class C be? I think

22 you said 80 percent.

23     **MS. ELLIS:** 80 -- 80 percent, potentially higher

24 because of the approach that they've used. We don't know how

25 to calculate that exactly. Could be 85 percent.

1          **THE COURT:** Okay. Keep going.

2          **MS. ELLIS:** Your Honor, the settlement was structured

3   the way it is -- as the parties explained in our preliminary

4   and final approval motions, the settlement was structured the

5   way it was because that's how the Department believed it would

6   best be able to meet the deadlines.

7          The settlement easily could have kept the settlement class

8   open until the date of final approval, in which case all of the

9   post-class Exhibit C people would have been swept into the

10  automatic relief group and we wouldn't be facing this situation

11  today. Obviously, that's not how it played out. But one can

12  imagine a world in which it did.

13         The Exhibit C applications have evidence behind them of

14  school misconduct. They have hundreds and thousands and

15  sometimes tens of thousands of consistent allegations about

16  ways in which students were misled.

17         **THE COURT:** Can I ask you a question? I'm sorry to

18  interrupt you.

19         **MS. ELLIS:** Of course.

20         **THE COURT:** Was there -- you remember the -- this is

21  going back two years. But there were some intervenors I

22  allowed to intervene who represented, I think, four of the

23  schools on the Exhibit C. And then they appealed, and then

24  I've lost track of what happened on that appeal.

25         Can you educate me on that now?

1    **MS. ELLIS:**  Yes, Your Honor.  The Ninth Circuit ruled

2  that the intervenors did not have standing to maintain an

3  appeal of the final approval order because in order to maintain

4  that appeal, they would have had to show that the settlement

5  agreement caused them formal legal prejudice, the actual

6  deprivation of a legal right.

7    One of the four intervenors sought *en banc* review, which

8  was denied, and that one intervenor has now filed a petition

9  for *certiorari*.  Our opposition and the Government's opposition

10  to *certiorari* are due on December 22nd.

11    **THE COURT:**  So that piece of it is still alive; is

12  that correct?

13    **MS. ELLIS:**  It is.  The remaining intervenor is

14  alleging that there's a circuit split on the formal legal

15  prejudice standard.  So it's now -- it's now, at this point, a

16  bit far removed from the actual facts of the case.  But that is

17  the current situation.

18    **THE COURT:**  Okay.  All right.  I interrupted you in

19  the middle of a sentence.  Please go back to that sentence.

20    **MS. ELLIS:**  I'm not sure I can remember exactly what

21  my sentence was.

22    **THE COURT:**  Just pick up on where you think you were.

23    **MS. ELLIS:**  Okay.  Well, we were talking about the

24  likelihood of appeal from an order in plaintiffs' favor today.

25    I think -- although that is a risk and I have, you know,

1  now suggested a potential avenue for compromise, I think it's

2  really impossible to completely -- to completely account for

3  that sort of risk.  It might be that in another 18 months, the

4  Department hasn't finished adjudicating the post-class

5  applications for all the reasons that we pointed out that their

6  plan to do so is faulty.  Then we'll have another motion here.

7  Maybe we win that one.  Maybe they appeal.  It's just very

8  difficult -- it's very difficult to predict how that would play

9  out.

10       And on the actual merits here, Your Honor, on both the

11  timeliness under Rule 60(c)(1) and on the equities under

12  Rule 60(b)(5), we believe that holding the Government to its

13  word is the correct outcome here today.

14            **THE COURT:**  Okay.  Is that it?

15         **MS. ELLIS:**  For now, Your Honor.

16            **THE COURT:**  Help me on this.  What are the official

17  motions here today that I need to decide?

18         **MS. ELLIS:**  There is the Government's Rule 60(b)(5)

19  motion for relief from judgment.

20       Technically speaking, we moved to strike this motion for

21  failing to comply with the settlement's procedures.  We still

22  believe the Government failed to comply with the settlement's

23  procedures, but we do not believe that under the circumstances,

24  there would be value in striking this motion and doing it all

25  over again in two months.  So we withdraw that motion.

**App.53**

1    **THE COURT:**  What is the standard that I'm supposed to

2  apply here?  Under the agreement, it looks like extraordinary

3  circumstances.  Is that the standard?

4    **MS. ELLIS:**  Well, under the agreement, Your Honor,

5  the Government was supposed to make a showing -- let me just

6  make sure I have --

7    **THE COURT:**  Paragraph V(D)(5).

8    **MS. ELLIS:**  Yeah, V(D)(5).

9    **THE COURT:**  Yes, I've got it right in front of me.

10    **MS. ELLIS:**  That's right, yes, that the defendants

11  would have to show that there are extraordinary circumstances

12  beyond defendants' control that prevent them from fully

13  performing their obligations.

14    The Department of Justice today argues that that standard

15  does not apply; that only the law of Rule 60(b) applies here

16  because they chose not to follow the settlement procedures.

17    Our argument would be, Your Honor, that they should have

18  followed the settlement procedures; that these were triggered;

19  and that even if there is reason to apply the general law of

20  Rule 60, that defendants are in material breach of the

21  agreement with respect to this paragraph.

22    **THE COURT:**  Well, did defendants notify plaintiffs'

23  counsel within 14 calendar days and so forth?

24    **MS. ELLIS:**  No, Your Honor.

25    **THE COURT:**  Was there a meet and confer?

1     **MS. ELLIS:**  Your Honor, we were alerted about

2  four hours before the Department filed the Rule 60(b) motion.

3     **THE COURT:**  At any point since then, was there a meet

4  and confer on this problem?

5     **MS. ELLIS:**  No, Your Honor.

6     **THE COURT:**  Okay.  All right.  Any other motions I'm

7  supposed to decide today?

8     **MS. ELLIS:**  I believe that's it, Your Honor.

9     **THE COURT:**  Motion to strike and the 60(b)(5)?

10    **MS. ELLIS:**  Yes.

11    **THE COURT:**  Now, do you have your own motion to

12  enforce?  Is there such a thing pending?

13    **MS. ELLIS:**  We -- if the procedures in the settlement

14  had been followed, we would have filed a motion to enforce.

15  Under the circumstances, we responded to the defendants'

16  Rule 60 motion.  But we did state in our brief that we believe

17  the defendants are in material breach, and we requested relief

18  according to the terms of the settlement.

19    **THE COURT:**  So is that something I need to decide or

20  request?

21    **MS. ELLIS:**  I suppose so, although our request is

22  simply to follow the settlement as written.  So there's

23  overlap.

24    **THE COURT:**  All right.  Rebuttal.  What was the

25  question I wanted you to answer?

1    Why did you start with the small schools instead of the
2    big schools?  And also, what approach was taken on the
3    Decision Groups 1 through 5?
4        MR. HOLLAND:  What approach was taken on the
5    Decision Groups 1 through 5?
6        THE COURT:  Yeah.  Was it start with the big schools
7    and go down to the --
8        MR. HOLLAND:  So on --
9        THE COURT:  -- smaller ones?
10       MR. HOLLAND:  -- that issue, so the decision group
11   schools were resolved under a standard that is established in
12   the settlement itself and that applies to class members; and
13   that's separate from any of the rule standards, whether it's
14   the 2016 rule or the 2022 rule.
15       That standard applies a presumption in favor of the
16   applicant's allegations, and the Department resolved them on
17   those.  I don't know if it was big or small, but I'm not
18   sure -- to move on to the issue for post-class applications and
19   why there's a difference there --
20       THE COURT:  All right.  Well, in the post-class, is it
21   correct that there have been 50,000 decided so far but they
22   have been for smaller schools?
23       MR. HOLLAND:  Yeah.  And can I just back up and
24   explain that a little bit?
25       So the parties agreed that the Government would adjudicate

**App.56**

1   post-class applications under the standards and procedures and

2   requirements of the 2016 regulations that governed borrower

3   defense applications, unlike the decision group classes that

4   are subject to procedures that are in the settlement agreement.

5       Those procedures require there to be fact finding with

6   respect to the type of conduct that the school at issue went

7   into.  That fact-finding process is resource intensive on the

8   Department, which, again, has only had between, you know,

9   40 and 70 folks, who have also been dealing with decision group

10  applications themselves, thousands and thousands and thousands

11  of those, as well as, again, dealing with all of the reporting

12  requirements of this case and others.

13      And so in an effort to get applications processed, yes,

14  initially, they had focused on applications for which the fact

15  finding, you know, arguably may have been, you know, less

16  resource intensive because, you know, there are these schools

17  that Your Honor is referring to.

18      I think if Your Honor looks at the supplemental Bergeron

19  declaration in which the Department puts forth its tranche plan

20  that's based on schools, you'll notice that the first tranche

21  has, I think it's four schools that have some of the largest

22  numbers of applications, because now that the Department has

23  been working on fact finding for so long, which, again, is

24  required -- it's required to do under the 2016 regulations that

25  apply, once it's prepared these fact findings, it can then

1    resolve a bunch of applicants with those same schools at the

2    same time.

3        That's why -- that's why --

4        **THE COURT:**  Why wouldn't that be an obvious way to go,

5    to get more bang for your buck right off the bat?

6        **MR. HOLLAND:**  Why would that be not --

7        **THE COURT:**  You have four schools or so that are a

8    large percentage of these applicants.  And so if you -- and

9    these -- your staff is already familiar with the Exhibit C

10   schools; right?

11       **MR. HOLLAND:**  The Exhibit C schools were placed on

12   that list based on a settlement procedure that the Department

13   had agreed to.  It was not based on the formal fact finding

14   that's required under the 2016 regulations.

15       **THE COURT:**  How hard is it write --

16       **MR. HOLLAND:**  The Department has been working on that.

17       **THE COURT:**  How hard is it to write up findings of

18   fact?

19       **MR. HOLLAND:**  Your Honor, I -- the Department has --

20       **THE COURT:**  Judges do that all the time.  Sometimes we

21   have to do it in one day.  How hard is that?

22       Whatever you've been -- you've been wallowing in the

23   Exhibit C school list for three years.  Not you, but the

24   Department of Education and these people who -- the 37 lawyers.

25       **MR. HOLLAND:**  Under the --

1    THE COURT:  Why can't they go ahead and just write it

2 up?

3    MR. HOLLAND:  That is what is in progress.  And if

4 the Court looks to the supplemental Bergeron declaration, it

5 has the timetables for when it anticipates getting the biggest

6 schools out.

7    THE COURT:  What if I disagree with that timetable?

8 What if I think it can be done a lot sooner?

9    MR. HOLLAND:  The Department -- the Department's

10 position is that with its resources and the resources it

11 anticipates getting, it cannot do it more quickly than what is

12 put forth in the supplemental Bergeron declaration.

13    Can I start with responding to the standard of review

14 issue that we were just -- that Your Honor just ended the

15 discussion with Ms. Ellis on?

16    THE COURT:  Sure.  Yeah.

17    MR. HOLLAND:  So the Department is not -- the material

18 breach provisions of the settlement agreement don't apply here.

19 The Department is not in material breach.  It's not -- of the

20 agreement.

21    The Department agreed that it will either adjudicate all

22 pending post-class applications by January 2026 or else

23 it'll -- and if it doesn't, it will provide full settlement

24 relief to the post-class applications.

25    THE COURT:  Why doesn't paragraph 5 apply?  It says

```
1    [as read]:
2              "If Defendants are reasonably prevented from or
3         delayed in fully performing any of the obligations
4         set forth in paragraph IV above, due to extraordinary
5         circumstances beyond Defendants'
6         control . . . Defendants will notify Plaintiffs'
7         Counsel within 14 days of Defendants' determination
8         that they will not be able to fully perform their
9         obligations.  Within that notification" --
10        Then it goes on to talk about meet and confer and then
11   that you could then bring a motion to -- to ask for more time.
12        So why doesn't that apply here?
13        MR. HOLLAND:  Because the Department is able to
14   provide full settlement relief and there is -- they are able to
15   discharge all of the non- -- all of the class -- post-class
16   applicants that have not been decided by January by -- within
17   the one-year period that's required under the agreement.
18        THE COURT:  No, no.  You're telling me that you can't
19   do it on the timetable in the agreement.
20        MR. HOLLAND:  The Department cannot adjudicate all of
21   the post-class applications, which is required under the
22   underlying law; but the Department is able to discharge all the
23   applications that have not been decided by January.
24        We're seeking a modification of the terms of the
25   agreement, just like this Court has granted with respect to,
```

1    for example, applying terminal C loan methodology to all of the

2    non-Exhibit C schools, all the decision groups and the

3    post-class.  The Court modified the agreement when it did that,

4    and it did so by considering equity and equitable factors.

5        The Court has required the plaintiffs to meet on a monthly

6    basis with us, even though that's not required in the

7    agreement.  And the Court did so -- it did that modification

8    under its equitable authority to do so, given the fact that it

9    has oversight over the agreement.

10        This is what Rule 60(b)(5) is for.  There's no provision

11    of the settlement agreement that precludes the Department from

12    coming to this Court and seeking Rule 60(b)(5) relief; and, in

13    fact, it would be -- the notion that the Department could have

14    waived its authority to seek Rule 60(b)(5) relief would be

15    fundamentally inconsistent with all of the Supreme Court

16    precedent we cite in our brief, such as *Horne*.

17        **THE COURT:**  Well, look, the very agreement that you

18    wrote -- not you personally, but that the DOE wrote -- it says

19    [as read]:

20        "The Court relinquishes jurisdiction over all

21        claims, causes of action, motions, suits,

22        allegations, and other requests for relief in this

23        Action that are not expressly stated in paragraph 5."

24        And I've read to you what's in paragraph 5.

25        Now, it is true that I have granted some relief, equitable

1   relief.  Both sides went along with it.

2       But I don't see what the point was of this whole

3   paragraph 5 if I can do what you want me to do.

4       **MR. HOLLAND:**  Your Honor, the paragraph 5 is for if

5   the Department cannot discharge all of its loans under the

6   terms of the settlement agreement.

7       If we were coming up against January -- let's say the

8   Department couldn't adjudicate 193,000 of the applications

9   by -- I'm sorry -- if the Court granted no relief and there's

10  193,000 applications pending -- right? -- and then so the

11  Department is required under the agreement then -- if the Court

12  doesn't modify it, the Department is required to discharge all

13  of those loans, working with the servicers by -- in a 12-month

14  period.

15      Because the Department can comply with the agreement by

16  doing so, it hasn't breached the agreement.  And that's why,

17  you know, a motion to enforce, just have the Court order

18  exactly what the agreement already says, doesn't really make

19  any sense.  I mean, the Department will comply with the

20  agreement, you know, if the courts don't modify it.

21      So -- but this is all just to say why that provision, just

22  it doesn't really apply by its terms to this circumstance at

23  all.  There is no prohibition on the Government seeking

24  Rule 60(b)(5) relief from the judgment incorporating the entire

25  agreement and all of its terms.

1    And the Supreme Court has made clear in cases like *Horne*

2 that the whole point of Rule 60(b)(5) in many instances is so

3 that successor public officials can bring new issues of

4 resources and revenue to a court when it's implementing a

5 complex prospective remedial decree.

6    And so that's exactly what we're asking the Court to do

7 here.  And the Court has -- you know, again, the Court has

8 modified the agreement in the past, and it has done so over the

9 Department's objections.  It's true that we've complied with

10 the Court's orders, and we're not seeking to modify the Court's

11 prior orders on, for example, terminal loan methodology.  But

12 we did not agree to that, and, you know, so I just respectfully

13 disagree with the Court insofar as it's suggesting that it's

14 something we just kind of agreed to.

15    Just moving into some of the other issues, so plaintiffs

16 started their argument by saying that they respond -- that it

17 was speculative whether anybody's going to respond to the

18 Department's requests for proposals to hire contracts -- to

19 hire contract attorneys.  That's not true.  On December 5th,

20 four firms have already responded, bidding to supply all the

21 required attorneys.

22    You know, and a lot of other of their arguments are just

23 based on speculation about the Department's plan, but there's

24 really no basis for why the plan would not be implementable --

25 achievable, I should say, especially in contrast to the

1   original plan that the plaintiffs had agreed to, where it was

2   clear there was not sufficient funding to process 250,000

3   applications.

4       Oh, I want to just discuss plaintiffs' suggestions

5   about -- I think there was some confusion about the

6   One Big Beautiful Bill Act and its provisions versus what

7   I think my friend was suggesting that the House has recently

8   done with respect to the Department's appropriations.

9       So the appropriations in the One Big Beautiful Bill Act,

10   they're what are called -- they're mandatory appropriations.

11   They're different than the kind of annual appropriations that

12   agencies are provided and have to spend each -- every year.

13       This is a mandatory appropriation that goes beyond a year.

14   So it says:  There's a billion dollars for the Department of

15   Education to spend -- I think for FSA to spend on

16   administrative costs over, I think, a prolonged time period.

17   I'm not even sure if there is -- I don't think there is an end

18   date for when it has to be spent.  It's totally different from

19   whatever Congress might do to the annual budget.

20       And, you know, I'm not sure that -- I can only speculate

21   about what Congress might do in the future with respect to the

22   annual budget, but that's separate from these funds.

23       And the funds were not earmarked, as my friend was

24   suggesting, for the programs that I think Ms. Ellis was

25   discussing.  They were for administrative costs for

1    Federal Student Aid.  Student Aid has worked with the Office of

2    Management Budget to put together this plan, which, again, is

3    already in works -- in the works.  Again, firms have already

4    responded to the request for proposals to hire the contract

5    attorneys.

6         On the equities issue, you know, obviously, it's

7    incredibly regrettable that it's taken this long to process

8    borrower defense applications, and I sympathize with applicants

9    incredibly who have been waiting such an incredible long period

10   of time.

11        But on the other side of the equation are billions of

12   dollars in taxpayer funds that might go to folks who have filed

13   unmeritorious applications.  And I know that my friend has

14   spent a lot of time trying to suggest that it might not be

15   $6 billion.  But even if it's $1 billion, Your Honor, that's an

16   incredible amount of money.  I think it's more money than

17   Congress's appropriations on maybe the judiciaries.  You know,

18   we're talking about a lot of money, and that is an important

19   thing for the Court to consider in balancing the equities.

20        And on the other hand, the post-class members, you know,

21   they will remain in forbearance status.  They will remain in a

22   status where any loans will not be collected upon.  So there's

23   really no change to the status quo.

24        **THE COURT:**  Well, what do you say to the young lady

25   who raised her hand and said even if she's in forbearance, it's

1   on her credit report and she can't borrow money to buy a house?

2          MR. HOLLAND:  I can't imagine being in that position,

3   Your Honor; and I -- you know, I really feel terrible.  But,

4   like, at the end of the day, if she has submitted a meritorious

5   application, her loans will be discharged.

6          And it's ultimately up to Congress to make the decisions

7   about whether or not, you know, folks should get -- what the

8   law is --

9          THE COURT:  Congress made this --

10         MR. HOLLAND:  -- in this area.

11         THE COURT:  -- decision about 1986 when Congress set

12  this whole program up.

13         I may be off by one year or two.  And the Department of

14  Education was quite slow, decade after decade, to ever get

15  around to setting up a system.  So I think Congress has made a

16  decision and the Department of Education has been slow.

17         And I'm not -- this can be laid at the feet of both

18  political parties.  It's not just the current administration.

19  If you go back and look at the actual history, both sides of

20  the aisle were slow.

21         And so here we have all these people who Congress wanted

22  to help or at least give them their day in court.  So I think

23  Congress did have -- say something long ago on this subject.

24         All right.  I interrupted you.

25         MR. HOLLAND:  No.  I totally understand that,

1    Your Honor, and we don't -- the Department certainly doesn't

2    disagree with you.  But the case law is clear that the

3    Department can only do the things that Congress tells it to the

4    extent that there is appropriated money available to do those

5    things.  We cite cases to that extent in our brief.

6         In our view, this case is resolved by, for example,

7    *Philadelphia Welfare Rights Organization*.  My friend suggested

8    that that case was not on point because in that case, which

9    involved a state agency in the 1970s that was obligated to

10   provide certain healthcare screenings under, I think, a federal

11   grant because throughout the settlement agreement and the

12   consent decree that was at issue in that case, the Department

13   had achieved one of the best programs in the country, even

14   though it still was unable to achieve the deadlines that were

15   at issue.

16        But here, I think the Department has done a fantastic job

17   considering the limited resources in the Borrower Defense Group

18   that it has had and the fact that Congress has repeatedly

19   rejected their funding.  And I would encourage anyone else to

20   try to accomplish what they have with the few resources that

21   they've had.  And I think that --

22        **THE COURT:**  What do you say to the suggestion made a

23   moment ago that you plan to do a repeat of what you did in

24   2020, which is to have form denials?

25        **MR. HOLLAND:**  The Department intends to comply with

1    its obligations under the law and under the terms of the

2    agreement that provide for processing the applications under

3    the 2016 rule standards.  So there will be fact finding.  And

4    insofar as a school is engaged in conduct that is impermissible

5    under the substantive law, then applications will be approved;

6    and if they have not, they will be denied.

7           **THE COURT:**  Well, but last -- that's what the agency

8    said in 2020, that they intend to comply.  And in form, they

9    did.  They had a letter that was saying, "You lose," and a long

10   string of form -- anyway, that's what you said then.  You

11   didn't.  Not you personally.  You weren't even there.  But

12   that's what was said back then, they intended to comply.

13          **MR. HOLLAND:**  The Department has worked in good faith

14   with the plaintiffs' counsel and on this issue over years.  We

15   have weekly meetings with the plaintiffs' counsel in the

16   Ombuds Office, where we go through individualized people who

17   have filed a complaint and figure out what's going on --

18          **THE COURT:**  That is true.

19          **MR. HOLLAND:**  -- with that person.

20          **THE COURT:**  That is true.

21          **MR. HOLLAND:**  The notion that the Department is

22   anything like it was at that time I think is without

23   foundation.

24       And I think that goes to the good faith in implementing

25   the agreement, in implementing its obligations here that go to

1   some of the factors the Court should consider in modifying the

2   judgment under the case law.

3       My friend suggested discovery.  I don't think there's any

4   basis for discovery here.  The standard in the administrative

5   law context, insofar as they're trying to seek, you know,

6   internal executive branch information, is a strong showing of

7   bad faith or improper behavior, and I don't think the

8   plaintiffs can make that showing.

9       And just to reiterate on the post-class -- the post-class

10  issue, my friend was bringing up some -- you know, whether or

11  not the Department will face delays in processing post-class.

12  They're not at issue in this case.  If there are delays or

13  alleged delays, then folks can bring a new action under the

14  Administrative Procedure Act, under 706(1), claiming it's

15  unreasonable; and we will -- you know, the Department will

16  justify its actions as best it can.

17      And, finally, and I think we already kind of went over

18  this, but there was a lot of socioeconomic reasons why the

19  plaintiffs' counsel believes that the numbers the Department

20  have come up with are inaccurate.  But in our view, it's

21  Congress's role to kind of balance a lot of those kind of

22  broader social implications, and Congress has not decided to

23  discharge loans.

24      And at the end of the day, regardless of whether it's

25  6 billion or 3 billion or 2 billion, it's an incredible amount

1    of money that we're talking about here, Your Honor.  It's a

2    very large number of money.  It's considerably more than, for

3    example, the -- you know, the terminal loan application issues

4    we were discussing earlier in this case, I think around this

5    time last year.  And so we urge the Court to consider the

6    financial implications to the public fisc when it balances the

7    equities and decides this motion.

8           **THE COURT:**  While I have you here, we have the

9    servicers here.  And let me ask the servicers to raise their

10   hand if they have anything they wish to say about these pending

11   motions made by the Government and the motion to strike.  I

12   want to give you that chance if you do.  I'm assuming you

13   don't, but I don't -- maybe I'm wrong.

14                          (No response.)

15          **THE COURT:**  Okay.  No hand goes up.

16      All right.  A different question about the servicers.

17   We're here also on a status conference to see how it's going,

18   and I usually do hear from the servicers on that.

19      Let me ask the plaintiff side, is there something that we

20   need to address with respect to the status report?

21          **MS. ELLIS:**  Not today, Your Honor.

22          **THE COURT:**  Is there anything I need to address with

23   the servicers?

24          **MS. ELLIS:**  I don't believe so.

25          **THE COURT:**  Are the servicers doing a good job?

1    **MS. ELLIS:**  They are.  I mean, we had an unusual

2  situation since the last status conference of a two-month

3  government shutdown.  Our understanding is they continued to

4  process relief to the extent that they were able during that

5  time, which we appreciate.

6    **THE COURT:**  Anything on your side that you wish to

7  bring up with the servicers?

8    **MR. HOLLAND:**  No, Your Honor.

9    **THE COURT:**  Now, do the servicers themselves have any

10  issue you want to bring up with respect to your ongoing work?

11  If so, raise your hand.

12                    (No response.)

13    **THE COURT:**  No hand goes up.

14    Okay.  I want to thank you for two things:  one, being

15  here today.

16    We've got, it looks like a number of class members here

17  today.  And you need to understand, these four lawyers have

18  been coming to all the meetings from all over the country to

19  help make this settlement work, and it's not been easy because

20  there have been hiccups left and right, and the servicers have

21  helped us work through all of those.  It's not easy.  It's been

22  complicated.

23    And I thank the servicers for their participation in this

24  process.  And also, I thank you for the work of actually

25  discharging these loans because there are hundreds of

1     thousands.  That's a lot of work.  And so, thank you.

2        Okay.  Anything more that anyone wants to add?

3        **MS. ELLIS:**  Just a couple of very brief responses,

4     Your Honor.

5        First of all, the agreement has never been modified

6     before.  Any orders from this Court on how to proceed with

7     settlement relief have been enforcement measures that all

8     stemmed from our motions to enforce the settlement.  They've

9     not been modifications.

10       Second, I'll just reiterate, in this situation, a billion

11     dollars is not a billion dollars.  A billion dollars is the

12     face value of loan balances.  It is not the amount of money

13     that the Government will ever expect to collect on those loans.

14     This is not a socioeconomic argument.  It's simple math.  It's

15     math that's been done by the General Accounting Office.  On

16     average, direct loans actually cost the Government $9 per every

17     $100 disbursed.

18        **THE COURT:**  How could that be?  Explain that.

19        **MS. ELLIS:**  Because when you take into account the

20     costs of servicing those loans versus the amount that is

21     ultimately paid back.

22       Next, on the tranches, in the supplemental Bergeron

23     declaration, I think this chart is indicative of how

24     the Government's proposed plan is questionable, let's say.

25     They say by June 28th, 2026, they can adjudicate 56,000

1   applications, even though, by their own account, they're not

2   going to hire -- they're not going to contract with any new

3   attorneys -- they're not going to bring on those contracted

4   attorneys until March.  Those contracted attorneys are going to

5   need to go through multiple weeks of onboarding, and yet

6   somehow between April and June they're going to adjudicate

7   54,000 applications?  How does this work?  It doesn't add up.

8       Finally, Your Honor, the last thing I want to say is that

9   this motion is based on the equities.  When the Government says

10  that paragraph V(D)(5) of the settlement is not triggered here,

11  they are saying, essentially, "We can follow the settlement but

12  we don't want to."  And --

13          THE COURT:  Well, how --

14          MS. ELLIS:  -- when you balance --

15          THE COURT:  What do you mean, they can't -- where did

16  they say they can follow it?  I think I heard him say something

17  like that.  But if they follow it, it means that there will be

18  a lot of money that is unnecessarily spent by the Treasury.

19          MS. ELLIS:  Well, first of all, Your Honor, as I said,

20  this money is mostly not getting spent.  This money is being

21  eliminated from a balance sheet where likely most of it never

22  would have been paid.

23      But, second, that is the question of the equities.  When

24  they say, "What's fair to the taxpayers?  What's fair to the

25  public?" the post-class is the taxpayers; the post-class is the

1   public.  They applied for borrower defense three years ago with

2   the reasonable expectation that the Government would keep its

3   word, and they haven't.  And they're being harmed on an ongoing

4   basis.

5           **THE COURT:**  Under 60(b)(5), Rule 60(b)(5), are there

6   factors that the Supreme Court has given that I need to take

7   into account, or is it just what I think is equitable?

8           **MS. ELLIS:**  Let me grab my brief, Your Honor, if you

9   don't mind.

10                      (Pause in proceedings.)

11      **MS. ELLIS:**  I believe there is some language on this.

12  I just want to be sure that I get it right.

13                      (Pause in proceedings.)

14      **MS. ELLIS:**  Oh, the language I was thinking of,

15  Your Honor, was actually on Rule 60(c)(1) timeliness, not on

16  Rule 60(b)(5) equities.

17      Rule 60(c)(1), the *Ashford v. Steuart* case, Ninth Circuit

18  1981, says [as read]:

19          "What constitutes 'reasonable time' depends upon

20          the facts of each case, taking into consideration the

21          interest in finality, the reason for delay, the

22          practical ability of the litigant to learn earlier of

23          the grounds relied upon, and prejudice to other

24          parties."

25      So that's the Rule 60(c) standard.  I don't believe there

1    are specific factors laid out for the Rule 60(b)(5) equities.

2          **THE COURT:**  You think there are not?  I'm sorry.  I

3    didn't hear that last sentence.

4          **MS. ELLIS:**  I'm sorry.  I don't believe there's a

5    specific --

6          **THE COURT:**  Okay.

7          **MS. ELLIS:**  -- list of factors like that laid out --

8          **THE COURT:**  What does the Government say --

9          **MS. ELLIS:**  -- for Rule 60(b)(5).

10          **THE COURT:**  -- on that point?

11          **MR. HOLLAND:**  Your Honor, we believe it is -- so the

12    Rule 60(b)(5) standard is whether applying the judgment

13    prospectively is no longer equitable.  And the Court should

14    look to traditional equitable factors, including the interest

15    and finality and the extent that was, in this context,

16    outweighed by achievability.

17        The Supreme Court has made clear that in several cases,

18    including *Rufo* and *Horne*, which we cite in our brief, it is an

19    extremely flexible and not a hardened standard, especially in

20    the context of public official defendants.

21        As the Supreme Court explained in *Horne* [as read]:

22         "Public officials sometimes consent to, or

23        refrain from vigorously opposing, decrees that go

24        well beyond what is required by federal law.

25        Settlement agreements with public officials may bind

1    them to the policy preferences of their predecessors

2    and may thereby improperly deprive future officials

3    of their designated legislative and executive

4    powers."

5    The Supreme Court has twice cited the *Philadelphia Welfare*

6  *Rights Organization* language, which I really encourage

7  the Court to look into it because I do think it applies here.

8  And in that case, the Supreme -- the Third Circuit had said

9  [as read]:

10    "Where an affirmative obligation is imposed

11    by" --

12    **THE COURT:**  Slowly, please.  Slowly.

13    **MR. HOLLAND:**  I apologize.

14    **THE COURT:**  I'm listening to you, but I'd like to hear

15  it right now.

16    **MR. HOLLAND:**  [As read]:

17    "Where an affirmative obligation is imposed by

18    court order on the assumption that it is

19    realistically achievable, the Court finds that the

20    defendants have made a good faith effort to achieve

21    the object by the contemplated means, and the object

22    nevertheless has not been fully achieved, a court of

23    equity has the power to modify the judgment in light

24    of that experience."

25    In this case, we simply did not have the resources to

1  process the 250,000 applications, despite going to Congress

2  twice.  Congress rejected the Department's request for funds.

3  But now Congress has finally provided those funds in July, and

4  for the first time, we have a plan.

5      My friend criticizes that plan.  But what she does not do

6  is discuss what the Department could have done to achieve this

7  during the time of the period -- of the settlement period,

8  despite the fact that the plaintiffs had agreed to this as

9  well.

10          **THE COURT:**  All right.  Anything more, Ms. Ellis?

11          **MS. ELLIS:**  *Rufo* also says that [as read]:

12          "Ordinarily, the party may not rely on events

13      that actually were anticipated at the time it entered

14      into a decree."

15      The Department knew the size of the post-class by the time

16  of final approval.  The Department knew it for three years and

17  never said a single word to suggest that it would do anything

18  but follow the letter of the settlement until it filed this

19  motion.

20          **THE COURT:**  Anything more?

21          **MR. HOLLAND:**  Nothing further, Your Honor.

22          **THE COURT:**  All right.  Okay.  You two have a seat.

23  I'm going to rule from the Bench.

24      I need to start by saying I'm going to take inactive

25  status on December -- near the end of the month, so this case

```
1   will have to be reassigned to another judge.

2        I am essentially retiring at the end of the month.  So I

3   won't be here to see the servicers again or the class members

4   or the lawyers, as much as I enjoy seeing you all.

5        So I'm going to -- I believe I have an adequate record and

6   adequate view of this immediate problem to go ahead and rule so

7   that you can proceed without having to wait for a written

8   order.

9        Okay.  Back in the '80s, Congress passed the law that set

10  up this system for reviewing loans, student loans.

11       And part of the problem that has developed over these

12  many years is that when it became obvious that Congress was

13  going to guarantee student loans, it became a bonanza for

14  fly-by-night colleges because ordinary students, thinking that

15  they were going to become a nurse and get a great job or

16  whatever the particular occupation was, it turned out it was

17  fly-by-night.  Not in all cases, of course, but in many, many

18  cases.  It was just too easy, and Congress wound up holding the

19  bag because it was guaranteed.

20       Well, in this -- but the student was still on the hook.

21  So Congress decided, well, we need to give the student a way to

22  get out from under that hook and to be discharged from that

23  obligation.

24       Now, there are times with me, as an ordinary citizen, I

25  wish Congress -- people in Congress could come and sit in on
```

1   some of these hearings and see what we're all up against here.

2       And I -- but you see the problem.  You see the problem.

3   There are -- I'm not saying every single school.  I'm not

4   saying that.  But in due course, there became some

5   investigations.

6       These investigations were mainly conducted by state

7   attorney generals, and they identified some schools that were

8   just bad offenders, and that's called the Exhibit C list that

9   we have referred to in the past.

10      It's a list of -- I've forgotten -- 26, 50, something --

11  what's the number, just the number?

12          **MS. ELLIS:**  151, Your Honor.

13          **THE COURT:**  151.  All right.

14      -- 151 schools that were highly suspect so that the person

15  who signed up and borrowed the money and thought they were

16  going to become a nurse, it was a fraud.  They weren't going to

17  become a nurse.  They even sometimes had phony statistics.

18      So that's the problem that Congress was trying to solve in

19  this statute back in the '80s that set up the student loan

20  forgiveness program.

21      Now, the Department of Education was supposed to implement

22  that.  Did they?  No.  Eventually, they got around to having a

23  title on the door somewhere, but then they did not adjudicate

24  the cases.  They didn't put the resources into it.  And this

25  was true for both administrations, both political parties.

1    So it got to be so bad that eventually Ms. Ellis and her

2   team, and I bet a number of you out there who feel you've been

3   victimized, brought this lawsuit.  And I've been the judge

4   from Day One in this case and slowly learned about this

5   problem.

6       Well, in 2022, the Department of Education and the

7   plaintiffs settled this case with a settlement agreement that

8   was filed on June 22, 2022.

9       Ms. Sweet, raise your hand.

10                    (A hand is raised.)

11      **THE COURT:**  You've been our class representative all

12  this time, and you've been to all but one hearing, I think.

13      **MS. SWEET:**  Mm-hmm.

14      **THE COURT:**  The Department of Education has changed

15  several times, the head of the department.  Right now, I guess

16  it's Cardona; is that correct?  No?

17      **UNIDENTIFIED SPEAKER:**  McMahon.

18      **THE COURT:**  Okay.  It's somebody else.

19                    (Laughter.)

20      **THE COURT:**  But it's changed.

21      So an agreement.  And it's a long agreement.  It's about

22  20 -- no.  It's more than that.  It's 27 pages, plus exhibits.

23  Exhibit C was part of that agreement.

24      Now, that's the background.

25      There were several groups and deadlines set by the

1     agreement. There was Decision Groups 1, 2, 3, 4, 5 with

2     different deadlines.

3         The largest of those groups was, looks like, thirty- --

4     about 32,000. There was also something called the automatic

5     relief group. That had 196,000 to 212.

6         All of those have been substantially completed or have

7     been completed. And I think that's a credit to both sides

8     here, that they worked through this, and the servicers too, to

9     get a lot of people -- I'm going to say 400,000, 350,000 --

10     relief.

11         And not quite all of them have been discharged, but I'm

12     going to say 90 percent discharged, and they're still working

13     on the others. So a lot of good has been done in this case.

14         Now, there's this one last group called the post-class

15     group, and you all heard how that came to be. Both sides

16     agreed at the time that there would be this stub period where

17     the class would include these people who had filed their claim

18     with the Department of Education after the settlement and

19     before approval. I think I got that right. It was just

20     several months. And that wound up being about 250,000 people.

21     And that's the group we're concerned with today.

22         The deadline for adjudicating those applications was set

23     to be the very last one, and that is January 28 of next year,

24     which is coming up now. It's about six weeks away.

25         All right. Everybody knew how many there were three years

1  ago.  That's not a surprise to anybody.  It was not known at

2  the time of the settlement agreement how many there would be.

3  It could have been a smaller number.  But it turned out by the

4  time it was approved in November of nineteen- -- sorry -- 2022,

5  that there was about 250,000, which we have known about for

6  three years.

7      Now, that then made it incumbent upon the Department of

8  Education, who gave their word, to figure out a way to get it

9  done.

10     Now, now we have learned, with a motion just filed in

11 November, for the first time that the Department thinks it

12 cannot get it done.  Can't even come close, although, as

13 Ms. Ellis read from the prior transcripts, earlier this year,

14 when we happened to ask "How's it coming with the post-class

15 group?" "Hunky-dory, Judge.  Hunky-dory."

16     You didn't use that phrase, but it made it --

17                      (Laughter.)

18         **THE COURT:**  -- it made it sound like, "Oh, we're going

19 to meet that deadline."

20     Well, now we have a motion that says they can't meet it

21 and they need 18 additional months to complete the 250,000.

22     Now, mind you, about 50,000 have already -- have been done

23 in that group.  So it's not like nothing has been done.  The

24 Department of Education has, in fact, adjudicated about

25 20 percent already of that group.

1    Interestingly, something I learned for this motion, the
2    quickest way to get through the largest number of people would
3    have been to take the Exhibit C schools because those were the
4    most suspect schools and also involved the most people.

5    So you could take the Exhibit C schools and maybe rank
6    them according to number of applicants.  So let's say there was
7    one school that had a thousand applicants or 10,000 applicants.
8    You might be able in short order to say, "Okay.  All 10,000,
9    you win; discharged."  Maybe there would be some circumstance,
10   timing problem in one or -- but those could be identified.

11   So that would, to my mind, have been the way to achieve
12   this so we would -- if they had gone about it that way, instead
13   of 50,000, we might have 200,000 have been adjudicated so far.
14   I don't know why they would have done it the other -- exactly
15   the opposite way.  They might have had a good reason.  But
16   there was a way to get very close to achieving the deadline.

17   Okay.  Another problem here concerns the staffing to work
18   on these problems.  There were, in November of 2024 -- so
19   that's about a year ago -- there were 73 attorneys at the
20   Department of Education working on these applications.

21   When the new administration came in, six attorneys took
22   deferred resignation; six probationary attorneys were
23   terminated; I think one was restored.

24   Nine HHS -- now, HHS stands for Health and Human Services.
25   There was an interagency agreement that had some attorneys come

1   over from a different agency to help with the back load.  Back

2   load, yes.  And so they came from HHS and helped out.  But

3   those -- that agreement, for reasons unknown to me, that

4   interagency agreement was not renewed, so there were another

5   nine that were lost.

6       Two attorneys resigned.  20 others attorneys were lost

7   without explanation in our record.  So that gets us down from

8   73 to 43.  One -- as I said, one probation employee returned to

9   work, and six attorneys were detailed from the agency's FSA

10  investigations to go over to the Borrower Defense Group, which

11  is the one that's doing our work.

12      So anyway, at the present time, there's 37, just about

13  half of what there were a year ago.

14      Now, the counsel for the Government has made the statement

15  that Congress is to blame because Congress didn't appropriate

16  enough money in the past to get the job done; and it's only

17  thanks to the One Beautiful Bill that -- One Big Beautiful

18  Bill, I think it's called -- that money was finally

19  appropriated.

20      Ms. Ellis points out, well, that wasn't specifically

21  earmarked for borrower defense.

22      I do not accept the idea that there was not enough money

23  before.  There was enough money from someplace a year ago to

24  have 73 attorneys.  There was.  There was enough money.  And

25  now we're down to 37.  So I don't accept the rationale that

1    only after passage of the Big Beautiful Bill was there enough

2    money to get this job done.

3         And if that was really true, the Department of Education

4    should have come to me a long time ago and raised this problem

5    instead of telling me it's all hunky-dory.  So I don't -- I

6    don't accept that rationale.  It's a good lawyer trick -- not

7    "trick," but it's a good lawyer argument.  It's not a trick,

8    but it's a good lawyer argument, but it's not persuasive.

9    I think this could have been done.

10        The Department of Education had it within its ability,

11   instead of firing people, to keep people and keep them on the

12   job to work on these people -- all of your cases.  And they had

13   a contractual obligation to do that and a court order to do

14   that.  So I don't accept that rationale.

15        I do, up to an extent, accept a large part of what -- the

16   declaration submitted by the Department of Education, Bergeron,

17   what he said.  But I don't think -- it's my own judgment that

18   this can be done a lot sooner than his 18-month delay, which is

19   just totally unacceptable.

20        Here's why it's unacceptable.  It varies from individual

21   to individual, but all of you are here today and I think some

22   people are on the telephone -- on the Zoom; right?

23             **THE COURTROOM DEPUTY:**  Yes, Your Honor.

24             **THE COURT:**  How many is on?

25             **THE COURTROOM DEPUTY:**  At full capacity at 1,000.

1    **THE COURT:** All right. A thousand people -- I didn't

2 know the number -- are listening to this. They have a great

3 interest in this because the student loan has been hanging over

4 their head for how many years? How many decades? Wrecking

5 their credit. Yes, forbearance exists, but credit wrecked.

6 It's just not right. Congress didn't want that. Congress

7 wanted these things adjudicated. So there is that huge equity

8 working in favor of the class.

9    Here's what I'm going to -- I'm either -- I will allow the

10 following relief to the Government.

11    I want to say, I do recognize that another equity going

12 the other way is there is a chance that some applications would

13 be automatically denied come January 28th and they shouldn't

14 have been. If they were adjudicated on the merits, the student

15 would not have won. There is that risk. And the taxpayers

16 will pick up that, I recognize that. But you've got to balance

17 that against what the class members have been suffering through

18 all these years.

19    All right. So I will either -- I would grant relief to

20 this extent: All Class C school applicants -- not Class C --

21 Exhibit C must be adjudicated by the original deadline of the

22 28th of January, six weeks from now. I think it can be done.

23 Don't tell me holidays.

24               (Laughter.)

25    **THE COURT:** You can take Christmas off, maybe

1  New Year's Day off.  But Government employees should work.

2  When I worked for the Government, I worked on Christmas Day and

3  New Year's Day.

4       So it's possible to get this job done because the people

5  on the Exhibit C, they're already highly suspect.  These are

6  the schools that the attorney generals in various states have

7  already singled out as fraudulent.  All right.  So that

8  deadline will stand.

9       But all the other non-Exhibit C applicants -- so I want to

10  make it very clear.  If the student went to one of those

11  schools, even in part, that's got to be adjudicated by

12  January 28th.

13       Then the rest of them, I'll give you until April 15th to

14  do the rest.  But there is an important caveat on the rest.  By

15  then, you'll have a new judge.  And I recommend to the new

16  judge that if before April 15th -- April 15th conveniently

17  being Tax Day --

18                      (Laughter.)

19       **THE COURT:**  -- if, before April 15th, the Government

20  can demonstrate "Look at all the good progress we have made in

21  great good faith.  Look at all these people we've hired and

22  trained.  And they're not turning out form denials, no.

23  They're doing a good job," then I recommend to the next judge

24  that the next judge give the Government more slack to finish

25  the job.

1    But if it turns out that Ms. Ellis's suspicions are right

2  and this is going to be a repeat of what happened in 2020, then

3  I recommend to the next judge no more, no, no more extensions.

4    So this scheme that I have here will put some incentive on

5  the Government to act in good faith, prioritize where it will

6  do the most good.

7    Now, if the Government doesn't like that, then I deny the

8  motion in its entirety.  But I will grant relief to that

9  extent.

10    I don't think it's time yet for depositions.  That'll be

11  up to the next judge.  But I do order that all evidence,

12  including emails that deal with this problem, be preserved.

13    One thing I've learned, you class members, over 54 or

14  55 years of being a lawyer and a judge, those emails is where

15  the evidence is.

16                          (Laughter.)

17    **THE COURT:**  So if there's any evidence that's worth

18  looking at, it'll be in the emails.  So I'm ordering to

19  the Government that they all be preserved that have to do with

20  the implementation of the new plan.

21    So I think you should go -- my advice to you is go ahead

22  and hire these people, train these people.  Do it as

23  expeditiously as you can and get them working on it.  But

24  meanwhile, you've already got 37 people who can work over the

25  holidays and, in my judgment, get the Exhibit C schools

1    completed.

2        So the motion to strike is denied.

3        The Rule 60(b)(5) motion is granted to the limited extent

4    that I have described about keeping the January 28th date for

5    the Exhibit C schools and the rest be due by April 15th, but

6    with the caveat that the subsequent judge is invited to give

7    more time if the Government shows progress, satisfactory

8    progress.  To that extent only.  Otherwise, denied.

9        Discovery denied for now.

10       Ordered to preserve evidence.

11       And the request to enforce is granted, subject to the

12   caveat that I've given about the limited relief that I would

13   give to the Government.

14       So I think we're at the end; correct?

15           **MS. ELLIS:**  (Nods head.)

16       **THE COURT:**  Thanks to all the class members for coming

17   today and all of those who are on the Zoom.

18           **THE COURTROOM DEPUTY:**  Yes.

19       **THE COURT:**  And, Counsel, I've enjoyed knowing all of

20   you.  And good luck to both sides in the future.

21       Okay?  Is that it?

22       I'm not going to do a written order.  So this is the

23   order.  So please don't go up and say to the Court of Appeals

24   you've been waiting for the written order.  No.  This is the

25   order.  So if you want to appeal, I think you should appeal

1   pronto.

2       All right?  Bye-bye, everybody.

3         **THE COURTROOM DEPUTY:**  Court is adjourned.

4           (Proceedings adjourned at 10:03 a.m.)

5               ---oOo---

6

7             **CERTIFICATE OF REPORTER**

8       I certify that the foregoing is a correct transcript

9   from the record of proceedings in the above-entitled matter.

10

11  DATE:  Monday, December 15, 2025

12

13

14

15               _Ana Dub_

                 _____

16     Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG

17           Official United States Reporter

18

19

20

21

22

23

24

25

1  BRETT A. SHUMATE
   Assistant Attorney General
2
3  MICHELLE BENNETT
   Assistant Branch Director
4
   LIAM C. HOLLAND
5  Trial Attorney
   United States Department of Justice
6  Civil Division, Federal Programs Branch
   1100 L St. NW
7  Washington, DC 20005
   Tel: (202) 616-8098
8  E-mail: liam.c.holland@usdoj.gov

9  *Attorneys for Defendants*

10
                 **UNITED STATES DISTRICT COURT FOR THE**
11                 **NORTHERN DISTRICT OF CALIFORNIA**
                         **OAKLAND DIVISION**
12

13
   THERESA SWEET et al.
14                                              Case No. 4:19-cv-03674-HSG
15                      Plaintiffs,
                                                **SUPPLEMENTAL**
16          v.                                  **DECLARATION OF**
                                                **RICHARD LUCAS**
17  LINDA MCMAHON, *in her official capacity*
18  *as Secretary of Education*, and
   UNITED STATES DEPARTMENT OF               (Class Action)
19  EDUCATION,                               (Administrative Procedure Act Case)

20                      Defendants.
21

22
          Pursuant to 28 U.S.C. § 1746, I, Richard Lucas, declare as follows:
23
          1.      On November 17, 2025, I was appointed to serve as the Acting Chief Operating
24
   Officer ("Acting COO") of the Department of Education's ("Department") Federal Student Aid
25
   ("FSA") office.   I certify that I am duly qualified and authorized by the Department to make the
26
   statements contained in this Supplemental Declaration.  I restate and incorporate by reference all
27

28

statements made in the Declaration I executed January 22, 2026 ("First Declaration" or "First Lucas Declaration") (ECF No. 514-1) in support of the Defendants' January 22, 2026 Motion For Relief Under Federal Rule of Civil Procedure 60(b) (ECF No. 514).

2.     In its December 11, 2025 order, the Court denied the Defendants' Motion for Temporary Relief from Judgment (ECF No. 492) ("First Rule 60(b) Motion") with respect to any post-class application whose debt is associated with a school on Exhibit C to the Settlement Agreement.  As a result of the ruling, the adjudication deadline for those post-class applicants remained as January 28, 2026 (the "January Tranche").  The Court partially granted the First Rule 60(b) Motion with respect to all post-class applications whose debt is not related to an Exhibit C school.  For that group of applications, the Court set an adjudication deadline of April 15, 2026, with the possibility of a further extension (the "April Tranche").

3.     In my First Declaration, I reported the progress of the Department's adjudications of the post-class applications in the January and April Tranches.  *See* First Lucas Declaration at ¶¶8, 9, respectively.  That data was through January 20, 2026 (inclusive).  As of February 9, 2026, approximately 167,700 applications from the January Tranche remained unadjudicated.

4.     As of February 9, 2026, 17,400 applications from the April Tranche are unadjudicated.

5.     The refund and discharge amounts associated with the unadjudicated applications total approximately $11.4 billion for the January Tranche and approximately $659 million for the April Tranche.

1    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

2  and correct.

3    Executed on February 12, 2026.

4

5                                                    _____
                                                     Richard Lucas
6                                                    Acting Chief Operating Officer
                                                     Federal Student Aid Office
7                                                    U.S. Department of Education

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRETT A. SHUMATE
Assistant Attorney General

MICHELLE BENNETT
Assistant Branch Director

LIAM C. HOLLAND
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 616-8098
E-mail: liam.c.holland@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| THERESA SWEET et al.<br><br>Plaintiffs,<br><br>v.<br><br>LINDA MCMAHON, *in her official capacity as Secretary of Education*, and UNITED STATES DEPARTMENT OF EDUCATION,<br><br>Defendants. | Case No. 4:19-cv-03674-HSG<br><br>**DECLARATION OF RICHARD LUCAS**<br><br>(Class Action)<br>(Administrative Procedure Act Case) |

Pursuant to 28 U.S.C. § 1746, I, Richard Lucas, declare as follows:

1.     On November 17, 2025, I was appointed to serve as the Acting Chief Operating

Officer ("Acting COO") of the Department of Education's ("Department") Federal Student Aid

("FSA") office.   In May 2024, I was delegated the duties and responsibilities of the Assistant

Secretary and Chief Financial Officer in the Office of Finance and Operations. I advised senior

officials on financial management, accounting, human capital, and grant management, while overseeing all financial activities and integrating key financial information with the Department's policies and objectives.

2.     Among my various responsibilities as FSA's Acting COO, I oversee the adjudication functions of FSA's borrower defense branch ("BDB") (formerly known as the Borrower Defense Group), which is the FSA branch responsible for adjudicating borrower defense applications, including, but not limited to, those applications that are subject to the Settlement Agreement.  I also have oversight of FSA's Office of Strategic Acquisitions and the Office of Finance.

3.     I certify that I am duly qualified and authorized by the Department to make the statements contained in this Declaration in support of the Defendants' motion for relief under Federal Rule of Civil Procedure 60(b) seeking relief from the January 28, 2026 deadline for adjudicating the remaining applications of post-class applicants under the parties June 22, 2022 settlement agreement, as adopted and approved by the Court on November 16, 2022, ECF Nos. 345 & 346 ("Settlement Agreement").  The statements contained herein are based either on my personal knowledge as an employee of the Department or on information reported to me by Department officials and staff.  Some of the statements contained herein are based on forecasts or predictions, which reflect my or other Department officials' or staff's good-faith assessments that are inherently subject to unknown future developments.

4.     The Settlement Agreement groups borrowers into three categories:  class members receiving automatic settlement relief because they took out Department loans to attend a school on Exhibit C to the Settlement Agreement (the "Exhibit C class members");  class members whose applications are reviewed and adjudicated under a streamlined process (the "Decision Group class members") (divided into five decision groups); and borrowers who were not

members of the certified class in this case but who applied for borrower defense relief during the period between the parties' execution of the Settlement Agreement and the Court's order finally approving that agreement (*i.e.*, from June 23, 2022 up to and including November 15, 2022) (the "post-class applicants"). Applications submitted by post-class applicants are adjudicated pursuant to the borrower defense regulation finalized on November 1, 2016, as provided in the Settlement Agreement (¶ IV.D.1. ). Pursuant to the Settlement Agreement, whether a borrower is a Decision Group class member or a post-class applicant depends solely on the date of the borrower's borrower defense application. Any borrower (other than Exhibit C class members) who had a borrower defense application pending on June 22, 2022, when the Settlement Agreement was executed, was categorized as a Decision Group class member. Any borrower who applied for borrower defense relief from June 23, 2022 (the day *after* the Settlement Agreement was executed) to and including November 15, 2022 (the day *before* the Court granted final approval to the Settlement Agreement) was categorized as a post-class applicant.

5.     In addition to establishing the different categories of borrowers, the Settlement Agreement establishes dates by which applications of borrowers in the five decision groups and of borrowers in the post-class group have to be adjudicated. If an adjudication deadline is missed, that borrower is entitled to full settlement relief. Pursuant to the Settlement Agreement, the adjudication deadline for the post-class applicant group is January 28, 2026.

6.     As the Defendants have previously explained in their Motion for Temporary Relief from Judgment (ECF No. 492) ("First Rule 60(b) Motion") , the supporting First and Second Declarations of James Bergeron (ECF Nos. 492-1 and 498-1, respectively) and the Declaration of Nicholas Kent (ECF No. 507),  the Department determined that it would not be able to meet the January 28, 2026 deadline for adjudicating all remaining post-class applications. However, due to additional funding to be made available to the Department through the One Big Beautiful Bill

Act ("OBBB Act"), Public Law 119-21, the Department determined that it would have the resources to undertake a mass hiring of new attorneys, on a contract basis, sufficient to complete adjudications of substantially all of the remaining post-class applications by an extended deadline of July 28, 2027.

7.      At the December 11, 2025 hearing ("December Hearing"), the Court denied the Defendants' First Rule 60(b) Motion with respect to any post-class application whose debt is associated with a school on Exhibit C to the Settlement Agreement.  The adjudication deadline remains January 28, 2026 for those applications (the "January Tranche").  The Court partially granted the First Rule 60(b) Motion with respect to all post-class applications whose debt is not related to an Exhibit C school.  For that group of applications, the Court set an adjudication deadline of April 15, 2026, with the possibility of a further extension (the "April Tranche").

8.      In the approximately five-week period that has elapsed since the December Hearing, the Department has worked diligently to review and adjudicate as many post-class applications as possible.  Although Department staff were able to make some improvement in the rate of adjudications, which was 1,500 applications per month in the months leading up to the December Hearing, the increased rate did not have a material impact on the progress of adjudications. Since the December Hearing through January 20, 2026 (inclusive), adjudication decisions have been issued regarding approximately 1,390 post-class applications from the January Tranche. Approximately 169,900 cases from the January Tranche remain unadjudicated.

9.      In addition, from the December Hearing through January 20, 2026 (inclusive), the Department has issued adjudication decisions with respect to approximately 640 post-class applications from the April Tranche.  Approximately 18,080 cases from the April Tranche have not yet been issued adjudication decisions.

10.     The Department has also made progress with respect to the mass-hiring plan.  As reported at the December Hearing, the Department had by then already posted requests for quotes ("RFQ") and had received responses from four contractors.  December Hearing Transcript at 8.  In the weeks since the hearing, the Blanket Purchase Agreement ("BPA") has been awarded which will allow the Department to issue task orders to the four firms that provided quotes in response to the RFQ.  Now that the BPA has been awarded, the Department is in the process of finalizing and issuing task orders, with hiring and onboarding to follow thereafter.  The Department still projects that it is on track to meet the timelines included in the Second Bergeron Declaration. ECF No. 498-1 at ¶7 (projecting that the first group of contract attorneys could be onboarded by March 1, 2026 and sufficiently trained to begin adjudicating cases by late March or early April, 2026).

11.     The Department needs further guidance from the Court as soon as possible to continue implementing the hiring plan.  If this motion is denied and no relief is secured on appeal, the Department anticipates revising its mass hiring plan with respect to the number of attorneys to be hired and onboarded in the first group.  The Department had previously anticipated hiring an initial group of 225 attorneys, with weekly hiring of additional attorneys thereafter. *Id*. at ¶¶6-7. If the Court's December 2025 Order granting only a brief extension of the January 28, 2026 deadline and for only the smaller April Tranche is not further modified, the Department instead anticipates hiring approximately 125 attorneys in the first group, with additional weekly hiring to follow.

1       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

2  and correct.

3    Executed on January 22, 2026.

| RICHARD LUCAS | Digitally signed by RICHARD LUCAS |
|---|---|
| | Date: 2026.01.22 15:41:19 -05'00' |

Richard Lucas
Acting Chief Operating Officer
Federal Student Aid Office
U.S. Department of Education

1  BRETT A. SHUMATE
   Assistant Attorney General
2
   MICHELLE BENNETT
3  Assistant Branch Director

4  R. CHARLIE MERRITT
   Senior Counsel
5  LIAM C. HOLLAND
   Trial Attorney
6  United States Department of Justice
   Civil Division, Federal Programs Branch
7  1100 L St. NW
   Washington, DC 20005
8  Tel: (202) 616-8098
   E-mail: robert.c.merritt@usdoj.gov
9
   *Attorneys for Defendants*
10

11              UNITED STATES DISTRICT COURT FOR THE
12                NORTHERN DISTRICT OF CALIFORNIA
                       SAN FRANCISCO DIVISION
13

14

15  THERESA SWEET et al.                    Case No. 19-cv-03674-WHA

16              Plaintiffs,                  **DECLARATION OF**
                                             **JAMES BERGERON**
17       v.

18  LINDA MCMAHON, *in her official capacity*  (Class Action)
    *as Secretary of Education*, and           (Administrative Procedure Act Case)
19  UNITED STATES DEPARTMENT OF
    EDUCATION,
20
                Defendants.
21

22

23       Pursuant to 28 U.S.C. § 1746, I, James Bergeron, declare as follows:

24       1.      In January, 2025, I was appointed as the Deputy Under Secretary and Acting

25  Under Secretary of the Department of Education ("Department").   I served as the Acting Under

26  Secretary until August 4, 2025 when the Under Secretary was sworn in.  In addition to continuing

27  to serve as the Deputy Under Secretary, I assumed the additional role of the Acting Chief

28

Operating Officer ("Acting COO") of the Department's Federal Student Aid ("FSA") office on April 2, 2025.

2.     I certify that I am duly qualified and authorized by the Department to make the statements contained in this Declaration in support of the Department's Rule 60(b) motion for relief from the January 28, 2026 deadline for adjudicating the remaining applications of post-class applicants under the parties June 22, 2022 settlement agreement, as adopted and approved by the Court on November 16, 2022, ECF Nos. 345 & 346 ("Settlement Agreement").  The statements contained herein are based either on my personal knowledge as an employee of the Department or on information reported to me by Department officials and staff.  Some of the statements contained herein are based on forecasts or predictions, which reflect my or other Department officials' or staff's good-faith assessments that are inherently subject to unknown future developments.

3.     Among my various responsibilities as FSA's Acting COO, I oversee the adjudication functions of FSA's borrower defense branch ("BDB") (formerly known as the Borrower Defense Group), which is the FSA branch responsible for adjudicating borrower defense applications, including, but not limited to, those applications that are subject to the Settlement Agreement.

### POST-CLASS APPLICANTS COMPARED TO
### OTHER SETTLEMENT CATEGORIES

4.     The Settlement Agreement groups borrowers into three categories:  class members receiving automatic settlement relief because they took out Department loans to attend a school on Exhibit C to the Settlement Agreement (the "Exhibit C class members");  class members whose applications are reviewed and adjudicated under a streamlined process (the "Decision Group class members") (divided into five decision groups, "DG1," "DG2," "DG3," "DG4" and "DG5"); and borrowers who were not members of the certified class in this case but who applied

for borrower defense relief during the period between the parties' execution of the Settlement Agreement and the Court's order finally approving that agreement (i.e., from June 23, 2022 up to and including November 15, 2022) (the "post-class applicants") whose applications, pursuant to the Settlement Agreement (¶ IV.D.1. ), are adjudicated pursuant to the borrower defense regulation finalized November 1, 2016 (the "2016 Regulation"). Pursuant to the Settlement Agreement, whether a borrower is a Decision Group class member or a post-class applicant depends solely on the date of the borrower's borrower defense application. Any borrower (other than Exhibit C class members) who had a borrower defense application pending on June 22, 2022, when the Settlement Agreement was executed, was categorized as a Decision Group class member. Any borrower who applied for borrower defense relief from June 23, 2022 (the day *after* the Settlement Agreement was executed) to and including November 15, 2022 (the day *before* the Court granted final approval to the Settlement Agreement) was categorized as a post-class applicant.

5.    When the parties executed the Settlement Agreement in June, 2022, the class consisted of approximately 291,000 individuals who had submitted more than 300,000 applications. There were approximately 196,000 Exhibit C class members and they submitted approximately 212,000 borrower defense applications. Because the Exhibit C class members received automatic settlement relief, those 212,000 borrower defense applications did not have to be adjudicated, *i.e.*, reviewed to determine whether they should be approved or denied. Only the borrower defense applications of the Decision Group class members and the post-class applicants require adjudication. Table 1[1] below shows the number of Decision Group applications and

---

[1] The numbers of Decision Group applications and borrowers in Table 1 reflect the composition of each Decision Group as of June 22, 2022, the date the settlement class was closed. The numbers do not include the historic data of all applications received during those periods but adjudicated prior to June 22, 2022. Even so, the approximately 250,000 applications received during the less-than 5-month post-class period represent approximately one third of all applications received from 2015 to November 2022.

borrowers compared to the post-class borrowers, and Table 2 shows the number of applications

received in the periods before, during and after the post-class period:

**TABLE 1:  Post-Class compared to Decision Groups (numbers are rounded)**

| Category | Borrowers | Apps | Date Range of Applications |
|---|---|---|---|
| DG1 | 33,000 | 34,000 | 01/01/2015-12/31/2017 (3 years) |
| DG2 | 11,000 | 12,000 | 01/01/2018-12/31/2018 (1 year) |
| DG3 | 14,000 | 14,000 | 01/01/2019-12/31/2019 (1 year) |
| DG4 | 9,000 | 10,000 | 01/01/2020-12/31/2020 (1 year) |
| DG5 | 33,000 | 36,000 | 01/01/2021-06/22/2022 (1 year, 5 months, 22 days) |
| **Post-Class** | **207,000** | **251,000** | **06/23/2022-11/15/2022 (4 months, 24 days)** |

**TABLE 2:  Post-Class Application Rate Compared to Other Comparable Periods (numbers are rounded)**

| Applications | Dates Received |
|---|---|
| 21,000 | 01/01/2020-05/31/2020 (5 months) |
| 15,000 | 06/01/2020-10/31/2020 (5 months) |
| 14,000 | 11/01/2020-03/31/2021 (5 months) |
| 35,000 | 04/01/2021-08/31/2021 (5 months) |
| 39,000 | 09/01/2021-01/31/2022 (5 months) |
| 48,000 | 02/01/2022-06/22/2022 (5 months) |
| **251,400 (Post-Class)** | **06/23/2022-11/15/2022 (4 months, 24 days)** |
| 44,000 | 11/16/2022-04/30/2023 (5 months) |
| 45,000 | 05/01/2023-09/30/2023 (5 months) |
| 40,000 | 10/01/2023-02/29/2024 (5 months) |
| 37,000 | 03/01/2024-07/31/2024 (5 months) |
| 24,000 | 08/01/2024-12/31/2024 (5 months) |
| 37,000 | 01/01/2025-05/31/2025 (5 months) |

6.      As Table No. 1 shows, the number of post-class applications that were received in the less than five-month post-class period is more than twice the number of all Decision Group applications, which cover a more than seven-year period, ***combined***.   Comparing the number of applications received in several five-month periods before and after the Settlement Agreement was executed to the number of applications received during the post-class period demonstrates the unprecedented surge of post-class applications, as shown in Table 2. In the past, the Department has seen application volume temporarily triple from the previous month following announcements such as  a large institution of higher education closing, but these spikes were often temporary and followed low-volume application months. The Department had never had a 523 percent increase over a comparable 5-month period, and so the post-class application period was the largest increase in applications the Department had ever seen by far.   Had the rate of applications received in an average 5-month period held, the Department would have expected to receive approximately 50,000 applications during the post-class period, not 250,000 applications. In fact, the application volume submitted during the post-class application period represented one-third of all borrower defense to repayment applications ever submitted to the Department through November 2022. When the parties executed the Settlement Agreement, the Department did not know the number of post-class applicants whose applications would have to be adjudicated because, by definition, those are the borrowers who applied for borrower defense relief *after* the Settlement Agreement was executed.  Settlement Agreement at ¶ IV.D.1.  Based on historical experience prior to June 22, 2022, the Department could not have anticipated the high number of applications received during the June-to-November, 2022 post-class period. Because the size of the post-class was able to continue to grow, the Department did not know the size of the post-class until the Settlement Agreement received final court approval on November 16, 2022, closing the post-class period.

**FSA RESOURCES**

7. As of November 16, 2022, when the Settlement Agreement received final court approval, FSA employed 33 BDB attorneys. For consecutive years thereafter, the President's Budget Request to Congress requested increases in funding.  In those budget submissions, the Department highlighted the need for additional attorneys to effectively manage the borrower defense program.  The Fiscal Year ("FY") 2024 request, submitted March 9, 2023, highlighted the urgent need for additional resources to meet the terms of the Settlement Agreement.  The Department requested $21.0 million for additional staffing needed to provide decisions on approximately 250,000 claims received at the budget request date and meet the relevant deadlines https://www.ed.gov/sites/ed/files/about/overview/budget/budget24/justifications/q-saa.pdf.    In the President's Budget for FY25, the Department requested $56 million to hire hundreds of attorneys to adjudicate these applications.  This larger request reflected the fact that BDB did not receive additional funding in FY24. www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/r-saa.pdf.  For each of these fiscal years, Congress did not approve increases, maintaining level funding for Federal Student Aid from FY 2022 through FY 2025.

8. Absent increased funding from Congress, FSA was unable to increase the number of attorneys adjudicating borrower defense applications to the extent needed to meet the deadlines in the Settlement Agreement.  FSA also was not able to significantly reallocate resources from other FSA programs toward borrower defense due to competing statutory requirements placed on FSA by Congress. These included the FUTURE Act (the Fostering Undergraduate Talent by Unlocking Resources for Education Act) and the FAFSA Simplification Act, which set requirements and deadlines for significant technology changes for the delivery of federal student aid.

9.  Even with these challenges, FSA increased the number of BDB attorneys from 34 in January 2023 to a high of 73 attorneys in November 2024.  This increase included a temporary interagency agreement the Department entered into with the Department of Health and Human Services ("HHS"), which the Department was not able to continue long-term once the period of performance ended because HHS attorneys were needed for emerging requirements at their agency. As a result of attrition, the number of attorneys is currently 42.   Over time, the number of BDB attorneys has both increased and decreased, as shown in Table 3:

**TABLE 3:  FSA Staffing Level Changes**

| Time Period | Number of Attorneys | Increase/Decrease Notes |
|---|---|---|
| June 2022 | 33 | |
| November 2022 | 33 | |
| January 2023 | 34 | |
| March 2023 | 35 | |
| May 2023 | 44 | |
| August 2023 | 44 | |
| September 2023 | 41 | |
| October 2023 | 41 | |
| November 2023 | 44 | |
| December 2023 | 44 | |
| January 2024 | 45 | |
| February 2024 | 46 | |
| June 2024 | 58 | BDB increased its hiring authority and ED entered into inter-agency agreement with HHS to detail attorneys to FSA |
| November 2024 | 73 | BDB increased its hiring authority and ED entered into inter-agency agreement with HHS to detail attorneys to FSA |
| February 2025 | 50 | • BDB lost 9 HHS attorneys when inter-agency agreement was not renewed<br>• 6 attorneys took the deferred resignation<br>• 6 probationary attorneys were terminated (eventually following a lawsuit, they were offered the opportunity to return, but only 1 returned).<br>• 2 attorneys resigned |
| March 2025 | 46 | |
| April 2025 | 52 | 6 attorneys from FSA's investigations group were detailed to BDB |
| May 2025 | 51 | |
| June 2025 | 47 | |
| July 2025 | 47 | |
| August 2025 | 42 | |

| September 2025 | 42 | |

Although the number of attorneys noticeably decreased in and after February 2025, no BDB

attorneys were terminated due to the agency-wide reduction-in-force ("RIF") that was initiated in

March 2025.   As shown in Table 3, only 6 attorneys were involuntarily terminated; this was due

to their probationary status, and all were subsequently offered reemployment. The decrease in

attorneys since February 2025 is due exclusively to voluntary departures.

## ADJUDICATION COMPARISON

10.     There is a difference in how borrower defense applications are adjudicated

depending on whether a borrower is a Decision Group class member or a post-class applicant.

The Settlement Agreement provides that the borrower defense applications of Decision Group

class members are adjudicated according to a streamlined review process.  Settlement Agreement

at ¶ IV.C.1.  By contrast, the applications of post-class applicants are decided under the 2016

Regulation.  *Id.* at ¶ IV.D.1.

11.     Adjudicating the post-class applications under the 2016 Regulation takes

significantly more time than adjudicating Decision Group applications under the streamlined

process for several reasons.  First, the streamlined process (described at Paragraph IV.C. of the

Settlement Agreement), unlike adjudication under the 2016 Regulation, does not require any fact-

finding.  Second, the streamlined process does not require the same detailed individual

adjudication.  Under the 2016 Regulation, the borrower must demonstrate by a preponderance of

the evidence each element under the legal standard.  By contrast, under the streamlined process, a

borrower need only state an allegation that, if true, establishes a ground for borrower defense.  No

weighing of the evidence is required.  Lastly, for approved Decision Group applications, the

streamlined adjudication process does not require a relief determination because the Settlement

Agreement dictates that Full Settlement Relief is to be awarded to all Decision Group class

members whose borrower defense applications are approved.  Settlement Agreement at ¶

IV.C.2.i. For approved post-class applications, however, a relief determination under the 2016

Regulation must be made.

12.     As noted above, the 2016 Regulation requires fact-finding.  It provides, in

pertinent part, that a Department official is designated to "determine whether the application

states a basis for a borrower defense, and resolves the claim through a fact-finding process

conducted by the Department official." 34 C.F.R. § 685.222(e)(3).  Fact-Finding is a school-

based process that is conducted on a regular cadence, meaning that once BDB completes fact-

finding on a school, it will not conduct fact-finding with respect to that school again for another

two years unless a significant number of applications are submitted warranting further fact-

finding before the two-year period ends. At a threshold level, fact-finding consists of review by a

BDB attorney of the following evidence:  (a) any borrower evidence and/or argument; (b) any

responses the school submits to the Department after being notified of pending applications; (c)

any Department Records; and (d) any additional information or arguments that may be obtained

by the Department official (such as accreditor records, documentation from the school, court

records, or information obtained from law enforcement partners).  34 C.F.R. § 685.222(e)(3)(i).

The Department defined "Department Records" and "any additional information" in new policies

and procedures BDB had to develop for adjudication under the 2016 Regulation because previous

policies and procedures had been rescinded.  *See infra* at ¶ 21. In 2022, after the *Sweet* settlement

was finalized, BDB created policies and procedures for streamlined adjudication and began

adjudicating Decision Group applications. In January of 2023 BDB began drafting policies and

procedures for post-class adjudication and fact-finding which were finalized in April of 2023.

13.     At minimum, all schools receive the above-described threshold level of fact-

finding (*i.e.*, review of borrower evidence and/or argument; school responses, Department

Records and any additional information or arguments that the Department obtains). 34 C.F.R. §
685.222(e)(3)(i).

14.     Further fact-finding will be conducted if, after reviewing any Department Records
or additional information, the BDB attorney discovers evidence relevant to the adjudication of
borrower defense applications.  Any further fact-finding includes summarizing the evidence
gathered and, if necessary, gathering additional evidence from the following sources: the school
at issue, law enforcement partners, and/or accreditors or other licensing bodies.  The process of
gathering and reviewing additional evidence can take significant time as it requires drafting
requests for information and negotiating with third parties on production schedules.  Depending
on the amount of evidence gathered and the nature of the evidence, BDB may draft common
findings to make adjudication more efficient.

15.     Once fact-finding is completed, the borrower defense applications associated with
the school at issue can be adjudicated independently on their merits.  During adjudication, BDB
attorneys consider the individual claims made by the applicant as well as the evidence gathered
during fact-finding to determine whether the borrower establishes a borrower defense by a
preponderance of the evidence.  The 2016 Regulation allows for three different grounds for relief:
(a) substantial misrepresentation; (b) breach of contract; and (c) nondefault favorable contested
judgment.  As part of the adjudication process, the BDB attorney determines if each element of
the alleged grounds for relief is established by a preponderance of the evidence.

16.     If each element under the legal standard in the 2016 Regulation is established, the
post-class application is approved.  If one or more elements are not established, the post-class
application is denied.

17.     If a post-class application is approved, the next step is to determine the relief.  Any
approved post-class application that is based on a non-default favorable contested judgment is

entitled to relief based on the unsatisfied amount of the judgment or, if no specific relief is

awarded, on an amount determined by the Department based on applicable law and the holding of

the case. 34 C.F.R. § 685.222(*i*)(2)(ii). If the approved application is based on a breach of

contract, the relief is determined according to the common law of contracts. 34 C.F.R. §

685.222(*i*)(2)(iii). Where the approved application is based on a substantial misrepresentation,

the Department's current policy is to presume that the borrower is entitled to full relief (full

discharge and refund of all payments made to the Department). However, this presumption can

be rebutted by the facts and circumstances of the specific case. Specifically, where the borrower

defense is based on substantial misrepresentation, BDB considers facts relating to the cost of the

education, the value of the education a reasonable borrower would have received after the

misconduct as compared to what they should have expected to receive; and what value the actual

borrower received. 34 C.F.R. § 6685.222(*i*)(2)(i). Depending on the facts and circumstances, the

relief may be reduced. 34 C.F.R. § 6685.222(*i*)(1). BDB attorneys then recommend relief to the

Department official, who ultimately determines the relief to be given to the borrower. The

borrower receives a brief written notification that the application has been approved and that the

borrower is entitled to relief.

18. If a case is denied, the BDB attorney drafts a detailed denial letter describing each

allegation made, the legal standard applied to the allegation, and why the allegation did not meet

the legal standard.

### BDB'S PRIORITIES DURING IMPLEMENTATION
### OF THE SETTLEMENT AGREEMENT

19. Although the Settlement Agreement did not receive final court approval until

November 16, 2022 and did not become "effective" until January 28, 2023 (*see* ECF 382 at 6-10),

the Department began to take steps to implement the Settlement Agreement soon after the

Settlement Agreement was executed and was preliminarily approved by the Court.

20.     As the Department began to implement the Settlement Agreement, it first prioritized putting processes into place to meet the settlement deadlines for class members (*i.e.*, Exhibit C class members and borrowers in Decision Groups 1-5).   Although the Exhibit C class members' borrower defense applications did not have to be adjudicated (because they were automatically approved), the Department was facing a one-year deadline to effectuate Full Settlement Relief for those borrowers.   Although the applications of the Decision Group class members were adjudicated pursuant to a streamlined process that was less onerous than the process required by the 2016 regulation, the Department had to meet decision and relief effectuation deadlines for the Decision Group class members at six-month intervals starting July 28, 2023.   In addition, once the first Decision Group adjudication deadline (July 28, 2023) passed, BDB has had to re-adjudicate the applications of any Decision Group borrower who took advantage of the opportunity to revise and resubmit an application that did not receive an initial approval. *See* Settlement Agreement at ¶ IV.C.2.ii.  All final decisions on resubmitted applications are due no later than six months after the Department's receipt of the resubmission. *Id.* at IV.C.4.

### TABLE 4 – DECISION GROUP ADJUDICATION AND RELIEF DEADLINES

| Deadline | Action |
|---|---|
| July 28, 2023 | DG1 Decisions Due |
| January 28, 2024 | DG2 Decisions Due |
| July 28, 2024 | DG1 relief due for initial approvals |
| | DG1 Revise & Resubmit decisions due |
| | DG3 Decisions Due |
| January 28, 2025 | DG2 relief due for initial approvals |
| | DG2 Revise & Resubmit decisions due |
| | DG4 Decisions Due |
| July 28, 2025 | DG1 relief due for Revise & Resubmit approvals |
| | DG3 relief due for initial approvals |
| | DG3 Revise & Resubmit decisions due |
| | DG5 Decisions Due |

| January 28, 2026 | DG2 relief due for Revise & Resubmit approvals |
| | DG4 relief due for initial approvals |
| | DG4 Revise & Resubmit decisions due |
| July 28, 2026 | DG3 relief due for Revise & Resubmit approvals |
| | DG5 relief due for initial approvals |
| | DG5 Revise & Resubmit decisions due |
| January 28, 2027 | DG4 relief due for Revise & Resubmit approvals |
| July 28, 2027 | DG5 relief due for Revise & Resubmit approvals |

21.     At the time the Department was prioritizing putting processes into place to meet the relief and decision deadlines for the Exhibit C and Decision Group class members, it had to develop new policies and procedures for adjudicating the post-class applications under the 2016 Regulation because the previous policies and procedures had been rescinded.  Thus, during the first two years of implementing the Settlement Agreement, BDB's priority for the post-class borrowers was to stand up its new policies and procedures, primarily by focusing on schools with a low number of applications.  BDB started with schools with a low number of applications because these schools are less likely to have evidence of school misconduct beyond the allegations in a particular application; to the extent such evidence exists and additional fact-finding is required, that can delay adjudication of applications from schools with higher numbers of applications. Additionally, during this time, BDB prioritized responding to group borrower defense requests made by third parties that in some applications had been pending for years. When a group request is granted, all borrowers who enrolled in the school during the relevant time period receive a discharge of their eligible student loan balance. This positively impacted post-class applicants because there was a significant number of post-class applications associated with those group requests, which were approved through the group process.    BDB began training staff on post-class adjudications early in the summer of 2023 and issued its first decision letters to post-class applicants in August of 2023.   BDB ramped up to a steady pace of approximately 1,500 post-class adjudications per month by January 2025.

## BDB'S IMPLEMENTATION OF THE SETTLEMENT AGREEMENT

22.     BDB has worked on all aspects of implementing the Settlement Agreement, other than effectuating the relief by discharging loans, which is carried out by the servicers.  This work can be divided into five main categories: (a) determining class and post-class borrowers and tagging applications; (b) adjudicating class member applications; (c) adjudicating post-class applications;  (d) conducting administrative work needed to comply with the Settlement Agreement; and (e) working with the Ombudsman office to resolve class member questions.

23.     First, BDB worked on identifying which borrowers were Exhibit C class members and which borrowers were Decision Group class members.  Once the Decision Group class members were identified, BDB identified the Decision Group (DG1, DG2, DG3, DG4 or DG5) in which they belonged.  This process involved running multiple data queries on pending borrower defense applications and cross-referencing that data with data pulled from the National Student Loan Data System ("NSLDS").  Additionally, this process included determining which Office of Postsecondary Education Identifier numbers ("OPEID") fell within the list of schools on Exhibit C to the Settlement Agreement.  Once determinations were made, BDB had to work with the Department's technology contractors to correctly tag all of the applications in the Department's system of record.  Much of this work took place in the second half of 2022 between the time the Settlement Agreement was executed and the time the Settlement Agreement received final court approval.

24.     Second, BDB had to develop all new policies and procedures required to adjudicate class member applications that fell under Decision Groups 1 through 5.  The Settlement Agreement created a new "streamlined" adjudication process for class members that did not previously exist. BDB drafted policies and procedures and obtained the necessary approval from Department

leadership. Much of this work happened relatively quickly with policies and procedures approved by the end of July 2022. However, once these policies and procedures were approved, BDB needed to train staff and adjudicate the DG1 applications to ensure the Department met the first decision deadline of July 28, 2023. BDB completed its training of staff on class member adjudication in January 2023, meaning from that date BDB staff could focus their full energy on class member adjudication for the five Decision Groups.

25.     Third, as discussed *supra*, BDB developed new policies and procedures required to adjudicate post-class applications. These applications are adjudicated under the 2016 Regulation, a regulation under which BDB had previously adjudicated applications. However, the manner in which the Department adjudicated applications under the 2016 regulation in late December 2019 and early 2020 led to the collapse of a 2020 settlement agreement that had received preliminary (but not final) approval from the court. Effective October 21, 2020, the Department stopped issuing further decisions denying the applications of *Sweet* class members and confirmed that it would not issue any further decisions denying the borrower defense applications of class members until entry of a final judgment on the merits by the Court. *See* ECF 150-1 (Declaration of then FSA Chief Operating Officer Mark Brown) at ¶ 5. In March of 2021, the Department announced the rescission of the partial relief methodology that had been in use since December 2019 and amended in August 2020. A copy of the March 2021 press release is attached as Exhibit 1. Following final court approval in November 2022 of the extant Settlement Agreement, the Department developed new policies and procedures for adjudicating applications under the 2016 Regulation to replace the policies and procedures previously rescinded. The newly developed policies and procedures are significantly more complex than the streamlined review process for adjudication of the Decision Group borrowers because the 2016 Regulation does not include a presumption that borrower allegations are true (as there is for the streamlined review

process for class members).  Additionally, the 2016 Regulation requires school notification and fact-finding that must be conducted prior to adjudication. BDB finalized its fact-finding policies and procedures in March of 2023 and its adjudication and letter writing policies and procedures in May of 2023. BDB then trained staff on these policies and procedures. All then-existing staff were trained by December 2023; however, BDB continued to train staff over the next year as it onboarded new staff.

26.     Fourth, there has been significant administrative work required to implement the Settlement Agreement, which took several forms.  BDB had to create a fact-finding database to track and document the results of fact-finding.  BDB also had to implement technology updates in its claim review system to properly adjudicate class member and post-class applications. While these updates were completed on a rolling basis, many of them were not completed until the Fall of 2023 and required significant time working with BDB's technology contractor to implement. BDB also had to draft the notice letters sent to borrowers. These included letters informing class members that they were part of the class, letters informing class members that their previous denial was being rescinded, various iterations of approval, revise and resubmit, and denial letters for the class members, and a separate set of letters for approvals and denials of the post-class applications. BDB also had to coordinate with the Department regarding how to pull data for the Settlement Agreement's required quarterly reporting.  Lastly, and most time consuming, BDB spent significant time hiring, onboarding, and training new staff.  In June of 2022, BDB had approximately 35 staff, but at its peak it had approximately 75 staff.  It took significant resources to develop job postings, review thousands of resumes, interview hundreds of candidates, onboard new hires, and fully train new hires – these steps applied to all new hires, including those detailed from HHS.

27.     Lastly, BDB spends resources working with the Office of the Ombudsman to resolve questions that come into the Department as part of the Ombudsman complaint process set up to address complaints from class members and post-class applicants.  While this often does not take significant BDB resources because many of the questions relate to processing concerns outside of BDB's expertise, BDB has had to regularly meet with members of the Ombudsman team to resolve questions relating to adjudication and class membership.  Further, BDB has had to spend resources to ensure that Ombudsman work is being correctly entered into borrower applications so that the Department can provide accurate data reporting to the Court and Plaintiffs.

28.     In November of 2024, the Department approved a policy addressing the prioritization of BDB resources through January 2026.  That policy reflected the Department's determination that BDB should prioritize adjudication of all class member applications and all post-class applications related to schools with no or minimal evidence found during fact-finding.  Additionally, the policy discussed how to prioritize schools for which there was significant evidence identified and further evidence gathering was needed.  Factors the policy considered were the volume of post-class applications from the school, whether additional fact-finding was anticipated and how long it might take, whether group relief was under consideration, the number of borrowers impacted by the evidence, and the magnitude of the alleged school misconduct.  However, due to the significant decrease in BDB's staffing from the conclusion of the interagency agreement with HHS and attrition (*see supra* at Table 3), BDB, under policy direction from the current administration, has focused on adjudicating applications where fact-finding for the school has already been completed and on schools where there are high-dollar amounts involved.

29.     Currently, the BDB team has 42 staff consisting of 37 staff attorneys, four supervisory attorneys, and one Acting Branch Chief.  Since approximately January 2025, this staff has adjudicated and issued decisions on approximately 1,500 applications per month.  This rate of post-class adjudication is similar to what BDB was completing when it had nearly double the staff.  BDB has been able to increase its pace by reprioritizing its work and not using staff resources to complete the fact-finding on schools where the threshold level of fact-finding indicated that there may be significant supporting evidence.  BDB will need to reallocate resources to complete fact-finding on schools that may have significant evidence so those applications can be adjudicated. This additional fact-finding takes significant time and resources and may result in a slower adjudication rate as more complex schools move through the fact-finding workstream.

### STATUS OF POST-CLASS ADJUDICATIONS

30.     The Settlement Agreement establishes deadlines for issuing decisions to the Decision Group class members and to the post-class applicants.  The decision deadline for DG1 was July 28, 2023 and the decision deadlines for DG2 through DG5 followed at six-month intervals until the July 28, 2025 decision deadline for DG5.  The Department has substantially met the adjudication deadlines that have already passed for all five Decision Groups and anticipates meeting the January 28, 2026 deadline for adjudicating any DG5 resubmissions under the revise and resubmit process.  Separately, January 28, 2026 is also the adjudication deadline for adjudicating all post-class applications.

31.     The Department reported at the August 29, 2025 hearing that approximately 50,800 post-class applications had been adjudicated.  As of October 31, 2025, nearly 54,000 post-class applications have been adjudicated.  At the adjudication rate of approximately 1,500 adjudications per month, the Department estimates that it will adjudicate another 4,500

applications by the deadline and has determined that it will not meet the January 28, 2026

deadline for adjudicating the remaining post-class applications. The Department currently

projects that by the January 28, 2026 deadline, approximately 193,000 applications will remain

unadjudicated.

32.     Under the terms of the Settlement Agreement, the Department must provide full

settlement relief to any post-class applicant that has not received a decision by the January 28,

2026 deadline. Settlement Agreement at ¶ IV.D.2. If an extension is not granted and the

Department is unable to adjudicate those remaining 193,000 applications by the January deadline,

the Department has determined that the associated liability is approximately $11.8 billion in

discharges and $640 million in refunds. This estimated liability is significantly greater due to the

Exhibit C terminal loan methodology that was not required by the Settlement Agreement for post-

class applicants, but the Court ordered must be used to calculate relief for any borrower, including

post-class applicants, entitled to relief. *See* ECF 451 (12/12/2024 Minute Order). If the

liabilities were to be limited to only the loans relating to the school that is the subject of the

borrower defense application, the total estimated liability would be $7.3 billion in discharges and

$446 million in refunds. Having to use the Exhibit C terminal loan methodology thus increases

the liability by approximately $4.5 billion in discharges and approximately $194 million in

refunds.

33.     To date, BDB has denied approximately 50% of the post-class applications that it

has adjudicated. Although it is difficult (if not impossible) to predict in advance whether a post-

class application will be approved or denied, if this ratio were to continue, half of the $11.8

billion - or $6 billion - of the outstanding student loan balances getting discharged as the result of

a missed deadline would amount to a windfall to borrowers whose applications might otherwise

have been denied had they been adjudicated on the merits. The Department has significant

interests in protecting taxpayer resources, and windfall discharges result in more significant losses for the government.

**INCREASED STAFFING OPPORTUNITIES DUE TO RECONCILIATION ACT**

34.     On July 4, 2025, the One Big Beautiful Bill Act ("OBBB Act"), Public Law 119-21, was enacted.  Among its other provisions, the OBBB Act provides additional funding to FSA to support administrative costs associated with the servicing and oversight of federal student loans.  The OBBB Act appropriated an additional $1 billion for FSA.  In addition to its annual appropriation, these additional resources will enable FSA to provide stable and dedicated funding for its administrative functions to include meeting the terms of the Settlement Agreement should the Court agree to extend the January 28, 2026 decision deadline.

35.     Even though the additional funds from the OBBB Act are now available for FSA to use for additional hiring, the onboarding and training process has made it impractical to increase BDB's staffing at such a late date with the January 28, 2026 post-class decision deadline still intact.  Typically, it takes FSA at least three months to recruit and onboard new staff attorneys, which in and of itself would take the Department up to the deadline.  Even if this process could be sped up or if existing Department staff could be detailed to BDB, there would be minimal if any impact on the number of post-class applications adjudicated prior to the deadline, due to the time it takes new staff to be trained and become proficient in adjudication.  Training on the borrower defense adjudication process takes approximately three weeks of hands-on training which is followed by a quality control ("QC") period where 100 percent of the work of newly hired attorneys is reviewed by an experienced attorney to ensure a full understanding of BDB's policies and procedures.  After the initial three-week training period, it typically takes another couple of months for that attorney to be fully proficient at adjudication.  During this training and ramp up period, BDB expends significant staff resources conducting the training, conducting the

quality control, and assisting staff in getting up to speed, which takes that staff away from its own

adjudication work.  While training new staff would increase BDB production in the long term, in

the short term, it can reduce production because experienced staff is training the new staff. FSA

has initiated the process to hire and contract for a substantial increase in attorneys.  Given the

short period of time left until the January 28, 2026 deadline and the time needed to complete

onboarding and training as explained above, these additional attorneys will not be on-board with

sufficient time to allow BDB to increase its rate of post-class adjudications by the final

adjudication deadline.

36.    FSA intends to use a significant amount of funds made available to it through the

OBBB Act to conduct a major hiring campaign of contract and permanent BDB attorneys to

adjudicate the post-class applications.    These contract attorneys will be supervised by, and final

decision-making authority will continue to reside with, government attorneys in BDB.  Because

of the additional time needed for the hiring of contract attorneys due to the time it takes to award

such a contract, in September 2025, the Department conducted market research of contract

attorney firms that could assist in this endeavor. The market research concluded that the

Department would have to issue a "multiple award" contract to several firms with demonstrated

capability to quickly provide legal services at scale.   An award to several firms would enable the

Department to onboard approximately 450 attorneys in as little as three months.  Based on the

market research, the Department has identified a number of firms capable of providing these

kinds of legal services.  The Department is proceeding to finalize the market research needed to

provide an acquisition approach and full timeline to award such contracts for attorneys.

37.    Because of the time that these additional steps will take - *e.g.,* the additional

market research, the acquisition process, onboarding and training - the Department estimates that

the new attorneys could begin adjudicating applications within six months of the current deadline

1  (*i.e.,* by approximately July 28, 2026).  The Department estimates that all post-class applications

2  could be adjudicated within one year after the newly hired contract attorneys have been

3  onboarded and trained.  Accordingly, the Department estimates that it can complete the remaining

4  post-class adjudications within 18 months of the current deadline (*i.e.,* by July 28, 2027).

5

6

7          Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

8  and correct.

9      Executed on November 6, 2025.

10

11                                                     James Bergeron
                                                       Deputy Under Secretary and
12                                                     Acting Chief Operating Officer
                                                       Federal Student Aid Office
13                                                     U.S. Department of Education

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Skip to main content | About Us (https://www2.ed.gov/about/landing.jhtml) | Contact Us (https://www2.ed.gov/about/contacts/gen) |
FAQs (https://www.ed.gov/answers/) | 🅰 Language Assistance ▾

Search...

**ARCHIVED INFORMATION**

# Department of Education Announces Action to Streamline Borrower Defense Relief Process

MARCH 18, 2021

**Contact:**   Contact: Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

Today, the U.S. Department of Education (Department) announced it will streamline debt relief determinations for borrowers with claims approved to date that their institution engaged in certain misconduct. The Department will be rescinding the formula for calculating partial relief and adopting a streamlined approach for granting full relief under the regulations to borrower defense claims approved to date. The Department anticipates this change will ultimately help approximately 72,000 borrowers receive $1 billion in loan cancellation.

"Borrowers deserve a simplified and fair path to relief when they have been harmed by their institution's misconduct," said Secretary of Education Miguel Cardona. "A close review of these claims and the associated evidence showed these borrowers have been harmed and we will grant them a fresh start from their debt."

Current provisions in federal law called "borrower defense to repayment" or "borrower defense" allow federal borrowers to seek cancellation of their William D. Ford Direct Loan (Direct Loan) Program loans if their institution engaged in certain misconduct. Beginning today, the Department will ensure that borrowers with approved borrower defense claims to date will have a streamlined path to receiving full loan discharges. This includes borrowers with previously approved claims that received less than a full loan discharge.

Full relief under the regulations will include:

- 100 percent discharge of borrowers' related federal student loans.
- Reimbursement of any amounts paid on the loans, where appropriate under the regulations.
- Requests to credit bureaus to remove any related negative credit reporting. And,
- Reinstatement of federal student aid eligibility, if applicable.

This new approach replaces a methodology first announced in December 2019 (https://www.ed.gov/news/press-releases/secretary-devos-approves-new-methodology-providing-student-loan-relief-borrower-defense-applicants?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=) to determine the amount of relief granted to borrowers with approved claims. After completing a comprehensive review of that methodology, the Department determined that it did not result in an appropriate relief determination.

This is the Department's first step in addressing borrower defense claims as well as the underlying regulations. The Department will be pursuing additional actions, including re-regulation, in the future.

The Department will begin applying this new approach today and affected borrowers will receive notices from the Department over the next several weeks with discharges following after that. Updated information for borrowers will be posted to StudentAid.gov/borrower-defense (https://studentaid.gov/borrower-defense/?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=).

**Tags:** Defense Relief (/category/keyword/defense-relief)
Federal Student Loans (/category/keyword/federal-student-loans)
Press Releases (/news/press-releases)

# How Do I Find...?

- Student loans, forgiveness (https://www2.ed.gov/fund/grants-college.html?src=rn)
- Higher Education Rulemaking (https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html?src=rn)
- College accreditation (https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=rn)
- FERPA (https://studentprivacy.ed.gov?src=rn)
- FAFSA (https://fafsa.gov/?src=edgov-rn)
- 1098, tax forms (https://www.ed.gov/1098-e?src=rn)
- More... (https://www2.ed.gov/about/top-tasks.html?src=rn)

# Information About...

- Elevating Teaching (https://www.ed.gov/teaching?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)
- Engage Every Student (https://www.ed.gov/ost?src=rn)
- Unlocking Career Success (https://cte.ed.gov/unlocking-career-success/)
- Cybersecurity (https://tech.ed.gov/cyberhelp/)

# Search press releases

Search...

# Find By Month

- October 2023 (/news/press-releases/monthly/202310)
- September 2023 (/news/press-releases/monthly/202309)
- August 2023 (/news/press-releases/monthly/202308)
- July 2023 (/news/press-releases/monthly/202307)
- June 2023 (/news/press-releases/monthly/202306)
- May 2023 (/news/press-releases/monthly/202305)
- April 2023 (/news/press-releases/monthly/202304)
- March 2023 (/news/press-releases/monthly/202303)
- February 2023 (/news/press-releases/monthly/202302)
- January 2023 (/news/press-releases/monthly/202301)
- December 2022 (/news/press-releases/monthly/202212)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, et al.,

        Plaintiffs,

    v.

MIGUEL CARDONA, et al.,

        Defendants.

No.  C 19-03674 WHA

**FINAL JUDGMENT**

    For the reasons stated in the accompanying order granting final approval of the class settlement, the Court directs that judgment of dismissal of the class's claims against the Secretary of Education and the United States Department of Education shall be final and appealable in accordance with Federal Rule of Civil Procedure 54.  The Court should retain jurisdiction to monitor and oversee implementation of the settlement as set forth in the settlement agreement.

    **IT IS SO ORDERED.**

Dated:  November 16, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

1
2
3
4
5
6            UNITED STATES DISTRICT COURT
7
8          NORTHERN DISTRICT OF CALIFORNIA
9
10   THERESA SWEET, et al.,
11          Plaintiffs,                        No.  C 19-03674 WHA
12       v.
13   MIGUEL CARDONA, et al.,                   **ORDER GRANTING FINAL**
                                               **SETTLEMENT APPROVAL**
14          Defendants.
15   _____
16
17                      **INTRODUCTION**
18          The United States Secretary of Education has reached a settlement with a class of
19   student-loan borrowers whose complaint alleges that, for years, the Department of Education
20   unlawfully delayed processing, or perfunctorily denied, hundreds of thousands of "borrower-
21   defense" applications — requests by students to discharge their loans in light of alleged
22   wrongful acts and omissions of the schools they attended.  The settlement leaps over the
23   borrowers' request to require administrative proceedings and provides for the automatic
24   discharge of billions of dollars of student loans and streamlined claim processing.  This
25   settlement is separate and apart from President Biden's broader program to forgive $430
26   billion in student debt.  The key question now at final approval concerns whether the Secretary
27   has the authority to enter into such a settlement.
28

United States District Court
Northern District of California

United States District Court
Northern District of California

**STATEMENT**

Title IV of the Higher Education Act directs the Secretary of Education "to assist in making available the benefits of postsecondary education to eligible students" through financial-assistance programs. The Student Loan Reform Act of 1993 directed the Secretary to promulgate legislative regulations for agency consideration of discharges of loans due to the wrongful acts or omissions of the schools attended by the borrowers. 20 U.S.C. §§ 1070, 1087e(h); Pub. L. No. 103-66 (1993).

The Secretary established the first "borrower defense" program for certain federal loans in 1994, which allowed a borrower to "assert as a defense against repayment of his or her loan any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994); *see also* 60 Fed. Reg. 37,768 (July 21, 1995). These rules went largely unused for the next twenty years (AR 590).

That all changed in May 2015 with the collapse of Corinthian Colleges, Inc., a for-profit college with more than 100 campuses and over 70,000 students. The Department faced a "flood of borrower defense claims submitted by Corinthian students." Secretary John B. King, Jr. quickly moved to update the regulations for handling these applications to expedite processing. 81 Fed. Reg. 39,330, 39,330, 39,335 (June 16, 2016); 81 Fed. Reg. 75,926 (Nov. 1, 2016) (final regulation).[1]

The Secretary recruited an interim "Special Master" Joseph Smith to assess the influx of claims, and eventually created a "Borrower Defense Unit" ("BDU") to address the backlog. In total, by the end of the Obama Administration, the Secretary had approved 31,773 applications for discharge and found 245 ineligible, for a 99.2% grant rate (a rate that includes both Corinthian students and claimants who attended other schools). Borrowers, however, had

---

[1] Our action does not directly address issues related to Corinthian, which proceeded in a separate action filed in our district, *Calvillo Manriquez v. DeVos*, No. C 17-07210 (N.D. Cal. filed Dec. 20, 2017) (Judge Sallie Kim).

1    submitted many thousands more which remained unexamined (AR 339–40, 347, 369, 384–85,

2    392–94, 502–03).

3        After the 2016 election and a change in administrations, new Secretary Elisabeth DeVos

4    paused claim adjudications in order to review the overall procedure.  She did, however, honor

5    16,164 borrower-defense applications approved but not yet finalized before the change in

6    administrations, albeit with "extreme displeasure" (Dkt. No. 66-3, Ex. 7).  Including all prior

7    decisions, by June 2018 the Department had granted in total 47,942 applications and denied or

8    closed 11,940, for an 80% grant rate for borrower defense-claims.  (The grant rate under

9    Secretary DeVos alone was 58%.)  By that point, borrowers had submitted, in total, 165,880

10   applications, leaving 105,998 still to be decided (AR 401).  The flood of applications

11   continued.

12       Then, all adjudication stopped.  For *eighteen* months, well into this suit, the Secretary

13   issued zero decisions.  As of June 2019, borrowers had filed (from day one) 272,721

14   applications and 210,168 of them remained pending (AR 350, 397–404, 587–88).

15       Named plaintiffs accordingly brought this suit to require the Secretary to adjudicate these

16   applications.  They argued the Secretary's delay constituted unlawful stonewalling.  The

17   complaint spelled out the relief sought:  "[Named plaintiffs] do not ask this Court to adjudicate

18   their borrower defenses.  Nor do they ask this Court to dictate how the Department should

19   prioritize their pending borrower defenses.  Their request is simple:  they seek an order

20   compelling the Department to start granting or denying their borrower defenses and vacating

21   the Department's policy of withholding resolution" (Compl. ¶¶ 1, 10).

22       A Rule 23(b)(2) class was eventually certified as follows:

23           All people who borrowed a Direct Loan or FFEL loan to pay for a
            program of higher education, who have asserted a borrower
24           defense to repayment to the U.S. Department of Education, whose
            borrower defense has not been granted or denied on the merits, and
25           who is not a class member in *Calvillo Manriquez v. DeVos*, No.
            17-7106 (N.D. Cal.) [the latter action concerning Corinthian
26           Colleges specifically]

27

28

**App.128**  3

1    (Dkt. No. 46 at 14).  Afterwards, an administrative record was lodged and cross-motions for

2    summary judgment were filed.  At that point, the number of pending applications was around

3    225,000 (AR 591).

4         Before an order issued on summary judgment, the parties ostensibly reached a settlement

5    (an earlier one than the settlement now under consideration).  A May 2020 order preliminarily

6    approved that proposal as it appeared to impose an eighteen-month deadline for the Secretary

7    to decide claims and a twenty-one-month deadline to effect relief for claims filed by April 7,

8    2020.  That settlement also set reporting requirements and established hefty penalties should

9    the Secretary fail to uphold her end of the bargain (Dkt. No. 103).  The parties notified the

10   class and solicited comments for a fairness hearing scheduled for October 2020.

11        However, unbeknownst to class counsel or the Court, the Secretary had already adopted a

12   practice of sending alarmingly curt form-denial notices, in violation (as class counsel put it) of

13   both the spirit of the proposed settlement and the Administrative Procedure Act.  Upon inquiry

14   from the Court, the Secretary acknowledged that, since December 2019 (when decisions on

15   borrower-defense applications had resumed), the Department used four templates to deny

16   118,300 of 131,800 applications reviewed (for an 89.8% denial rate).  This was so out of

17   keeping with the supposed settlement that the Court found there had been no meeting of the

18   minds.  An October 2020 order denied the class settlement and restarted discovery.  The

19   Secretary thereafter agreed to abstain from those types of form denials until further order (Dkt.

20   Nos. 116, 146, 150).

21        Plaintiffs filed a supplemental complaint that alleged the Secretary had not actually

22   restarted adjudication of borrower-defense claims.  Rather, plaintiffs argued she had violated

23   the law and the settlement by sending boilerplate denials without review.  Plaintiffs asserted

24   the Secretary's "presumption of denial" policy constituted further violations of the

25   Administrative Procedure Act and the Due Process Clause of the Fifth Amendment.

26        After a trip to our court of appeals regarding the extent of permissible discovery (*In re*

27   *Dep't of Education*, 25 F.4th 692 (9th Cir. 2022)), an order herein set a new summary

28   judgment schedule with a hearing planned for July 28, 2022.  During the pendency of the

United States District Court
Northern District of California

summary judgment briefing schedule, and after another change in administrations, the parties

reached the instant settlement and filed their second motion for preliminary approval.

Separate from our litigation, President Biden announced a different plan to cancel up to

$10,000 of student debt for low- to middle-income borrowers. The reader should keep in mind

that this order does not consider President Biden's initiative but considers only a discrete

settlement for a specific group of borrowers who have filed borrower-defense applications.

In brief, the settlement under consideration here sorts class members into three groups.

For group one, approximately 200,000 borrowers or 75% of the class as defined by the

settlement, the agreement provides for "full," "automatic" relief, *i.e.*, discharge of the

borrower's federal loans, cash refunds of amounts paid to the Department, and credit repair.

This "up-front" relief would go to class members who attended one of the 151 schools listed in

Exhibit C to the settlement (151 of the 6,000 colleges operating in the United States). The

relief provided for this group will result in the discharge of approximately six billion dollars of

debt in the aggregate.

For group two, the remaining 25% of the class as defined by the settlement

(approximately 64,000 borrowers), the agreement provides for final written decisions on their

borrower-defense applications within specified periods of time, correlated to how long they

have been waiting for a decision. The Department will make those decisions according to a

streamlined process that provides certain presumptions in favor of the borrower. Should the

Department not issue a decision within a specified time, the borrower will receive full,

automatic relief like the borrowers in group one. The Secretary estimates the relief provided

for this group will result in the discharge of a further $1.5 billion in cumulative student debt.

For group three, those who submitted a borrower-defense application after execution of

the settlement on June 22, 2022, and before final approval (approximately 179,000 borrowers),

*i.e.*, "post-class applicants" as defined by the settlement, the agreement provides a streamlined

process for their borrower-defense applications. If the Secretary does not render a decision

within three years of final approval, then the borrower would receive full, automatic relief like

1  the borrowers in group one.  The settlement also has reporting requirements and some appeal

2  procedures (Dkt. No. 246-1).

3  Four schools filed motions to intervene to oppose the settlement:  American National

4  University (ANU), The Chicago School of Professional Psychology, Everglades College, Inc.,

5  and Lincoln Educational Services Corporation.  The schools take issue with their inclusion on

6  Exhibit C, which they label a scarlet letter.  Argument on their motions to intervene were heard

7  during the hearing on preliminary approval.

8  Preliminary approval was granted.  After no further interested parties moved to intervene,

9  an order found that the schools could not intervene as of right but could permissively intervene

10  to object to the settlement (Dkt. Nos. 307, 322).  This order follows full briefing and oral

11  argument.

**ANALYSIS**

### 1.  THE SECRETARY HAS AUTHORITY TO ENTER INTO THE SETTLEMENT.

15  Let's consider the central issue.  The settlement provides extensive relief for the class:

16  complete and automatic discharge of all loans for 75% of the settlement class — about six

17  billion dollars in loan forgiveness; streamlined adjudication with a presumption towards

18  discharge for the rest of the settlement class; and a presumption of discharge and borrower-

19  friendly procedures for "post-class applicants," as defined by the settlement.  This bonanza

20  raises the question whether the Secretary has authority to provide such relief.

21  It is important to observe (again) that this settlement is separate and apart from the

22  significantly more expansive loan-forgiveness plan recently announced by President Biden.

23  That plan will (potentially) affect 40 million borrowers and cancel approximately $430 billion

24  in student debt.  *See* The Congressional Budget Office, Re: Costs of Suspending Student Loan

25  Payments and Cancelling Debt (Sept. 26, 2022); The White House, Assessing Debt Relief's

26  Fiscal and Cash-Flow Effects (Aug. 26, 2022).  The instant settlement is anchored in separate

27  authority.  Even if the broader loan-forgiveness plan recently announced by President Biden

28

United States District Court
Northern District of California

1  lacks authority (and this order does not so hold), this lesser litigation settlement lies within the

2  authority of the government.

3  "[T]he Attorney General has plenary discretion under 28 U.S.C. §§ 516 and 519 to settle

4  litigation to which the federal government is a party."  *United States v. Carpenter*, 526 F.3d

5  1237, 1241 (9th Cir. 2008).  The compromise and settlement authority has long been

6  considered an inherent facet of the Attorney General's charge to supervise litigation for the

7  United States.  *See Confiscation Cases*, 7 Wall. 454, 19 L. Ed. 196 (1869); *Power of the*

8  *Attorney General in Matters of Compromise*, 38 U.S. Op. Atty. Gen. 124 (1934).  And, Section

9  5 of Executive Order No. 6166 (June 10, 1933), transferred to the Department of Justice the

10  powers "to prosecute, or to defend, or to compromise, or to appeal, or to abandon prosecution

11  or defense" of actions involving the United States.  *See also* 28 U.S.C. § 510; *see generally*

12  *Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive*

13  *Branch Discretion*, 23 U.S. Op. Off. Legal Counsel 126, 135 (1999).

14  Of course, the Department of Justice, though it has plenary settlement authority, cannot

15  agree to something that the Secretary of Education cannot do in the first place.  For example,

16  the Department of Justice could not settle a lawsuit against the Federal Communications

17  Commission by giving a plaintiff the privilege of putting a new pharmaceutical drug on the

18  market.  The FCC lacks that authority (which is possessed by the Food and Drug

19  Administration).  "The Attorney General's authority to settle litigation for its government

20  clients stops at the walls of illegality."  *Carpenter*, 526 F.3d at 1242 (quoting *Exec. Bus.*

21  *Media, Inc. v. Dep't of Defense*, 3 F.3d 759, 762 (4th Cir. 1993)); *see also Heckler v. Chaney*,

22  470 U.S. 821, 834 (1985).

23  The Secretary primarily relies upon two provisions of the Higher Education Act to

24  effectuate the instant settlement, 20 U.S.C. Sections 1082(a)(6) and 1087e(a)(1).  *See also* 20

25  U.S.C. §§ 3441, 3471.  Section 1082(a)(6) of Title 20 of the United States Code recites, in

26  relevant part, "In the performance of, and with respect to, the functions, powers, and duties,

27  vested in him by this part, the Secretary may . . . enforce, pay, compromise, waive, or release

28  any right, title, claim, lien, or demand, however acquired, including any equity or any right of

United States District Court
Northern District of California

**App.132**   7

1   redemption."  This provision has been in effect since 1965 and passage of the original iteration

2   of the Higher Education Act.  Upon a plain reading, it bestows the Secretary with broad

3   discretion over handling — and discharging — student loans.  *See Nat'l Ass'n of Mfrs. v. Dep't*

4   *of Defense*, 138 S. Ct. 617, 631 (2018); *United States v. Lillard*, 935 F.3d 827, 833–34 (9th

5   Cir. 2019).  The legislative history supports this reading.  *See* H.R. Rep. No. 89-621, at 49

6   (1965); *see also* Robert A. Katzmann, Judging Statutes 29, 51–52 (2014).

7       The reader will note that the provision specifies "this part."  Section 1082 is housed

8   under Part B of the Student Assistance subchapter, which outlines the Federal Family

9   Education Loan (FFEL) Program.  The Federal Direct Loan Program is under a different part,

10  Part D.  Section 1087e(a)(1) of Part D, says in relevant part:  "Unless otherwise specified in

11  this part, loans made to borrowers under this part shall have the same terms, conditions, and

12  benefits, and be available in the same amounts, as loans made to borrowers, and first disbursed

13  on June 30, 2010, under sections 1078, 1078-2, 1078-3, and 1078-8 of this title."  Since the

14  Department first proposed borrower-defense regulations in 1994, it has construed Section

15  1087e to confirm that the Secretary's general discretion to discharge loans made pursuant to

16  the FFEL Program applied with equal force to the Direct Loan program, ensuring parity.  *See*

17  59 Fed. Reg. 42,646, 42,649 (Aug. 18, 1994); 81 Fed. Reg. 39,330, 39,368, 39,379 (June 16,

18  2016).

19      "[C]ourts generally will defer to an agency's construction of the statute it is charged with

20  implementing."  *Chaney*, 470 U.S. at 832.  The legislative history supports this conclusion, in

21  part due to the fact that the Direct Loan Program was intended to eventually replace the FFEL

22  Program.  H.R. Rep. 102-447, at 156 (1992); H.R. Doc. No. 103-82 at 3, 357 (1993); H.R.

23  Doc. No. 103-49, at 92 (1993).  Another district court has also recently found that Section

24  1082(a)(6) covers both FFEL loans and Direct Loans.  This order finds unpersuasive the dicta

25  from a different district court that reached the opposite conclusion as it considered different

26  issues and because Section 1082 is the only congressional authorization in the Higher

27  Education Act for the Secretary to sue and be sued regarding student aid, *e.g.*, Direct Loans,

28  FFEL loans, or otherwise.  *Compare Weingarten v. DeVos*, 468 F. Supp. 3d 322, 328 (D.D.C.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    2020) (Judge Dabney L. Friedrich), *with Pa. Higher Educ. Assistance Agency v. Perez*, 416 F.

2    Supp. 3d 75, 96–97 (D. Conn. 2019) (Judge Michael P. Shea).  This order finds the Secretary's

3    interpretation of Section 1087e(a)(1) the most reasonable interpretation of the provision and

4    concludes that Section 1082(a)(6) applies to both FFEL loans and Direct Loans.

5       The school-intervenors argue, however, that the Secretary's interpretation of the Higher

6    Education Act hides "elephants in mouseholes," which sets this action apart as a "major

7    questions case."  *See West Virginia v. EPA*, 142 S. Ct. 2587 (2022).  As the Supreme Court

8    recently explained,

9            Extraordinary grants of regulatory authority are rarely
accomplished through modest words, vague terms, or subtle

10            devices.  Nor does Congress typically use oblique or elliptical
language to empower an agency to make a radical or fundamental

11            change to a statutory scheme.  Agencies have only those powers
given to them by Congress, and enabling legislation is generally

12            not an open book to which the agency may add pages and change
the plot line.  We presume that Congress intends to make major

13            policy decisions itself, not leave those decisions to agencies.

14    *Id.* at 2609 (cleaned up).

15       In *West Virginia*, EPA had "issued a new rule concluding that the 'best system of

16    emission reduction' for existing coal-fired power plants included a requirement that such

17    facilities reduce their own production of electricity, or subsidize increased generation by

18    natural gas, wind, or solar sources."  "The White House stated that the Clean Power Plan

19    would 'drive a[n] . . . aggressive transformation in the domestic energy industry.'"  In other

20    words, the rule "restructure[ed] the Nation's overall mix of electricity generation."  *Id.* at 2599,

21    2604, 2607.

22       Our settlement, in contrast, will not fundamentally transform a domestic industry, nor

23    will it have any national ripple effect.  The relief will remain limited to class members in a

24    litigated case.  Yes, this settlement will discharge over six billion dollars in loans, but *West*

25    *Virginia* made clear that determining whether a case contains a major question is not merely an

26    exercise in checking the bottom line.  The representative decisions cited in *West Virginia*

27    considered "unusual" and "unheralded" applications of agency authority.  *Id.* at 2608–09.

28    There is nothing unusual about the Secretary exercising his discretion to discharge student-loan

debt, and the *scale* of relief here is inherently limited to the metes and bounds of this federal class-action litigation. *Cf. Chaney*, 470 U.S. at 833 n.4.[2]

Justice Frankfurter, as quoted with approval in *West Virginia*, reasoned that "just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." 142 S. Ct. at 2610. The Secretary has exercised the authority utilized in our settlement many times, even in the past few years, even across administrations:

| School | Date Announced | Est. Number of Borrowers | Est. Amount Discharged |
|---|---|---|---|
| Dream Center Education Holdings (Art Inst. of Colo.; Ill Inst. of Art) | 2019 | 7,400 | $175    M |
| *Weingarten v. Cardona*, No. C 19-02056 DLF, Dkt. No. 49 (D.D.C.) | 2021 | 7 | $0.283 M |
| Minnesota School of Business / Globe University | 2021–22 | 1,191 | $26     M |
| Marinello Schools of Beauty | 2022 | 28,000 | $238    M |
| Corinthian Colleges, Inc. (Everest; Heald College; WyoTech) | 2022 | 560,000 | $5.8    B |
| ITT Technical Institute | 2022 | 208,000 | $3.9    B |
| Westwood College | 2022 | 79,000 | $1.5    B |

These discharges addressed both Direct Loans and loans pursuant to the FFEL program. The Secretary also stressed that the Department has discharged many student loans pursuant to Section 1082(a)(6) on an individual basis (Dkt. No. 337).

Our settlement will discharge less than three percent of the outstanding federal student loan portfolio (*see* Dkt. Nos. 325-2; 331 at 16). Intervenors assert the Department's press releases regarding the above discharges did not specifically cite Section 1082(a)(6). This is

---

[2] Everglades tears down a strawman when it argues that interpreting Section 1082(a)(6) to support the settlement leaves the Secretary with exclusive authority to eliminate a $1.6 trillion industry and discharge every student loan in America (Everglades Opp. 23). The Secretary has asserted no such broad authority. His actions remain rooted in, and limited to, this litigation. Recall, *West Virginia* based its analysis on EPA's own projections of the effects of the "Clean Power Plan" it had promulgated. 142 S. Ct. at 2603–04. Common sense dictates we consider the actual agency action — the settlement — not a hypothetical.

10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

specious.  Statements to the general public regarding an agency action need not provide the legal minutiae regarding the authority underlying the action.  The Secretary has provided those details in a filing herein (Dkt. No. 337).

Here's the practical litigation problem the Secretary faces and seeks to settle.  The borrower-defense program set up by Congress has devolved into an impossible quagmire.  This has been true across all administrations, as detailed above.  As of now, approximately 443,000 borrowers have pending borrower-defense applications.  That is a staggering number.  If, hypothetically, the Department's Borrower Defense Unit had all 33 of its claim adjudicators working 40 hours a week, 52 weeks a year (no holidays or vacation), with each claim adjudicator processing two claims per day, it would take the Department *more than twenty-five years* to get through the backlog.

Had each and every class member sued the Department individually, the Department could have settled those individual actions one by one, and it could have done so using precisely the same criteria set forth for Exhibit C — namely, indicia of misconduct and the volume of claims associated with a given school.  Indeed, it could have done so without even revealing its internal criteria used to settle claims.  If it can do that, then this order holds that it can resolve them all in a class settlement using the same criteria and that such a settlement falls within the plenary authority of the Secretary and the Attorney General.  "For convenience, therefore, and to prevent a failure of justice, a court of equity permits a portion of the parties in interest to represent the entire body, and the decree binds all of them the same as if all were before the court."  *Smith v. Swormstedt*, 57 U.S. 288, 303 (1853).  This order holds that this group approach is the only feasible way for the agency to give practical relief to class members.  Conducting individualized reviews is no longer practicable.

Yes, the agency has explained its criteria and placed 151 schools on a list (151 of the 6,000 colleges operating in the United States).  This was done to explain why some class members will get full relief whereas others will get less relief.  This does not change the fact that the Department could have used the very same criteria to settle each application one at a

1
2

time and therefore can now do the same thing on a class basis. The approach taken here is group-wise and within the plenary settlement authority of the Secretary and Attorney General.

3

This order rejects intervenors remaining arguments.

4
5
6
7
8
9
10
11
12
13

*First*, intervenors dispute the Secretary's authority under Section 1082(a)(6) based upon a rescinded, January 2021 memorandum composed by the Department's Office of General Counsel, which the Department later substantively and procedurally disavowed. *See* Dep't of Educ., Office of the General Counsel, Memorandum re: Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority (Jan. 12, 2021); 87 Fed. Reg. 52,943 (Aug. 30, 2022). The memo stated: "[W]e believe 20 U.S.C. § 1082(a)(6) is best construed as a limited authorization for the Secretary to provide cancellation, compromise, discharge, or forgiveness only on a case-by-case basis and then only under those circumstances specified by Congress." The memo has been rescinded and this order disagrees with it for the reasons stated above.

14
15
16
17
18
19
20

*Second*, at the hearing intervenors highlighted two other provisions they deemed statutory bars to relief. The anti-injunction provision in 20 U.S.C. Section 1082(a)(2) is inapplicable because the government is requesting and consenting to this settlement. Plaintiffs have also maintained a viable theory throughout this litigation that the Secretary acted *ultra vires*, and that consequently the anti-injunction provision does not apply. And, Section 1082(b) only places a cap on the size of settlements where the Attorney General is not involved. The government confirmed at the hearing the settlement is properly authorized.

21
22
23
24
25
26
27
28

*Third*, intervenors say that the settlement must incorporate the Department's standard borrower-defense regulations, citing the *Accardi* doctrine (*e.g.*, Everglades Opp. 20). This order disagrees. Those regulations constitute a procedure promulgated by the Department to perform ordinary reviews of borrower-defense applications, as enabled by 20 U.S.C. Section 1087e(h). Within the specific context of settling this class-action litigation, in contrast, the Secretary relies upon different, independent sources of statutory authorization — Sections 1082(a)(6) and 1087e(a)(1). The Secretary has plenary discretion to settle litigation within the confines of the law; this order cannot dictate the basis by which the Secretary effectuates the

1    settlement, particularly in light of the fact that the Secretary has multiple sources of statutory

2    authority on which to premise action on student loans. *See Carpenter*, 526 F.3d at 1241;

3    *United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992). Imposing such a mandate

4    would limit the Secretary's broad discretion in settlement — "the court's role should be more

5    restrained." *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126–27 (D.C. Cir. 1983).

6        *Fourth*, intervenors similarly argue that the Secretary cannot "circumvent" notice-and-

7    comment rulemaking under the guise of settlement, citing *Conservation Northwest v. Sherman*,

8    715 F.3d 1181 (9th Cir. 2013). But in that opinion our court of appeals held "that a district

9    court abuses its discretion when it enters a consent decree that *permanently and substantially*

10   amends an agency rule that would have otherwise been subject to statutory rulemaking

11   procedures." *Id.* at 1187 (emphasis added). The Secretary has not altered the borrower-

12   defense procedures at all. Those regulations remain in place. In fact, the Department recently

13   amended them. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022). Rather, for the specific group of

14   borrowers contemplated by the class certification order and this settlement, the Secretary has

15   crafted a process for resolving the enormous backlog of claims, and he has done so pursuant to

16   specific congressional authorization. *See Turtle Island Restoration Network v. Dep't of

17   Commerce*, 672 F.3d 1160, 1167 (9th Cir. 2012).

18       *Fifth*, intervenors assert "the parties cannot achieve by settlement what the [p]laintiffs

19   could not have achieved by litigating the case to judgment" as a further reason that the

20   borrower-defense regulations must be followed (*see* Lincoln Opp. 17). The Supreme Court has

21   made clear, however, that "a federal court is not necessarily barred from entering a consent

22   decree merely because the decree provides broader relief than the court could have awarded

23   after a trial." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525

24   (1986). This statement applies with equal force to settlements. *See id.* at 519; *Conservation

25   Nw.*, 715 F.3d at 1185–86.

26       In sum, the Secretary has not exceeded his statutory authority or failed to follow the

27   agency's regulations by entering into the settlement. Intervenors' constitutional arguments

28

United States District Court
Northern District of California

1    concern their inclusion on Exhibit C, which this order considers next in conjunction with their

2    broader reputational harm contentions.

3        **2.    EXHIBIT C DOES NOT INVALIDATE THE SETTLEMENT.**

4        The settlement grants full and automatic relief to all class members that attended the

5    schools listed on Exhibit C.  Intervenors argue Exhibit C constitutes an impermissible scarlet

6    letter.  This order finds the list does not carry the necessary legal significance to justify

7    denying final approval of the settlement.

8        The settlement agreement recites that the Secretary "will effectuate Full Settlement

9    Relief for each and every Class Member whose Relevant Loan Debt is associated with the

10   schools, programs, and School Groups listed in Exhibit C."  Intervenors point to a statement

11   made in the class and Secretary's joint motion for preliminary approval:

12           The Department has determined that attendance at one of these
             schools justifies presumptive relief, for purposes of this settlement,
13           based on strong indicia regarding substantial misconduct by listed
             schools, whether credibly alleged or in some instances proven, and
14           the high rate of class members with applications related to the
             listed schools
15

16   (Dkt. No. 246 at 3).  The joint motion for final approval further discussed automatic loan

17   discharge for students who attended a school on Exhibit C:

18           Such automatic relief is warranted in the context of the overarching
             settlement structure, as certain indicia of misconduct by the listed
19           schools, including the high volume of Class Members with
             applications related to the listed schools, led the Department to
20           conclude that these Class Members were entitled to summary
             settlement relief without any further time-consuming
21           individualized review process

22   (Br. 11).  Intervenors concentrate their fire on these statements and their inclusion on

23   Exhibit C.

24       These explanations do not impose any liability whatsoever on intervenors, for the schools

25   cannot be held liable for any remedial measures absent proceedings initiated specifically

26   against them.  To understand why this is so, it is necessary to summarize the relevant

27   regulations.  When a borrower-defense application criticizes a school, the Department gives the

28   school notice and the opportunity to file a responsive statement, although the school is not

**App.139** [14]

United States District Court
Northern District of California

required to do so.  *Regardless of whether the school files such a statement (or not), the grant of a borrower-defense application has no binding effect on the school*.  If the Department approves a borrower-defense application, then that can be the predicate for the department *initiating* a proceeding against the school for recoupment.  But even in such an instance, the school still retains all due process rights, is not bound by the success of the student's application, and is free to litigate *ab initio* the merits of its performance.  The Department may also pursue other remedial actions against a school unrelated to a successful borrower-defense application but, again, in those instances the school still has all of its due process protections.  *See* 34 C.F.R. § 685.308; 34 C.F.R. Pt. 668, Subpt. G.[3]  Nothing in this settlement will cause any school to lose a dime.

Moreover, the settlement does not constitute a successful or approved borrower-defense claim, a position maintained by both the class and Secretary (*see* Dkt. No. 300).  Therefore, no recoupment action could be initiated in any event as a result of the settlement.

In *Paul v. Davis*, 424 U.S. 693, 701 (1976), the Supreme Court, in consideration of an "active shoplifters" flyer distributed by police that listed the plaintiff therein, held that "[w]hile we have in a number of our prior cases pointed out the frequently drastic effect of the 'stigma' which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause."  *See also Fikre v. FBI*, 35 F.4th 762, 776 (9th Cir. 2022).

---

[3] For clarity, this order lays out the order of operations regarding a school's participation in borrower-defense claims.  For loans issued prior to July 1, 2017, a Department official notifies the school and considers any response or submission from the school.  *See* 34 C.F.R. § 685.222(a)(1); *id.* § 685.206(c)(2); *id.* § 685.222(e)(3)(i).  For loans issued on or after July 1, 2017 but before July 1, 2020, a Department official will follow that same procedure of notifying the school and considering any response or submission from the school.  *Id.* § 685.222(a)(2), (e)(3)(i).  For loans issued on or after July 1, 2020, the Department provides the school a copy of the borrower's claim and other evidence, after which the school may respond and the borrower may reply (copies of which will also be provided to the school).  *Id.* § 685.206(e)(8)–(12).  A new set of regulations will go into effect July 1, 2023.  *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022).

As explained, the schools have lost no procedural rights, nor has their status been altered. No liberty or property interest has been disturbed. Any hypothetical, future remedial action would proceed according to established regulations, which would provide the schools with full due process. *Cf. Endy v. Cnty. of Los Angeles*, 975 F.3d 757, 764–65 (9th Cir. 2020). The Department has also represented in the sworn declaration of Benjamin Miller that it does not consider inclusion on Exhibit C a finding of misconduct and that inclusion does not constitute evidence that could or would be considered in an action by the Department against a school. The Court relied upon, and the Court expects the government to stand behind, the statements made in the Miller Declaration (Dkt. No. 288-1).

Furthermore, because the class and Secretary's briefing advocating for approval of the settlement had no legally binding effect on the intervenors, no actionable reputational harm exists on that basis either. *See Joshi v. Nat'l Transp. Safety Bd.*, 791 F.3d 8, 11–12 (D.C. Cir. 2015); *see also Przywieczerski v. Blinken*, 2021 WL 2385822, at *4 (D.N.J. June 10, 2021) (Judge Kevin McNulty) (citing cases). The issues herein differ from those in *Foretich v. United States*, 351 F.3d 1198, 1212–13 (D.C. Cir. 2003), which considered a fully enacted law that embodied a congressional determination of misconduct. Here, there is no binding or official determination of misconduct against the schools. To repeat, since the settlement does not utilize the borrower-defense procedure, the Secretary cannot initiate a recoupment action against any of the schools listed on Exhibit C premised upon a successful borrower-defense application.

Finally, intervenors contend their inclusion on Exhibit C means the settlement is not fair to them. They argue the "court must 'reach a reasoned judgment that . . . the settlement, taken as a whole, is fair, reasonable and adequate *to all concerned*'" (Lincoln Opp. 9, quoting *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982), emphasis in brief). In light of the foregoing, and taking stock of the settlement as a whole, this order finds that intervenors' speculative assertions of harm fail to render the settlement unfair, especially in light of the significant benefits to both the class and Department in settling this litigation.

16

1       To repeat, had borrowers brought individual actions, each could have been compromised

2   using whatever criteria the Attorney General and Secretary felt wise in the circumstances,

3   including the criteria behind Exhibit C.  That the claims are aggregated and now settled on a

4   class basis using the same criteria does not matter.

5       **3.      THE CASE IS NOT MOOT AND PLAINTIFFS STILL HAVE STANDING.**

6

7       The school-intervenors further argue the district court does not have jurisdiction to

8   entertain the settlement because plaintiffs lack standing and the action is now moot.  Both

9   arguments fail.

10      *First*, to establish Article III standing, plaintiffs must show they have suffered an injury

11  in fact that is concrete, particularized, and actual or imminent, that the injury was likely caused

12  by the defendants, and that the injury would likely be redressed by judicial relief.  Plaintiffs

13  must demonstrate standing to the degree required by each stage of the litigation, including at

14  the class-action settlement stage.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203, 2208

15  (2021); *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1116 (9th Cir. 2020).

16      This order finds all class members, including our named plaintiffs, have properly asserted

17  a real and concrete injury arising from the Secretary's alleged unlawful handling of their

18  borrower-defense claims.  The injury is two-fold.  The Secretary's improper delay and

19  suspension of processing claims for debt relief has directly led to a specific economic injury to

20  each class member.  Unlawful delay of debt relief results in clear monetary harm.  Moreover,

21  as detailed in the supplemental complaint, the Secretary's "presumption of denial" policy and

22  form denials have resulted in another layer of injury to class members.  These issues would

23  likely be redressed by judicial action.  To this, the intervenors make the following arguments.

24      Everglades and ANU argue plaintiffs cannot demonstrate standing for the remedies

25  provided by the settlement (Everglades Opp. 8; ANU Opp. 24).  The standing analysis,

26  however, considers plaintiffs' stake in the case and whether they can demonstrate standing "for

27  each claim that they press and for each form of relief that they seek (for example, injunctive

28  relief and damages)."  *See TransUnion*, 141 S. Ct. at 2203, 2208.  Plaintiffs have properly

United States District Court
Northern District of California

**App.142** [17]

United States District Court
Northern District of California

demonstrated such a stake in this action and for the judicial relief they seek. And again, a settlement agreement can provide broader relief than a court could have awarded after a trial. *See Firefighters*, 478 U.S. at 519, 525; *Conservation Nw.*, 715 F.3d at 1185–86. ANU's assertion that the settlement's rescinding of form denials impermissibly puts borrowers that lack standing back into the class misses the mark for an additional reason: it wholly ignores the supplemental complaint and the allegations that the Secretary never lawfully adjudicated those claims in the first place. ANU's contention that this constitutes a "second bite at the apple" ignores the problem they never got a bite in the first place.

The Chicago School and ANU further argue the class as defined is overbroad and inherently includes individuals who lack standing. Their theory is incorrect. Per the class definition, any class member that has their claims properly adjudicated will drop out of the class. All current class members, therefore, have a concrete injury stemming from the Secretary's alleged improper delay and presumption of denial policy. The intervenors' reference to other settlements and discharges apart from this litigation is similarly inapposite. This settlement provides no opportunity for any "unjust enrichment" as it simply discharges a borrower's affirmative obligation to repay their student loans. The agreement provides that a borrower's relief cannot exceed the student loan debt associated with their borrower-defense application (Settlement Agreement II.W, Dkt. No. 246-1). On our record, there is no proof of any double recovery and specifically no proof of any litigation against a school that resulted in money going to a student specifically for loans. So, it is speculation by intervenors, and speculation only, that some will get duplicative recovery.

*Second*, litigation that becomes moot during the proceedings "is no longer a 'Case' or 'Controversy' for purposes of Article III, and is outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (quotations removed). Dismissal based on mootness, however, "is justified only if it is absolutely clear that the litigant no longer has any need of the judicial protection that it sought." *Pizzuto v. Tewalt*, 997 F.3d 893, 903 (9th Cir. 2021) (cleaned up).

That is not the case here. Intervenors argue the Secretary has already "approved tens of thousands of borrower defense applications" (Everglades Opp. 7, quoting Dkt. No. 249 at 1). But what of the hundreds of thousands of applications that remain? It is not enough for merely some absent class members to have dropped out of the class because they have had their claims adjudicated. Unquestionably, five of our seven named plaintiffs' borrower-defense applications remain pending and their loans outstanding. The Chicago School says that two class representatives who attended Corinthian (but are not part of the *Calvillo Manriquez* class action) will have their loans discharged by the Secretary in a separate agency action (Chicago Opp. 13). This does not render our action moot, nor otherwise impact the validity of the class. *See also Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014).

True, the Secretary argued that this action was moot in his most recent cross-motion for summary judgment, briefing of which was interrupted by the joint filing of the motion for preliminary approval (Dkt. No. 249). Like all litigants, however, the Secretary can aggressively advocate for his position while simultaneously negotiating a settlement that will end the litigation without the risk of trial. "Settlement is to be encouraged." *Turtle Island*, 672 F.3d at 1167. Because the Secretary has not resolved all of the pending borrower-defense applications, nor addressed the issues stemming from the presumption of denial policy used during the pendency of this action, this litigation is not moot.

Finally, Everglades, ANU, and Lincoln all argue that class members lack standing or that this action is moot in light of President Biden's recently announced initiative for student loan relief, which *could* provide up to $10,000 of debt relief for low and middle-income federal student-loan borrowers. *See* The White House, Fact Sheet: President Biden Announces Student Loan Relief for Borrowers Who Need It Most (Aug. 24, 2022). The instant settlement, however, is anchored in separate authority and is completely independent from the Biden plan, which has already been declared unlawful by one district court, so relief thereunder is in some doubt. *See Brown v. Dep't of Education*, 2022 WL 16858525, No. C 22-0908, Dkt. No. 37 (N.D. Tex. Nov. 10, 2022) (Judge Mark T. Pittman); *see also, e.g.*, *Nebraska v. Biden*, No. 22-3179 (8th Cir. Nov. 14, 2022). This order need not and does not opine on the authority of the

President to cancel student loans (one way or the other), but this order does hold that the instant settlement, involving a narrower class and narrower relief, falls within the government's authority.

In sum, this order finds that plaintiffs have adequately demonstrated standing at this stage of the proceedings and that this action is not moot.

### 4. THE SETTLEMENT IS STILL VIABLE AND FAIR, REASONABLE, AND ADEQUATE.

A settlement purporting to bind absent class members must be fair, reasonable, and adequate. *See* FRCP 23(e). This settlement is not only fair, reasonable, and adequate but a grand slam home run for class members. They originally sued just to get a decision one way or another on their applications. Now, they are getting total forgiveness in most cases. For the remainder of the class, it is at least a home run. This is a very good deal for the class.

Intervenors initially question whether a viable Rule 23(b)(2) class still exists for which settlement relief can be approved, challenging commonality, typicality, adequacy, the relief provided by the settlement, and the validity of the "post-class applicant" group.

Considering commonality, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). The class certification order, to this end, found "the Department's alleged policy of inaction applies to the proposed class as a whole." The order made clear that "whether a borrower defense claim has been pending for three years or three months, all claims were subject to the same alleged policy of inaction" (Dkt. No. 46 at 12, 13). As the litigation progressed, and the Secretary's practice of issuing form denials came to light, plaintiffs sought additional relief consistent with Rule 23(b)(2) to hold the Secretary accountable for further alleged *ultra vires* actions (*e.g.*, Dkt. No. 245 at 33). All class members remain subject to the same delay and allegedly unlawful policies. A single judicial remedy directed at the Secretary's activities could provide class-wide relief in a single stroke. Commonality remains.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Everglades argues that differences in class member's individual circumstances defeat typicality, but it provides no support for that argument. Typicality — like all the Rule 23 requirements — "limit[s] the class claims to those fairly encompassed by the named plaintiff's claims." *Dukes*, 564 U.S. at 349 (quotation omitted). Plaintiffs' claims focus on the Department's policy of inaction, form denials, and presumption of denial. Typicality is still satisfied.

Next, Lincoln says that the settlement "effectively" provides damages, which therefore destroys the viability of the class (Lincoln Opp. 15). *Dukes* explained that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." 564 U.S. at 360–61. The settlement relief here fits squarely within Rule 23(b)(2) as it in effect provides injunctive relief voiding the borrower's obligation to repay their student loans. In some cases a class member will receive refunds, but refunds are restitution and fall within the relief available in an injunction/declaratory relief action. Discharge of an obligation to repay a debt does not constitute monetary damages.

Intervenors similarly argue that the settlement is inadequate and unfair because some class members will receive automatic debt relief while others will have their borrower-defense applications reviewed. This mirrors the fairness inquiry recited by Rule 23(e)(2)(D), which requires the settlement to treat class members equitably relative to one another, not for each class member to receive identical relief. The class and Secretary have provided a logical and reasoned explanation regarding how the volume of applications and certain indicia of misconduct asserted against each school warrant tailoring settlement relief to certain subgroups. This order finds such differentiation equitable. Rule 23(b)(2) does not affect this conclusion because it remains true that a single injunction or declaratory judgment after a trial could provide relief and, as explained, a settlement can provide broader relief than a court could have awarded after a trial. *See Firefighters*, 478 U.S. at 519, 525; *Conservation Nw.*, 715 F.3d at 1185–86.

The last issue intervenors raise regarding the general viability of the settlement concerns the "post-class applicant" group, which is composed of individuals that filed a borrower-

1    defense application in between execution of the settlement on June 22, 2022, and final

2    approval.  The named plaintiffs and Department state that this group does not fall "within the

3    class definition and thus [is] not formally part of the Rule 23 analysis" (Mot. Final Approval

4    12 n.3).  Contrary to these points, the class certification order set no cut-off date for

5    membership, so the class definition as recited in that order clearly encompasses all of these

6    borrowers.  Nevertheless, to ensure the overall fairness of the settlement, this group will

7    receive relief under the agreement, namely their applications will be decided with streamlined

8    procedures within three years on pain of automatic discharge of the loans.  This lesser relief is

9    justified on the ground that this group has not been waiting as long for a decision as groups one

10   and two.

11        With no issues regarding the viability of the class, this order turns to the eight *Churchill*

12   factors our court of appeals has enumerated for review in the final fairness assessment to

13   determine whether the settlement is fair, reasonable, and adequate:  (1) the strength of the

14   plaintiff's case; (2) the suit's risk, expense, complexity, and the likely duration of further

15   litigation; (3) the risk of maintaining class-action status throughout the trial; (4) the amount

16   offered in settlement; (5) the extent of discovery and the stage of the proceedings; (6) the

17   experience and views of counsel; (7) the presence of a governmental participant; and (8) the

18   reaction of class members of the proposed settlement.  Rule 23(e)(2) also requires the district

19   court to consider an overlapping set of factors.  *See Kim v. Allison*, 8 F.4th 1170, 1178–79 (9th

20   Cir. 2021) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir.

21   2011)); *Churchill Vill., LLC. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004).

22        Many of these factors have been addressed in the foregoing analysis.  This order finds the

23   second, fifth, sixth, and seventh *Churchill* factors all clearly and strongly favor settlement.  A

24   brief review of the docket (and this order) will reveal to the reader the complexity of the issues

25   this action considers.  Continuing on with this litigation through summary judgment and

26   (possibly) trial would require still more expense and delay in an action directly addressing

27   undue delay and agency inaction.  *Indeed, we have already attempted a settlement once and*

28   *the proposed timeline for that entire process has come and gone*.  Discovery has already taken

United States District Court
Northern District of California

place, so the parties have had an adequate opportunity to evaluate the strengths and weaknesses of their respective positions. Counsel for both sides, which includes the government, have advocated for the advantages of this settlement.

Next, the first and third factors also favor settlement. Plaintiffs have strong arguments that the Secretary's actions were unlawful, but as the opening salvos in the latest round of summary judgment reveal, the ordinary risks of litigating on a class-wide basis persist. Moreover, as plaintiffs acknowledge, questions remain about the remedies they could seek and be granted after a trial.

The relief offered (the fourth factor) clearly favors settlement. This order pauses to again emphasize that automatic loan discharges and a streamlined process for adjudicating the remaining borrower-defense applications as provided for in the settlement will likely prove a transformative opportunity for many class members. These class members decided to take on considerable debt to attend schools that they now allege misled them on the value of such a significant financial decision. The relief also furthers the Secretary's interest in resolving the backlog of claims. Notice was sufficient, the discharge process ranks as adequate, attorney's fees have been left to the Court's discretion, and the method for processing relief is also fair.

The reaction of the class (the eighth and final *Churchill* factor) also supports the settlement. The class has actively participated in the settlement approval process, sending both class counsel and the Court over 1,500 letters and emails.

Most of these letters express complete support for the agreement. One class member wrote that, "Like so many thousands of college students I was misled by my graduate school and given a financial death sentence in student loan debt. I have spent my adult life following the path of my heart and helping hundreds of patients, yet I can barely help myself." Another voiced support but "ask[ed] the Court to ensure that [the] final terms of the settlement protect individual applicants from arbitrary treatment by the Department." As this order demonstrates, the settlement includes appropriate protections.

Fewer than 175 borrowers objected or requested changes to the settlement. Primarily, these borrowers requested: additional schools be added to Exhibit C; delay of the cut-off date

United States District Court
Northern District of California

1    for class membership (as defined by the settlement); automatic debt relief for "post-class

2    applicants"; faster timelines for debt relief; and relief for those borrowers who refinanced their

3    loans into private loans. None of these concerns constitute meaningful objections to the

4    settlement as a whole. Rather, these borrowers request further relief and do not call into

5    question the overall fairness of the settlement. One "objector" expressed concern about never

6    receiving notice of this class action (she did not file her borrower-defense application until

7    after the announcement of the instant settlement). She hence objected to being considered a

8    "post-class applicant." As discussed, this objector's issues speak to the importance of the

9    streamlined procedures for the "post-class applicant" designation in ensuring the overall

10   fairness of the settlement. Finally, private borrowers are not part of our class.[4]

11       In sum, the *Churchill* factors favor settlement. We turn to the remaining two factors

12   listed in Rule 23(e)(2).

13       *First*, named plaintiffs and class counsel have adequately represented the class.

14   Everglades, the Chicago School, and one objector argued that, because class counsel was (until

15   recently) affiliated with Harvard Law School, a conflict of interest existed. The objector noted,

16   and intervenors echoed, that his program, the American Repertory Theater/Moscow Art

17   Theater Institute for Advanced Theater Training at Harvard ("ART") was not on Exhibit C.

18   This order is not persuaded. Any speculative conflict of interest is now resolved (class counsel

19   have separated from Harvard) and neither the objecting class member nor the intervenors

20   provide any meaningful basis to call into question counsel's representation or ART's exclusion

21   from Exhibit C. The settlement provides substantial relief to class members, which supports

22   the conclusion named plaintiffs and class counsel have adequately represented the class.

23       *Second*, the proposal was negotiated at arm's length. Everglades and the Chicago School

24   object that the settlement is collusive. Taking a step back, the purpose of any such objection is

25   to protect absent class members from settlements that disproportionately reward named

26

27   ────────────────────────

     [4] ANU makes a brief argument that the settlement is unfair to the class because it imposes tax
     risks that the Secretary and named plaintiffs failed to address. But every class member has
28   voluntarily filed a borrower-defense application to have their loan discharged. Any ensuing tax
     consequences accordingly do not rank as unfair.

United States District Court
Northern District of California

1  plaintiffs and their counsel at the expense of the class as a whole.  Intervenors do not raise this

2  problem at all.  They argue instead that the settlement provides so much to the class it could

3  not have been negotiated at arm's length.  This just underscores all the more that the settlement

4  is and will be in the best interest of the class.  That the settlement was conducted in "secret"

5  goes nowhere.  It's a common practice.

6       In short, the *Churchill* and Rule 23 factors favor final approval of the settlement.

**CONCLUSION**

8       For the foregoing reasons, all objections are **OVERRULED**.  Final approval of the

9  settlement is **GRANTED**.  This action is hereby **DISMISSED WITH PREJUDICE**, except in that the

10  Court shall retain jurisdiction over this action as set forth in the settlement agreement.  Once

11  the defendants have effectuated all appropriate relief, plaintiffs and defendants shall file a

12  notice with the Court.  A joint status report regarding the class and Department's progress in

13  carrying out the settlement is due **JANUARY 26, 2023**.

14       **IT IS SO ORDERED.**

16  Dated:  November 16, 2022.

                                       WILLIAM ALSUP
                                       UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al.*,

               Plaintiffs,

      v.

MIGUEL CARDONA, in his official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

            Defendants.

No. 3:19-cv-03674-WHA

**SETTLEMENT AGREEMENT**

**I.     INTRODUCTION**

WHEREAS, in this class action the Plaintiffs assert that the U.S. Department of Education ("Department") has (i) unreasonably delayed and unlawfully withheld decisions on pending "borrower defense" claims, *i.e.*, claims for relief from certain federal student loan obligations based on institutional misconduct; (ii) issued unlawful notices denying certain borrower defense claims; and (iii) adopted unlawful policies governing the process of evaluating borrower defense claims;

WHEREAS, Defendants, the Department and its Secretary, Miguel Cardona, in his official capacity, deny any wrongdoing and deny that Plaintiffs are entitled to the relief they have sought in this Action;

WHEREAS, Defendants and Plaintiffs (referred to herein collectively, where appropriate, as "the Parties") now mutually desire to avoid the delay, uncertainty, inconvenience and expense of protracted litigation, and have determined to settle this Action, including all claims that Plaintiffs, the certified Class (as defined below), and the members of that Class have brought in this case;

NOW, THEREFORE, in reliance upon the representations, mutual promises, covenants, releases, and obligations set forth in this Settlement Agreement, and for good and valuable consideration, the Parties hereby stipulate and agree to compromise, settle, and resolve this case on the following terms and conditions.

**II.    DEFINITIONS**

Unless otherwise noted, the following definitions apply in this Settlement Agreement, and for purposes of this Settlement Agreement alone.

A.     **Action** means the litigation styled *Sweet, et al. v. Cardona, et al.*, No. 3:19-cv-3674-WHA (N.D. Cal.).

B.     **Agreement** means this Settlement Agreement, including any attached exhibits.

C.     **Borrower defense application** means a request by a Direct Loan or Federal Family Education Loan Program borrower for relief from his or her repayment obligations with respect to those loans based on the alleged misconduct of the borrower's

school. A borrower's application can include multiple claims of alleged misconduct on behalf of his or her school.

D.    **Borrower defense claim** means an allegation made for relief from a borrower's repayment obligations in a borrower defense application.

E.    **Class** or **Class Members** are the members of the class that has been certified by this Court and refers to individuals who meet the criteria set forth in Section II below. When used in this Agreement, the terms Class and Class Members refer, individually and collectively, to the Plaintiffs, the Class, and each Member of the Class.

F.    **Class Counsel** or **Plaintiffs' Counsel** refers to Plaintiffs' attorneys of record in this Action.

G.    **Class Notice** means the document attached hereto as Exhibit A, which shall be distributed pursuant to subsection X.B, below.

H.    **Court** means the U.S. District Court for the Northern District of California.

I.    **Department** refers to the U.S. Department of Education.

J.    **Direct Loan** means and refers to a loan made pursuant to the William D. Ford Federal Direct Loan Program, 20 U.S.C. § 1087a *et seq*.

K.    **Effective Date** means the date upon which, if this Agreement has not been voided under Section XIII, the Final Judgment approving this Agreement, entered by the Court in the form attached hereto as Exhibit B, becomes non-appealable, or, in the event of an appeal by a Class Member based upon a timely filed objection to this Agreement, upon the date of final resolution of said appeal. When this Agreement refers to the date on which the Agreement became "Effective," such date is the Effective Date.

L.    **Execution Date** means the date upon which all Parties to this Agreement, and/or their counsel of record, have signed the Agreement.

M.   **Fairness Hearing** means a hearing held by the Court at which time the Court will determine whether this Agreement should be approved under Federal Rule of Civil Procedure 23(e).

N.   **Final Approval Date** refers to the date on which the Court enters Final Judgment approving this Agreement in the form attached hereto as Exhibit B.

O.   **Final Decision** refers to a decision by the Department either approving or denying settlement relief to a borrower under the terms of this Agreement.

P.   **FFEL** means and refers to a loan made pursuant to the Federal Family Education Loan Program, 20 U.S.C. §§ 1071-1087-4.

Q.   **Form Denial Notice** refers to a notice sent by the Department to a Class Member, in substantially the form of one of the documents submitted by Defendants to the Court in this Action at ECF Nos. 116-1, 116-2, 116-3, and 116-4.

R.   **FSA** is the Department's Federal Student Aid office.

S.   **Full Settlement Relief** means (i) discharge of all of a Class Member's Relevant Loan Debt, (ii) a refund of all amounts the Class Member previously paid to the Department toward any Relevant Loan Debt (including, but not limited to, Relevant Loan Debt that was fully paid off at the time that borrower defense relief is granted), and (iii) deletion of the credit tradeline associated with the Relevant Loan Debt.

T.   **Involuntary Collection Activity** means any attempt by the Department or its agents to collect payments toward the Relevant Loan Debt (in whole or in part), as defined below, through involuntary means from a borrower in default, including but not limited to certifying the borrower's debts for collection through the Treasury Offset Program and/or administrative wage garnishment. Any activity by the Department or its agents that reduces the borrower's Relevant Loan Debt without any action by the borrower or which eliminates a default on the loan without action by the borrower is not an Involuntary Collection Activity.

U.   **Plaintiffs**, for purposes of Section V, includes Post-Class Applicants as the term is defined in Section IV.D.

V.     **Preliminary Approval Date** refers to the date on which the Court enters a preliminary approval order, as set forth in subsection X.A.

W.     **Relevant Loan Debt** refers to Direct Loans or FFEL loans associated with the school that is the subject of the Class Member's borrower defense application. That debt includes the original principal of the affected federal student loan plus any and all interest and fees that accrued or were incurred on that loan.

X.     **School Group** refers to the name of a multi-institution organization based on ownership data and/or multi-campus institution as defined in FSA's Postsecondary Education Participants System ("PEPS"), to the extent that data is included in the borrower defense review platform.

Y.     **Written Notice** is provided when the Department sends an email to the relevant individual's email address or, where the Department does not have such an email address available or becomes aware that email is undeliverable to the email address on file, the Department sends a copy of the relevant communication to the individual's last known mailing address.

III.   CLASS

A.     Pursuant to Federal Rule of Civil Procedure 23(b)(2), the Court has certified a plaintiff class consisting of all people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to the Department, whose borrower defense has not been granted or denied on the merits, and who is not a class member in *Calvillo Manriquez v. DeVos*, No. 3:17-cv-7210 (N.D. Cal.). *See* ECF No. 46 (Oct. 30, 2019). In this Agreement, individuals who meet this class definition as of the date of class closure are referred to as "the Class" or "Class Members."

B.     For the purposes of this Agreement, the Parties agree that the Class includes individuals who are members of the Plaintiffs' proposed "§ 555(e) Subclass," which the Parties agree includes all members of the class certified in this case on October 30, 2019 (ECF No. 46) whose borrower defense applications were denied

between the date of class certification and the Execution Date.  *See* Pls.' Suppl. Compl., ECF No. 198 ¶ 430 (May 4, 2021).

C. As of the Effective Date, all Class Members are bound by the terms of this Agreement.

D. The Class is closed as of the Execution Date.

IV. **DEFENDANTS' CONSIDERATION**

In consideration for the promises of Plaintiffs set forth in this Agreement, Defendants agree as follows:

A. <u>Relief for applications meeting certain school criteria.</u>

1. No later than one year after the Effective Date, Defendants will effectuate Full Settlement Relief for each and every Class Member whose Relevant Loan Debt is associated with the schools, programs, and School Groups listed in Exhibit C hereto. If any such Class Member receiving relief under this Paragraph IV.A previously received a Form Denial Notice, the provision of Full Settlement Relief will be deemed to rescind that Form Denial Notice.

2. Class Members shall be eligible for this form of relief regardless of whether the Class Member is a member of the § 555(e) Subclass.

3. Defendants shall provide Written Notice of this relief to each qualifying Class Member no later than 90 calendar days after the Effective Date. The notice shall specify that the Class Member will receive Full Settlement Relief, as defined in this Agreement, and need not take any additional action to receive this relief. The notice shall also specify that the Class Member's Relevant Loan Debt will remain in forbearance or stopped collection status pending the effectuation of relief. If the notice is sent by email and it bounces back, Defendants will have an additional 90 calendar days to send the notice by first class mail to the last known mailing address.

4.     The Parties acknowledge that some Class Members may be eligible for discharges of their loans, outside of this Agreement, based on the misconduct of schools they attended, and that nothing in this Agreement shall prevent the Department from effectuating such relief outside this Agreement. The Department agrees, however, that any such Class Members who are deemed eligible for such relief outside this Agreement shall receive Full Settlement Relief pursuant to this Agreement.

5.     If the Department's borrower defense or loan data includes conflicting evidence which raises a substantial question as to whether a Class Member's Relevant Loan Debt is associated with a program, school, or School Group listed in Exhibit C, the question will be resolved in favor of the Class Member (*i.e.*, in favor of granting relief).

B.     Rescission of Form Denial Notices.

1.     For Class Members who do not receive relief pursuant to Paragraph IV.A, above, but previously received a Form Denial Notice, Defendants, no later than 120 calendar days after the Effective Date, will provide Written Notice to those Class Members that their denials have been rescinded and that their borrower defense applications are again under consideration.

2.     For purposes of Paragraph IV.C.3, the Department will deem the applications of Class Members who previously received a Form Denial Notice to have been pending since the original date of submission.

C.     Process and timeline for issuing decisions on remaining Class applications.

1.     Defendants will apply the following procedures to their review of borrower defense applications submitted by Class Members who did not receive relief pursuant to Paragraph IV.A:

   i.     Defendants will review the borrower defense application and any attachments included by the Class Member to determine whether the application states a claim that, if presumed to be true, would assert

a valid basis for borrower defense relief under the standards in the borrower defense regulations published by the Department on November 1, 2016 (81 *Fed. Reg.* 75,926). If it does, Defendants will provide that Class Member Full Settlement Relief.

ii.   If a Class Member's borrower defense application reviewed under this Paragraph IV.C alleges a misrepresentation or omission that, if presumed to be true, would assert a valid basis for borrower defense relief, Defendants will presume that the Class Member reasonably relied on that misrepresentation or omission regardless of whether the Class Member alleges such reliance in his or her application.

iii.  No borrower defense application reviewed under this Paragraph IV.C will be denied on the basis of insufficient evidence.

iv.   Defendants will not apply any statute of limitations to borrower defense applications reviewed under this Paragraph IV.C.

2.   Defendants will issue any Class Member whose borrower defense application is reviewed under this Paragraph IV.C a "settlement relief decision," a "revise and resubmit notice," or a "denial notice," as defined below.

i.   A "settlement relief decision" notifies a Class Member that his or her borrower defense application has been approved under the terms of this Settlement Agreement and that the Class Member will receive Full Settlement Relief.

ii.  A "revise and resubmit notice" notifies a Class Member that his or her borrower defense application is deficient, provides instructions on how to revise and resubmit his or her application, and advises the Class Member that he or she may do so within 6 months of the date of the notice. The notice will state that if the Class Member does not submit a revised application within 6 months, the notice itself will

serve as Defendants' final decision of denial and that the Class Member has the right to seek review of such decision in federal district court.

iii.  A "denial decision" will only be issued to Class Members whose applications are denied after having resubmitted their application following receipt of a "revise and resubmit notice," as defined in the preceding subparagraph. A denial decision will explain the reasons the application was denied and apprise the recipient of his or her right to seek review of the decision in federal district court.

3.  Defendants will issue decisions to Class Members whose applications are reviewed under this Paragraph IV.C according to the timelines set forth below. For purposes of this subparagraph, a "decision" refers to either a "settlement relief decision" or a "revise and resubmit notice," as defined in Paragraph IV.C.2.

i.  For any application submitted between January 1, 2015 and December 31, 2017, Defendants will issue a decision no later than 6 months after the Effective Date.

ii.  For any application submitted between January 1, 2018 and December 31, 2018, Defendants will issue a decision no later than 12 months after the Effective Date.

iii.  For any application submitted between January 1, 2019 and December 31, 2019, Defendants will issue a decision no later than 18 months after the Effective Date.

iv.  For any application submitted between January 1, 2020 and December 31, 2020, Defendants will issue a decision no later than 24 months after the Effective Date.

v.      For any application submitted between January 1, 2021 and the Execution Date, Defendants will issue a decision no later than 30 months after the Effective Date.

vi.     If a Class Member has submitted more than one borrower defense application, the earliest submitted application will control for purposes of the timelines set forth above.

4.      Defendants will issue a final decision to any Class Member who resubmits his or her application after receiving a "revise and resubmit notice" no later than 6 months after Defendants receive the Class Member's resubmission. For purposes of this subparagraph IV.C.4, a "final decision" refers to either a "settlement relief decision" or a "denial decision" as defined in Paragraph IV.C.2.

5.      Class Members shall be eligible for the relief set forth in this Paragraph IV.C regardless of whether the Class Member is a member of the § 555(e) Subclass.

6.      The decisions required by this Paragraph IV.C shall be sent by Written Notice, as defined in this Agreement.

7.      The Relevant Loan Debt for each Class Member eligible under this section will remain in forbearance or stopped collection status either until he or she receives Full Settlement Relief or until the Department's decision denying the Class Member's claim becomes final pursuant to either Paragraph IV.C.2.ii or Paragraph IV.C.2.iii, as applicable. For this period of forbearance or stopped collection status, the Department will remove any interest that accrues on the Relevant Loan Debt.

8.      If a Class Member has not received a timely decision required under Paragraphs IV.C.3 and IV.C.4, as applicable, that Class Member shall receive Full Settlement Relief. Defendants shall provide the affected Class

Member with notice that the Class Member will receive this relief within 60 calendar days following the expiration of the applicable deadline.

9.   Defendants will effectuate relief for any Class Member entitled to settlement relief pursuant to Paragraphs IV.C.3, IV.C.4, or IV.C.8, as applicable, no later than one year after the date that Defendants provide that Class Member Written Notice of the settlement relief decision.

D.   <u>Relief for Certain Post-Class Applicants.</u>

1.   If an individual submits a borrower defense application after the Execution Date (*i.e.*, the date the class closes), but before the Final Approval Date, such individual is a Post-Class Applicant. Defendants will issue a final decision on the merits of a Post-Class Applicant's application no later than 36 months after the Effective Date.  In making these decisions, the Department will apply the standards in the borrower defense regulations published by the Department on November 1, 2016 (81 *Fed. Reg.* 75,926).

2.   If a Post-Class Applicant has not received a timely decision as required under Paragraph IV.D.1, that applicant shall receive Full Settlement Relief. Defendants shall provide the affected Post-Class Applicant with notice that the applicant will receive this relief within 60 calendar days following the expiration of the applicable deadline.

3.   Defendants will effectuate relief for any Post-Class Applicant entitled to settlement relief pursuant to Paragraphs IV.D.1 and IV.D.2 no later than one year after the date that Defendants provide that applicant Written Notice of the settlement relief decision.

E.   <u>Class Member informational webpage.</u> The Department will establish a webpage on its studentaid.gov website providing general information about this Agreement and links to copies of the Agreement and related Court documents.  The webpage will be available to the public within 30 calendar days after the Preliminary Approval Date and will be updated no later than 30 calendar days after the Effective

Date to include information about how Class Members can contact the Department if the Class Member has questions regarding their borrower defense application.

F.    <u>Effectuating relief.</u>

    1.    Defendants have effectuated relief for purposes of Paragraphs IV.A, IV.C, and IV.D when they and their loan servicers have taken all steps necessary to discharge the Relevant Loan Debt of the Class Member (or Paragraph IV.D. Post-Class Applicant), including but not limited to (1) discharging any interest that accrued while the borrower defense application was pending; (2) determining if the Class Member (or Paragraph IV.D Post-Class Applicant) is entitled to any refund, and if so, issuing refund check(s) for payment of that refund; (3) if the Class Member's (or Paragraph IV.D Post-Class Applicant's) Relevant Loan Debt was previously in default, removing such debt from default status; and (4) requesting the deletion of the relevant tradeline.

    2.    Class Members (or Paragraph IV.D Post-Class Applicants) who receive relief under Paragraphs IV.A, IV.C, or IV.D shall not be required to take steps to consolidate any Relevant Loan Debt into a Direct Loan to receive the relief to which they are entitled pursuant to those Paragraphs. Defendants shall take all necessary steps to ensure that other loan holders effectuate the required relief.

G.    <u>Reporting Requirement.</u>

    1.    Within 30 calendar days after the Effective Date, Defendants will provide Plaintiffs with, as of the Final Approval Date, (i) the total number of Class Members, (ii) the total number of Class Members the Department has determined are eligible for Full Settlement Relief pursuant to Paragraph IV.A; (iii) the total number of Class Members who must receive decisions pursuant to Paragraph IV.C; and (iv) the total number of Class Members and Post-Class Applicants who must receive decisions by each deadline set

forth in Paragraph IV.C.3(i) through (v) and Paragraph IV.D, respectively, and a schedule of the dates certain by which such decisions must be received pursuant to these paragraphs.

2. Defendants will submit quarterly reports to Plaintiffs documenting their progress toward fulfilling their obligations under Paragraphs IV.A, IV.C, and IV.D of this Agreement. Defendants will submit these reports to Plaintiffs' Counsel via electronic mail and will post those reports publicly on their Federal Student Aid website.

3. The first quarterly report shall be submitted 120 calendar days after the Effective Date, unless that day falls on a weekend or Federal holiday, in which case the report shall be submitted on the next business day. The quarterly reports shall be submitted every 90 calendar days thereafter, subject to the same exceptions where the 90th day falls on a weekend or Federal holiday.

4. The quarterly reports described herein shall contain the information listed below. The first report will reflect progress Defendants have made since the Effective Date and later reports will reflect the progress Defendants made from the last date reported in the prior report to the end of each reporting period. The first reporting period will start on the Effective Date. Each subsequent reporting period will start on the last date for which progress was reported in any previous report. Each reporting period shall exclude a period not exceeding 30 calendar days immediately preceding the submission of a report, during which Defendants pull, confirm, and validate the data provided in each report.

   i. The total number of Class Members with pending borrower defense applications (which number shall include members of the § 555(e) Subclass);

ii.     The total number of settlement relief decisions, revise and resubmit notices, and denial decisions, as defined in Paragraph IV.C.2, that Defendants have issued to Class Members pursuant to Paragraph IV.C;

iii.    The number of Class Members who received settlement relief decisions; the number of Class Members who received "revise and resubmit notices"; and the number of Class Members who received final denial decisions during the reporting period; and

iv.     The total number of Class Members for whom Defendants have effectuated relief pursuant to Paragraph IV.A, including the number of Class Members for whom Defendants effectuated relief during the reporting period.

v.      For any quarterly report covering the time period during which a deadline established in Paragraphs IV.C.3(i) through (v) and Paragraph IV.D falls, the total number of Class Members for whom the Department did not provide a decision.

5.     All of the data required in this section is subject to privacy restrictions and will be suppressed where the total number of Class Members for any data point is less than 10.

6.     Defendants shall notify Plaintiffs' Counsel within 30 calendar days of the date as of which they have resolved all Class Members' borrower defense applications, notified all Class Members of their final decisions (where applicable), and effectuated all appropriate relief to Class Members, at which point Defendants' reporting obligations will cease. Until Defendants provide such notice, Defendants shall continue providing quarterly reports as required by this Paragraph IV.G.

H.     Other Assurances. In accordance with applicable statutory and regulatory requirements, and additional governing policies and procedures specific to

Defendants' consideration of borrower defense claims, Defendants represent and confirm that the following policies will apply to all Class Members throughout the time covered by the Agreement:

1.      Defendants do not take action to collect outstanding student loan debts through involuntary collection activity against individuals with pending borrower defense applications, as required by the Department's borrower defense regulations. However, this Agreement does not preclude a Class Member from proactively and voluntarily paying his or her student loans.

2.      Defendants provide an interest credit for any interest that accrues on the relevant federal student loan accounts of borrowers between the time that the borrower submits his or her borrower defense application and the time the Department issues a final decision on the application and notifies the borrower of that decision.

## V.   ENFORCEMENT

A.      Notwithstanding all other provisions outside Section V of this Agreement, the Court shall retain jurisdiction only to review claims set forth in this Section V, and only in the manner explicitly provided in Section V. In connection with each such claim, the Court shall retain jurisdiction only to order the relief explicitly specified for each particular claim and only where Defendants have not provided that relief pursuant to the procedures specified in this Section. The Court shall lack jurisdiction to imply any claims, or authority to issue any other relief, under this Agreement.

B.      The only claims permissible to enforce this Agreement are as follows:

1.      <u>Failure to Provide Relief to Class Members Who Did Not Receive a Decision by the Decision Due Date.</u> Plaintiffs may bring a claim alleging that Defendants have materially breached the Agreement if Defendants have (i) failed to issue to a Class Member or Post-Class Applicant by the due date established in Paragraph IV.C.3, IV.C.4, or IV.D.2, as applicable,

a decision, as defined by Paragraph IV.C.2; and (ii) subsequently failed, within 30 calendar days following the expiration of the applicable deadline, to provide that Class Member with notice that they will receive Full Settlement Relief, as required by Paragraph IV.C.8 or IV.D.2, as applicable.

    i.    Should Plaintiffs prevail on this claim, the only relief available from the Court shall be an order requiring Defendants to promptly provide Full Settlement Relief to each affected Class Member on a timetable set by the Court. Defendants shall also be liable for Plaintiffs' reasonable attorneys' fees and costs incurred in bringing the claim.

    ii.    In the event of such a Court order, Defendants will report to Plaintiffs' Counsel and the Court on its progress of issuing relief, as provided herein, to affected Class Members.

2.    <u>Failure to Issue Relief by Relief Due Date.</u> Plaintiffs may bring a claim alleging that Defendants have materially breached Paragraph IV.A.1, IV.C.9, IV.D.1, and/or IV.D.3 of the Agreement by failing to effectuate relief within the prescribed time periods for any individual who is entitled to receive relief pursuant those Paragraphs.

    i.    Should Plaintiffs prevail on this claim, the only relief available from the Court shall be an order requiring Defendants to promptly provide Full Settlement Relief to each affected individual on a schedule set by the Court. Defendants shall also be liable for Plaintiffs' reasonable attorneys' fees and costs incurred in bringing the claim.

    ii.    In the event of such a Court order, Defendants will report to Plaintiffs' Counsel and the Court on its progress of issuing relief, as provided herein, to affected Class Members.

3.    <u>Failure to Submit Timely Quarterly Reports.</u> Plaintiffs may bring a claim alleging that Defendants have materially breached Paragraph IV.G of the Agreement by failing to submit a timely and complete quarterly report to

Plaintiffs' Counsel via electronic mail within 90 calendar days after the deadline for the report according to the timelines specified therein. Should Plaintiffs prevail on this claim, the only relief available from the Court shall be an order requiring Defendants to submit their reports on a monthly basis from the point of the order forward. Defendants shall also be liable for Plaintiffs' reasonable attorneys' fees and costs incurred in bringing the claim.

4.  <u>Involuntary Collections of Class Members' Student Loan Debt.</u> Plaintiffs may bring a claim alleging that Defendants have materially breached Paragraph IV.H.1 of the Agreement by collecting on a Relevant Loan after the Effective Date through involuntary collection activity against a Class Member or Post-Class Applicant while his or her application was or is pending or while the Class Member or Post-Class Applicant was or is awaiting the effectuation of relief.

    i.  Should Plaintiffs prevail on this claim, the only relief available from the Court shall be an order requiring the Department to refund the payment(s) collected.  If Defendants do not have a valid address for the affected borrowers to send the refunds, Defendants will take reasonable steps to engage in skip tracing to find a valid address.

    ii.  Defendants shall be liable for a material breach under this Paragraph V.B.4 if involuntary collection activity occurs because they, their agents, or their contractors took action to collect a debt through an involuntary collection activity. Defendants shall not be liable based on events outside of Defendants' control, including but not limited to a situation where a third party, such as an employer, undertakes debt collection activities, such as wage garnishment, inconsistent with Defendants' instructions that collection activity cease.

C.  All claims listed above are subject to the complete defense of impracticability or impossibility of performance, as set forth below in Paragraph V.D.5 and Paragraph XII, as well as the defense that the breach claimed by Plaintiffs is not material.

D.  The exclusive procedure for bringing a claim to enforce the terms and conditions of this Agreement shall be as follows:

 1.  Prior to asserting any claim pursuant to Paragraph V.B, above, Plaintiffs' Counsel shall submit written notice alleging a material breach of this Agreement to counsel for Defendants. Such notice shall be submitted by electronic mail, and shall specify what alleged breach has occurred; describe the facts and circumstances supporting the claim; and state that Plaintiffs intend to seek an order from the Court pursuant to Paragraph V.B. Plaintiffs shall not inform the Court of their allegation(s) at that time.

 2.  Within 2 business days of receipt of the notice from Plaintiffs' Counsel, Defendants will acknowledge receipt of Plaintiffs' notice.

 3.  Defendants shall have a period of 14 calendar days after receipt of such notice from Plaintiffs' Counsel to inform Plaintiffs' Counsel in writing of its determination on whether a material breach has occurred, including relevant information that informed Defendants' determination.

  i.  If Defendants agree that a material breach has occurred, Defendants will disclose any action they propose to take to resolve the alleged material breach in the written notice to Plaintiffs as described by this Paragraph V.D.3. The Parties will meet and confer to determine whether those actions are sufficient within 5 business days of Plaintiffs' receipt of Defendants' notice.

   a.  Upon Defendants' request, Plaintiffs shall provide to Defendants any information and materials available to Plaintiffs that support the violation alleged in the notice.

b. Defendants will have 21 calendar days following the Parties' meet and confer to take the action(s) specified in their written notice and/or any further action(s) agreed upon in writing by the Parties.

c. If the Parties agree about the existence of a material breach, but cannot reach consensus on the appropriate action to resolve that breach within 21 calendar days following the Parties' meet and confer, either Party may file a motion for enforcement of the Agreement.

ii. If Defendants do not agree that a material breach has occurred, the Parties will meet and confer to determine if a consensus can be reached within 5 business days after Plaintiffs' receipt of Defendants' notice as described in this Paragraph V.D.3. If a consensus cannot be reached within 21 business days following the Parties' meet and confer, Plaintiffs may file a motion for enforcement of the Agreement.

4. Absent the prior, written agreement of the Parties, any motion for enforcement of the Agreement must be brought within two (2) years after the Parties notify the Court that Defendants have resolved all Class Members' borrower defense applications, notified all Class Members of their final decisions (where applicable), and effectuated all appropriate relief to Class Members, as specified in Paragraph XI, below. Otherwise, any claim of material breach not brought within two (2) years of such date shall be forever waived by Plaintiffs.

5. If Defendants are reasonably prevented from or delayed in fully performing any of the obligations set forth in Paragraph IV, above, due to extraordinary circumstances beyond Defendants' control, Defendants will notify Plaintiffs' Counsel within 14 calendar days of Defendants' determination

that they will not be able to fully perform their obligations. Within that notification, Defendants will describe the facts providing their basis for believing extraordinary circumstances beyond Defendants' control prevent Defendants from fully performing their obligations. Within 14 calendar days of that notice, the Parties will meet and confer as to whether the circumstances are beyond the Defendants' control and to what extent they affect Defendants' ability to issue final decisions or effectuate relief. If the Parties agree an extension is warranted, the Parties will negotiate the length of an appropriate extension, and the deadlines set forth for Defendants' performance in Paragraph IV may be altered accordingly. If the Parties cannot agree as to whether extraordinary circumstances exist or what the appropriate length of an extension is, Plaintiffs may raise a claim of material breach of Paragraph IV with the Court prior to the expiration of the timelines provided in that Paragraph. Defendants shall be permitted to oppose the filing of such a claim upon the grounds of extraordinary circumstances, and the Court will at that point have jurisdiction to determine whether Defendants are entitled to any extension of the deadlines set forth in Paragraph IV on the basis of extraordinary circumstances. The extension set forth in this Paragraph V.D.5 shall be for a minimum of seven (7) calendar days beyond the deadlines for performance set forth in Paragraph IV without requiring any action by any Party other than Defendants, and may be longer than that period pursuant to written agreement among the Parties.

E.   The Court relinquishes jurisdiction over all claims, causes of actions, motions, suits, allegations, and other requests for relief in this Action that are not expressly stated in this Paragraph V.

F.      The Court shall have no jurisdiction to supervise, monitor, or issue orders in this Action, except to the extent that Plaintiffs invoke the Court's jurisdiction pursuant to the procedures set forth in this Paragraph V.

## VI.   ATTORNEYS' FEES

A.      To resolve Plaintiffs' claim for attorneys' fees, costs, and expenses, Plaintiffs will submit a petition for fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), to the Court.

B.      Defendants agree that Plaintiffs are the prevailing party in this action for purposes of a fee petition under the Equal Access to Justice Act.

C.      Nothing in this Section shall affect the Parties' ability to attempt to reach a compromise regarding Plaintiffs' claim for attorneys' fees, costs, and expenses.

## VII.  WAIVER AND RELEASE

Plaintiffs, the Class Members, and their heirs, administrators, representatives, attorneys, successors, and assigns, and each of them hereby forever waive, release, and forever discharge Defendants, and all of their officers, employees, and agents, from, and are hereby forever barred and precluded from prosecuting, any and all claims, causes of action, motions, and requests for any injunctive, declaratory, and/or monetary relief, including but not limited to damages, tax payments, debt relief, costs, attorney's fees, expenses, and/or interest, whether presently known or unknown, contingent or liquidated, alleged in this Action against Defendants through and including the Effective Date, including but not limited to the right to appeal any and all claims Plaintiffs asserted in this Action.  This Agreement is not intended to release any claim based on an act or omission or other conduct occurring after the Effective Date, including but not limited to claims by Class Members based on the substance or content of their borrower defense decisions. The Parties do not intend to waive or narrow any res judicata defense Defendants could assert against a future claim brought by any Plaintiff.

## VIII. NO ADMISSION OF LIABILITY

A.      Nothing in this Settlement Agreement shall constitute or be construed to constitute an admission of any wrongdoing or liability by Defendants, an admission by

Defendants of the truth of any allegation or the validity of any claim asserted in this Action, a concession or admission by Defendants of any fault or omission of any act or failure to act, or an admission by Defendants that the consideration provided to Plaintiffs under Paragraph IV, above, represents relief that could be recovered by Plaintiffs in this Action.

B.  Plaintiffs may not offer, proffer, or refer to any of the terms of this Agreement as evidence in any civil, criminal, or administrative proceedings other than proceedings that may be necessary to enforce the Agreement as set forth in Paragraph V, above, or to obtain approval from the Court as set forth in Paragraph X, below.

**IX.  PLAINTIFFS' COVENANTS NOT TO SUE**

A.  Plaintiffs hereby covenant not to commence any action, claim, suit, or administrative proceeding against Defendants related to the non-performance, failed performance, or otherwise unsatisfactory performance in fulfilling their duties and responsibilities under this Agreement; provided, however, that Plaintiffs may initiate an action against Defendants pursuant to the continuing jurisdiction of the Court to compel Defendants' performance of their obligations under this Agreement, but only as expressly articulated in this Agreement in Paragraph V, above.

B.  Plaintiffs hereby covenant not to commence against Defendants any action, claim, suit, or administrative proceeding on account of any claim or cause of action that has been released or discharged by this Agreement.

**X.  PROCEDURES GOVERNING APPROVAL OF THIS AGREEMENT**

A.  Within 14 calendar days of the Execution Date, the Parties shall jointly submit this Agreement and its exhibits to the Court, and shall apply for entry of an Order in which the Court:

1.  Grants preliminary approval to this Agreement as being fair, reasonable, and adequate to Plaintiffs;

2.      Approves the form of the Class Notice attached hereto as Exhibit A;

3.      Directs the Parties to provide Class Notice as set forth in Paragraph X.B below, and grants approval of such plan as reasonable under Federal Rule of Civil Procedure 23(e)(1);

4.      Schedules a Fairness Hearing to determine whether this Agreement should be approved as fair, reasonable, and adequate, and whether an order approving the settlement should be entered pursuant to Federal Rule of Civil Procedure 23(e);

5.      Provides that any person who wishes to object to the terms of this Agreement, or to the entry of an Order approving this Agreement, must file a written Notice of Objection with the Court specifying the objections and the basis for such objections as provided in the Class Notice, with copies served on all Parties' counsel;

6.      Provides that between the Execution Date and the Fairness Hearing, the Defendants shall direct all inquiries from Class Members and Post-Class Applicants regarding the Agreement to Plaintiffs' Counsel;

7.      Provides that in order to have an objection considered and heard at the Fairness Hearing, such written Notice of Objection must be filed with the Court and served on counsel by the date specified in the Class Notice;

8.      Provides that the Parties shall each be entitled, but not required, to respond, in writing, to any Objections up to 14 calendar days prior to the Fairness Hearing; and

9.      Provides that the Fairness Hearing may, from time to time and without further notice to the Class, be continued or adjourned by order of the Court.

B.    After the Court enters an Order containing all of the items set forth in Paragraph X.A, above, the Parties shall promptly distribute the Class Notice as follows:

1.      Defendants shall email all Class Members who provided their e-mail addresses to the Department on their borrower defense applications, or,

where Defendants do not have such an e-mail address available or become aware that email is undeliverable to the email address on file, Defendants shall send a copy of the notice to the Class Member's last known mailing address by first class mail.

2. Class Counsel will update the Class Member website's "Frequently Asked Questions" page regarding the lawsuit. A link to the Class Members' website will be included in the Class Notice and will be included on the Department's website.

3. Plaintiffs will also circulate the Class Notice to legal aid and advocacy organizations across the country providing borrower defense assistance.

C. No later than 3 business days before the Fairness Hearing, the Parties shall each file with the Court a declaration confirming compliance with the Notice procedures approved by the Court.

D. At the Fairness Hearing, the Parties shall jointly request the Court's final approval of this Agreement, pursuant to Federal Rule of Civil Procedure 23(e). The Parties agree to take all actions necessary to obtain approval of this Agreement.

E. If, after the Fairness Hearing, the Court approves this Agreement as fair, adequate, and reasonable, the Parties consent to entry of Final Judgment in a form substantively identical to the Final Judgment attached hereto as Exhibit B.

F. Within 120 days after the Effective Date, Defendants shall send Written Notice to all Post-Class Applicants informing them of their status as Post-Class Applicants and the provisions of the Agreement that apply to them.

**XI. DISMISSAL AND JURISDICTION OF THE COURT TO ENFORCE THIS AGREEMENT**

The Parties hereby stipulate and agree to entry of Final Judgment in a form substantively identical to the Final Judgment attached hereto as Exhibit B. As provided in that exhibit, Plaintiffs' claims in this Action are dismissed with prejudice, except that the Court shall retain limited jurisdiction for the sole purpose of enforcing the terms of this Agreement as expressly set forth in Paragraph V of this Agreement. Once Defendants have resolved all Class Members' and Post-

Class Applicants' borrower defense applications, notified all Class Members and Post-Class Applicants of their final decisions (where applicable), and effectuated all appropriate relief to Class Members and Post-Class Applicants, the Parties will file a notice with the Court. Upon the date of that notice, the Court's jurisdiction over this Action shall completely terminate.

The Parties agree that any order of the Court granting approval of this Agreement does not render the terms and conditions of this Agreement subject to the contempt powers of the Court.

## XII.   IMPOSSIBILITY OF PERFORMANCE

In addition to the excuses to performance listed in Paragraph V.D.5, above, if Congress renders Defendants' performance under this Agreement impossible, in whole or in part, then Defendants shall forever be relieved of all obligations that would, as a result of such Congressional action, be impossible to perform. Defendants shall not be required to take any action, or attempt to take any action, which would circumvent or violate, or have the effect of circumventing or violating, the law.

## XIII.   CONDITIONS THAT RENDER THIS AGREEMENT VOID OR VOIDABLE

A.   This Agreement shall be void if it is not approved as written by a final Court order not subject to any further review.

B.   This Agreement shall be voidable by Plaintiffs and/or Defendants if the Court does not enter a Final Judgment, or other Final Approval Order, that is substantively identical to the one attached hereto as Exhibit B. Any Party's decision to void the Agreement under this provision is effective only if that Party provides notice of its decision, in writing, to the counsel of record for all other Parties within 30 calendar days of the date on which the Court entered Final Judgment.

C.   This Agreement shall be voidable by Plaintiffs if a condition of impossibility occurs, as described in Paragraph XII. Plaintiffs' decision to void the Agreement under this provision is effective only if Plaintiffs' Counsel provides notice of their decision, in writing, to the counsel of record for Defendants.

**XIV. EFFECT OF AGREEMENT IF VOIDED**

    A.    Should this Agreement become void as set forth in Section XIII above, none of the Parties will object to reinstatement of this Action in the same posture and form as it was pending immediately before the Execution Date.

    B.    All negotiations in connection herewith, and all statements made by the Parties at or submitted to the Court as part of the Fairness Hearing process, shall be without prejudice to the Parties to this Agreement and shall not be deemed or construed to be an admission by a Party of any fact, matter, or proposition, nor admissible for any purpose in the Action other than with respect to the settlement of same.

    C.    The Parties shall retain all defenses, arguments, and motions as to all claims that have been or might later be asserted in this Action, and nothing in this Agreement shall be raised or construed by any Party to defeat or limit any claims, defenses, arguments, or motions asserted by either Party.

**XV. MODIFICATION OF THIS AGREEMENT**

    A.    Before the Preliminary Approval Date, this Agreement, including the attached exhibits, may be modified only upon the written agreement of the Parties.

    B.    After the Preliminary Approval Date—including the time after which Final Judgment has been entered—this Agreement, including the attached exhibits, may be modified only with the written agreement of all the Parties and with the approval of the Court, upon such notice to the Class, if any, as the Court may require.

**XVI. RULES OF CONSTRUCTION**

    A.    The Parties acknowledge that this Agreement constitutes a negotiated compromise. The Parties agree that any rule of construction under which any terms or latent ambiguities are construed against the drafter of a legal document shall not apply to this Agreement.

    B.    This Agreement shall be construed in a manner to ensure its consistency with federal law. Nothing contained in this Agreement shall impose upon Defendants any duty, obligation, or requirement, the performance of which would be

1  inconsistent with federal statutes, rules, or regulations in effect at the time of such

2  performance.

3      C.    The headings in this Agreement are for the convenience of the Parties only and

4  shall not limit, expand, modify, or aid in the interpretation or construction of this

5  Agreement.

6  **XVII. INTEGRATION**

7      This Agreement and its exhibits constitute the entire agreement of the Parties, and no prior

8  statement, representation, agreement, or understanding, oral or written, that is not contained herein,

9  will have any force or effect.

10  **XVIII. EXECUTION**

11      This Agreement may be executed in counterparts. Facsimiles and Adobe PDF versions of

12  signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

13

14  For the Defendants:                  For the Plaintiffs:

15

16  *R. Charlie Merritt*

17  BRIAN D. NETTER                  EILEEN M. CONNOR (SBN 248856)
Deputy Assistant Attorney General      econnor@law.harvard.edu

18  STEPHANIE HINDS                 REBECCA C. ELLIS (*pro hac vice*)
United States Attorney                rellis@law.harvard.edu

19  MARCIA BERMAN                  LEGAL SERVICES CENTER OF
Assistant Branch Director            HARVARD LAW SCHOOL

20  R. CHARLIE MERRITT             122 Boylston Street

21  Trial Attorney                    Jamaica Plain, MA 02130
U.S. Department of Justice           Tel.: (617) 390-3003

22  Civil Division, Federal Programs Branch  Fax: (617) 522-0715

23  1100 L Street, N.W.
Washington, DC 20005

24  Telephone: (202) 616-8098        JOSEPH JARAMILLO (SBN 178566)
E-mail: robert.c.merritt@usdoj.gov    jjaramillo@heraca.org

25                                HOUSING & ECONOMIC RIGHTS
ADVOCATES

26                                3950 Broadway, Suite 200
Oakland, California 94611

27                                Tel.: (510) 271-8443
Fax: (510) 868-4521

28

# Exhibit A

**DRAFT**

**Internal Name:** BD Sweet v. Cardona – General Notification
**Internal Number:** 01
**Subject if sent electronically:** Notice of Proposed Class Action Settlement - Important borrower defense information for you

[DATE]

Borrower Defense Application #: [Case Number]

Dear [Primary Contact Name]:

**Your rights may be affected, please read carefully.**

You filed a borrower defense application asking the U.S. Department of Education ("Department") to cancel some or all of your federal student loan debt because you allege the school you (or your child) attended engaged in unlawful conduct.  We write to inform you that there is a proposed settlement in a class action lawsuit that could affect your claim and to explain how your legal rights may be affected by that lawsuit.

As a borrower defense applicant, you may have been previously informed of a class action lawsuit called *Sweet v. DeVos*, which challenged the Department's delay in issuing final decisions on borrower defense applications, including yours.  You may also have been informed in 2020 that the parties had proposed a settlement of the lawsuit, subject to the court's approval.  The court did not approve that proposed settlement, so the lawsuit continued.  You can find more information about that here: https://predatorystudentlending.org/news/press-releases/in-new-ruling-judge-denies-borrower-defense-settlement-over-department-of-educations-perfunctory-alarmingly-curt-denials-press-release/. The lawsuit now also challenges the Department's denial of certain borrower defense applications.

We now write to inform you that there is a new proposed settlement of the lawsuit.  The settlement will not become final until it is approved by the court as fair, adequate, and reasonable.  This Notice describes how your legal rights may be affected by this settlement.

**What is the case about?**

A lawsuit was filed in a federal court in California by seven borrower defense applicants who represent, with certain exceptions, all borrowers with pending borrower defense applications.  The lawsuit challenges the way the Department has been dealing with borrower defense applications over the past few years, including the Department's delays in issuing final decisions and the Department's denial of certain applications starting in December 2019.  The case is now called *Sweet v. Cardona*, No. 3:19-cv-3674 (N.D. Cal.).

Now, both parties are proposing to settle this lawsuit.  This proposed settlement is a compromise of disputed claims, and Defendants continue to deny that they have acted unlawfully.

**What are the terms of the proposed settlement for borrowers who applied for borrower defense relief *on or before June 22, 2022*?**

In the proposed settlement, the Department agrees to resolve the borrower defense applications of people who have borrower defense applications pending as of June 22, 2022 on the following terms:

- If your borrower defense application related to federal student loans borrowed to pay for attendance at a school on the list attached to this letter, you will receive a discharge of federal loans associated with that school and a refund of any amounts paid to the Department on those federal loans, and the credit tradeline for those loans will be deleted from your credit report. Within 90 days of the date that the court's approval of the settlement agreement becomes final, the Department will notify you that you will receive this relief. You will receive the relief within one year of the final effective date of the settlement agreement. Until this relief is provided, the Department will not take action to collect your debt.

- If your loans are not associated with a school on the list attached to this letter, you will receive a decision on your application according to the following schedule:

  o If you submitted your application between January 1, 2015 and December 31, 2017, the Department will issue a decision no later than 6 months after the court's approval of the settlement agreement becomes final.

  o If you submitted your application between January 1, 2018 and December 31, 2018, the Department will issue a decision no later than 12 months after the court's approval of the settlement agreement becomes final.

  o If you submitted your application between January 1, 2019 and December 31, 2019, the Department will issue a decision no later than 18 months after the court's approval of the settlement agreement becomes final.

  o If you submitted your application between January 1, 2020 and December 31, 2020, the Department will issue a decision no later than 24 months after the court's approval of the settlement agreement becomes final.

  o If you submitted your application between January 1, 2021 and June 22, 2022, the Department will issue a decision no later than 30 months after the court's approval of the settlement agreement becomes final.

- If you do not receive a decision within the timeline outlined above, you will receive a discharge of federal loans associated with your borrower defense applications and a refund of any amounts paid to the Department on those federal loans, and the credit tradeline for those loans will be deleted from your credit report.

- The Department will decide your application in a streamlined review process that will determine whether the application states a claim that, if presumed to be true, would assert a valid basis for

**App.180**

borrower defense; will not require further supporting evidence; will not require proof of reliance; and will not apply any statute of limitations to your application.

- If your application is approved under the procedures above, you will receive a discharge of federal loans associated with your borrower defense application and a refund of any amounts paid to the Department on those federal loans, and the credit tradeline for those loans will be deleted from your credit report.

- The Department will not deny your application without first providing instructions on what is required for a successful application and giving you the opportunity to resubmit your application.

  o If you choose to resubmit your application, you must do so within 6 months after receiving those instructions.  The instructions will explain that if you do not resubmit within the 6-month period, your application will be considered denied.

  o If you choose to resubmit your application within the 6-month time period after receiving the instructions, the Department will issue you a final decision no later than 6 months after receiving your resubmitted application.

- If you received a notice from the Department in December 2019 or later informing you that your borrower defense application was denied, that denial has been voided and the Department is reviewing your application pursuant to the terms described above.

**What are the terms of the proposed settlement for borrowers who applied for borrower defense relief *after June 22, 2022 but before final approval of the settlement*?**

- If you submitted your application after June 22, 2022, but before the court approves the settlement agreement, the Department will issue a decision on your application no later than 36 months after the court's approval of the settlement agreement becomes final.  If the Department does not issue a decision within that time period, you will receive a discharge of federal loans associated with your borrower defense application and a refund of any amounts paid to the Department on those federal loans, and the credit tradeline for those loans will be deleted from your credit report.

**Does the Department have any reporting obligations?**

- The Department will provide your lawyers with information about its progress making borrower defense decisions every three months, including how many decisions the Department has made and how many borrowers have received a loan discharge.

**What if my loan is in default?**

- If you are in default, the Department will not take action to collect your debt, such as by garnishing your wages (that is, taking part of your paycheck) or taking portions of your tax refund, while your application is pending or while you are waiting to receive any relief you are owed under the settlement.

**What happens next?**

The court will need to approve the proposed settlement before it becomes final.  The court will hold a public hearing, called a fairness hearing, to decide if the proposed settlement is fair.  The hearing will be held on _____, 2022, beginning at _____, at the following address:

> United States District Court
> Northern District of California
> 450 Golden Gate Avenue, Courtroom 12, 19th Floor
> San Francisco, California 94102

Information about the hearing, including the process for participation and virtual attendance (if any), will be posted at https://predatorystudentlending.org/cases/sweet-v-devos/.

**What should I do in response to this Notice?**

IF YOU AGREE with the proposed settlement, you do not have to do anything.  You have the right to attend the fairness hearing, at the time and place above, but **you are not required to do so.**

IF YOU DISAGREE WITH OR HAVE COMMENTS on the proposed settlement, you can write to the court or ask to speak at the hearing.  You must do this by writing to the Clerk of the Court, at the following mailing address:

> Clerk of the Court
> United States District Court
> Northern District of California
> 450 Golden Gate Avenue
> San Francisco, California 94102

You can also submit comments by email to the Clerk of Court at [email address]. Your written comments or request to speak at the fairness hearing must be postmarked or date-stamped by ____, 2022.  The Clerk will provide copies of the written comments to the lawyers who brought the lawsuit.

**Where can I get more information?**

There is more information about the *Sweet* lawsuit on Class Counsel's website at https://predatorystudentlending.org/cases/sweet-v-devos/. Check this site periodically for updated information about the lawsuit.

A copy of the proposed settlement is available online at https://predatorystudentlending.org/cases/sweet-v-devos/documents/.

If you have questions about this lawsuit or about the proposed settlement, please visit this Frequently Asked Questions page, https://predatorystudentlending.org/sweet-v-devos-class-members/, which also has contact information for the lawyers who brought the lawsuit.

Sincerely,

U.S. Department of Education

Federal Student Aid

# Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, *et al.*, | No. 3:19-cv-03674-WHA |
| Plaintiffs, | |
| v. | **ORDER APPROVING SETTLEMENT AGREEMENT AND ENTERING FINAL JUDGMENT** |
| MIGUEL CARDONA, in his official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | Hon. William Alsup |
| Defendants. | |

Following this Court's Order preliminarily approving the proposed Settlement Agreement ("Agreement"), Plaintiffs and Defendants ("the Parties") disseminated a Notice of Proposed Settlement and Fairness Hearing to the Plaintiff Class.  After consideration of the written submissions of the Parties, the Agreement between the Parties, any objections to the Agreement, all filings in support of the Agreement, and the presentations at the hearing held by the Court to consider the fairness of the Agreement, the Court hereby Orders, Finds, Adjudges, and Decrees that:

1.     The Agreement between the Parties is finally approved as fair, reasonable, and adequate.  The Court hereby incorporates the terms of the Agreement, executed by the Parties on June 22, 2022, into this Judgment Order.

2.     Except as provided in paragraph 3 of this Order, this action is hereby dismissed with prejudice.

3.     The Court shall retain jurisdiction over this action solely to enforce the terms of the Agreement, but only such jurisdiction as expressly set forth in Section V of the Agreement.

4.     Once Defendants have decided all Class Members' borrower defense claims, notified all Class Members of their final decisions (where applicable), and effectuated all

appropriate relief to Class Members, the Parties will file a notice with the Court.  Upon the date of

that notice, the Court's jurisdiction over this action shall completely terminate.

**IT IS SO ORDERED.**

Dated:

_____
The Honorable William Alsup
United States District Judge

# Exhibit C

*Sweet v. Cardona* Settlement Agreement Exhibit C

| School Owner(s) | School/Brand Name |
|---|---|
| Alta Colleges, Inc. (Westwood) | Westwood College |
| American Commercial Colleges, Inc. | American Commercial College |
| American National University | American National University |
| Ana Maria Piña Houde and Marc Houde | Anamarc College |
| Anthem Education Group; International Education Corporation | Anthem College |
| | Anthem Institute |
| Apollo Group | University of Phoenix |
| | Western International University |
| ATI Enterprises | ATI Career Training Center |
| | ATI College |
| | ATI College of Health |
| | ATI Technical Training Center |
| B&H Education, Inc. | Marinello School of Beauty |
| Berkeley College (NY) | Berkeley College |
| Bridgepoint Education | Ashford University |
| | University of the Rockies |
| Capella Education Company; Strategic Education, Inc. | Capella University |
| Career Education Corporation | American InterContinental University |
| | Briarcliffe College |
| | Brooks College |
| | Brooks Institute |
| | Collins College |
| | Colorado Technical University |
| | Gibbs College |
| | Harrington College of Design |
| | International Academy of Design and Technology |
| | Katharine Gibbs School |
| | Le Cordon Bleu |
| | Le Cordon Bleu College of Culinary Arts |
| | Le Cordon Bleu Institute of Culinary Arts |
| | Lehigh Valley College |
| | McIntosh College |
| | Missouri College of Cosmetology North |
| | Pittsburgh Career Institute |
| | Sanford-Brown College |
| | Sanford-Brown Institute |
| | Brown College |
| | Brown Institute |
| | Washington Business School |
| | Allentown Business School |
| | Western School of Health and Business Careers |
| | Ultrasound Diagnostic Schools |
| | School of Computer Technology |

| School Owner(s) | School/Brand Name |
| --- | --- |
|  | Al Collins Graphic Design School |
|  | Orlando Culinary Academy |
|  | Southern California School of Culinary Arts |
|  | California Culinary Academy |
|  | California School of Culinary Arts |
|  | Pennsylvania Culinary Institute |
|  | Cooking and Hospitality Institute of Chicago |
|  | Scottsdale Culinary Institute |
|  | Texas Culinary Academy |
|  | Kitchen Academy |
|  | Western Culinary Institute |
| Center for Employment Training | Center for Employment Training |
| Center for Excellence in Higher Education (CEHE) | California College San Diego |
|  | CollegeAmerica |
|  | Independence University |
|  | Stevens-Henager |
| Computer Systems Institute |  |
| Court Reporting Institute, Inc. | Court Reporting Institute |
| Cynthia Becher | La' James College of Hairstyling |
|  | La' James International College |
| David Pyle | American Career College |
|  | American Career Institute |
| Delta Career Education Corporation | McCann School of Business & Technology |
|  | Miami-Jacobs Career College |
|  | Miller Motte Business College |
|  | Miller-Motte College |
|  | Miller-Motte Technical College |
|  | Tucson College |
| DeVry | American University of the Caribbean |
|  | Carrington College |
|  | Chamberlain University |
|  | DeVry College of Technology |
|  | Devry Institute of Technology |
|  | DeVry University |
|  | Keller Graduate School of Management |
|  | Ross University School of Veterinary Medicine |
|  | Ross University School of Medicine |
| EDMC/Dream Center | Argosy University |
|  | The Art Institute |
|  | Brown Mackie College |
|  | Illinois Institute of Art (The) |
|  | Miami International University of Art & Design |
|  | New England Institute of Art (The) |
|  | South University |
|  | Western State University College of Law |
|  | All-State Career School |

*Sweet v. Cardona*  Settlement Agreement Exhibit C

| School Owner(s) | School/Brand Name |
|---|---|
| Education Affiliates (JLL Partners) | Fortis College |
| | Fortis Institute |
| Edudyne Systems Inc. | Career Point College |
| Empire Education Group | Empire Beauty School |
| Everglades College, Inc. | Everglades University |
| | Keiser University |
| FastTrain | FastTrain |
| Globe Education Network | Globe University |
| | Minnesota School of Business |
| Graham Holdings Company (Kaplan) | Bauder College |
| | Kaplan Career Institute |
| | Kaplan College |
| | Mount Washington College |
| | Purdue University Global |
| Grand Canyon Education, Inc. | Grand Canyon University |
| Infilaw Holding, LLC | Arizona Summit Law School |
| | Charlotte School of Law |
| | Florida Coastal School of Law |
| International Education Corporation | Florida Career College |
| | United Education Institute |
| ITT Educational Services Inc. | ITT Technical Institute |
| JTC Education, Inc. | Gwinnett College |
| | Medtech College |
| | Radians College |
| Laureate Education, Inc. | Walden University |
| Leeds Equity Partners V, L.P. | Florida Technical College |
| | National University College |
| | NUC University |
| Liberty Partners | Concorde Career College |
| | Concorde Career Institute |
| Lincoln Educational Services Corporation | International Technical Institute |
| | Lincoln College of Technology |
| | Lincoln Technical Institute |
| Mark A. Gabis Trust | Daymar College |
| Mission Group Kansas, Inc. | Wright Business School |
| | Wright Career College |
| Premier Education Group L.P. | American College for Medical Careers |
| | Branford Hall Career Institute |
| | Hallmark Institute of Photography |
| | Hallmark University |
| | Harris School of Business |
| | Institute for Health Education (The) |
| | Micropower Career Institute |
| | Suburban Technical School |
| | Salter College |
| | Beckfield College |

**App.189**

*Sweet v. Cardona*  Settlement Agreement Exhibit C

| School Owner(s) | School/Brand Name |
|---|---|
| Quad Partners LLC | Blue Cliff College |
| | Dorsey College |
| Remington University, Inc.; Remington College BCL, Inc. | Remington College |
| Southern Technical Holdings, LLC | Southern Technical College |
| Star Career Academy | Star Career Academy |
| Sullivan and Cogliano Training Center, Inc. | Sullivan and Cogliano Training Centers |
| TCS Education System | Chicago School of Professional Psychology |
| Vatterott Educational Centers, Inc. | Court Reporting Institute of St Louis |
| | Vatterott College |
| Wilfred American Education Corp. | Robert Fiance Beauty Schools |
| | Robert Fiance Hair Design Institute |
| | Robert Fiance Institute of Florida |
| | Wilfred Academy |
| | Wilfred Academy of Beauty Culture |
| | Wilfred Academy of Hair & Beauty Culture |
| Willis Stein & Partners (ECA) | Brightwood Career Institute |
| | Brightwood College |
| | New England College of Business and Finance |
| | Virginia College |