# PLAINTIFF-APPELLEES' SUPPLEMENTAL APPENDIX

## OPPOSITION TO MOTION FOR STAY PENDING APPEAL

| Docket No. | Date | Description | Page |
|---|---|---|---|
| ECF 382 | 02/24/2023 | Order re Motion to Stay Judgment Pending Appeal | Supp.A.1 |
| n/a | 02/27/2023 | U.S. Dep't of Educ., Office of Fed. Student Aid, "Initial Report under Settlement Agreement in Sweet et al. v. Cardona" | Supp.A.26 |
| ECF 492 | 11/06/2025 | Defendants' Notice of Motion and Motion for Temporary Relief from Judgment | Supp.A.29 |
| ECF 502 | 11/21/2025 | Plaintiffs' Opposition and Motion to Strike Defendants' Motion for Relief from Judgment | Supp.A.55 |
| ECF 502-1 | 11/21/2025 | Declaration of Rebecca C. Ellis, Esq. | Supp.A.80 |
| ECF 502-2 | 11/21/2025 | Declarations of Post-Class Applicants | Supp.A.162 |
| ECF 502-3 | 11/21/2025 | Declarations of Post-Class Applicants | Supp.A.227 |

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, et al.,

      Plaintiffs,                No.  C 19-03674 WHA

     v.

MIGUEL CARDONA, et al.,         **ORDER RE MOTION TO STAY**
**JUDGMENT PENDING APPEAL**
      Defendants.

---

## INTRODUCTION

On November 16, 2022, a settlement between the United States Secretary of Education and a class of student-loan borrowers received final approval.  The entry of final judgment started a 60-day clock to appeal.  Of roughly half a million class members, none appealed the final approval order.  But on day 58, three intervenor schools did.  They now move this district court for a stay pending appeal.  Specifically, they move to stay the entire judgment or, in the alternative, the judgment as to them.

Recall this settlement is independent from the more far-reaching loan forgiveness initiative under review by the Supreme Court.  And notwithstanding the broad relief that this settlement provides, the instant motion turns on a narrow question:  have these three intervenor schools shown that they are likely to succeed on the merits of their appeals and suffer irreparable harm absent a stay?  This order concludes that they have not.

United States District Court
Northern District of California

For the following reasons, the motion to stay judgment pending appeal is **DENIED**.  To the extent stated below, this order temporarily stays judgment with respect to discharges and discharge requests for loans associated with the three intervenor schools to allow the three intervenor schools to present a stay motion to our court of appeals.

## STATEMENT

The final approval order described the factual background and procedural history at length.  *See Sweet v. Cardona*, 2022 WL 16966513, at *1–4 (N.D. Cal. Nov. 16, 2022).  Here, they will be sketched in broader strokes and supplemented with the latest developments.

### 1.   FROM "FLOOD OF CLAIMS" TO FINAL APPROVAL.

In 1994, the Secretary of Education established the first "borrower defense" program for federal student loans, allowing a borrower to "assert as a defense against repayment[] any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."  59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994); *see also* 60 Fed. Reg. 37,768 (July 21, 1995).

Twenty years passed in which the borrower-defense regulations largely lay dormant (AR 590).  But after the collapse of one of the nation's largest for-profit college chains in 2015, the Department of Education faced a "flood of borrower defense claims."  81 Fed. Reg. 39,330, 39,330 (June 16, 2016).  The agency updated its regulations to expedite application processing and created a "Borrower Defense Unit" to address the backlog.  81 Fed. Reg. 75,926 (Nov. 1, 2016); (AR 341).  Yet thousands more applications poured in, including from borrowers who attended other schools, and the backlog persisted (AR 339–41).

In 2017, a new Secretary paused claim adjudications to review the borrower-defense procedures and then stopped conducting claim adjudications entirely (AR 502–03).  For eighteen months, well into this suit, she issued zero decisions (AR 350).  As of June 2019, borrowers had filed 272,721 total applications, 210,168 of which remained pending (AR 399–400).  Named plaintiffs filed this action to require the Secretary to carry out her statutory duty to adjudicate borrower-defense applications.

Supp.A.2

After the certification of a Rule 23(b)(2) class and the filing of cross-motions for summary judgment, plaintiffs (a class of borrowers) and defendants (the Secretary and the Department) ostensibly reached a settlement and moved for preliminary approval. That settlement received preliminary approval in May 2020 but failed to receive final approval four months later once it became known that there was, in fact, no meeting of the minds; unbeknownst to the class and the undersigned, the Secretary had adopted a practice of sending form-denial notices to borrowers. Following a trip to our court of appeals to clarify permissible discovery and the filing of new cross-motions for summary judgment, plaintiffs and defendants reached the instant settlement and again moved for preliminary approval. This settlement received preliminary approval in August 2022 and final approval that November (Dkt. No. 246-1).

In brief, the settlement agreement sorts class members into three groups. For group one (approximately 200,000 borrowers), it provides for "full," "automatic" relief, *i.e.*, discharge of federal loans, cash refunds of amounts paid to the Department, and credit repair. This relief goes to class members who attended one of the 151 schools listed in Exhibit C to the agreement. As explained in the joint motion for final approval, "certain indicia of misconduct by the listed schools, including the high volume of Class Members with applications related to the listed schools, led the Department to conclude that these Class Members were entitled to summary settlement relief without any further time-consuming individualized review process" (Dkt. No. 323 at 11).

Meanwhile, for groups two and three, the agreement provides for streamlined borrower-defense application adjudication. Specifically, for group two (approximately 64,000 borrowers), it provides for decisions within specified periods of time correlated to how long the applications have been pending, with certain presumptions in favor of the borrower. And for group three (those who submitted applications after the execution of the settlement but before final approval, approximately 206,000 borrowers), it provides for decisions within three years of final approval without such presumptions. If the Secretary does not render decisions

3

United States District Court
Northern District of California

on applications for borrowers in groups two and three within the periods of time set out in the agreement, those borrowers receive full, automatic relief like borrowers in group one.

At the preliminary approval stage, four schools moved to intervene to oppose the settlement:  American National University (ANU), the Chicago School of Professional Psychology (CSPP), Everglades College, Inc. (Everglades), and Lincoln Educational Services Corporation (Lincoln).  These schools took issue with their inclusion on Exhibit C, which they labeled a "scarlet letter."  An order found the schools could not intervene as of right but could permissively intervene to object to the settlement.  When plaintiffs and defendants moved for final approval, each intervenor school filed an opposition, which the final approval order discussed in detail.  The settlement received final approval on November 16, 2022, and the entry of final judgment that day started a 60-day clock to appeal the final approval order.[1]

## 2.    THE LATEST DEVELOPMENTS.

Fifty-eight days later, on January 13, 2023, three of the four intervenor schools noticed appeals and jointly moved this district court to stay judgment pending the resolution of their appeals.[2]  In their motion, ANU, Everglades, and Lincoln explained that they filed "[i]n an abundance of caution," convinced the settlement agreement "itself is best read to delay the Effective Date during an appeal or until the final judgment is not subject to any further review" (Br. 1–2) (internal quotation and citation omitted).  Movants requested a stay of the entire judgment or, in the alternative, a stay of the judgment only as to movants, recognizing they "represent only a miniscule fraction of the claims included in the class" and "do not wish to prevent a legitimate settlement of this case or prevent granting of meritorious [borrower-defense] applications" (Br. 25).  All parties were subsequently notified that the impact of the

---

[1] Because the United States is a party to this litigation, the original deadline to file a notice of appeal was sixty days after the entry of final judgment.  Fed. R. App. P. 4(a)(1)(B).  Sixty days after November 16, 2022, was January 15, 2023.  That day, however, fell on a Sunday, and the following Monday was Martin Luther King Day.  Thus, had the three intervenor schools not extended the deadline by noticing appeals, the original deadline would have been January 17, 2023.  Fed. R. App. P. 4(a)(3).

[2] CSPP neither noticed an appeal nor joined the motion to stay.

4

United States District Court
Northern District of California

1    stay motion and its pendency on the settlement would be discussed at a status conference set

2    for January 26, 2023.

3          At the status conference, fireworks erupted.  After explaining that plaintiffs and

4    defendants disputed movants' reading of the Effective Date — which they believed was

5    actually two days away, on January 28, 2023 — counsel revealed that the Department planned

6    to undertake "immediate actions" the following business day, on January 30, 2023 (Tr. 5).

7    These immediate actions included "sending lists to servicers so that those servicers could start

8    performing discharges, and that would include about 99-percent of borrowers in Exhibit C,"

9    with the expectation that some servicers would discharge loans "within that week" (Tr. 6, 9).

10   The Department also planned to email "borrowers, including substantially all Exhibit C

11   borrowers, letting them know about settlement relief," email "borrowers notifying them that

12   the denials had been rescinded and their cases had been reopened," "update its own internal

13   tracking system to reflect . . . [that those borrowers'] status had been changed," and "begin the

14   adjudication process for reopening cases" (Tr. 5–6).  According to the defendants, "the

15   Department really need[ed] all the time that[] [was] allowed under the settlement to fully

16   satisfy its obligations" (Tr. 6).  Movants asked, "at the very least[,] that the Court implement an

17   administrative stay through its decision on the underlying stay motion" (Tr. 15).

18         Seeking to balance fairness to plaintiffs and defendants in maintaining the settlement's

19   momentum with fairness to movants in allowing them an opportunity to be heard, the

20   undersigned proposed delaying loan discharges and discharge requests for borrowers who

21   attended movants' schools until the stay motion could be heard and ruled upon.  But counsel

22   for defendants explained that the Department could not, at that time, separate out discharge

23   requests for borrowers who attended movants' schools.[3]  In light of this disclosure, the

24   undersigned ordered that no discharge requests be sent and no loans be discharged until a

25   hearing took place and an order on the stay motion issued.  That hearing occurred on February

26   15, 2023.  This order follows full briefing and oral argument.

27

28   _____

     [3] Defendants have since filed declarations describing changes made to facilitate separating out
     these requests (Dkt. Nos. 363, 376).

Supp.A.5

Before proceeding, it is important to reiterate that this order does not involve President Biden's plan to forgive student debt under review by the Supreme Court. *See Biden v. Nebraska*, No. 22-506; *Dep't of Educ. v. Brown*, No. 22-535. Rather, it involves approval of a discrete settlement involving a group of borrowers who filed borrower-defense applications. And this discrete settlement is based on a separate policy, enacted under a separate legal authority, designed to serve different purposes under different circumstances. *See Sweet*, 2022 WL 16966513, at *4–7.

## ANALYSIS

It is well-established that a "stay is not a matter of right" but "an exercise of judicial discretion." *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion," and the "propriety" of the stay "is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009); *Virginian Ry. Co.*, 272 U.S. at 672–73.

In ruling on a motion to stay pending appeal, a district court considers four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 426 (citation omitted). Under our court of appeals' "sliding scale" approach, a stronger showing of one factor may offset a weaker showing of another. *Leiva-Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011). But the Supreme Court has made clear that the "most critical" factors are the first two; once they are satisfied, the third and fourth factors are considered. *Nken*, 556 U.S. at 434–35.

### 1.    EFFECTIVE DATE OF THE SETTLEMENT: JANUARY 28, 2023.

Prior to considering the stay factors, however, this order must address a threshold question raised by the motion: whether the settlement is now in effect. Movants maintain that the settlement "provides for a self-executing stay pending appeal" (Reply Br. 2). Accordingly, "[i]f the Court recognizes that the Settlement cannot take effect until appeals are resolved, the

Supp.A.6

Court need not consider equitable stay relief" (*ibid.*). The implication seems to be that if there is no settlement in effect, there is no reason to stay judgment. Movants base their arguments on interrelated provisions in the settlement agreement: Sections II.K and XIII.A.

### A.    SECTION II.K.

Section II.K defines Effective Date based on two potential events:

> the date upon which, if this Agreement has not been voided under Section XIII, the Final Judgment approving this Agreement, entered by the Court in the form attached hereto as Exhibit B, becomes non-appealable, or, in the event of an appeal by a Class Member based upon a timely filed objection to this Agreement, upon the date of final resolution of said appeal.

(Dkt. No. 246-1 § II.K). Movants assert that the first potential event, final judgment "becom[ing] non-appealable," has not occurred because final judgment "*has been appealed*" (Reply Br. 2 (emphasis in original); *see* Br. 22). Meanwhile, acknowledging that the second potential event, "the date of final resolution of said appeal," anticipates "appeal by a Class Member," movants declare that this language is best read to cover their appeals as well because it was "written prior to intervention" (Br. 20). Walking this back a bit, they add that even if this language does not cover their appeals, it establishes that the settling parties agreed delaying the Effective Date would be necessary to prevent harm upon reversal (*ibid.*).

For their part, the settling parties reiterate that the Effective Date is January 28, 2023, pursuant to Section II.K. Both read final judgment "becom[ing] non-appealable" as "the expiration of the time to appeal the District Court's final judgment" (Plaintiffs' Opp. 18; *see also* Defendants' Opp. 8). As explained by plaintiffs, because movants timely noticed appeals on January 13, 2023, this extended the deadline for others to notice appeals fourteen days from that date under Federal Rule of Appellate Procedure 4(a)(3). Thus, final judgment "bec[ame] non-appealable" the following day, January 28, 2023, and Section II.K's first potential event defined the Effective Date (Plaintiffs' Opp. 18 n.9).

Both settling parties vehemently contest movants' suggestion that the second potential event is applicable when no class member appealed the settlement. According to defendants, "[n]othing in the settlement agreement contemplates delaying the [E]ffective [D]ate based on

Supp.A.7

an appeal by a non-class member . . . [a]nd for good reason, as this litigation concerns the rights of borrowers and the harm that attends delay in resolving their borrower defense claims" (Defendants' Opp. 8). According to plaintiffs, "[t]he Settlement is not ambiguous; there is no need to turn to canons of construction to see that it intends for the Effective Date to be delayed only by a class member's appeal" (Plaintiffs' Opp. 18).

This order finds that the plain language of the settlement agreement supports the interpretation of its signatories. Movants conflate "the date upon which . . . Final Judgment approving this Agreement . . . becomes non-appealable" (§ II.K) and the date of "a non-appealable judgment" (Reply Br. 2). This is a paradigmatic distinction with a difference. Once movants noticed appeals on January 13, 2023, they extended the deadline for other parties to notice appeals fourteen days from that date, through January 27, 2023. Fed. R. App. P. 4(a)(3). Thus, final judgment "bec[ame] non-appealable" the next day, January 28, 2023. That is the Effective Date — a steady point of reference in a turbulent world.

True, Section II.K demonstrates the settling parties had agreed that delaying the Effective Date would be necessary to prevent harm upon reversal. As plaintiffs and defendants attest, however, this provision was drafted (and approved) with an eye to the harm that would befall *class members* eager to move on with their lives and without the threat of collection. For that reason, the settlement agreement allows for delaying the Effective Date "in the event of an appeal by a Class Member based upon a timely filed objection to this Agreement."

This order will not read in "intervenor" or "school" where the settlement agreement clearly says "Class Member." Not only would this contravene the stated intent of the signatories — and brazenly violate some of the more widely accepted canons of construction — but it would unduly equate the (accepted) rights and harms of class members and (contested) rights and harms of movants that are implicated by the settlement. Movants are parties to this litigation, but they were not parties to this settlement agreement, which was carefully negotiated after years of heated litigation between the class of borrowers and the Secretary. The Court allowed movants to permissively intervene to oppose the agreement, but it will not entertain their attempts to re-write it.

Supp.A.8

**B.     SECTION XIII.A.**

Movants also invoke Section XIII.A, which provides:  "This Agreement shall be void if it is not approved as written by a final Court order not subject to any further review" (Dkt. No. 246-1 § XIII.A).  According to movants, this provision "powerfully confirms that the Effective Date is delayed until all appeals are resolved" (Reply Br. 2).  Defendants do not address this provision specifically, but plaintiffs counter that "[t]he plain, logical reading of the interaction between Section II.K and Section XIII.A is that the Settlement would not become effective if it were not finally approved" in a final approval order (Plaintiffs' Opp. 18 n.8).  Meanwhile, movants' "counter-textual interpretation would create the absurd result of rendering the Settlement Agreement void from the moment it was approved" (*ibid.*).

This order agrees with plaintiffs.  In the motion to stay, movants reason that "the Settlement is *void* altogether unless approved by a final order that is 'not subject to any further review'" (Br. 22) (emphasis in original).  By extension, movants suggest that the agreement is now void under Section XIII.A because their appeals reflect "it is not approved as written by a final Court order not subject to any further review."  Consequently, the Effective Date cannot be "the date upon which, if this Agreement has not been voided under Section XIII, the Final Judgment approving this Agreement . . . becomes non-appealable" under Section II.K because the agreement *has* "been voided under Section XIII."  But if this agreement is now void, there can be no "self-executing stay pending appeal" because there can be no Effective Date to delay.  Indeed, there can be no approved settlement to appeal.  As counsel for Lincoln acknowledged at the status conference, "the agreement provides that if the agreement is void, the consequence of that is the parties resume litigating . . . as they were before the settlement agreement" (Tr. 13; *see* Dkt. No. 246-1 § XIV.A).

The undersigned is not convinced that plaintiffs and defendants negotiated a settlement that could conceivably lock them into settlement negotiation forever, sending them back to the drawing board with each noticed appeal irrespective of its merit.  Movants do not appear convinced either, as they equivocate in their reading of the term "void."  At the status conference, for example, counsel for Lincoln explained, "[w]e can't know whether the

1    agreement is void until the judgment is not subject to any further review" (Tr. 11). Yet if *this*

2    is the case, and Section XIII.A delays the Effective Date indefinitely until all appeals are

3    resolved, it short circuits Section II.K. That provision's two potential events for defining

4    Effective Date would then only be evaluated "if this Agreement has not been voided under

5    Section XIII," at which point the second potential event would always be superfluous. In the

6    event of an unsuccessful class member appeal, "the date of final resolution of said appeal" and

7    "the date upon which . . . the Final Judgment approving this Agreement . . . bec[ame] non-

8    appealable" would invariably be identical. The settlement agreement cannot be read to create

9    such redundancy.

10       In sum, this order concludes that the Effective Date of the settlement agreement is

11   January 28, 2023. As such, the settlement is now in effect. The actions anticipated by the

12   settlement that have yet to take effect — effecting loan discharges and sending discharge

13   requests — are actions administratively stayed awaiting this order. Because there is no "self-

14   executing stay pending appeal," this order turns to whether movants have carried their burden

15   of showing that the circumstances warrant a stay of judgment based on the stay factors.

16       **2.    INADEQUATE SHOWING OF IRREPARABLE INJURY TO MOVANTS.**

17       Whether movants will be irreparably injured absent a stay will be considered first.

18   "[S]imply showing some possibility of irreparable injury fails to satisfy [this] factor." *Nken*,

19   556 U.S. at 434. "An applicant for a stay pending appeal must show that a stay is necessary to

20   avoid likely irreparable injury to the applicant while the appeal is pending." *Al Otro Lado v.*

21   *Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (citing *Nken*, 556 U.S. at 434). Thus, "[t]he

22   minimum threshold showing for a stay pending appeal requires that irreparable injury is likely

23   to occur during the period before the appeal is likely to be decided." *Ibid.* (citing *Leiva-Perez*,

24   640 F.3d at 968). Accounting for all evidence on this record — even the new and tardy

25   evidence plaintiffs sought to strike from movants' reply and attached declarations — movants

26   do not make the minimum threshold showing here.

27       Their irreparable injury arguments fall into two categories: purported regulatory harm

28   and purported reputational harm. (Conspicuously absent is purported financial harm: recall,

the settlement does not require any school to make any payment.)  These categories will be taken up in turn.

### A.    PURPORTED REGULATORY HARM.

Starting with purported regulatory harm, movants argue that their rights enshrined in the Department's borrower-defense regulations stand to be violated in effecting the settlement. According to movants, the settlement "will eliminate an essential step of the administrative process" because "[t]here will no longer be [borrower-defense] proceedings at the Department in which the schools can participate to defend their reputations" and they "will also be denied a reasoned decision on each [borrower-defense] claim" (Br. 18–19).  Thus, the "schools will immediately be denied *their* right to an agency process defined by duly promulgated regulations" (Br. 19) (emphasis in original).  But as plaintiffs and defendants explain, movants seriously overstate their rights under the borrower-defense regulations, which are not even implicated.

The final approval order summarized the regulations that govern a school's participation in the borrower-defense administrative process.  *See Sweet*, 2022 WL 16966513, at *9; *see also* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (new regulations effective July 2023).  Briefly here, while carrying out fact-finding in review of a borrower-defense application, the Department gives a school notice and an opportunity to file a responsive statement.  34 C.F.R. §§ 685.222(a)(1), (a)(2), (e)(3)(i); 685.206(c)(2), (e)(8)–(12).  The school is not required to respond, and only a borrower is entitled to a reasoned decision (upon *denial* of a borrower-defense application).  *Id*. § 685.222(e)(4)(ii).  Upon approval of a borrower-defense application, if the Department elects to initiate a proceeding against a school for recoupment of an amount discharged, it gives this school a statement of facts and law, as well as an opportunity to respond, request a hearing, and litigate the merits *de novo*.  *Id.* §§ 685.308(a)(3); 668.87(a)–(b).

As defendants point out, however, "[t]he settlement does not call for the Department to adjudicate the borrower defense applications of the group of class members to which Exhibit C applies, nor does the provision of full settlement relief to those class members constitute

11

Supp.A.11

1  borrower defense decisions" (Defendants' Opp. 7).  In other words, the settlement does not call

2  for the Department to adjudicate the borrower-defense applications of class members who

3  attended movants' schools, nor does the provision of full settlement relief to these class

4  members constitute decisions on their borrower-defense applications.  Accordingly, the relief

5  provided to class members who attended movants' schools does not trigger the borrower-

6  defense regulations.  Movants therefore cannot be deprived of any rights under the borrower-

7  defense regulations through effecting the settlement.

8      Plaintiffs stress that "the Department has repeatedly stated that it will not seek to recoup

9  any of the amounts discharged pursuant to the settlement" (Plaintiffs' Opp. 6) (emphasis

10  omitted).  The reader should keep in mind, however, that the Department *cannot* recoup

11  amounts discharged pursuant to the settlement from movants.  This is because the settlement

12  does not call for the adjudication of borrower-defense applications of class members who

13  attended movants' schools (as explained above).  Thus, "[t]he school's actions that gave rise to

14  a successful claim for which the Secretary discharged a loan, in whole or in part, pursuant to

15  § 685.206, § 685.214, § 685.216, or § 685.222" (the borrower-defense regulations) cannot be

16  the predicate for the Department to initiate proceedings against movants for recoupment.

17  34 C.F.R. § 685.308(a)(3).  Under the settlement, the loans of class members who attended

18  movants' schools are discharged pursuant to a separate authority.  *See Sweet*, 2022 WL

19  16966513, at *4–7.

20      Recoupment of amounts discharged pursuant to the settlement from movants is also

21  foreclosed by the Miller Declaration.  As explained in the final approval order, the Department

22  has "represented in the sworn declaration of Benjamin Miller that it does not consider inclusion

23  on Exhibit C a finding of misconduct and that inclusion does not constitute evidence that could

24  or would be considered in an action by the Department against a school.  The Court relied

25  upon, and the Court expects the government to stand behind, the statements made in the Miller

26  Declaration." *Id.* at *10 (citing Dkt. No. 288-1).  Because there can be no recoupment from

27  movants pursuant to the settlement, there can be no deprivation of movants' rights in

28  recoupment proceedings pursuant to the settlement.

1    To summarize, movants' rights under the borrower-defense regulations are simply not

2 implicated by the settlement and the relief it provides to class members who attended movants'

3 schools.  Thus, movants do not suffer any regulatory harm — let alone irreparable regulatory

4 harm — in the absence of a stay.

5                    **B.    PURPORTED REPUTATIONAL HARM.**

6    Next, this order turns to purported reputational harm.  In some instances, movants

7 contend that they "are experiencing irreparable harm by being branded with the Exhibit C

8 scarlet letter, and that harm will intensify after the Settlement's Effective Date" (Br. 18).  In

9 others, they claim that they "will suffer irreparable harm to their reputations, goodwill, and

10 standing with regulators if the Settlement takes effect" (*id*. at 20).  According to movants, "all

11 schools on Exhibit C will immediately suffer the stigma of having all [borrower-defense]

12 claims against them summarily granted — without any administrative process, judicial fact-

13 finding, or reasoned decision on the merits" (*id*. at 19).  They aver that "this unproven stigma

14 will carry the imprimatur of both the Department and the final judgment of a federal court that

15 deemed the Department's finding fair and reasonable," and "[i]t will be impossible to fully

16 reverse that stigma after class members receive their promised relief" (*ibid*.).  Plaintiffs and

17 defendants respond, *inter alia*, that movants fail to offer satisfactory evidence of any

18 reputational injury likely to befall movants as a result of the settlement that a stay would allow

19 movants to avoid (Plaintiffs' Opp. 6–8; Defendants' Opp. 9–10).  This proves to be the silver

20 dagger to the "scarlet letter."

21    At the outset, to the extent that movants argue they "*are* experiencing irreparable harm by

22 being branded with the Exhibit C scarlet letter" (back in June 2022), they cut off their noses to

23 spite their faces (Br. 18) (emphasis added).  Recall, "[a]n applicant for a stay pending appeal

24 must show that a stay is necessary to avoid likely irreparable injury to the applicant while the

25 appeal is pending."  *Al Otro Lado*, 952 F.3d at 1007 (citing *Nken*, 556 U.S. at 434).  If the

26 reputational injury experienced by movants is already irreparable, it is unclear why a stay

27 would be necessary to avoid irreparable injury pending appeal.  As movants recognize, the

28 harm inquiry requires consideration of "the significance of the change from the status quo

United States District Court
Northern District of California

13

which would arise in the absence of a stay" (Br. 18 (quoting *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 206 (D.D.C. 2017) (Judge Rudolph Contreras)). According to movants' theory of harm here, however, in the absence of a stay, there would be no change from the status quo. Exhibit C would continue to "brand" them, either indefinitely or until our court of appeals reverses or vacates judgment. Put simply, issuing a stay would have no effect.

But to the extent that movants argue they "*will* suffer irreparable harm to their reputations, good will, and standing with regulators if the Settlement takes effect," their showing is weak (Br. 20) (emphasis added). Movants were on notice they would have to make this showing here. In their stay motion, they cite the correct legal standard and entitle a section "Intervenors Will Suffer Irreparable Harm Absent a Stay" (*id.* at 2, 18–22). What's more, the final approval order expressly cautioned that "intervenors' speculative assertions of harm fail to render the settlement unfair, especially in light of the significant benefits to both the class and the Department in settling this litigation." *Sweet*, 2022 WL 16966513, at *10. Two months after that order issued — and more than seven months after the settlement and Exhibit C were made public — movants' assertions of reputational harm remain markedly speculative, "grounded in platitudes rather than evidence." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

### (i)      Evidence Presented with the Motion.

In support of the reputational harm arguments made in their stay motion, movants cite a report from a students' rights advocacy group, the National Student Legal Defense Network, that has purportedly "leveraged Lincoln's mere inclusion on Exhibit C to pressure and criticize the Department for recently renewing its Program Participation Agreement [(PPA)] with Lincoln College of Technology," an agreement that is necessary for receipt of Title IV funding (Br. 21 (citing Townsend Decl. Exh. 1)). The report is attached to the motion in an attorney declaration, along with an article from the publication *Higher Ed Dive* describing this report (Townsend Decl. Exh. 2). Neither the report nor the article supports a showing of irreparable reputational harm to movants that a stay would counteract.

United States District Court
Northern District of California

The National Student Legal Defense Network report explains that "[i]n recent months, the Department has affirmatively granted new PPAs to numerous for-profit colleges with a history of law enforcement activity and consumer fraud abuses," and "[t]his includes schools that the Department itself has determined to have 'strong indicia' of having engaged in 'substantial misconduct' that had either been 'credibly alleged' or 'proven'" (Townsend Decl. Exh. 1 at 2).  As defendants observe, movants make no effort to explain why, in light of this "history of law enforcement activity and consumer fraud abuses," any reputational harm experienced by Lincoln that is reflected in or compounded by the report is attributable to Exhibit C (Defendants' Opp. 9 n.3).  In fact, the heading for the section in the report discussing Lincoln is titled, "The Department Awarded a New Contract to Lincoln Tech After *Massachusetts Attorney General* Maura Healey Issued a Civil Investigatory Demand and while the *MA AG Borrower Defense Claim* on Behalf of Lincoln Tech Students Remains Pending at [the Department]" (Townsend Decl. Exh. 1 at 2) (emphasis added).

This section recounts a series of enforcement activities involving Lincoln:

> In July 2015, the Massachusetts Attorney General ("MA AG") entered a consent judgment with Lincoln Tech and Lincoln Educational Services (collectively "Lincoln") to resolve allegations that the school violated state consumer protection law regarding its enrollment, disclosure, admissions, and educational practices. Lincoln agreed to pay $850,000 and forgive $165,000 in student debt to resolve an investigation into the disclosure and reporting of job placement data for a single program of study at two Lincoln Tech campuses in Massachusetts.  In January 2016, the MA AG sent a letter to the Department of Education seeking a discharge of debt for affected students.

> In the meantime, Lincoln has been the subject of numerous law enforcement inquiries.  In September 2021, the Department's Inspector General determined that Lincoln failed to follow federal requirements associated with COVID-19 emergency relief programs.  In December 2021, the school received a letter from the Consumer Financial Protection Bureau ("CFPB") stating that the CFPB was requesting information and assessing conduct regarding the school's "extensions of credit" to its students.  That same month, the Department cited Lincoln for "untimely refunds," demanding that Lincoln provide a financial surety to the Department.  On June 7, 2022, the MA AG issued a new civil investigative demand to investigate consumer misconduct "in connection with their policies regarding fee refunds and associated disclosures to students and prospective students."  Lincoln reports to be "cooperating" with the MA AG investigation.

Supp.A.15

(*id*. at 2–3) (footnotes omitted). It is only after a survey of "numerous law enforcement inquiries" that the report matter-of-factly states: "Meanwhile, as noted above, in 2022, the Department included Lincoln on its list of schools with a 'strong indicia' of having engaged in 'substantial misconduct' that had either been 'credibly alleged' or 'proven'" (*id*. at 3). The relationship between alleged stigma and approved settlement is thereby strained. Perhaps this report could support a showing of stigma afflicting Lincoln, but it does not support a showing of stigma *likely deriving from Exhibit C* or a showing of stigma *that a stay would likely offset*. Lincoln seems to make a scapegoat of the settlement here.

The article from *Higher Ed Dive* also discusses law enforcement inquiries (*see* Townsend Decl. Exh. 2 at 1 ("The U.S. Department of Education is allowing several for-profit colleges to continue accessing federal financial aid even though they're facing scrutiny from state attorneys general and their accreditors, according to a new report from the National Student Legal Defense Network.")). And it offers an even-handed summary of Exhibit C, going so far as to observe that "some institutions on the list have objected to the idea that the settlement proves wrongdoing on their behalf" and "[a] federal judge who approved the settlement wrote that the list of 151 colleges does not brand them with 'an impermissible scarlet letter'" (*id*. at 2). Lincoln even provided a statement for the article: "We believe the report strongly mischaracterizes the issues and does not properly reflect the respective outcomes" (*id*. at 3). Again, in light of the "scrutiny from state attorneys general and their accreditors," the asserted connection between stigma and settlement is too attenuated. Using this article, movants have not shown that Exhibit C will cause them any reputational injury. Indeed, the very issuance of a PPA to Lincoln and other schools listed on Exhibit C powerfully signals that the Department sees no stigma arising from Exhibit C.

Based on the evidence presented with their motion, movants have not shown that a stay would avoid any reputational injury to them, let alone irreparable reputational injury.[4]

---

[4] Elsewhere, movants cite a public statement by plaintiffs' counsel, about schools that "cheated" students, as a direct consequence of Exhibit C that caused movants harm (Br. 21 (citing Dkt. No. 325-4 at 5)). Counsel's statement did not mention Exhibit C or any school on Exhibit C, so the statement cannot be read that way.

### (ii)   *Evidence Presented with the Reply.*

Tellingly, movants raise new evidence in their reply, drawing from new declarations (Reply Br. 9–13).  They cite Lincoln executive Francis Giglio's declaration for the illustrative example that "six months after Exhibit C was released, Lincoln was denied an opportunity to speak with a class at Centennial High School in Nevada specifically because 'Lincoln Tech is on the U.S. Department of Ed's list of predatory schools'" (Reply Br. 11 (citing Giglio Decl. ¶ 4)).  For his part, Mr. Giglio cites and attaches a post on the Federal Trade Commission's website that he alleges "expressly equates inclusion on Exhibit C with deceptive practices," and he describes harm to Lincoln flowing from disclosure of this litigation as a material risk in securities filings with the Securities Exchange Commission (Giglio Decl. ¶¶ 6, 9).  Meanwhile, movants rely on Everglades executive Joseph Berardinelli's declaration for its proposition that "[s]ome lenders have expressed concern and begun inquiring about the Settlement as part of their due diligence, which has (1) required [Everglades] to dedicate resources to addressing those questions and concerns, (2) delayed and/or increased the cost of financing, and (3) caused in some instances, potential lenders not to provide financing" (Berardinelli Decl. ¶ 13; *see* Reply Br. 11).  Plaintiffs formally object to these excerpts and request they be struck from the record because they allegedly involve untimely evidence that should have been presented with the motion to stay (Dkt. No. 361).[5]

Generally, a district court declines to consider information and arguments presented for the first time in a reply.  Although it has discretion to consider new evidence presented in a reply, it generally exercises this discretion when "the new evidence appears to be a reasonable

---

[5] Plaintiffs also request leave to file a sur-reply in response to Mr. Giglio and Mr. Berardinelli's claims that their respective institutions were unable to locate records relating to three class members who filed declarations in support of plaintiffs' opposition and claimed to attend these institutions (Dkt. No. 366 (citing Giglio Decl. ¶ 8; Berardinelli Decl. ¶ 9)).  Plaintiffs seek to attach supplemental declarations from these class members that explain why the claims in the Giglio and Berardinelli Declarations were inaccurate and/or incomplete:  two class members who attended Keiser University (owned by Everglades) changed their names after marriage, and one class member attended a school that was later acquired by Lincoln (the New England Institute of Technology).  Recognizing that movants do not object to this sur-reply or the supplemental class member declarations, this order **GRANTS** plaintiffs' motion but **DENIES** the request in the sur-reply to strike the associated language from the Giglio and Berardinelli Declarations.

17

1   response to the opposition" or upon "giving the non-movant the opportunity to respond."

2   *Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1249 (N.D. Cal. 2018) (Judge Donna M. Ryu);

3   *Harris v. City of Kent*, 2022 WL 1310080, at *5 (W.D. Wash. Mar. 11, 2022) (Judge Theresa

4   L. Fricke) (citing *Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996)).

5        This order agrees with plaintiffs that it was unfair to lard the record on reply and thus

6   deprive the settling parties of the opportunity to address the new material in their oppositions.

7   The incident with the high school teacher that Mr. Giglio describes reportedly took place on

8   January 9, 2023 (Giglio Decl. ¶¶ 4–5). The FTC post he cites is dated September 16, 2022 (*id*.

9   ¶ 6). And the securities filings he references are from August 8, 2022, and November 7, 2022,

10   respectively (*id*. ¶ 9). Movants could have appended all of the evidence in the Giglio

11   Declaration to their stay motion filed on January 13, 2023. Meanwhile, although Mr.

12   Berardinelli does not date his assertions, he also does not in any way indicate that the harms he

13   describes took place between January 13, 2023, when movants filed their stay motion, and

14   February 3, 2023, when movants filed their reply.

15        Ordinarily, judges would not allow movants to introduce this evidence, and the relevant

16   passages from the reply and attached declarations would be struck. Here, however, these

17   passages will be considered. Plaintiffs' objections are **OVERRULED**. Even so, on this new and

18   late evidence, movants have failed to show that they are likely to experience irreparable

19   reputational harm that a stay would counteract.

20        *First*, with respect to the incident involving the high school teacher, it should be noted at

21   the outset that any alleged reputational harm associated with this incident (and other potential

22   incidents of this sort) is reparable through correction. Lincoln could provide essentially the

23   same statement it provided to *Higher Ed Dive*: "We believe [this characterization] strongly

24   mischaracterizes the issues . . . " (Townsend Decl. Exh. 2 at 3). What is more problematic,

25   however, is that movants have not shown that the alleged reputational harm associated with

26   this incident could be avoided with a stay in place. There is no indication that a *stay of*

27   *judgment* would divest this teacher of the false impression that "Lincoln Tech is on the U.S.

28

United States District Court
Northern District of California

18

1     Department of Ed's list of predatory schools."  Recall, a stay would not remove Lincoln or

2     other movants from Exhibit C.  Only our court of appeals' merits ruling could do that.

3           *Second*, with respect to the FTC post, movants are not candid.  This order reproduces the

4     language that Mr. Giglio discusses in full:

5                 Some of the names on the list of schools included in the *Sweet*
                  settlement may look familiar — and they should.  The FTC has
6                 also sued the University of Phoenix, DeVry, and the operators of
                  American InterContinental University and Colorado Technical
7                 University for their allegedly deceptive practices.  Students who
                  took out loans to attend those schools got more than $300 million
8                 in payments and debt cancellation through these FTC actions.  If
                  you got a check from one of these settlements:  You're still eligible
9                 to get your federal loans forgiven through the borrower defense
                  program, so file your application.
10

11    (Giglio Decl. ¶ 6).  This post does not impugn the non-movant schools listed on Exhibit C on

12    account of their inclusion on Exhibit C such that it could cause reputational harm to movants.

13    Exhibit C is invoked in a neutral, accurate fashion here, solely to inform borrowers that they

14    may still be entitled to debt relief even if they have already received money from an FTC

15    settlement.  Yes, the post mentions "scammers," but that does not refer to schools listed on

16    Exhibit C but rather con artists who will try to rip-off borrowers by "helping" them get their

17    borrower-defense claims approved.

18          *Third*, with respect to Lincoln's securities filings with the SEC, this order finds that

19    plaintiffs captured the deficiency in their objection:

20                Mr. Giglio claims that disclosing the existence of the Settlement in
                  this case in Lincoln's securities filings has "caused concrete and
21                material consequences for the company, its financial reporting, and
                  its shareholder relations."  Giglio Decl. ¶ 9.  Yet a brief perusal of
22                Lincoln's listing on the NASDAQ exchange shows that Lincoln's
                  stock was higher as of the date of the Reply Brief ($6.58) than it
23                was on the date Exhibit C was made public ($6.00).  *See*
                  https://finance.yahoo.com/chart/LINC.  Indeed, the stock equaled
24                its 2022 high point ($7.71) on August 2, 2022, after Exhibit C had
                  been public for over a month, and hit its 2022 low ($4.69) on
25                October 14, 2022, which was not anywhere near the disclosure
                  dates cited in the Declaration.  *See id.*
26

27    (Dkt. No. 365 at 2 n.1).  No harm, no foul.

28

Supp.A.19

United States District Court
Northern District of California

*Fourth*, with respect to Mr. Berardinelli's assertions, they are simply too speculative. How is the undersigned (or Mr. Berardinelli, for that matter,) to know whether the "delayed and/or increased . . . cost of financing" or decisions "in some instances . . . not to provide financing" came about on account of "inquir[ies] about the Settlement"? (Berardinelli Decl. ¶ 13). The undersigned will not connect the dots and delineate reputational harm for movants. "[C]onclusory factual assertions and speculative arguments that are unsupported in the record" will not suffice. *Doe #1 v. Trump*, 957 F.3d 1050, 1059–60 (9th Cir. 2020).

This order recognizes movants may be correct that, if our court of appeals reverses or vacates judgment, class members may have new claims of reliance and assertions of hardship (Br. 20). This could result in harm — even irreparable harm — but not irreparable harm to movants. The key question for this order is whether movants can show that *movants* will be irreparably injured absent a stay. The showing here is too weak. At bottom, movants fail to show that a stay is necessary to avoid likely irreparable injury to movants while their appeals are pending.[6]

### 3.   INADEQUATE SHOWING OF LIKELIHOOD OF SUCCESS ON THE MERITS.

"An applicant for a stay pending appeal must make 'a strong showing that he is likely to succeed on the merits.' Where, as here, the showing of irreparable harm is weak at best, the [applicant] must make a commensurately strong showing of a likelihood of success on the merits to prevail under the sliding scale approach." *Al Otro Lado*, 952 F.3d at 1010 (quoting *Nken*, 556 U.S. at 434). In brief, movants have not made a commensurately strong showing of a likelihood of success on the merits.

---

[6] Two days ago, one week after the hearing, movants sought leave to file yet another piece of evidence in support of its showing of harm: a letter from plaintiffs' counsel and other organizations submitted to an entity that is considering affiliating with a non-movant school listed on Exhibit C, the University of Phoenix (Dkt. No. 381). According to movants, "[t]his letter is another example of how Plaintiffs and others are using Exhibit C to harm schools on that list, how the harm manifests itself over time, and why effectuation of the settlement during appeal will cause irreparable harm to Intervenors" (Mot. 1–2). The Court has already generously considered tardy evidence. The motion to consider even more tardy evidence is **DENIED**.

United States District Court
Northern District of California

The bulk of the stay motion is dedicated to the same merits arguments that movants made at the final approval stage (Br. 2–18). The final approval order attended to every legal argument that movants have repeated in their stay motion, often verbatim, and the Court stands by its analysis. At any rate, this order need not revisit these arguments because what tips the scales for this factor is a different issue — and a threshold one.

Noticeably absent from movants' stay motion is any discussion of Article III standing. Such discussion is also noticeably absent from movants' reply, despite plaintiffs raising Article III standing in their opposition (Plaintiffs' Opp. 19–23; *cf.* Defendants' Opp. 9). An intervenor who appeals a judgment when neither original party has appealed must demonstrate independent Article III standing to maintain that appeal. *See Wittman v. Personhuballah*, 578 U.S. 539, 543–44 (2016) (holding that intervenors lack standing and dismissing appeal for lack of jurisdiction). The Supreme Court has explained:

> A party has standing only if he shows that he has suffered an "injury in fact," that the injury is "fairly traceable" to the conduct being challenged, and that the injury will likely be "redressed" by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561. . . (1992) (internal quotation marks and ellipsis omitted). The need to satisfy these three requirements persists throughout the life of the lawsuit. *Arizonans for Official English* [*v. Arizona*], 520 U.S. [43,] 67 [(1997)] . . . .
>
> An "intervenor cannot step into the shoes of the original party" (here, the Commonwealth) "unless the intervenor independently 'fulfills the requirements of Article III.'" *Id.*, at 65 . . . (quoting *Diamond v. Charles*, 476 U.S. 54, 68 . . . (1986)).

*Ibid.*

As alluded to in the final approval order and this order's discussion of harm, movants have not identified an injury in fact, a "legally protected interest" they have that the settlement affects in a sufficiently "concrete and particularized" way. *Lujan*, 504 U.S. at 560; *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2212 (2021). This district court is at a loss to identify an injury to movants arising from this settlement agreement (that they were not a party to) resolving this litigation (that did not involve them). As discussed above and at even greater length in the final approval order, "the schools have lost no procedural rights, nor has their status been altered. No liberty or property interest has been disturbed." *Sweet*, 2022 WL

United States District Court
Northern District of California

16966513, at *10. And it is well-recognized that case law "does not establish the proposition that reputation alone, apart from some more tangible interest such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976); *see also Sweet*, 2022 WL 16966513, at *10. As plaintiffs observe, even if there were evidence of reputational harm on this record, movants fail to establish a "plus factor," "the denial of a more tangible interest" in connection with alleged stigmatization (Plaintiffs' Opp. 21 (quoting *Hart v. Parks*, 450 F.3d 1059, 1069 (9th Cir. 2006) (internal quotation and citation omitted)).

In light of this, movants' showing on this stay factor is unsatisfactory. "Whether [movants have] failed to show any irreparable harm during the pendency of the appeal or [have] made only a minimal showing, [they have] not carried [their] burden to establish a sufficient likelihood of success on the merits." *Al Otro Lado*, 952 F.3d at 1010.

### 4. BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A STAY.

"Because the [movants] ha[ve] not satisfied the first two factors, we need not dwell on the final two factors — harm to the opposing party and the public interest." *Id.* at 1014 (internal quotations and citations omitted). But this order would be remiss not to mention that both heavily weigh against a stay. Seeing as "[t]hese factors merge when the Government is [an] opposing party," they are addressed together here. *Nken*, 556 U.S. at 435.

With respect to the third factor — whether issuance of the stay will substantially injure the other parties interested in the proceeding — movants emphasize that a stay would not cause irreparable harm to plaintiffs because their loans are in forbearance and because movants could potentially receive loan cancellation from President Biden's debt relief initiative (Reply Br. 13). They also aver that a stay would *benefit* defendants because they would not have to expend resources effecting the settlement when it could later be reversed (Br. 22–23).

Whereas movants' claims of harm experienced by movants are acutely overstated, their claims of harm experienced by plaintiffs and defendants are acutely understated. In short, that loans are currently in forbearance is of little consolation to plaintiffs when the sword of

United States District Court
Northern District of California

Damocles hangs over their heads.  There is ample evidence on this record of abiding and evolving harm to plaintiffs who are awaiting decisions on their borrower-defense applications that forbearance or hope for other debt relief cannot allay.  These include reputational harms, not to mention financial, physical, and emotional ones (*see* Plaintiffs' Opp. Exh. A (declarations of 144 borrowers in opposition to stay motion)).  Meanwhile, this order credits defendants' assertion that defendants do not, in fact, benefit from a stay that frustrates their strong interest in resolving this litigation and eliminating their backlog of borrower-defense applications — especially when defendants have already devoted substantial resources to resolving this matter (Defendants' Opp. 11).  On this record, it is evident that a stay would substantially injure plaintiffs and defendants.[7]

With respect to the fourth factor — where the public interest lies — movants argue:  (1) a stay would protect the Ninth Circuit's jurisdiction; (2) a stay would promote the orderly administration of justice, with the Supreme Court presently reviewing President Biden's debt forgiveness program; and (3) the public has no legitimate interest in constricting appellate review (Br. 23–25).  But the public interest favors the significant benefits to roughly half a million class members and the Department in settling this litigation here.

Movants state that "[a] stay would preserve the status quo while the appeal plays out" (Br. 23).  As defendants emphasize, however, movants fail to earnestly reckon with the fact "that the status quo before settlement — a massive, ever-expanding backlog of unresolved borrower-defense claims — was the impetus of this lawsuit" (Defendants' Opp. 11).  There is

---

[7] Movants also call attention to the fact that the Supreme Court recognized the propriety of maintaining a stay pending appeal of President Biden's debt forgiveness initiative in a parallel context, and that plaintiffs' claims of harm are undermined by the fact that they "chose not to advance" this litigation for seventeen months while they unsuccessfully appealed a discovery issue (Br. 22 n.12, 23).  This order (again) cautions that President Biden's initiative is separate and apart from this settlement, so drawing parallels about the harm arising from stays in these actions is perilous.  And this order considers it unfair to suggest that plaintiffs "chose not to advance" this litigation while appealing a discovery issue and that this thereby calls into question the harm they would suffer upon grant of a stay.  Indeed, this argument is particularly feeble given that movants waited until the tail end of the appeal window to notice appeals of the final approval order despite the alleged irreparable harm they discuss in their stay motion.  Movants' other arguments, including those involving the Effective Date and the students who allegedly did not attend movants' schools, are addressed elsewhere in this order and the final approval order.

Supp.A.23

United States District Court
Northern District of California

no public interest in the preservation of this stubborn and burgeoning backlog. The settlement breaks a logjam that has vexed several Secretaries and allows the Department to redirect resources to other initiatives. And it gives plaintiffs, who have languished in borrower-defense application limbo, their long-awaited relief. Note the relief provided by this settlement (financial and otherwise) will allow plaintiffs to breathe easier, sleep easier, repair their credit scores, take new jobs, enroll in new educational programs, finish their degrees, get married, start families, provide for their children, finance houses and vehicles, and save for retirement (Plaintiffs' Opp. Exh. A). It will allow them not only to move on, but also to move up, elevating others in the process. The public interest favors this settlement.

Resolution of a lawsuit concerning monumental delay should not be delayed any longer by three intervenor schools who were not parties to the settlement agreement and who were not involved in the long, hard-fought litigation that preceded it. For the foregoing reasons, the joint motion to stay the entire judgment pending appeal is **DENIED**. For the same reasons, the alternative request to stay judgment pending appeal only as to movants is **DENIED** as well.

### 5. TEMPORARY STAY.

Nevertheless, this order **GRANTS** a temporary, same-day stay of judgment with respect to discharges and discharge requests for loans associated with movants to allow them to present a stay motion to our court of appeals. *See* Fed. R. App. P. 8(a)(2). The judgment with respect to discharges and discharge requests for loans associated with movants is hereby stayed for **SEVEN DAYS** pursuant to Ninth Circuit Rule 27-2. If movants file a motion to stay in our court of appeals within seven days of the entry of this order, the temporary stay will continue until our court of appeals rules on the stay motion. If movants fail to so file, however, then the temporary stay shall expire seven days after the entry of this order. Movants shall please notify the Court if they seek a stay in our court of appeals.

### CONCLUSION

For the reasons stated herein, the motion to stay judgment pending appeal is **DENIED**. This order temporarily stays judgment with respect to discharges and discharge requests for

Supp.A.24

loans associated with movants for **SEVEN DAYS** to allow them to present a stay motion to our court of appeals.

**IT IS SO ORDERED.**

Dated:  February 24, 2023.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

# U.S. Department of Education

# Office of Federal Student Aid

# Initial Report under Settlement Agreement in *Sweet et al. v. Cardona*, Case No. 3:19-cv-03674-WHA, U.S. District Court for the Northern District of California

**February 27, 2023**

# **INITIAL REPORT**

Pursuant to the Settlement Agreement executed June 22, 2022 ("Agreement") and

granted final approval by the Court on November 16, 2022 (ECF No. 345), the U.S. Department

of Education through its Federal Student Aid office submits this Initial Report (reflecting

numbers as of November 16, 2022) to Plaintiffs as required by Paragraph IV.G.1 of the

Agreement and states as follows:[1]

1. Total Number of Class Members:  290,832

2. Total Number of Class Members determined to be eligible for Full Settlement Relief
   pursuant to Section IV.A. of the Agreement:
    195,993

3. Total Number of Class Members who must receive decisions pursuant to Paragraph
   IV.C. of the Agreement:   100,346

4. Total Number of Class Members and Post-Class Applicants who must receive
   decisions by each deadline set forth in Paragraph IV.C.3(i) through (v) and Paragraph
   IV.D., respectively, and a schedule of the dates certain by which such decisions must
   be received pursuant to these paragraphs:

| | Total Number of Class Members | Deadline for Decision |
|---|---|---|
| Class Members submitting applications 1/1/2015-12/31/2017, inclusive | 33,172 | 7/28/2023 (6 months after Effective Date) |
| Class Members submitting applications 1/1/2018-12/31/2018, inclusive | 11,553 | 1/28/2024 (Saturday) (12 months after Effective Date) |

---

[1] On February 24, 2023, the Court denied the joint motion of Lincoln Educational Services, Everglades College, Inc., and American National University (the "Appealing Intervenor Schools") to stay the Court's final judgment approving the settlement pending appeal. *See* ECF No. 382. The Court did, however, grant a seven-day administrative stay to allow the Appealing Intervenor Schools the opportunity to seek a stay from the Ninth Circuit. The information in this Initial Report captures applications filed by Class Members who attended the Appealing Intervenor Schools. To the extent the schools succeed in obtaining a stay from the Ninth Circuit, Defendants will make any appropriate revisions in a subsequent report.

1

|  | **Total Number of Class Members** | **Deadline for Decision** |
|---|---|---|
| Class Members submitting applications 1/1/2019-12/31/2019, inclusive | 13,604 | 7/28/2024 (Sunday) (18 months after Effective Date) |
| Class Members submitting applications 1/1/2020-12/31/2020, inclusive | 9,471 | 1/28/2025 (24 months after Effective Date) |
| Class Members submitting applications 1/1/2021-6/22/2022, inclusive | 32,551 | 7/28/2025 (30 months after Effective Date) |
| Post-Class Applicants submitting applications 6/23/2022-11/15/2022, inclusive | 205,448 | 1/28/2026 (36 months after Effective Date) |

2

BRETT A. SHUMATE
Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

R. CHARLIE MERRITT
Senior Counsel
LIAM C. HOLLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| THERESA SWEET, et al., | |
| Plaintiffs, | Case No. 3:19-cv-03674-WHA |
| v. | **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RELIEF FROM JUDGMENT** |
| LINDA MCMAHON, *in her official capacity as Secretary of the United States Department of Education*, and | Date: December 11, 2025 |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | Time: 8:00 a.m. Place: Courtroom 12, 19th Floor |
| Defendants. | |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR TEMPORARY RELIEF FROM JUDGMENT .................1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................................1

INTRODUCTION ...............................................................................................................................1

ISSUE TO BE DECIDED ...................................................................................................................3

BACKGROUND .................................................................................................................................3

I.  This Case and The Parties' Settlement Agreement..............................................................3

II.  The Department's Implementation of the Agreement ..........................................................6

LEGAL STANDARD..........................................................................................................................8

ARGUMENT .......................................................................................................................................9

I.  The Court Has Jurisdiction to Modify the Settlement Agreement Pursuant to Rule
60(B). ....................................................................................................................................9

II.  Relief Under Rule 60(B)(5) Is Appropriate. ......................................................................11

    A.  The Judgment Adopting the Settlement Agreement Has Prospective
Application...............................................................................................................11

    B.  Requiring Defendants to Provide Full Discharges and Refunds to 190,000
Post-Class Applicants at a Cost of $12 Billion to the Public Fisc Is No Longer
Equitable. ................................................................................................................12

    C.  It Would Serve the Public Interest to Allow Defendants Additional Time to
Adjudicate Post-Class Applications Before Requiring Automatic Settlement
Relief.......................................................................................................................20

III.  In the Alternative, Relief Under Rule 60(b)(6) Is Appropriate. ........................................21

CONCLUSION..................................................................................................................................22

**TABLE OF AUTHORITIES**

**Cases**

*Am. Hosp. Assoc. v. Price*,
   867 F.3d 160 (D.C. Cir. 2017) ............................................................................. 18

*Bay Marine Boatworks, Inc. v. S/Y Pursuit*,
   No. 3:20-cv-05399, 2022 WL 991751 (N.D. Cal. Apr. 1, 2022) ......................... 10

*BLOM Bank SAL v. Honickman*,
   605 U.S. 204 (2025) .............................................................................................. 9

*California v. EPA*,
   978 F.3d 708 (9th Cir. 2020) .......................................................................... 8, 11

*Career Colls. & Schs. of Texas v. U.S. Dep't of Educ.*,
   98 F.4th 220 (5th Cir. 2024) .............................................................................. 16

*Clark v. California*,
   739 F. Supp. 2d 1168 (N.D. Cal. 2010) ............................................................ 13

*Flores v. Rosen*,
   984 F.3d 720 (9th Cir. 2020) ............................................................................ 12

*FTC v. Hewitt*,
   68 F.4th 461 (9th Cir. 2023) .............................................................................. 11

*Hajro v. USCIS*,
   811 F.3d 1086 (9th Cir. 2016) ............................................................................. 9

*Henson v. Fidelity Nat'l Fin., Inc.*,
   943 F.3d 434 (9th Cir. 2019) ........................................................................ 9, 21

*Horne v. Flores*,
   557 U.S. 433 (2009) ......................................................................................... 8, 9

*Kelly v. Wengler*,
   822 F.3d 1085 (9th Cir. 2016) ....................................................................... 9, 10

*LaShawn A. v. Fenty*,
   701 F. Supp. 2d 84 (D.D.C 2010) ..................................................................... 20

*Maraziti v. Thorpe*,
   52 F.3d 252 (9th Cir. 1995) ............................................................................... 11

*Richardson v. Nat'l R.R. Passenger Corp.*,
   150 F.R.D. 1 (D.D.C. 1993) .............................................................................. 22

*Rufo v. Inmates of Suffolk Cnty. Jail*,
   502 U.S. 367 (1992) .......................................................................................... 12

*United States v. Asarco Inc.*,
   430 F.3d 972 (9th Cir. 2005) ............................................................................ 13

*United States v. Suarez*,
   880 F.2d 626 (2d Cir. 1989) .............................................................................. 21

*United States v. Turner*,
    No. 3:13-cv-1827, 2022 WL 1570741 (S.D. Cal. May 17, 2022) ....................... 20

*United States v. Western Elec. Co.*,
    46 F.3d 1198 (D.C. Cir. 1995) ....................................................................... 14

*Walsh v. U.S. Postal Serv.*,
    No. 1:20-cv-00435, 2021 WL 2337605 (E.D. Cal. June 8, 2021) ...................... 12

*Warren v. City of Chico*,
    No. 2:21-cv-00640, 2025 WL 974068 (E.D. Cal. Mar. 31, 2025).................... *passim*

**Rules**

Federal Rule of Civil Procedure 23(e) ..................................................................... 5, 12

Federal Rule of Civil Procedure 60(b) ...................................................................... 1, 8

Federal Rule of Civil Procedure 60(b)(5) ............................................................... *passim*

**Regulations**

34 C.F.R. § 685.406(g) ........................................................................................... 16

Notice of Proposed Rulemaking, 87 Fed. Reg. 41878 (July 13, 2022) .................... 16

Final Regulations, 87 Fed. Reg. 65904 (Nov. 1, 2022) ........................................... 16

**Other Authorities**

Admin. Off. of the U.S. Courts, The Judiciary Fiscal Year 2026 Congressional Budget Summary (April
    2025), https://www.uscourts.gov/sites/default/files/document/fy-2026-congressional-budget-
    summary.pdf ............................................................................................... 8

Cong. Rsch. Serv., R43397, Legislative Branch Appropriations: Frequently Asked Questions (2025),
    https://www.congress.gov/crs-product/R43397 ............................................. 8

Cong. Rsch. Serv., R43419, NASA Appropriations and Authorizations: At a Glance (2025),
    https://www.congress.gov/crs-product/R43419 ............................................. 8

Dep't of Educ., Fisal Year 2024 Budget Request (Mar. 9, 2023) ............................. 16

FSA Data Center, Borrower Defense Monthly Report for November 2022,
    https://perma.cc/DE8R-HGRD ................................................................... 14

## NOTICE OF MOTION AND MOTION FOR
## TEMPORARY RELIEF FROM JUDGMENT

Notice is hereby given that on December 11, 2025, at 8:00 a.m., before the Honorable William Alsup, in Courtroom 12 of the 19th Floor of the San Francisco Courthouse, Defendants will move the Court for relief pursuant to Federal Rule of Civil Procedure 60(b).

Defendants seek temporary relief from the provision of the parties' settlement agreement, as incorporated in the Court's final judgment order (ECF No. 346), that requires Defendants to provide full settlement relief to certain non-class members if Defendants fail to issue timely final decisions on such non-class members' borrower defense applications by January 28, 2026. Defendants respectfully request that the deadline for providing final decisions to these non-class members be extended by eighteen months, until July 28, 2027, at which point Defendants' obligation to provide full settlement relief to any non-class members whose applications are undecided by that date would be reinstated. The basis for the motion is set forth in the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES
### INTRODUCTION

In June 2022, the Department of Education and Plaintiffs reached a settlement agreement that provided a comprehensive framework for resolving hundreds of thousands of pending borrower defense applications, some of which had been pending for more than seven years. The Court approved that agreement, finding it to be a "grand slam home run for class members," Order Granting Final Settlement Approval at 20, ECF No. 345, and retained jurisdiction to oversee the settlement's implementation. In the three years since, the settlement agreement has provided a reasonable and equitable resolution of class member claims, and the Department has substantially complied with all of its obligations to class members. However, obligations to one group of individuals addressed in the settlement—the "post-class," consisting of certain individuals who had not submitted borrower defense applications at the time the parties executed their agreement—remain outstanding. The settlement requires the Department to adjudicate all claims submitted by this set of "post-class applicants" by January 28, 2026 or else provide them full settlement relief (including discharging relevant student loan debt, refunding amounts paid to

Supp.A.33

the Department toward those loans, and facilitating corresponding credit reporting relief). But things have changed, and due to a variety of circumstances—including most notably the unanticipated size of the post-class pool, the Department's reasonable but unexpected resource constraints, and the new requirement in certain circumstances that the Department now discharge ineligible loan debt unrelated to a post-class applicant's borrower defense application—the Court should provide the Department relief from this one aspect of the parties' comprehensive and otherwise nearly concluded settlement agreement.

Federal Rule of Civil Procedure 60(b)(5) provides a Court discretion to "relieve a party or its legal representative from a final judgment, order or proceeding [if] . . . applying it prospectively is no longer equitable." This standard is met with respect to the requirement that the Department provide full settlement relief on any post-class borrower defense application that remains unadjudicated as of January 28, 2026. To start, the Court has jurisdiction to provide relief because it approved the agreement, incorporated it into a final judgment, and retained jurisdiction over the matter—the agreement is thus subject to modification the same as any other "final judgment" or "order." And relief is appropriate here because the size of the post-class—comprising 207,000 applicants who submitted more than 251,000 applications in the less than five-month period from June 23, 2022 (the day after the settlement was executed) to November 15, 2022 (the day before it received final Court approval)—is an order of magnitude greater than anything the Department could have reasonably expected when it entered the settlement. Indeed, the post-class pool of applications exceeds by more than 200,000 the number of applications that were submitted in any comparable 5-month period before or after the agreement was executed and rivals the total number of borrower defense applications that were pending at the time the settlement was executed. Moreover, the Department has not received the resources that are needed to adjudicate post-class applications—Congress repeatedly ignored requests for funding to increase staffing to the levels the Department deemed necessary to fully implement the settlement, and the Department's Federal Student Aid office ("FSA") has instead seen staffing dwindle at the time when resources for post-class adjudication are most needed. As a result, the Department currently projects that it will come well short of adjudicating all post-class claims by the deadline, and the consequences are magnified by the Court's recent (as of 2024) requirement that post-class applicants with certain types of loans who receive

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

Supp.A.34

1   relief as a result of the missed deadline should receive a discharge of ineligible debt as well as eligible

2   debt; the Department estimates that this requirement will transfer an additional $4.5 billion windfall to

3   post-class borrowers with unadjudicated claims at taxpayer expense.

4        In these circumstances, it would be inequitable to require the Department to approve without

5   review nearly 200,000 applications from borrowers who are explicitly not defined as class members and

6   who only made themselves parties to the settlement by filing claims after the agreement was announced

7   and the allegedly illegal practices giving rise to the settlement were discontinued.  As set forth below, the

8   Court should instead exercise its equitable authority to allow the Department to continue its work of

9   adjudicating post-class applications and extend the relevant deadline imposing the automatic relief

10   requirement to July 28, 2027.

11                 **ISSUE TO BE DECIDED**

12       1.     Whether it remains equitable to require the Department of Education to provide full

13            settlement relief to non-class members whose applications it is unable to adjudicate,

14            regardless of the merits of their claims or if their loans are eligible for discharge under the

15            terms of the settlement, by the January 28, 2026 deadline established by the settlement

16            agreement.

17                  **BACKGROUND**

18   **I.**    **This Case and The Parties' Settlement Agreement**

19        Plaintiffs filed this case in 2019 to challenge the Department's alleged delay in adjudicating

20   borrower defense claims.  They sought and obtained certification of a class consisting of all individuals

21   with a pending borrower defense application, which at the time consisted of more than 200,000

22   applications dating as far back as 2015.  *See*, *e.g.*, Defs.' Mot. for Summ. J. at 11, ECF No. 63.[1]  After

23   three years of litigation, the parties executed a settlement agreement on June 22, 2022 and submitted it for

24   the Court's preliminary approval that same day.  *See generally* Joint Mot. for Prelim. Approval, ECF No.

25   246.  The parties' settlement agreement provides a framework to comprehensively address the then-

26

27         [1] Defendants respectfully refer the Court to their previously filed summary judgment briefs for a
complete statement of the facts and background predating the filing of the parties' joint motion for

28   preliminary settlement approval.  *See* ECF No. 63, ECF No. 249.

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

Supp.A.35

1    pending hundreds of thousands of class member borrower defense applications.  *See generally* ECF No.

2    246-1 ("Agreement").

3        The Agreement generally divides class members into two groups.  *See* Agreement ¶ IV.  The first

4    group consisted of approximately 196,000 class members, *see* Decl. of James Bergeron ¶ 5 ("Bergeron

5    Decl."), who received federal student loans to attend one of the 151 schools identified in the settlement's

6    Exhibit C ("Exhibit C Group" borrowers).  *See* Agreement ¶ IV.A.  The second group consisted of all

7    remaining class members who submitted claims on or before the date the Agreement was executed.  These

8    class members ("Decision Group" borrowers) received a streamlined adjudication and final decision

9    within set timeframes under the Agreement and benefitted from certain presumptions designed to speed

10   up the adjudication of claims, including a presumption of the truth of the claims asserted.  *Id.* ¶ IV.C.

11   These presumptions reduce the time it takes to adjudicate a claim, but they also likely provide overbroad

12   relief to the extent that certain borrowers' claims would not have survived scrutiny had the Department

13   engaged in the type of fact-finding that would be required under otherwise applicable regulations.  The

14   Agreement divides this set of borrowers into five decision groups, based on the date they submitted their

15   application, and provides for decisions to be issued to each group every six months, with the oldest

16   applications receiving the earliest decisions.  *Id.*

17       Decision Group 1 consisted of approximately 33,000 class members who filed more than 34,000

18   applications between January 1, 2015 and December 31, 2017.  *See* Bergeron Decl. ¶ 5, Table 1.  Decision

19   Group 2 consisted of more than 11,000 class members who filed 12,000 claims between January 1, 2018

20   and December 31, 2018.  *Id.*  Decision Group 3 consisted of nearly 14,000 borrowers who filed more than

21   14,000 claims between January 1, 2019 and December 31, 2019.  *Id.*  Decision Group 4 consisted of more

22   than 9,000 borrowers who filed 10,000 claims between January 1, 2020 and December 31, 2020.  *Id.*  And

23   Decision Group 5 consists of approximately 33,000 class members who filed 36,000 claims between

24   January 1, 2021 and June 22, 2022.  *Id.*  To the extent the Department fails to issue a final decision to a

25   class member according to the negotiated timeline applicable to any Decision Group borrower's claim,

26   the Agreement requires that the class member receive full settlement relief.  *See* Agreement ¶ IV.B.8.

27       The Agreement provides that the "Class is closed as of the Execution Date," *i.e.*, June 22, 2022,

28

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

Supp.A.36

1    and that only "Class Members are bound by the terms of this Agreement." *Id.* ¶ III. Nonetheless, it

2    contains a subsection providing certain limited relief to a subset of definitionally non-class member "post-

3    class applicants." *See id.* ¶ IV.D. In particular, the Agreement provides that borrower defense applications

4    submitted after the Agreement's Execution Date and before the date of the Agreement's final approval

5    will be adjudicated within three years of the Agreement's Effective Date (*i.e.*, the date on which the

6    Court's final approval order becomes a final judgment). *See id.*; *see also id.* ¶ I.K (defining "Effective

7    Date"). As with the Decision Group deadlines, the Agreement specifies that if a post-class application is

8    not adjudicated within the prescribed period, the applicant will receive full settlement relief. *Id.* ¶ IV.D.2.

9    The time period during which a borrower could submit a "post-class application" and receive the benefit

10   of this provision of the Agreement ultimately spanned less than five months, from June 23, 2022 (the day

11   after the Execution Date) to November 15, 2022 (the day before the Final Approval date). In that short

12   time period, 207,000 borrowers submitted more than 251,000 claims, *see id.* ¶ 5, Table 1, a number of

13   borrowers that more than doubled all five Decision Groups combined and amounted to more than two-

14   thirds of the entire set of class members covered by the Agreement, which swept in all 291,000 borrowers

15   who had asserted borrower defense claims and not received a decision before June 22, 2022, *see id.* ¶¶ 5-

16   6. This represents a 523 percent increase in applications over the average number of applications the

17   Department received during even the most voluminous comparable timeframe. *See id.* ¶ 5, Table 2 (setting

18   forth the number of applications received in comparable 5-month periods before and after the post-class

19   period, which never exceeded 48,000).

20   The Court preliminarily approved the settlement on August 4, 2022. ECF No. 307. After

21   following the class action settlement procedures specified in Federal Rule of Civil Procedure 23(e), and

22   hearing the objections of a group of permissive intervenors, *see* ECF No. 322, the Court finally approved

23   the Agreement and entered final judgment on November 16, 2022. Order Granting Final Settlement

24   Approval; Final J., ECF No. 346. The Agreement provides that its "Effective Date" is the date on which

25   that final judgment becomes non-appealable, or in the event of an appeal by a Class Member, upon the

26   date of final resolution of that appeal. Agreement ¶ I.K. Although the intervenors sought to appeal the

27   Court's final approval order, no class member did, and so the Agreement became effective on January 28,

28

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

Supp.A.37

2023. *See* Order Re: Mot. to Stay J. Pending Appeal at 10, ECF No. 382 ("In sum, this order concludes that the Effective Date of the settlement agreement is January 28, 2023."). Among other things, this effective date established January 28, 2026 as the deadline for issuing timely decisions to post-class applicants. Agreement ¶ IV.D.1 ("Defendants will issue a final decision on the merits of a Post-Class Applicant's application no later than 36 months after the Effective Date.").

## II.    The Department's Implementation of the Agreement

In general, the Agreement contemplated processes and procedures for reviewing the claims of and providing relief to class members—both Exhibit C class members and Decision Group class members—that had not previously existed. Before it could begin the actual work of effectuating settlement relief (for each group of borrowers covered by the Agreement), then, the Department needed to establish a new framework for doing that work, including new processes, rules, and procedures. *See* Bergeron Decl. ¶¶ 19-28. As a general matter, due to the timelines involved, the Department first prioritized the class members in the Exhibit C and Decision Groups. *Id*. ¶ 20. But it also began laying the foundation for the adjudication of post-class claims—standing up new policies and procedures that differed from those used for class members, including those related to fact-finding and decision-making, training staff, and making technological updates. *See id*. ¶¶ 21, 25-26. FSA's Borrower Defense Branch ("BDB") began issuing decisions on post-class applications in approximately August 2023 and worked up to a steady pace of approximately 1,500 adjudications per month by January 2025. *Id*. ¶ 21. BDB also worked on "all aspects of implementing the Settlement Agreement, other than effectuating relief by discharging loans," *id*. ¶ 22, meaning the same staff responsible for adjudicating Decision Group class member applications pursuant to the Agreement's staggered deadlines have also been responsible for adjudicating post-class applications, as well as engaging in relevant administrative work and helping to research and respond to class member questions and concerns. *Id*. Over time, the staffing in the BDB has fluctuated, with staffing generally in the range of 30-50 attorneys, other than a brief period throughout 2024 when BDB was able to bring in detail attorneys from another federal agency (the Department of Health and Human Services, "HHS") to perform borrower defense work on a temporary basis. *See id*. ¶ 9.

As the Court is aware, the Department was not able to meet some of the settlement deadlines,

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

Supp.A.38

1   particularly those related to effectuating relief, due to a host of complications relating to the mechanics of

2   loan discharge.  *See, e.g.*, Defs.' Resp. to Pls.' Mot. to Enforce, ECF No. 403 (explaining some of these

3   issues).  Defendants have worked collaboratively with Plaintiffs and the Court to address those issues and

4   will not extensively reproduce that history.  But relevant here, many of the delays in processing were the

5   result of complex "mixed consolidation" loans that consist of both loans eligible for relief under the

6   Agreement and loans ineligible for such relief.  When it was unable to meet either the original or a revised

7   schedule for providing relief to Exhibit C class members, the Department suggested a streamlined

8   approach to accelerate the provision of such relief to those specific class members with mixed

9   consolidations loans—which has come to be known as the Exhibit C terminal loan methodology.  *See,*

10  *e.g.*, Defs.' Notice, ECF No.  421 (July 11, 2024) ("Defs.' Notice"); Defs.' Mot. to Approve Settlement

11  Relief Process, ECF No. 443.  This approach was easier to implement because it included discharging the

12  terminal consolidation loan in full.  While quicker, the relief provided has been overbroad and provides a

13  windfall benefit to certain borrowers because it requires discharging ineligible debt that is not the subject

14  of an eligible borrower defense application.  *Id*.  The Court first approved and ordered this methodology

15  to be applied to Exhibit C borrowers and borrowers in Decision Groups 1 and 2.  *See* Defs.' Notice; Minute

16  Entry, ECF No. 416 (June 13, 2024), Minute Entry, ECF No. 434 (Sep. 26, 2024).  Eventually, despite

17  concerns raised by Defendants about the fiscal responsibility of continuing to apply the Exhibit C terminal

18  loan methodology outside of the limited context in which it was developed, the Court ordered that the

19  methodology "be used for Decision Group Three, Decision Group Four, Decision Group Five, and the

20  Post-Class Applicants."  Minute Entry, ECF No. 451 (Dec. 12, 2024).

21       At present, the Department has come into substantial compliance with its obligation to provide

22  relief to the Exhibit C Group; has substantially met the decision deadlines for all five Decision Groups;

23  and anticipates meeting the January 28, 2026 deadline for adjudicating any Group 5 applications that are

24  resubmitted under the revise and resubmit process.  *See* Bergeron Decl. ¶ 30.  With respect to the post-

25  class, the Department is currently adjudicating approximately 1,500 applications per month, *id*. ¶ 29; *see*

26  *also id*. ¶¶ 10-18 (describing the complexities associated with adjudicating such applications).  As of

27  October 31, 2025, nearly 54,000 post-class applications have been adjudicated.  *Id*. ¶ 31.  Continuing at

28

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

Supp.A.39

1   the pace of 1,500 adjudications per month, the Department estimates that it will adjudicate another 4,500

2   applications by the January 28, 2026 deadline, and it projects that it will not meet that deadline for

3   approximately 193,000 applications whose associated outstanding loan balances total $11.8 billion. *Id*.

4   ¶¶ 31-32.  To date, approximately half of the post-class applications have been denied. *Id*. ¶ 33.  The

5   Department cannot predict whether that rate will continue for all post-class applications or whether the

6   actual denial rate will be higher or lower than fifty percent.  But if that rate were to continue and the relief

7   requested in this motion is not granted, the Department estimates that the result will be an approximately

8   $6 billion windfall for borrowers who might not have been eligible for relief had their applications been

9   adjudicated. *Id*. ¶ 33.  This is an extraordinary sum of taxpayer resources that would flow to borrowers

10   who, based upon the denial/approval rate of post-class applications to date, would otherwise be ineligible

11   for relief.  For context, the appropriation for fiscal year 2025 to fund the Legislative Branch was

12   approximately $6.7 billion; to fund the federal Judicial Branch was approximately $8.6 billion; and to

13   fund the exploration budget for the National Aeronautics and Space Administration ("NASA") was

14   approximately $7.6 billion.[2]

15                   **LEGAL STANDARD**

16       Federal Rule of Civil Procedure 60(b) allows a Court to "relieve a party or its legal representatives

17   from a final judgment, order, or proceeding for" specified reasons.  One of these reasons is that applying

18   the final judgment or order "prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).  This Rule

19   "provides a means by which a party can ask a court to modify or vacate a judgement or order if 'a

20   significant change either in factual conditions or in law renders continued enforcement detrimental to the

21   public interest.'"  *Horne v. Flores*, 557 U.S. 433, 447 (2009) (citation omitted).  Ultimately, Rule 60(b)(5)

22   establishes a "pliable standard" that "codifies the courts' traditional authority, inherent in the jurisdiction

23   of the chancery, to modify or vacate the prospective effect of their decrees."  *California v. EPA*, 978 F.3d

24

25          [2] *See* Cong. Rsch. Serv., R43397, Legislative Branch Appropriations: Frequently Asked Questions

26   (2025), https://www.congress.gov/crs-product/R43397; Admin. Off. of the U.S. Courts, The Judiciary
Fiscal     Year     2026     Congressional     Budget     Summary,     at     *i*     (April     2025),

27   https://www.uscourts.gov/sites/default/files/document/fy-2026-congressional-budget-summary.pdf;
Cong. Rsch. Serv., R43419, NASA Appropriations and Authorizations: At a Glance (2025),

28   https://www.congress.gov/crs-product/R43419.

708, 713 (9th Cir. 2020) (citation omitted).  If a party carries its burden of establishing that "changed circumstances warrant relief," a "court abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes." *Horne*, 557 U.S. at 447 (cleaned up).

Rule 60(b)(6) also allows a court to provide relief from a final judgment, order, or proceeding for "any other reason that justifies relief."  This "catchall" provision provides "grounds for relief not already covered by the preceding five paragraphs." *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 212 (2025). A movant "seeking relief under Rule 60(b)(6) must show extraordinary circumstances justifying the reopening of a final judgment." *Henson v. Fidelity Nat'l Fin., Inc.*, 943 F.3d 434, 443-44 (9th Cir. 2019) (cleaned up).

## ARGUMENT

At this point, Defendants have carried out nearly all their settlement obligations with respect to the class members defined in the parties' settlement agreement.  What remains is a "post-class" group that had not filed applications or otherwise been made parties to the case at the time the Agreement was executed.  Under the terms of the Agreement, more than 190,000 of these individuals are now projected to receive full settlement relief, regardless of the merits of their claims, because the Department, despite reasonable efforts, will not be able to adjudicate their applications within the specified three-year timeline. The size of this "post-class group" was not reasonably anticipated when the parties signed the Agreement, and subsequent developments—most notably, the required application of the Exhibit C terminal loan methodology, which was not contemplated by the Agreement—now place a nearly $12 billion price tag on the automatic relief provision for these borrowers.  Applying that provision of the settlement prospectively to require such windfall relief with extraordinary harm to the public fisc is not equitable, and relief under Rule 60(b) is appropriate.

## I.    The Court Has Jurisdiction To Modify The Settlement Agreement Pursuant To Rule 60(b).

In its final judgment order, the Court expressly "retain[ed] jurisdiction to monitor and oversee implementation of the settlement as set forth in the settlement agreement."  Final J. at 1.  It thus plainly has jurisdiction to "enforce the terms of [the Agreement] under the doctrine of ancillary jurisdiction." *Hajro v. USCIS*, 811 F.3d 1086, 1099 (9th Cir. 2016); *see also Kelly v. Wengler*, 822 F.3d 1085, 1094

(9th Cir. 2016) ("When a court's order dismissing a case with prejudice incorporates the terms of a settlement agreement, the court retains ancillary jurisdiction to enforce the agreement because a breach of the incorporated agreement is a violation of the dismissal order."). Moreover, the Court's orders approving the Agreement and dismissing the case subject to an explicit retention of jurisdiction incorporate the Agreement and make its terms subject to modification to the same extent as any court order. *See, e.g.*, *Kelly*, 822 F.3d at 1097-98 (finding that modification of a term in a court-approved settlement was "a modification of a court order"); *Bay Marine Boatworks, Inc. v. S/Y Pursuit*, No. 3:20-cv-05399, 2022 WL 991751, at *3 (N.D. Cal. Apr. 1, 2022) (although "settlement agreements are private contracts that courts do not usually rework, that does not prevent altering the terms because the *judicial order* itself is what allocated the parties' rights and obligations"). Given the Court's Rule 23-mandated role in approving any class action settlement, and the retention of jurisdiction provisions in the Agreement itself, *see* Agreement ¶ XI, and the final judgment order, the Agreement here is one that "the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Bay Marine Boatworks*, 2022 WL 991751, at *3. The Court's jurisdiction thus extends to "its inherent power to modify its order and, by incorporation, the Settlement Agreement." *Warren v. City of Chico*, No. 2:21-cv-00640, 2025 WL 974068, at *3 (E.D. Cal. Mar. 31, 2025); *see also Bay Marine Boatworks*, 2022 WL 991751, at *2-3 (finding that the court had jurisdiction under Rule 60(b) to modify a court-approved settlement over one party's objection).

In this case, the parties' settlement agreement establishes a dispute resolution process that defines Plaintiffs' ability to bring, and the Court's jurisdiction to hear, claims that Defendants have materially breached the Agreement. *See generally* Agreement ¶ V. The Agreement further provides that any such claims are subject to "the complete defense of impracticability," *id.* ¶ V.C, *i.e.*, that "Defendants are reasonably prevented from or delayed in fully performing any of the obligations set forth in Paragraph IV," *id.* ¶ V.D.5. But the purpose of this provision—which requires Defendants to notify Plaintiffs if Defendants determine in advance that they will not be able to fully perform any settlement obligation due to extraordinary circumstances beyond their control and for the parties to meet and confer about an appropriate extension—is to provide Plaintiffs with a means of asserting a claim for anticipatory breach

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

Supp.A.42

prior to the expiration of a settlement deadline (which the Agreement does not otherwise provide for). *See id.* (stating that if the parties "cannot agree as to whether extraordinary circumstances exist or what the appropriate length of an extension is, Plaintiffs may raise a claim of material breach . . . prior to the expiration of the [relevant] timelines").[3]  It does not prevent Defendants from seeking other available means of relief from the Court's judgment or deprive the Court of its inherent jurisdiction to modify the terms, in accordance with Rule 60, of a final judgment adopting a settlement agreement. *See, e.g.*, *Warren*, 2025 WL 974068, at *4 ("Though the parties' Settlement Agreement contains an explicit modification procedure under its Dispute Resolution process, this does not displace the alternative means of a party to modify the Settlement Agreement pursuant to Rule 60(b).").

## II.    Relief Under Rule 60(b)(5) Is Appropriate.

"Rule 60(b)(5) authorizes relief from a judgment where, *inter alia*, 'applying it prospectively is no longer equitable.'" *FTC v. Hewitt*, 68 F.4th 461, 466 (9th Cir. 2023) (quoting Fed. R. Civ. P. 60(b)(5)). That standard is met here with respect to the requirement that the Department award full settlement relief, including the discharge of ineligible debt pursuant to the Exhibit C terminal loan methodology, to all post-class applicants who claims it has not adjudicated by January 28, 2026, regardless of the merits of such claims.

### A.    The Judgment Adopting the Settlement Agreement Has Prospective Application.

As a threshold matter, Rule 60(b)(5)'s "no longer equitable" prong is available to seek relief from judgments that apply "prospectively."  "The standard used in determining whether a judgment has prospective application is 'whether it is executory or involves the supervision of changing conduct or conditions.'" *Maraziti v. Thorpe*, 52 F.3d 252, 254 (9th Cir. 1995) (citation omitted).  The Agreement, as adopted and incorporated by the Court's orders, does both.  It is "executory" because it "compels a party to perform," *California*, 978 F.3d at 717—the provision from which Defendants seek relief requires them to provide full settlement relief to any post-class applicant who does not receive a decision by January 28,

---

[3] As this motion makes clear, Defendants have now determined that they will not be able to meet the Agreement's deadline for adjudicating post-class applications.  Whether or not that delay is due to "extraordinary circumstances beyond Defendants' control"—a standard that does not govern the relief Defendants seek in this motion—Defendants have, as a courtesy, begun the meet-and-confer process set forth in Paragraph V.D.5 of the Agreement.

2026, Agreement ¶ IV.D.2.  And it contemplates and even requires ongoing court supervision of any changes in conduct or conditions.  As noted above, the Court retained jurisdiction to "monitor and oversee implementation of the settlement as set forth in the settlement agreement," Final J. at 1, a jurisdiction it has exercised on multiple occasions to resolve disputes and ensure that settlement obligations are met in response to evolving circumstances (including, for example, ordering continued application of the Exhibit C terminal loan methodology in response to Defendants' delays in effectuating relief due to complications associated with mixed consolidation loans, *see supra* pp. 6-7).  *See Warren*, 2025 WL 974068, at *4 (recognizing that a settlement's retention of jurisdiction provisions "contemplated court oversight to some degree" and gave the agreement "some prospective effect").

**B.    Requiring Defendants to Provide Full Discharges and Refunds to 190,000 Post-Class Applicants at a Cost of $12 Billion to the Public Fisc Is No Longer Equitable.**

When a party seeks to modify a court order under Rule 60(b)(5), it "must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Flores v. Rosen*, 984 F.3d 720, 740-41 (9th Cir. 2020) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992)).  At the outset, Defendants acknowledge that this standard has most often been applied in the context of injunctions or consent decrees.  But as discussed above, the Agreement in this case is effectively a judicial order because the Court was required by law to approve it, did approve it via a final judgment, and then entered a final judgment that retained jurisdiction to oversee implementation and compliance.  And, similar to a consent decree, the Agreement—like all class action settlements—must be approved by the court as "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e); *see, e.g.*, *Walsh v. U.S. Postal Serv.*, No. 1:20-cv-00435, 2021 WL 2337605, at *2 (E.D. Cal. June 8, 2021) (noting that a "consent decree is essentially a settlement agreement subject to continued judicial policing," and that, before approving one, a "district court must independently determine that the proposed agreement is 'fundamentally fair, adequate, and reasonable' and 'conforms to applicable laws'" (citations omitted)).  There is thus no basis to apply Rule 60(b) any differently here merely because Defendants seek to modify a court-approved class action settlement agreement rather than a formal injunction or consent decree.

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

Supp.A.44

Under the relevant standard, modification "may be warranted when changed factual conditions make compliance with the order substantially more onerous, when an order proves to be unworkable because of unforeseen obstacles, or when enforcement of the order without modification would be detrimental to the public interest." *Clark v. California*, 739 F. Supp. 2d 1168, 1233 (N.D. Cal. 2010). A court should "not ordinarily modify" an order "where a party relies upon events that actually were anticipated at the time it entered into a decree," *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005), but "the movant is not required to show that the changed circumstances were unforeseeable," *Warren*, 2025 WL 974068, at *9.

Again, Defendants seek to modify only the requirement that they be required to provide automatic full settlement relief to post-class applicants who do not receive a decision by January 28, 2026, and instead seek an additional 18 months to adjudicate such applications before such relief would be required. This modification is appropriately tailored to current circumstances. Enforcing this term of the Agreement is no longer equitable, and modification is appropriate, for three key reasons: (1) the unanticipated size of the post-class pool; (2) unanticipated constraints on the Department's resources and staffing; and (3) unanticipated issues with mixed consolidation loans that led to the imposition of the Exhibit C terminal loan methodology, which results in significant windfalls to borrowers and detriment to the public fisc.

<u>The Explosion of Post-Class Applications</u>

When the parties executed the Agreement in June 2022, the class consisted of approximately 291,000 individuals who had submitted more than 300,000 applications. *See* Bergeron Decl. ¶ 5. This included all individuals who had submitted borrower defense applications (and not yet had them decided), dating at least as far back as 2015. *Id*. ¶ 5 & n.1. No Decision Group encompassed more than 35,000 borrowers,[4] and in the five months preceding the parties' execution of the Agreement, the Department received 48,000 borrower defense claims. *See id*. ¶ 5, Tables 1 & 2. The post-class period was open for four months and 24 days, and during that time 207,000 borrowers filed more than 251,000 claims,

---

[4] This does not account for the 196,000 Exhibit C borrowers who submitted applications during the time periods covered by the decision groups, but the post-class exceeds the entire size of the Exhibit C Group, and even if the latter group of borrowers were to be equally attributed to each of the five Decision Groups, the largest Decision Group would consist of less than 80,000 borrowers.

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

Supp.A.45

1  supplying in less than 150 days nearly one-third of the borrower defense applications that had been

2  submitted in the previous six-and-a-half years.[5] As set forth in Table 2 to the Bergeron Declaration, in

3  each of the six five-month intervals preceding the Agreement's execution (dating back to 2020), the

4  Department never received more than 48,000 applications and the average rate was fewer 29,000 per five-

5  month interval. *Id.* ¶ 5, Table 2. In one period (November 1, 2020 through March 31, 2021), only

6  approximately 14,000 applications were received. *Id.* Over the subsequent six five-month intervals after

7  the settlement received final approval and the post-class period closed, the Department has never received

8  more than 45,000 borrower defense applications, and the average rate was fewer than 38,000 applications

9  per post-approval five-month interval. *Id.* In sum, during the post-class period, the Department received

10  a *523 percent increase* in borrower defense applications when compared to the highest number of

11  applications (48,000) it received in any comparable five-month period either before or after the Agreement

12  was executed and finally approved. *See id.*

13  It may have been reasonable for the Department to expect a slight increase in applications during

14  the post-class period based on the likelihood that borrowers would be alerted about the Agreement's

15  treatment of post-class applicants. But the Department had no reason to think that there would be a 523

16  percent increase in applications. In the past, "the Department has seen application volume temporarily

17  triple from the previous month following announcements such as a large institution of higher education

18  closing, but these spikes were often temporary and followed low-volume application months." Bergeron

19  Decl. ¶ 6. The Department had never had a 523 percent increase over a comparable five-month period,

20  and so the post-class application period was "the largest increase in applications the Department had ever

21  seen by far." *Id.* The increase was so anomalous that it was not reasonably foreseeable at the time the

22  parties executed the Agreement because the Department did not have any historical precedent for such a

23  large volume of applications being submitted in a comparable period of time. *See United States v. Western*

24  *Elec. Co.*, 46 F.3d 1198, 1205 (D.C. Cir. 1995) ("Rule 60(b)(5) does not foreclose modifications based on

25  

26  [5] As of the end of November 2022, borrowers had submitted 762,800 applications since 2015. *See* FSA Data Center, Borrower Defense Monthly Report for November 2022, https://perma.cc/DE8R-HGRD. That number includes the 251,000 post-class applications, so 511,800 applications were received over a six-and-a-half year period, and then the 251,000 post-class applications were received in less than five months.

27  

28

1    developments that, in hindsight, were things that 'could' happen. . . The focus of Rule 60(b)(5) is not on

2    what was possible, but on what the parties and the court reasonably anticipated.'").

3            The size of the post-class impacts the Department's ability to meet the applicable deadline because

4    adjudication of post-class claims is a much more time-consuming process than adjudicating class member

5    claims under the procedures set forth in the Agreement.  The Agreement was designed to provide

6    comprehensive and expedited relief to a large (as noted above, just under 300,000) set of class members

7    with pending applications, in recognition of the claims at issue in the lawsuit, including the original

8    unreasonable delay claim from 2019.  This result was achieved by awarding relief without adjudication to

9    Exhibit C borrowers and by using streamlined procedures to issue decisions to Decision Group borrowers

10   more quickly than would otherwise be possible under the Department's regulations.  But the post-class,

11   on the other hand, "did not experience the allegedly unlawful policies and procedures that Plaintiffs

12   describe in their original and supplemental Complaints," Joint Mot. for Final Approval at 12 n.3, ECF No.

13   323, and were instead guaranteed only "the benefit of a set timeline for decision on their BD applications"

14   under the 2016 borrower defense regulations, *id*.  Unlike the streamlined adjudication procedures the

15   Department agreed to provide to Decision Group class members, post-class adjudications under the 2016

16   regulations generally require fact-finding, consideration of any rebuttal materials submitted by the

17   schools, weighing of evidence, and a determination of the proper amount of relief.  *See* Bergeron

18   Decl.¶¶ 10-18.

19           It is true that the Department became aware of the size of the post-class at the point at which the

20   Court granted final approval, closed the post-class, and entered the judgment from which Defendants now

21   seek relief.  But the obligation itself was memorialized in the Agreement, which was executed without

22   knowledge of the extraordinary increase in claims that would occur during the post-class period.  And the

23   Agreement is a final document that explicitly states that it will be submitted to the Court for preliminary

24   and final approval without change.  *See, e.g.*, Agreement ¶ X (providing that the "Parties shall jointly

25   submit this Agreement and its exhibits to the Court, and shall apply for entry of an Order" granting

26   preliminary approval, and that, following preliminary approval, the Parties "shall jointly request the

27   Court's final approval of this Agreement"); *id*. ¶ XIII (providing that the "Agreement shall be void if it is

28

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

Supp.A.47

1    not approved as written by a final Court order not subject to any further review").

2           It is also notable that, at the time of the Agreement, the post-class was being accorded the same

3    treatment as borrower defense applicants more generally would have been under a rule the Department

4    proposed in 2022.  *See* Notice of Proposed Rulemaking, 87 Fed. Reg. 41878, 42008 (proposed section

5    685.406(f)) (July 13, 2022) (proposing that borrower defense decisions should be issued within three years

6    of receipt of a materially complete application, and that the Department's failure to provide a decision on

7    that timeframe will render the loan obligation unenforceable).  The Department's final rule (87 Fed. Reg.

8    65904 (Nov. 1, 2022)), which contained a similar provision—*see* 87 Fed. Reg. at 66072 (34 C.F.R. §

9    685.406(g))—was enjoined before it could ever take effect.  *See Career Colls. & Schs. of Texas v. U.S.*

10   *Dep't of Educ.*, 98 F.4th 220 (5th Cir. 2024).  This is another factor that makes automatic discharge for

11   the post-class under the terms of the Agreement currently inequitable: when the Department executed the

12   Agreement, it could not foresee that its post-class provisions would lead to such differential treatment

13   between a much larger than expected set of post-class applicants and all other individuals who would

14   submit borrower defense applications after the final approval date.

15          <u>FSA Resources</u>

16          The Department has also faced significant resource constraints over the past three years, leaving

17   it with significantly fewer than expected resources to apply to adjudicating the exponentially larger than

18   expected pool of post-class applicants.  This starts with funding to hire and train staff to adjudicate

19   borrower defense applications.  Shortly after the Agreement received final Court approval, the Department

20   submitted a budget request to Congress that emphasized the need for, and sought $21 million in, additional

21   resources and staffing to "meet the terms of the *Sweet* settlement," Department of Education, Fisal Year

22   2024 Budget Request (Mar. 9, 2023) (cited at Bergeron Decl. ¶ 7).  Congress did not approve the requested

23   increase, leading the Department to seek even more additional resources the next year to "hire hundreds

24   of attorneys to adjudicate" pending borrower defense applications.  Bergeron Decl. ¶ 7.  Again, Congress

25   did not provide any additional resources and ultimately "maintain[ed] level funding for Federal Student

26   Aid from FY 2022 through FY 2025."  *Id.*  As a result, the Department was not able to devote additional

27   resources to borrower defense to "increase the number of attorneys adjudicating applications to the extent

28

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

Supp.A.48

1  needed to meet the deadlines" in the Agreement. *Id.* ¶ 8. FSA also was not able to significantly reallocate

2  resources from other FSA programs that would have been necessary to adjudicate post-class applications

3  more quickly, particularly in light of multiple competing statutory deadlines that the Department was

4  required to prioritize over the same period of time with the same limited resources. *Id.*

5      Despite these obstacles, the overall attorney staffing levels in the BDB have at times increased,

6  reaching a high of 73 attorneys in November 2024. *Id.* ¶ 9. As noted above, this growth was largely based

7  on increases to BDB hiring authority in 2024 that led to its ability to hire temporary detail attorneys from

8  HHS to work on borrower defense claims. *Id.* It is worth emphasizing, however, that during this period

9  of time, the Department was facing—and prioritizing its limited resources to meet—several Agreement

10  deadlines more imminent than the deadline for post-class adjudication, including providing decisions to

11  borrowers in the second, third, and fourth decision groups, *see* FSA, Initial Report (Feb. 27, 2023)

12  (attached hereto as Exhibit A) (setting forth decision group deadlines), and complying with Court-ordered

13  schedules for providing relief to Exhibit C and certain decision group borrowers, *see* Minute Entry, ECF

14  No. 407 (Apr. 24, 2024); Minute Entry, ECF No. 414 (May 23, 2024); Minute Entry, ECF No. 434 (Sept.

15  26, 2024); *see also* Bergeron Decl. ¶¶ 20-21 (explaining how the Department necessarily "prioritized

16  putting processes into place to meet the settlement deadlines for class members"). By the time those

17  deadlines passed and attention could focus more on the post-class, BDB staffing levels had decreased

18  significantly, down to a current level of about 42 attorneys. Bergeron Decl. ¶¶ 9, 29. The decrease was

19  not the result of "the agency-wide reduction-in-force ('RIF') that was initiated in March 2025," but did

20  reflect the end of the HHS-attorney details and voluntary resignations through attrition. *Id.* ¶ 9.

21      To be clear, the Department has devoted resources to the post-class applicant pool throughout the

22  period of settlement performance. At the beginning, the Department focused on developing "new policies

23  and procedures for adjudicating post-class applications under the 2016 Regulation," *Id.* ¶ 21, which was

24  required because the Department rescinded the prior policies and procedures that were challenged in

25  Plaintiffs' amended complaint, *id.* ¶¶ 12, 21, 25. After those new procedures were in place, the Department

26  began to adjudicate claims. While the pace of post-class adjudications has ebbed and flowed over time,

27  the pace has been at a steady rate of issuing approximately 1,500 post-class adjudication notices per month

28

since January 2025. *Id.* ¶ 29. That pace continues to this day, even in the face of significantly reduced staff, *id.*, but it is not enough: at the current rate, approximately 193,000 post-class applications will remain unadjudicated on January 28, 2026, and approximately $11.8 billion in outstanding student loan balances will as a result have to be forgiven with no adjudication. *Id.* ¶¶ 31-32. Absent relief, this would provide windfall benefits to any post-class applicants whose applications would have been denied had they been adjudicated, at the expense of taxpayers. *Id.* ¶¶ 32-33. In light of these constraints, which make it impossible for the Department to adjudicate all post-class claims by the current deadline, it would not be equitable to enforce the provision of the Agreement that requires all such unadjudicated applications to receive full windfall settlement relief, regardless of the merits of those applications. *Cf. Am. Hosp. Assoc. v. Price*, 867 F.3d 160, 167 (D.C. Cir. 2017) ("a court may not require an agency to render performance that is impossible"). Furthermore, the Department does not think it is appropriate for such a significant sum of taxpayer resources to flow to borrowers who would not otherwise qualify for relief.

Exhibit C Terminal Loan Methodology

All of these problems with applying the automatic full settlement relief provision to the post-class are exacerbated by the Court's requirement that "the methods adopted for implementing relief for the Automatic Relief Group and later ordered for Decision Group One and Decision Group Two shall be used for . . . the Post-Class Applicants." Minute Entry, ECF No. 451 (Dec. 12, 2024).

The Agreement makes clear that the "relevant loan debt" eligible for discharge under the Agreement's provisions is "loans associated with the school that is the subject of the Class Member's borrower defense application." Agreement ¶ I.W; *see also id.* ¶ I.S (defining "Full Settlement Relief" as a discharge of, and refunds of amounts paid toward, "Relevant Loan Debt"). As the Court is aware, the Department encountered difficulties with fully effectuating that measure of relief for borrowers with mixed consolidation loans and as a result was unable to meet the original or revised deadlines for effectuating relief for that subset of Exhibit C borrowers. In response, the Department suggested, and the Court ultimately approved and ordered the provision of relief according to, the Exhibit C terminal loan methodology (or "Exhibit C approach"). *See* Minute Entry, ECF No. 416 (June 13, 2024), Defs.' Notice. According to this method, borrowers who have consolidation loans made up of eligible and ineligible

loans—*i.e.*, loans that are subject to a borrower defense application and thus the *Sweet* case and settlement, and those that are not—receive discharge of their full terminal consolidation loan, including both the eligible and the ineligible debt, as well as a refund of all payments made to the Department on the terminal consolidation loan (including payments attributable to ineligible debt). The Exhibit C terminal loan methodology was developed in response to the particular circumstances in which it arose and, as the Department has previously explained, leads to the discharge of substantial quantities of ineligible debt. *See, e.g.*, Defs.' Mot. to Approve Settlement Relief Process at 1 (explaining that using this methodology for Decision Group 3 would result in disbursing "approximately $55 million in additional ineligible relief").

Defendants appreciate and respect the Court's prior orders rejecting proposed alternatives and requiring that the Exhibit C terminal loan methodology be applied to additional groups of borrowers receiving relief under the settlement. But Defendants emphasize how inequitable that result is for the post-class in particular. Again, unlike borrowers defined in the Agreement as class members, post-class applicants "did not experience the allegedly unlawful policies and procedures that Plaintiffs describe in their original and supplement complaints," and thus receive under the Agreement only a guarantee that their claims will be adjudicated in a set period of time. Joint Mot. for Final Approval at 12 n.3. Due to the size of the post-class and the Department's resource constraints, the Department currently projects that more than 190,000 post-class applicants will not have their claims adjudicated by the January 28, 2026 deadline and thus will be entitled, without the relief sought in this motion, to full settlement relief regardless of the merits of their claims. *See* Bergeron Decl. ¶¶ 31-32. Requiring that the Department use the Exhibit C terminal loan methodology "significantly" increases the cost to the taxpayer associated with providing such relief, raising it from approximately $7.3 billion in discharges and $446 million in refunds to approximately $11.8 billion in discharges and $640 million in refunds.[6] *Id.* ¶ 32. In other words, the

---

[6] Of course, the government and taxpayer will incur some of this cost even if this motion is granted, because some (and likely many) post-class applications will be granted. But the effect of the automatic relief provision is to short-circuit that process and ensure that no one will ever know the true size of the financial burden of unadjudicated claims that lack merit. This concern is not theoretical. While these numbers are always subject to change, to date the BDB has "denied approximately 50% of the post-class applications that it has adjudicated," and if that ratio were to continue, a significant number of borrowers

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

19

1    cost of applying the Exhibit C terminal loan methodology—which was indisputably not anticipated at the

2    time of the Agreement—to the post-class is approximately $4.5 billion in discharges alone (plus an

3    additional nearly $200 million in refunds). *Id.* "Financial constraints are a legitimate concern" that courts

4    should consider when evaluating a request for Rule 60(b) relief, *LaShawn A. v. Fenty*, 701 F. Supp. 2d 84,

5    102 (D.D.C 2010), and particularly here where those constraints have increased substantially in

6    unforeseeable ways since the settlement provision from which Defendants now seek relief was executed.

7    ### C.    It Would Serve the Public Interest to Allow Defendants Additional Time to Adjudicate Post-Class Applications Before Requiring Automatic Settlement Relief.

8

9    Instead of requiring the Department to provide full relief to any post-class application the

10   Department does not adjudicate by January 28, 2026, the Court should extend the relevant deadline by 18

11   months. *See, e.g.*, *United States v. Turner*, No. 3:13-cv-1827, 2022 WL 1570741, at *1 (S.D. Cal. May

12   17, 2022) ("Rule 60(b)(5) requires the Court to 'take all the circumstances into account,' including the

13   public interest and the judiciary's interest in the finality of judgments" (citation omitted)).

14   Recent changes in the Department's resources make the Department's proposed modification to

15   the timetable both manageable and appropriately tailored to current circumstances.   In particular,

16   Congress's most recent budget bill, passed on July 4, 2025, provides significant additional funding to

17   FSA—$1 billion—that will allow it to "provide stable and dedicated funding for its administrative

18   functions." Bergeron Decl. ¶ 34.  With these funds, FSA anticipates being able to hire approximately 450

19   new attorneys to adjudicate borrower defense claims. *Id.* ¶¶ 35-36.  These contract attorneys will be

20   supervised by, and final decision-making authority will continue to reside with, government attorneys in

21   BDB.  *Id.* ¶ 36.  The process of identifying and finalizing contracts for such attorneys, as well as the

22   subsequent onboarding and training process may take up to six months, which means that it is not

23   practicable for the Department to utilize these additional resources to meet the current January 2026

24   deadline. *See id.* ¶¶ 35-37.  Allowing for the time needed to enter into the contract and onboard and train

25   the new attorneys, the Department estimates that the newly hired attorneys could begin adjudicating

26

27   _____

28   "whose applications might otherwise have been denied had they been adjudicated on the merits" would receive windfall benefits.  Bergeron Decl. ¶ 33.

applications no later than July 2026. *Id.* ¶ 37.

This proposed modification advances both the overall framework of the Agreement and the public interest. It affects only those individuals who were not impacted by the issues that led to the litigation and its settlement, continues to provide those individuals with the same measure of relief in the form of an ultimately timely decision, and avoids providing the post-class windfall benefits that would exceed in many cases the relief received by actual class members at great harm to the public fisc. *See, e.g.*, *United States v. Suarez*, 880 F.2d 626, 630 (2d Cir. 1989) ("[T]here is an obvious legitimate public interest in how taxpayers' money is being spent, particularly when the amount is large."). The modification would also not deny post-class applicants any benefit to which they are otherwise entitled: if a post-class claim is ultimately successful, it will be granted and the post-class applicant will receive appropriate relief; post-class applicants still get a reasonably timely decision (at the latest, about five years after submitting an application instead of three); and they remain in forbearance and do not have to make payments on relevant loans while their applications are pending, *see, e.g.*, Agreement ¶ IV.H.

## III.    In the Alternative, Relief Under Rule 60(b)(6) Is Appropriate.

Even if the Court determines not to afford relief under Rule 60(b)(5), Defendants respectfully submit that the Court should grant them relief pursuant to Rule 60(b)(6), which permits a court to provide relief from a final judgment, order, or proceeding for "any other reason that justifies relief." This catch-all provision gives district courts the flexibility to "accomplish justice" where a movant is able to show "extraordinary circumstances justifying the reopening of a final judgment." *Henson*, 943 F.3d at 443 (citation omitted). While the Ninth Circuit has held that a "change in the controlling law can—but does not always—provide a sufficient basis for granting relief under Rule 60(b)(6)," case law does not foreclose the Court from granting relief where there is not a change in law so long as extraordinary circumstances are present. *Id.* at 444.

For the reasons discussed above, the extraordinary circumstances of the post-class warrant the approval of Defendants' requested relief. Absent an extension or other relief from the requirement that Defendants provide full settlement relief on any unadjudicated post-class application, the Department will be forced to provide loan discharges and refunds, including in many instances for loan debt that is not

eligible for discharge under the settlement, to nearly 200,000 borrowers, regardless of the merits of their claims and at a cost to the taxpayer of nearly $12 billion. This is primarily because of the extraordinary 523 percent increase in applications that the Department received during the post-class period that the Department could not have reasonably foreseen at the time it executed the Agreement.

In sum, it would accomplish justice, and work no unfairness to the pool of post-class applicants, to allow the Department a modest extension of time to avoid this result through the continued adjudication of claims on the merits. *See, e.g.*, *Richardson v. Nat'l R.R. Passenger Corp.*, 150 F.R.D. 1, 8 (D.D.C. 1993) (the underlying purpose of Rule 60(b)(6) is to "ensure that justice and fundamental fairness are not defeated" after "weigh[ing] conflicting equities, including the interests of plaintiffs and defendants and the interest of finality of judgment and fundamental fairness").

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion and allow them until July 28, 2027 to adjudicate post-class applications before requiring that post-class applicants receive full settlement relief regardless of the merits of their applications.

Dated: November 6, 2025

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT
Senior Counsel (VA Bar No. 89400)
LIAM C. HOLLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

Supp.A.54

1    EILEEN M. CONNOR (SBN 248856)
     econnor@ppsl.org
2    REBECCA C. ELLIS (*pro hac vice*)
     rellis@ppsl.org
3    REBECCA C. EISENBREY (*pro hac vice*)
     reisenbrey@ppsl.org
4    NOAH ZINNER (SBN 247581)
     nzinner@ppsl.org
5    PROJECT ON PREDATORY STUDENT
     LENDING
6    769 Centre Street
     Jamaica Plain, MA 02130
7    Tel.: (617) 390-2669

8    *Attorneys for Plaintiffs*

9

10

11                   **UNITED STATES DISTRICT COURT**
                     **NORTHERN DISTRICT OF CALIFORNIA**
12

13   THERESA SWEET, ALICIA DAVIS, TRESA          Case No. 19-cv-03674-WHA
     APODACA, CHENELLE ARCHIBALD,
14   DANIEL DEEGAN, SAMUEL HOOD, and             **PLAINTIFFS' OPPOSITION AND**
     JESSICA JACOBSON on behalf of themselves    **MOTION TO STRIKE DEFENDANTS'**
15   and all others similarly situated,          **MOTION FOR RELIEF FROM**
                                                 **JUDGMENT**
16          *Plaintiffs*,
                                                 **HEARING DATE: December 11, 2025**
17
            v.
18                                               (Class Action)
                                                 (Administrative Procedure Act Case)
19   LINDA MCMAHON, in her official capacity as
     Secretary of the United States Department of
20   Education, and

21   THE UNITED STATES DEPARTMENT OF
     EDUCATION,
22

23          *Defendants*.

24

25

26

27

28

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

II.  ARGUMENT ...................................................................................................... 2

    A.   The Court Should Strike the Department's Motion Because It Violates the Settlement Agreement .............................................................................. 2

    B.   The Motion Should Be Denied As Untimely ........................................... 4

    C.   The Department's Motion Fails on Its Merits .......................................... 9

        i.   The Equities Favor Plaintiffs ....................................................... 9

        ii.   The Department's Own Choices Caused This Situation ............... 13

        iii.   The Department Misrepresents the Financial Effects of Maintaining the Deadline ...................................................................................... 15

        iv.   Relief Is Not Available Under Rule 60(b)(6) .............................. 20

III.  DEFENDANTS ARE IN MATERIAL BREACH OF THE SETTLEMENT AGREEMENT ................................................................................................... 20

CONCLUSION ............................................................................................................ 21

## TABLE OF AUTHORITIES

**Cases**

*Agostini v. Felton*, 521 U.S. 203 (1997) ................................................................. 15

*Ashford v. Steuart*, 657 F.2d 1053 (9th Cir. 1981) (per curiam) ............................... 5, 9

*Bay Marine Boatworks, Inc. v. S/Y Pursuit*, No. 20-cv-05399, 2022 WL 991751 (N.D. Cal. Apr. 1, 2022) .......................................................................................................... 4

*Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) ..................... 14

*Cassidy v. Tenorio*, 856 F.2d 1412 (9th Cir. 1988) .................................................. 9

*Coleman v. Brown*, 922 F. Supp. 2d 1004 (E.D. Cal. 2013) ....................... 9, 13, 14, 15

*Ctr. For Biological Diversity v. Norton*, No. 01-cv-2101, 2003 WL 22225620 (S.D. Cal. Sept. 9, 2003) .......................................................................................................... 14

*Fed. Trade Comm'n v. Apex Capital Grp.*, No. 18-cv-9573, 2021 WL 7707269 (C.D. Cal. Sept. 3, 2021) .......................................................................................................... 20

*Flores v. Rosen*, 984 F.3d 720 (9th Cir. 2020) ........................................................ 9

*Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831 (7th Cir. 2005) ................................. 5

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016) ..................................................... 4

*Kingdom v. Lamerque*, 392 F. App'x 520 (9th Cir. 2010) ......................................... 5

*Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380 (1993) ......... 20

*Pratt v. DeVos*, No. 20-cv-1501 (D.D.C. Feb. 1, 2021) ............................................ 14

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) .................................... 9

*S.E.C. v. Coldicutt*, 258 F.3d 939 (9th Cir. 2001) .................................................... 9

*United States v. Asarco Inc.*, 430 F.3d 972 (9th Cir. 2005) ...................................... 13,

*Warren v. City of Chico*, No. 21-cv-00640, 2025 WL 974068 (E.D. Cal. Mar. 31, 2025) .................................................................................................... 4, 9, 15, 20

**Other Authorities**

Department of Education, Notice of Proposed Rulemaking, Student Debt Relief Based on Hardship for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal

Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the
Health Education Assistance Loan (HEAL) Program, 89 Fed. Reg. 87,130 (Oct. 31,
2024) ............................................................................................................................ 18

Department of Education, Notice of Proposed Rulemaking, Student Debt Relief for the William
D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan
(FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education
Assistance Loan (HEAL) Program, 89 Fed. Reg. 27,564 (Apr. 17, 2024)......................... 16, 19

Gov't Accountability Office, GAO-22-105365, Student Loans: Education Has Increased Federal
Cost Estimates of Direct Loans by Billions Due to Programmatic and Other Changes (July
2022) ............................................................................................................................ 18

**Rules**

Fed. R. Civ. P. 60(b)(5) ............................................................................................... *passim*

Fed. R. Civ. P. 60(b)(6) ............................................................................................... 20

Fed. R. Civ. P. 60(c)(1)................................................................................................. 5

Supp.A.58

## I.    INTRODUCTION

Three and a half years ago, the Department of Education ("Department") entered into a binding Settlement Agreement with Plaintiffs in which, among other things, it committed to issuing borrower defense decisions to Post-Class Applicants[1] within 36 months of the Effective Date of the Settlement. If it did not meet that deadline, the Department agreed, it would provide all Post-Class Applicants who hadn't received a timely decision with Full Settlement Relief. The Department had a realistic idea of the size of the Post-Class by at least September 2022, and—according to its own filing—had finalized its numbers by February 2023.

Post-Class Applicants have now relied on the Settlement Agreement for over three years. They have planned their lives around the expectation that they will get at least finality, and perhaps a grant of relief, by January 28, 2026. They have tuned in to the regular status conferences in this case over Zoom, listening as the Department repeatedly stated that it was on track and committed to meeting the Post-Class decision deadline.

Now, less than 12 weeks before the deadline, the Department reveals that not only is it behind schedule to meet that deadline, it *never had a prayer of meeting the deadline*: out of more than 251,000 Post-Class applications, it has adjudicated fewer than 54,000—barely one-fifth. *See* Defs.' Mot. for Temporary Relief from Judgment ("Mot.") at 7, ECF No. 492. This is far worse than the worst-case scenario that Plaintiffs anticipated in the June 2025 status conference. *See* Tr. of June 26, 2025 Hrg. at 12:20–13:5, ECF No. 479 ("The actual thing that we want the Court to instruct the Department on is that the deadline for the post-class is firm, that there will be no further extensions. . . . [W]hat we don't want to do is show up here on January 2nd, 2026, and have them say, 'Actually, we've still got 50,000 more to go. Can we have an extension, please?'").

This case, and this Settlement, has always been about relieving class members from the Department's chronic and unreasonable delays. Yet the Department now begs indulgence for its own poor planning and lack of candor with Plaintiffs and the Court, in the form of a last-minute

---

[1] Capitalized terms not otherwise defined in the text are used as in the parties' Settlement Agreement, ECF 246-1, and prior briefing in this matter.

18-month delay of the Post-Class deadline. The relevant loans have already wreaked havoc on Post-Class Applicants' lives, and further delay will, for many, be the literal difference between housing and homelessness, between health and illness, between being able to provide for their families and falling into desperation. In these circumstances, the Department's assertion that the equities favor further delay are positively Orwellian.

Even aside from that fundamental failing, the Department's motion is legally deficient in multiple other ways. First, the Settlement Agreement provides the exclusive procedures for resolving disputes about Settlement enforcement, including for situations where the Department determines it cannot meet a deadline. The Department did not follow those procedures; as such, its motion should be stricken.

Second, if the Court does entertain the motion, it should deny the motion because it is woefully untimely. Even crediting the Department's narrative (which has notable omissions), it is clear that the Department knew it would not meet the Post-Class deadline months or even years ago. Rule 60 requires a motion for relief from judgment to be brought "within a reasonable time." The Department, despite having every opportunity to bring a timely motion, did not do so.

Finally, the motion fails on its merits. The Department cannot demonstrate that there are any significant and unanticipated changes in the facts that would warrant the extraordinary step of granting it relief from a contract that it willingly entered into. Indeed, nothing could be *more* anticipated than the Department finding itself in the very situation that Plaintiffs have been warning about for months. After stringing Post-Class Applicants along for the last three years, it is time for the Department to hold to its commitments and move this Settlement to its final phase. The motion should be denied.

## II. ARGUMENT

### A. The Court Should Strike the Department's Motion Because It Violates the Settlement Agreement

Paragraph V.A of the Settlement Agreement provides that "the Court shall retain jurisdiction" of this case "only to review claims set forth in this Section V, and only in the manner explicitly provided in Section V." ECF 246-1 at 15. Further, "[i]n connection with each such claim,

Supp.A.60

1    the Court shall retain jurisdiction only to order the relief explicitly specified for each particular

2    claim," and "[t]he Court shall lack jurisdiction to imply any claims, or authority to issue any other

3    relief, under this Agreement." *Id.* The Settlement's language is crystal clear: if the Department

4    wants to seek relief relating to the Settlement, it must do so under the Settlement's procedures.

5          Indeed, the Settlement provides a procedure for this precise situation, which the

6    Department admits it did not follow. *See* Mot. at 10-11 & n.3. Under Paragraph V.D.5, if

7    "Defendants are reasonably prevented from or delayed in fully performing any of the obligations

8    set forth in Paragraph IV . . . due to extraordinary circumstances beyond Defendants' control,

9    Defendants will notify Plaintiffs' Counsel within 14 calendar days of Defendants' determination

10    that they will not be able to fully perform their obligations." ECF 246-1 at 19-20. The Department

11    certainly did not notify Plaintiffs within the required 14 days, given that it would have been

12    apparent long ago that the Department was hopelessly behind schedule on Post-Class

13    adjudications. Regardless, the Settlement instructs that the Parties must meet and confer "as to

14    whether the circumstances are beyond the Defendants' control and to what extent they affect

15    Defendants' ability to issue final decisions or effectuate relief."[2] *Id.* at 20. If the Parties cannot

16    reach agreement on either or both of those factors, "Plaintiffs may raise a claim of material breach

17    of Paragraph IV with the Court prior to the expiration of the timelines provided in that Paragraph."

18    *Id.* The Department notably omits the following sentences from its summary of the Settlement

19    terms (*see* Mot. at 10-11): It is only then, after Plaintiffs have raised a claim of breach, that

20    "Defendants shall be permitted to oppose the filing of such a claim upon the grounds of

21    extraordinary circumstances, and the Court **will at that point** have jurisdiction to determine

22    whether Defendants are entitled to any extension of the deadlines." *Id.* (emphasis added).

23          Plaintiffs do not contest that the Court retains subject matter jurisdiction over its final order

24    incorporating the Settlement Agreement, and with that the power to modify the order. *See, e.g.,*

---

[2] Defendants notified Plaintiffs' counsel of their intention to file the instant motion mere hours before filing it. *See* Ellis Decl. ¶¶ 42–43 & Ex. K. The Department's assertion that it "ha[s], as a courtesy, begun the meet-and-confer process set forth in Paragraph V.D.5 of the Agreement" (Mot. at 11 n.3) is misleading at best.

*Kelly v. Wengler*, 822 F.3d 1085, 1094 (9th Cir. 2016); *Bay Marine Boatworks, Inc. v. S/Y Pursuit*, No. 20-cv-05399, 2022 WL 991751, at *2–3 (N.D. Cal. Apr. 1, 2022). But in this case, there are specific procedures in the Settlement designed to create the conditions for the Court to exercise its authority to decide whether to modify a Settlement deadline. When such a remedy exists, following the settlement is the preferred way to establish the parties' rights, not a collateral attack via Rule 60. *See Bay Marine*, 2022 WL 991751, at *4 ("I will not exercise my discretion to rewrite the agreement in this way because [the Rule 60 movant] has long had other, better options for judicial relief that, for whatever reason, it has refused to use.").[3]

The Department contends that that Paragraph V.D.5 does not apply here, because the Department is not contending that the requested delay is due to "extraordinary circumstances beyond Defendants' control." Mot. at 11 n.3. But this argument proves too much. If the circumstances here are *not* extraordinary, and the situation is *within* Defendants' control, then there is certainly no legitimate basis for granting relief under Rule 60(b)(5).

### B. The Motion Should Be Denied as Untimely

Even if the Court entertains the motion despite Defendants' flaunting of the Settlement's procedures, the motion should be denied because it is untimely. Since the fall of 2022—before this Court signed the Final Approval Order—the Department has known at least the rough size of the Post-Class. Since February 2023, it has known the exact size of the Post-Class. Since April 2024, the Department has been attending regular status conferences before this Court to report on its progress implementing the Settlement, and at no point in all that time did the Department ever indicate that it would request an extension of the Post-Class decision deadline. To the contrary, when Plaintiffs expressed concern about the deadline, the Department responded, essentially,

---

[3] The court in *Warren v. City of Chico*, No. 21-cv-00640, 2025 WL 974068 (E.D. Cal. Mar. 31, 2025), reached the opposite conclusion, although with minimal legal analysis. *See id.* at *4 (stating merely that, "[t]hough the parties' Settlement Agreement contains an explicit modification procedure under its Dispute Resolution process, this does not displace the alternative means of a party to modify the Settlement Agreement pursuant to Rule 60(b)").

"Nothing to see here." There was, it turns out, ample reason for concern. The Department cannot now be heard to request an extension that it studiously avoided requesting for over three years.

Rule 60(c)(1) provides that "[a] motion under Rule 60(b) must be made within a reasonable time." Fed. R. Civ. P. 60(c)(1). "What constitutes 'reasonable time' depends upon the facts of each case, taking into consideration the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to other parties." *Ashford v. Steuart*, 657 F.2d 1053, 1055 (9th Cir. 1981) (per curiam). Reconsideration is not, however, "an appropriate place to slip in arguments that should have been made earlier." *Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831, 837 (7th Cir. 2005) (cited in *Kingdom v. Lamerque*, 392 F. App'x 520, 522 (9th Cir. 2010)).

The Department has always had a clear view of its obligations to the Post-Class under the Settlement. As the Parties jointly explained in support of preliminary approval, the Settlement contains "strong procedural protections" for Post-Class Applicants: "If the Department fails to meet the deadlines set forth in the Agreement, . . . Post-Class Applicants receive Full Settlement Relief." Joint Mot. for Prelim. Settlement Approval at 16, ECF No. 246; *see also* Tr. of Prelim. Approval Hrg. (Aug. 4, 2022) at 8:5-10, ECF No. 311 ("And by imposing consequences, if the Department is not able to meet those deadlines, we provide some sort of disincentive for the Government to slide back into its old patterns of delay. With that being said, these timelines were set through negotiation with the understanding and expectation that the Department is committed to meeting them."). Post-Class members relied on these representations in supporting approval of the Settlement: During the comment period, 796 Post-Class Applicants signed a letter to the Court urging approval of the Settlement because it "ensures that the Department of Education meets strict measures, which have been proven necessary by the discovery in this case." Letter from Post-Class Applicants, ECF No. 292.

By the time the Department jointly moved with Plaintiffs for final approval of the Settlement, it was already on notice that the Post-Class would be significantly larger than any of the Decision Groups in the class proper. *See* Joint Mot. for Final Settlement Approval at 14, ECF No. 323 (noting that, "as of September 20, 2022," the Post-Class Applicant group already included

"approximately 179,000 borrowers"). The Department viewed this fact as a feature, not a bug, in the Settlement's structure, stating that the classification of later-applying borrowers as Post-Class Applicants was necessary to enable the Department "to meet the deadlines carefully negotiated and included in the Agreement." *Id.* at 18-19. In its Final Approval Order, this Court reiterated the Department's obligations to the Post-Class and the then-known size of the Post-Class. Order Granting Final Approval at 5-6, ECF No. 345; *see also id.* at 22 (Post-Class applications will be decided "within three years on pain of automatic discharge of the loans").[4] As the Department's own attachment to the instant motion shows, the number of Post-Class Applicants was known with certainty by, at the latest, February 27, 2023. ECF 492-2 at 2.

When Plaintiffs brought a Motion to Enforce in March 2024, asserting Defendants had breached other provisions of the Settlement (*see* ECF No. 397), this Court ordered the Parties to engage in monthly in-person meetings and regular status conferences to address the violations and get Settlement implementation on track. *See* Minute Order, ECF 407. These meetings and hearings were eventually successful in correcting most of the problems with discharge and refund delivery for the Automatic Relief Group and Decision Groups—including, in December 2024, through the Court's ruling establishing the "terminal consolidation discharge methodology" as the applicable relief method for all Settlement groups. *See* Minute Entry, ECF 451. When it came to the Post-Class, however, warning signs soon began to emerge.

As early as February 27, 2025, Plaintiffs questioned in an in-person meeting whether there were enough Borrower Defense Branch ("BDB") staff to complete Post-Class adjudications. Ellis Decl. ¶ 35. In a hearing on March 13, 2025, Plaintiffs expressed to the Court their "serious concerns about the capacity of the borrower defense group to handle [Post-Class] adjudications." Tr. of Mar. 13, 2025 Hrg. at 9:20-21, ECF 466; *see also id.* at 5:7–17, 10:3–6 ("In its fiscal year 2025 budget,

---

[4] The Court also found that because "the class certification order set no cut-off date for membership, . . . the class definition as recited in that order clearly encompasses all of these [Post-Class] borrowers." Order Granting Final Approval at 22. As such, Post-Class Applicants are members of the *Sweet* class. Under the law of the case, the Department is simply wrong that Post-Class Applicants "are explicitly not defined as class members." Mot. at 3.

FSA had said that in order to complete the adjudication of post-class applications on time, it would need $56 million to hire 300 contract attorneys. A staff of 50 simply is not enough."). Because of those concerns, Plaintiffs asked the Court to order the Department to regularly report on its progress adjudicating Post-Class applications, *id.* at 11:7–16, and for the Court to recommit the Department to its decision deadline, because "we don't want … another drawn-out series of enforcement proceedings where the Government blows the deadline and then comes and says, well, we just need more time," *id.* at 12:6–11. In response, the Department assured the Court that it was "committed to providing full settlement relief." *Id.* at 14:5–6. When the Court asked the Department's attorney whether, "despite the reorganization [at the Department], you're confident that you will honor the settlement agreement?", the DOJ attorney responded, "The Department fully understands its obligations under the settlement agreement ... [T]he Department is committed to honoring the settlement agreement." *Id.* at 25:21–26:17.

At the next hearing, it was more of the same. Plaintiffs expressed their concerns about BDB staffing and the Department's lack of transparency about its progress for the Post-Class, particularly given the large size of that group. *See* Tr. of Apr. 15, 2025 Hrg. at 10:4–7, 11:8–18, 13:8–14. ECF 472. In response, the DOJ attorney assured the Court that "the bottom line, though, is that, as Your Honor has pointed out, if the Department doesn't issue decisions by [the deadline], then the borrower is entitled to full settlement relief." *Id.* at 15:3–5. Once again, the Court asked the DOJ attorney whether the Department was going to meet its deadlines; once again, he responded, "[W]e understand that those are our obligations, and we're going to work on it." *Id.* at 31:13–22.

Two months later, the same. By then, the Department had revealed that it had only adjudicated a tiny fraction of Post-Class applications so far. Tr. of June 26, 2025 Hrg. at 7:9–18. Plaintiffs asked the Court again to "instruct the Department … that the deadline for the post-class is firm, that there will be no further extensions," because "we don't want to … show up here on January 2nd, 2026, and have them say, 'Actually, we've still got 50,000 more to go. Can we have an extension, please?'" *Id.* at 12:20–13:5. The Court asked the Department's attorney, "[A]re you going to make the deadline?" *Id.* at 13:6–7. And the DOJ attorney responded, "We have every

Supp.A.65

incentive to make the deadline. I think, as both plaintiffs' counsel and you have said, if we don't, everyone who has not received a decision will be entitled to full settlement relief." *Id.* at 13:10–13. The Court then stated that it was "not going to issue an order" for the Department to stick to the deadline because "[i]t's already an order; right? It's already an order. That's in your settlement agreement that I reduced to an order." *Id.* at 13:15–17.

On it went. *See* Tr. of Aug. 28, 2025 Hrg. at 4:22–5:1 (Plaintiffs' counsel: "I think our primary concerns coming up are the next deadlines, which are for the post-class decisions, and that's going to be in January. That is a large group of people, 250,000 people. We have asked for but not received data on how that, those reviews are going[.]").[5] Not once, in any of these hearings, did the Department suggest to the Court that it might move for an extension of the Post-Class deadline. To the contrary, it repeatedly reassured the Court—and the Plaintiffs, and all of the Post-Class Applicants listening to these hearings over Zoom—that it was committed to the deadline and understood that breaching the deadline would mean the automatic delivery of Full Settlement Relief to anyone who had not received a decision.

Under these circumstances, the Department cannot with a straight face assert that its present motion is timely. It was on notice of the facts relevant to the current situation for years. The Department acts shocked at the size of the Post-Class and the scope of the adjudication task, when these factors have been clear since at least late 2022 and Plaintiffs have explicitly brought up this very issue at four hearings over the past nine months. Issues with mixed consolidation loans have been apparent since at least early 2024, *see, e.g.*, Tr. of June 13, 2024 Hrg. at 11:2–12:23, and the terminal consolidation discharge methodology has been in place for the Post-Class for nearly a year, *see* Minute Order, ECF 451 (Dec. 12, 2024). The Department thus fails to carry its burden to show that the "interest in finality, the reason for delay, [or] the practical ability of the

---

[5] At the August hearing, the DOJ attorney represented that "the Department has made progress on the post-class. … I did forecast[] for plaintiffs' counsel that we would be -- the Department would be providing some top-line data in the coming weeks." *Id.* at 7:11–16. *But see* Ellis Decl. ¶¶ 37–41 (Department did not provide the requested Post-Class data at July, August, September, or October 2025 meetings).

Supp.A.66

litigant to learn earlier of the grounds relied upon" favor its position here. *Ashford*, 657 F.2d at 1055. As for "prejudice to other parties," *id.*, as detailed *infra* Section C.i, Post-Class Applicants will be severely prejudiced by further delay, whereas the Department will simply have to do exactly what it agreed to do.

### C.   The Department's Motion Fails on Its Merits

The Department argues that it should be excused from complying with its own contractual obligations because, under Rule 60(b)(5), it is "no longer equitable" to enforce the Settlement as written. Mot. at 3. This position is meritless and should be rejected.

The moving party bears the burden of establishing that Rule 60(b) relief is justified. *Cassidy v. Tenorio*, 856 F.2d 1412, 1415 (9th Cir. 1988). This is a heavy burden. "Relief from a court order should not be granted . . . simply because a party finds 'it is no longer convenient to live with the terms' of the order." *S.E.C. v. Coldicutt*, 258 F.3d 939, 942 (9th Cir. 2001) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992)). "Ordinarily, the party may not rely on 'events that actually were anticipated at the time it entered into a decree'" to argue for Rule 60(b)(5) relief. *Coleman v. Brown*, 922 F. Supp. 2d 1004, 1027 (E.D. Cal. 2013) (three-judge panel) (quoting *Rufo*, 502 U.S. at 385).

In general, under Rule 60(b)(5), the movant must "establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Flores v. Rosen*, 984 F.3d 720, 740–41 (9th Cir. 2020) (quoting *Rufo*, 502 U.S. at 393). Notably, the Department cites a number of cases involving government requests for modification of consent decrees. *See* Mot. at 9, 12. But here, of course, the Settlement is not a consent decree or an injunction, but rather "a contract agreed to by the parties," and in such a situation "it is certainly arguable that a more stringent standard should apply." *Warren v. City of Chico*, 2025 WL 974068, at *5 (E.D. Cal. Mar. 31, 2025).

### i.   The Equities Favor Plaintiffs

The Department makes an argument fundamentally based on the equities, yet never once considers the effect that its proposed delay would have on the people most affected by it: the Post-Class Applicants themselves. Indeed, the Department's argument relies on a pernicious underlying

assumption that Post-Class Applicants are not part of "the public" or "taxpayers" whom the Department sees itself as serving. *See* Mot. at 21. But they are, and the Department's proposed delay would cause them immediate, irreparable, life-changing harm. *See* Order Denying Class Settlement, to Resume Discovery, and to Show Cause at 15, ECF 146 ("Here, time is of the essence. We don't enjoy the luxury of seeking simply to forestall harm — it descended upon the class long ago."); Ex. 2, Decl. of Alice Zafiris ¶ 13 ("To hear the Department describe borrowers like me as receiving a 'windfall' is profoundly demoralizing. There is nothing windfall-like about years of waiting, mounting debt, and living in constant financial instability. We are not opportunists; we are people who believed the settlement meant what it said.").

In the two weeks since the Department filed its motion, Plaintiffs' counsel have conducted a survey of Post-Class Applicants to gather information about how an additional 18-month delay would affect their lives. *See* Ellis Decl. ¶¶ 23–29. Over 20,000 Post-Class Applicants responded to the survey, *id.* ¶ 30; this level of engagement alone indicates how important this issue is to so many people. And the results of the survey were overwhelming: over 80% of respondents reported that they were concerned about being placed back into repayment; over 81% reported that a further delay would negatively affect their credit report, credit score, and/or debt-to-income ratio; and nearly 90% (18,443 people) reported that a further delay would cause them stress, anxiety, and/or other negative impacts to their mental and emotional health. *Id.* ¶ 31. Respondents were also highly concerned about negative effects on their family's well-being (66.5%), being unable to afford an important purchase or cover an important expense (58.6%), suffering negative effects on their physical health (48.3%), and having their tax refunds or wages garnished because their loans had previously been in default (46.8%). *Id.* Over a quarter of respondents reported that having these loans outstanding was preventing them from going back to school or finishing their degree. *Id.* Just one percent (218 people) said a delay would have no effect on them. *Id.*

These numbers, while striking in themselves, cannot do justice to the profound impact that a further delay will have on Post-Class Applicants' lives:

In the absence of a decision on their borrower defense applications, Post-Class Applicants' struggles with credit reporting have blocked them from access to reasonable options for housing,

Supp.A.68

transportation, and other forms of credit. *E.g.*, Ex. 3, Decl. of Sherri Mainhart ¶ 10; Ex. 4, Decl. of Beth Huegel ¶ 10; Ex. 5, Decl. of Erin Williams ¶ 9; Ex. 6, Decl. of Kimberly O'neill ¶ 8; Ex. 7, Decl. of Lauren Bartholomew ¶¶ 12-13; Ex. 8, Decl. of Meloney Garrett ¶ 8; Ex. 9, Decl. of Nina Mecham ¶ 11; Ex. 10, Decl. of Stacey Barton ¶ 8; Ex. 11, Decl. of Stephanie DiMaso ¶ 9; Ex. 12, Decl. of Mark Gomez ¶ 10.

They are likewise blocked from advancing in their careers because they do not know if they will be able to go back to school or pass a security clearance screening. *E.g.*, Ex. 13, Decl. of Contessa Tracy ¶ 11; Ex. 14, Decl. of Sean Sanders ¶ 16; Ex. 15, Decl. of Akram Jaber ¶ 11; Ex. 16, Decl. of Alexandra Strong ¶ 9; Ex. 7, Bartholomew Decl. ¶¶ 15-18; Ex. 9, Mecham Decl. ¶ 11.

They put off major needs such as home repairs, health insurance, and saving for retirement. *E.g.*, Ex. 17, Decl. of Chandy Niles ¶ 9; Ex. 18, Decl. of Jennifer McMillian ¶ 8; Ex. 19, Decl. of Lyndsay Pelchat ¶ 7; Ex. 20, Decl. of Margo Rutland ¶ 11; Ex. 21, Decl. of Richard Hancock ¶ 9.

The uncertainty of having these loans hanging over their heads causes physical symptoms from stress, such as loss of sleep, headaches, and high blood pressure. *E.g.*, Ex. 15, Jaber Decl. ¶ 9; Ex. 22, Decl. of Elizabeth Lahren ¶ 7. They struggle with anxiety, depression, and a loss of faith in their government. *E.g.*, Ex. 23, Decl. of Federico Garza ¶ 9; Ex. 3, Mainhart Decl. ¶ 14; Ex. 6, O'neill Decl. ¶ 11; Ex. 19, Pelchat Decl. ¶¶ 10–11.

Some have put off marriage or children because of the specter of their debt. *E.g.*, Ex. 24, Decl. of Tiffany Kobs ¶ 12; Ex. 2, Zafiris Decl. ¶ 11; Ex. 7, Bartholomew Decl. ¶ 21.

Under these excruciating conditions, Post-Class members are still doing their best to care for their families. *E.g.*, Ex. 25, Decl. of Danielle Desormier ¶ 10; Ex. 26, Decl. of Erica Eacott ¶ 11; Ex. 27, Decl. of Lacricia Lee ¶ 8; Ex. 28, Decl. of Summer Hardy ¶ 9; Ex. 29, Decl. of Stephen DeCoteau ¶ 11; Ex. 35, Decl. of Angela Nocom ¶¶ 7–8; Ex. 12, Gomez Decl. ¶¶ 12–13; Ex. 17, Niles Decl. ¶ 8; Ex. 20, Rutland Decl. ¶¶ 7–8.

Borrowers from around the country attest to the hardships they will face if the Department is permitted to break its word:

- "These student loans have hung over my head for years and destroyed my credit. When I learned in 2022 that I could apply for a borrower defense discharge of my student

loans I felt like I could breathe for the first time in a long time. … I am still waiting for this weight to be lifted off my shoulders so that I can work on building my life rather than surviving it. Recently, my husband's cancer recurred and he is now unable to work. The uncertainty of my outstanding student loans only adds to the stress and anxiety we are experiencing from my husband's illness." Allyse, age 32, Minnesota (Ex. 30, ¶ 9)

- "As the sole income earner for my family, this ongoing situation is creating unbearable financial and emotional stress, pushing me dangerously close to bankruptcy, and I can't tell if I need to file or not because I'm getting mixed information from my servicer, AidVantage, and from the Department. ... I have had to move far from my family because I couldn't afford the cost of living given my income and debts. My financial uncertainty means that I'm unable to move closer or even to visit them. This is extremely painful to me." Beth, age 35, South Carolina (Ex. 4, ¶¶ 9, 13)

- "My poor credit previously forced me into three months of homelessness in 2023, when I could not rent an apartment because [of] my credit score. I had to live in hotels until a family member could co-sign for me to rent an apartment. A delay will hurt my credit score even further. I will not be able to qualify for a loan unless the ITT debt is removed from my credit report. I have tried four different lenders for a home loan, and it always comes back to the same issue—my debt-to-income ratio." Dawnelle, age 50, Indiana (Ex. 31, ¶¶ 10–11)

- "I retired from employment with the City of Phoenix, but returned to work in 2023 due to the high cost of health insurance and rising costs in general. … I have health issues, but continue working because I'm afraid that student loan payments will come due. The stress of having this repayment lingering only adds to my health issues. Flare ups from my autoimmune disease are triggered by stress. I need to retire. I want to go into retirement knowing exactly where I stand financially as my income will be fixed." Terri, age 61, Arizona (Ex. 32, ¶¶ 7–8)

- "I was diagnosed [with cancer] in 2018 before learning about Borrowers Defense and the Sweet case. I lived in my own home and was living paycheck to paycheck. My circumstances changed during covid, and by 2021, I was homeless. Can you imagine trying to fight cancer while being homeless? I am grateful to my relatives for letting me rent a room from them, but it's not all perfect and we still struggle. ... [M]y cancer keeps coming back and doctors say it is from the stress. I need stability, privacy, and my own space to manage treatment and recovery. Uncertainty spikes stress, worsens symptoms, and disrupts care planning. Years of collection threats preceded my Borrower Defense application, including demands for unaffordable monthly payments and tax refund offsets. I fear this will return someday, and it adds to the trauma of it all." Michelle, age 51, Georgia (Ex. 33, ¶ 9)

- "In my field, or for certain job roles, the existence of large, unresolved debt can be a factor in hiring, security clearance, or professional licensing. I have to report any unresolved debt to my employer. This delay ensures that this potential negative effect

Supp.A.70

on my employment or professional well-being remains a reality." Sean, age 56, Florida (Ex. 14, ¶ 16)

- "As a service member, I made a commitment to serve my country and I have continued to uphold that commitment while also carrying the weight of unresolved student loan issues tied to an institution that misled students and misused federal aid funds. Because my application remains in limbo, I am not receiving credit toward Public Service Loan Forgiveness. This means that every month of delay pushes my financial future further out of reach and traps me in debt that would be forgiven if the Department honored the timelines promised under this settlement." Contessa, age 34, Maryland (Ex. 13, ¶¶ 9–10)

- "This week brought the most painful consequence yet — my father passed away on Sunday night and I am unable to apply for a low-interest funeral loan to pay for the services because of my debt to income ratio. I'm having to take out a much higher interest rate loan with a shadier creditor in order to pay for this. It's insult to injury. A dagger in my grieving heart." Alice, age 40, Virginia (Ex. 2, ¶ 15)

- "While I was in school, I was battling cancer. I had to take some time off school to get radiation treatments. My school forced me to retake classes I passed with an A, putting me in more debt. … It disgusts me to think of how I was deceived by a school that received government funding while I was fighting for my life. Meanwhile, the government doesn't seem to care about me." Brittney, age 36, Alabama (Ex. 34, ¶ 10)

### ii.  The Department's Own Choices Caused This Situation

The burden falls on Defendants to demonstrate a "significant and unanticipated change in factual conditions warranting modification" of the Settlement's deadline. *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005). Contrary to the Department's complaints, *see* Mot. at 13, there is nothing unanticipated about the situation in which it now finds itself. Rather, this situation is an entirely foreseeable consequence of the Department's own decisions, as it voluntarily entered into the Settlement and then spent the better part of three years kicking the can down the road. *See Coleman*, 922 F. Supp. 2d at 1044 (Rule 60(b) relief not justified where "defendants are fully responsible for" failure to achieve settlement goals, as defendants "prevent[ed] themselves from achieving a long-term solution . . . without taking a number of steps that they could but are unwilling to take").

According to its declarant, the Department employed between 33 and 46 BDB attorneys for most of the Settlement implementation period, Bergeron Decl. ¶ 9 Tbl. 3, despite it being clear that this was nowhere near enough people to adjudicate the number of applications. The

Department's purported attempt to increase staffing through an agreement with HHS lasted less than eight months, and staffing is now back at 2023 levels. *Id.* The Department asserts that it "was not able" to "reallocate resources" to comply with the Settlement by adding more staff, but it does not provide any statutory or regulatory basis for this supposed inability. *Id.* ¶ 8; *compare, e.g.*, *Ctr. For Biological Diversity v. Norton*, No. 01-cv-2101, 2003 WL 22225620, at *4 (S.D. Cal. Sept. 9, 2003) (agency prohibited by statute from expending further funds on habitat designations).

Reportedly, the Department spent the "first **two years** of implementing the Settlement Agreement" on "stand[ing] up its new policies and procedures." Bergeron Decl. ¶ 21 (emphasis added). The Department had the BDB spend months conducting fact-finding, *id.* ¶¶ 12–14—even though it had already established a factual basis for finding substantial indicia of misconduct by at least 151 schools on Exhibit C to the Settlement, *see* Joint Mot. for Final Settlement Approval at 11. The Department also prioritized analyzing whether it could justify partial relief for approved applications, Bergeron Decl. ¶ 17, even though the Department's partial relief methods have been successfully challenged in at least two other lawsuits.[6] In short, the Department spent its time doing anything *but* the task that actually had to be completed: deciding applications.

Nor does the Department's eleventh-hour insistence that it now has a better plan change the analysis. *See* Mot. at 20. To begin, the plan is not actually better. The Department states that it is "proceeding to finalize the market research needed to provide an acquisition approach and full timeline to award . . . contracts for attorneys." Bergeron Decl. ¶ 36. In other words, it still has no idea where the new attorneys will come from, how it will hire them, or when it will actually be able to make any hires. The Department then lays out an over six-month-long process of onboarding that will admittedly reduce the already limited capacity of the BDB. *See id.* ¶¶ 35, 37. It does not take a math genius to see that this plan risks even further delays if there are any hiccups at all in the purported hiring plan. What the Department offers here "is not a plan for compliance; it is a plan for non-compliance." *Coleman*, 922 F. Supp. 2d at 1049.

---

[6] *See Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018); Joint Status Report, *Pratt v. DeVos*, No. 20-cv-1501 (D.D.C. Feb. 1, 2021), ECF No. 23 (Department abandoned partial relief methodology after certification of class).

Supp.A.72

But regardless of the weaknesses in the plan itself, the fact remains that "we'll do better next time" is not the standard for a Rule 60(b)(5) motion—it is a "significant and unanticipated change in factual conditions." *Asarco*, 430 F.3d at 979. And as detailed above, the Department knew full well that if it did not decide the applications by January 28, 2026, then Post-Class Applicants without decisions would receive Full Settlement Relief. Its attorneys repeated and reaffirmed this fact over and over before this Court throughout the past year. Indeed, "[n]othing could be more 'anticipated' than" the exact situation described in the Settlement and discussed in multiple hearings coming to pass. *Coleman*, 922 F. Supp. 2d at 1032. The Department's new "contention that the enforcement procedures [in the Settlement] constitute a change in factual circumstances" is "unpersuasive" where "the Settlement Agreement which defendants assented to contained the terms for those procedures." *Warren*, 2025 WL 974068, at *10.

### iii. The Department Misrepresents the Financial Effects of Maintaining the Deadline

The Department asserts that delaying the Post-Class deadline will prevent billions of dollars of "windfall" to Post-Class Applicants at "taxpayer expense." Mot. at 3. For one thing, Post-Class Applicants are taxpayers too. For another, a party cannot argue for changed circumstances "based on the 'exorbitant costs of complying'" where it was "aware that additional costs would be incurred' due to the court's judgment"—here, the costs of Post-Class Applicants receiving either approvals or relief by default. *Coleman*, 922 F. Supp. 2d at 1027 (quoting *Agostini v. Felton*, 521 U.S. 203, 215–16 (1997)). "That these predictions of additional costs turned out to be accurate does not constitute a change in factual conditions warranting relief under Rule 60(b)(5)." *Agostini*, 521 U.S. at 216.

But more importantly, the Department's claim of cost savings is unreliable at best, and downright false at worst.

***First:*** The basis for the Department's claim is not adequately explained in its motion or in the Declaration of James Bergeron. The Bergeron Declaration states that the "associated liability" of following the Settlement is "approximately $11.8 billion in discharges and $640 million in refunds" under the Court-ordered terminal consolidation discharge methodology, whereas "[i]f the

Supp.A.73

liabilities were to be limited to only the loans relating to the school that is the subject of the borrower defense application, the total estimated liability would be $7.3 billion in discharges and $446 million in refunds." Bergeron Decl. ¶ 32. But the Declaration does not explain how these numbers were calculated. And in the absence of any substantiation, this assertion raises more questions than it answers.

To begin, this Court ordered the Department to use the terminal consolidation discharge methodology for all Settlement groups after briefing and argument showed that the Department quite simply *could not* execute its relief obligations under the Settlement any other way. At that time, the Department failed to present evidence that it knew or had any reliable way to calculate discharge or refund amounts that were solely "related to" underlying borrower defense school loans within mixed consolidation loans. The Bergeron Declaration does not explain how the Department supposedly knows that information now.[7]

Next, the Court has already ordered that the Department must use the terminal consolidation discharge methodology for the Post-Class. *See* Minute Entry, ECF 451. The amount that the Department would theoretically discharge under some other, unspecified methodology is therefore irrelevant. Rather, the relevant calculation would be how many Post-Class Applicants would receive Full Settlement Relief as a result of Defendants' breach of the deadline versus how many Post-Class applications would be approved during the Department's requested delay period. But the Department avoids addressing this obvious logical misstep, for an obvious reason: the Department does not know how many applications would be approved. It weakly suggests that its

---

[7] As one specific example: For any Post-Class Applicants whose loans were disbursed before 2005, the Department has publicly acknowledged that it does not know the original balances of these loans. *See* Department of Education, Notice of Proposed Rulemaking, Student Debt Relief for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program, 89 Fed. Reg. 27,564, 27,573 (Apr. 17, 2024) (hereinafter "Apr. 2024 NPRM") ("The Department faces certain data limitations that make it impossible to accurately ascertain the balance upon entering repayment for loans disbursed before January 1, 2005."). Without those original balances, the Department could not calculate a "related to unrelated" ratio.

50% approval rate to date might continue.[8] *See* Bergeron Decl. ¶ 33. But the Department's own description of its decision methodology suggests that the approval rate would, if the Department acts in good faith, likely be far greater.

Specifically, the Department (mystifyingly) prioritized making decisions on Post-Class applications where there was *less* evidence of school misconduct and *fewer* applications per school. Bergeron Decl. ¶ 21. Overall, more than 80% of Post-Class applications relate to schools on the Settlement's Exhibit C list. *See* Ellis Decl. ¶ 15 (204,530 Post-Class applications from Exhibit C schools). If the Department's Post-Class decisions to date overwhelmingly concern non–Exhibit C schools, that means an even greater percentage of remaining applications relate to schools with known, and in some cases very extensive, records of misconduct—including "group discharge" schools, where the Department has already ordered that *all* borrowers who attended over a period of many years should have their loans discharged.[9] One can reasonably expect that applications from these schools are likely to be granted at a much higher rate.

As a result, in order to realize the savings it predicts, the Department would have to deny tens of thousands of applications from schools with known evidence of misconduct. This would fly in the face of one of the Settlement's major purposes: preventing arbitrary denials.

---

[8] Plaintiffs do not concede that this approval rate accurately reflects the merits of the underlying applications adjudicated so far.

[9] The Bergeron Declaration misstates the effect of group discharges on Post-Class Applicants. Mr. Bergeron states that the group discharges "positively impacted post-class applicants because there was a significant number of post-class applications associated with those group requests, which were approved through the group process." Bergeron Decl. ¶ 21. This is wrong on a few levels. First, a group discharge is not a "group request"—there is no mechanism to request a group discharge. Second, borrower defense applications are not "associated with" group discharges; by definition, group discharges affect borrowers from a given school regardless of whether they ever filed for borrower defense. *See* Ellis Decl. Exs. A–I. Third, a Post-Class Applicant who is also eligible for a group discharge does *not* automatically receive an approval of their borrower defense application. *See, e.g.*, Ex. 4, Huegel Decl. ¶ 9 (Post-Class Applicant eligible for group discharge has not received approval or relief); Ex. 17, Niles Decl. ¶ 6 (Post-Class Applicant partially eligible for group discharge has not received approval for loans that fall outside group discharge time window). In fact, as far as Plaintiffs are aware, the Department does not even know which borrower defense applicants fall into the category of group discharge/Post-Class overlap—a piece of information that Plaintiffs requested at multiple in-person meetings. *See* Ellis Decl. ¶¶ 36–41.

**Second**, as Plaintiffs have explained before,[10] the Department's own accounting assumes that much of this debt would never be repaid even if it remained on the books. Federal student loans are, overall, a money-losing endeavor. *See* Gov't Accountability Office, GAO-22-105365, Student Loans: Education Has Increased Federal Cost Estimates of Direct Loans by Billions Due to Programmatic and Other Changes, at 12 (July 2022), *available at* www.gao.gov/assets/gao-22-105365.pdf (hereinafter "GAO Cost Report") ("[L]oans made from the fiscal year 1997 through 2021 cohorts were originally estimated to generate $6 in income per every $100 disbursed. As of fiscal year 2021, those cohorts are expected to cost the government almost $9 for every $100 disbursed."). Once the accounting is done, "[n]o Direct Loan cohort has finished repaying all of its loans since the start of the program in 1994." *Id.* at 4. It is thus deeply misleading to suggest that discharging a particular amount in loan balances would equate to that same amount in "losses" to "taxpayers."

There are reasons to believe that the portfolio of Post-Class Applicants' loans would be particularly unlikely to result in net gains for the Department. For one, students who attended for-profit colleges are statistically more likely to default than students who attended other types of institutions. *See* Department of Education, Notice of Proposed Rulemaking, Student Debt Relief Based on Hardship for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program, 89 Fed. Reg. 87,130, 87,143 (Oct. 31, 2024). Post-Class Applicants who attended more than one school frequently attended more than one for-profit college,[11] meaning that if they have consolidation loans, that entire balance would consist of debt that is less likely to be paid back.

In a best-case scenario, the Department would collect—over the course of decades—only some small fraction of whatever balances it would retain by delaying the Post-Class deadline in

---

[10] *See* Pltfs.' Opp. to Mot. to Approve Settlement Relief Process at 11-13, ECF 446.

[11] Over 41,000 Post-Class Applicants submitted more than one borrower defense application; of those, 20,516 people—very close to half—attended more than one Exhibit C school. Ellis Decl. ¶¶ 21–22. All but 12 Exhibit C schools are for-profit. *Id.* ¶ 14.

order to deny more applications.[12] Meanwhile, as detailed *supra*, the Post-Class is already suffering from the Department's slow march toward adjudicating applications, and will suffer further if any additional delay is allowed.

**Third,** in addition to these general accounting deficiencies, the Department's calculations make other unrealistic assumptions about the alleged gains to be realized under its proposed delay. For one, the Department does not take into account the fact that a significant portion of the balances to be discharged under the Settlement schedule would be discharged in any event. The Post-Class includes more than 32,000 applications—nearly 13% of the total—that relate to group discharge schools. Ellis Decl. ¶ 17. Thus, most of these loans would eventually be discharged even absent the Settlement. Some percentage of Post-Class Applicants are also very likely to be eligible for other forms of loan cancellation, such as total and permanent disability discharge, closed school discharge, income-based repayment discharge, or Public Service Loan Forgiveness ("PSLF"), so the full balances of their loans will or should be cancelled as well. *See* Defs.' Mot. to Approve Settlement Relief Process at 5, ECF 443 (26% of *Sweet* Decision Group 3 was eligible for PSLF); Ex. 13, Tracy Decl. ¶ 10 (Post-Class Applicant working toward PSLF); Ex. 5, Williams Decl. ¶ 8 (Post-Class Applicant working toward income-based repayment discharge); Ex. 33, Reed Decl. ¶ 11 (Post-Class Applicant is permanently disabled); Apr. 2024 NPRM at 27,565 (Department is currently holding $7.6 billion worth of loans that are eligible for closed school discharge).

Nor does the Department balance any alleged savings from its proposed plan against the costs of that plan—which appear to be significant, although the Department does not offer an estimate. It also does not take into account the costs of servicing and collection on loans that would

---

[12] For example, borrowers with loans that were disbursed before 2005 are also more likely to default, because "loans that are that old and are still outstanding belong to borrowers who have had long-term struggles repaying." Apr. 2024 NPRM at 27,573. The vast majority of borrowers in income-driven repayment plans are unlikely to pay back their principal balances before those plans reach the 20- or 25-year threshold for cancellation, because their "monthly payments [do] not cover the full amount of accumulating interest." *Id.* at 27,592. And if a borrower has been in default for an extended period of time despite "the availability of . . . powerful collection tools," the Department has concluded that "the odds that they would be fully repaid in a reasonable period are unlikely." *Id.* at 27,595.

remain, including the Department's own operational and administrative costs as well as the costs of compensating student loan servicers and/or debt collectors on a per-account basis.

#### iv.  Relief Is Not Available Under Rule 60(b)(6)

As a last-ditch effort, the Department briefly argues that if the Court rejects its Rule 60(b)(5) argument, it should receive relief under Rule 60(b)(6). Mot. at 21-22. But "[t]o justify relief under subsection (6), a party must show 'extraordinary circumstances' suggesting that the party is faultless in the delay." *Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 393 (1993). For all of the reasons detailed above, the Department cannot satisfy this standard. "When a party makes a conscious and informed choice of litigation strategy, [that party] cannot seek extraordinary relief [under Rule 60(b)(6)] merely because his assessment of the consequences was incorrect." *Warren*, 2025 WL 974068, at *15 (alterations in original) (quoting *Fed. Trade Comm'n v. Apex Capital Grp.*, No. 18-cv-9573, 2021 WL 7707269, at *4 (C.D. Cal. Sept. 3, 2021)).

### III.  DEFENDANTS ARE IN MATERIAL BREACH OF THE SETTLEMENT AGREEMENT

Defendants are in material breach of the following provisions of the Settlement:

Paragraphs V.A and V.D.5, by failing to follow the procedures established by the Settlement for situations in which the Department contends that it is unable to fully perform its obligations under the Settlement.

Paragraph V.D.5, by failing to "notify Plaintiffs' Counsel within 14 calendar days of Defendants' determination that they will not be able to fully perform their obligations" under the Settlement.

Paragraph IV.D.2, in an anticipatory breach. Pursuant to Paragraph V.D.5, where the parties are unable to agree "as to whether extraordinary circumstances exist [to justify a deadline extension] or what the appropriate length of an extension is"—which is the case here—then "Plaintiffs may raise a claim of material breach of Paragraph IV with the Court prior to the expiration of the timelines provided in that Paragraph." It is clear from the Department's motion that a material breach of this provision will occur on January 29, 2026.

**CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court strike or in the alternative deny Defendants' Motion for Relief from Judgment.

Plaintiffs further respectfully request that the Court find that Defendants are in material breach of the Settlement Agreement and, pursuant to Paragraph V.B.1 of the Settlement, (i) order Defendants to promptly provide Full Settlement Relief to each affected Post-Class Applicant on a timetable set by the Court, with that timetable to follow the Settlement's original agreed-upon schedule; and (ii) order Defendants to pay Plaintiffs' reasonable attorneys' fees and costs incurred in relation to these breaches of the Settlement.

Dated: November 20, 2025                    Respectfully submitted,

                                            _Rebecca C. Ellis_____

                                            Eileen M. Connor (SBN 248856)
                                            econnor@ppsl.org
                                            Rebecca C. Ellis (*pro hac vice*)
                                            rellis@ppsl.org
                                            Rebecca C. Eisenbrey (*pro hac vice*)
                                            reisenbrey@ppsl.org
                                            Noah Zinner (SBN 247581)
                                            nzinner@ppsl.org
                                            PROJECT ON PREDATORY
                                            STUDENT LENDING
                                            769 Centre Street
                                            Jamaica Plain, MA 02130
                                            Tel.: (617) 390-2669

                                            *Attorneys for Plaintiffs*

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al.*, | Case No.: 19-cv-03674-WHA |
| *Plaintiffs*, | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION, | **DECLARATION OF REBECCA C. ELLIS, ESQ.** |
| *Defendants*. | |

I, Rebecca C. Ellis, state as follows:

1. I am submitting this declaration in relation to the above-captioned case.

2. I am the Deputy Litigation Director at the Project on Predatory Lending ("PPSL"), which represents Plaintiffs in this case. I am a member in good standing of the bar of the Commonwealth of Massachusetts. I was admitted to practice *pro hac vice* in the U.S. District Court for the Northern District of California in relation to this matter on February 3, 2021.

3. The statements contained herein are true and accurate to the best of my knowledge.

**Post-Class Calculations**

4. On January 16, 2025, the Department of Education ("Department") provided PPSL with a spreadsheet containing the names of all Class Members and Post-Class Applicants in this matter.

5. The spreadsheet contains an entry for each borrower defense application that falls within the Class or the Post-Class. Thus, an individual borrower will appear on the spreadsheet more than once if they filed more than one borrower defense application within the applicable time frames. A borrower might thereby appear in more than one relief group (*e.g.*, if the borrower filed an application relating to an Exhibit C school on March 1, 2022, and another application relating to a

different school on August 1, 2022, they would appear in both the Automatic Relief Group and the Post-Class).

6.  The January 16, 2025, spreadsheet did not include a data field showing which school was associated with each entry.

7.  Previously, however, on September 13, 2024, the Department had provided a version of the Class and Post-Class spreadsheet that did include school information.

8.  Under my supervision, a PPSL employee used Microsoft Excel to match the school information from the September 13, 2024, spreadsheet to the January 16, 2025, spreadsheet, for as many entries as possible.

9.  I have personally reviewed the January 16, 2025, spreadsheet, as updated with school information, to determine the following statistics relating to the Post-Class.

10. Overall, there are 572,748 applications listed in the January 16, 2025, spreadsheet.

11. One of the data fields in the spreadsheet is labeled "Pending Litigation." This field identifies whether a particular application falls in the Automatic Relief Group, one of the five Decision Groups, or the Post-Class.

12. I used Microsoft Excel to filter the "Pending Litigation" field to show only the entries labeled "Sweet Post-Class." Of the total number of *Sweet*-related applications, 252,988 are Post-Class applications.

13. I used Microsoft Excel to filter the Post-Class applications by school, selecting only those entries that related to either (1) a school listed on the updated Exhibit C to the Settlement Agreement in this case, ECF No. 317-1, or (2) one of the three Corinthian Colleges, Inc. school brands (Heald, Everest, and Wyotech), which were subject to a group discharge order issued by the Department shortly before the Parties signed the Settlement Agreement.[1]

---

[1] *See* Ex. A, Press Release, "Education Department Approves $5.8 Billion Group Discharge to Cancel All Remaining Loans for 560,000 Borrowers Who Attended Corinthian" (June 1, 2022). I am attaching to this Declaration an archived copy of this press release, along with all other press releases subsequently cited, because these releases have been scrubbed from the Department of Education's website.

14. There are 151 schools on the Exhibit C list. *See* ECF No. 317-1. All but 12 are for-profit schools (or were, before they closed). Only three of those 12 have always been non-profits; the rest were formerly for-profit and underwent (sometimes contested) conversions of their tax status.[2]

15. Of the Post-Class applications, 204,529 of them (80.8%) relate to an Exhibit C school or a Corinthian school.

16. I used Microsoft Excel to filter the Post-Class applications by schools for which the Department has announced a group discharge (that is, the Department has committed to discharging all loans from these schools within a certain timeframe regardless of whether borrowers submitted a borrower defense application, based on findings of widespread school misconduct). The group discharge schools/school groups are: the Art Institutes[3]; Ashford University[4]; Centers for Excellence in Higher Education (California College San Diego, CollegeAmerica, Independence University, and Stevens-Henager College)[5]; Corinthian Colleges (Heald, Everest, and Wyotech)[6]; Drake College of Business[7]; ITT Technical Institute[8]; Marinello

---

[2] One additional school, Dorsey College, was for-profit at the time the Exhibit C list was created, although it was later purchased by a non-profit in 2023.

[3] *See* Ex. B, Press Release, "Biden-Harris Administration Approves $6.1 Billion Group Student Loan Discharge for 317,000 Borrowers Who Attended The Art Institutes" (May 1, 2024).

[4] *See* Ex. C, Press Release, "Biden-Harris Administration Announces Group Discharge for 261,000 Borrowers with Loans from Ashford University" (Jan. 15, 2025). Ashford University appears in the Department's data under the name University of Arizona Global Campus, because the University of Arizona purchased Ashford in 2020 and changed its name but still maintained the same federal identification number.

[5] *See* Ex. D, Press Release, "Biden-Harris Administration Approves $10 Million Group Discharge for 7,400 Borrowers from Colorado Locations of CollegeAmerica" (July 25, 2023); Ex. E, Press Release, "Biden-Harris Administration Surpasses 5 Million Borrowers Approved for Student Loan Forgiveness" (Jan. 13, 2025).

[6] *See* Ex. A.

[7] *See* Ex. E.

[8] *See* Ex. F, Press Release, "Extended Closed School Discharge Will Provide 115K Borrowers from ITT Technical Institute More Than $1.1B in Loan Forgiveness" (Aug. 27, 2021); Ex. G, Press Release, "Education Department Approves $3.9 Billion Group Discharge for 208,000 Borrowers Who Attended ITT Technical Institute" (Aug. 16, 2022).

Schools of Beauty[9]; and Westwood College.[10]

17. Of the Post-Class applications, 32,121 of them (12.7%) relate to a group discharge school.

18. I used Microsoft Excel's "UNIQUE" function to determine how many Post-Class Applicants submitted more than one borrower defense application. The "UNIQUE" function identifies how many unique entries there are in a list.

19. I applied the "UNIQUE" function to the "Email" field on the list of Post-Class applications to determine how many unique Post-Class Applicants appeared on the list. In my experience, the "Email" field is a more reliable indicator of uniqueness than the "Name" field, because multiple people can have the same name.

20. There are 208,310 unique Post-Class Applicants on the January 16, 2025, list.[11]

21. Of those applicants, 41,496 people submitted more than one Post-Class application.

22. Of the Post-Class Applicants who submitted more than one Post-Class application, 20,516 of them—very close to half—submitted applications for more than one Exhibit C school.

**Post-Class Survey**

23. In response to Defendants' Motion for Relief from Judgment, PPSL conducted a survey of Post-Class Applicants to determine how a further delay in the Post-Class deadline would affect them.

24. We built an online survey using FormAssembly and emailed a link to the survey to all Post-Class Applicants for whom Plaintiffs had an email address.

25. The survey first collected information about the respondent's name, email, location, borrower defense school, and BD application date. It asked whether the respondent had received a decision on their borrower defense application and whether the respondent had filed more than

---

[9] *See* Ex. H, Press Release, "Education Department Approves $238 Million Group Discharge for 28,000 Marinello Schools of Beauty Borrowers Based on Borrower Defense Findings" (Apr. 28, 2022).

[10] *See* Ex. I, Press Release, "Education Department Approves $1.5 Billion in Debt Relief for 79,000 Borrowers Who Attended Westwood College" (Aug. 30, 2022).

[11] This number includes 208,251 unique emails plus 59 unique applicants with no email listed. I reviewed the latter applicants' entries manually to determine uniqueness.

one borrower defense application. If the person responded that they had filed more than one, the survey collected information about each application.

26. The survey then asked, "How will you be affected if the court extends the deadline for the Department of Education to decide post-class applications?" Respondents were offered the following options and instructed to "check all that apply":

    a.  My credit report/credit score/debt-to-income ratio will be negatively affected

    b.  I will not be able to make an important purchase or cover an important expense

    c.  I am concerned about being placed back into repayment

    d.  I am concerned about having my tax refunds or wages garnished because my loan was in default

    e.  I will experience stress, anxiety, and/or other negative impacts to my mental and emotional health

    f.  I will experience negative impacts to my physical health

    g.  It will have a negative effect on my family's well-being

    h.  It will have a negative effect on my employment or professional well-being

    i.  I will not be able to go back to school/finish my degree

    j.  Other

    k.  None of the above, I will not be affected

27. After that question, the survey provided an open text box with the prompt: "In your own words, please describe how you would be affected by a delay in the post-class decision deadline."

28. To compile the survey results reported below, we de-duplicated the survey responses by email address to avoid double-counting respondents. We also excluded from the results below all respondents who answered "Yes" to the question "Have you received a decision on your BD application?" Finally, we compared the email addresses used by respondents to those of Post-Class Applicants on the January 16, 2025 list, and found that 93% matched. Of the remaining respondents, spot-checking confirmed that the vast majority are Post-Class Applicants whose names appear on the January 16, 2025 list but who used a different email address when completing the survey.

29. The survey results reported below are as of Thursday, November 20, 2025, at 2:55 p.m. Eastern.

30. In total, PPSL received 20,509 responses to the survey.

31. Of those responses[12]:

   a. 81.8% (16,775 people) reported that a further delay would negatively affect their credit report, credit score, and/or debt-to-income ratio.

   b. 58.6% (12,021 people) reported that they would not be able to make an important purchase or cover an important expense.

   c. 80.3% (16,476 people) reported that they were concerned about being placed back into repayment.

   d. 46.8% (9,602 people) reported that they were concerned about having their tax refunds or wages garnished because their loans had previously been in default.

   e. 89.9% (18,443 people) reported that a further delay would cause them stress, anxiety, and/or other negative impacts to their mental and emotional health.

   f. 48.3% (9,896 people) reported that a further delay would cause negative impacts to their physical health.

   g. 66.5% (13,269) reported that a further delay would have a negative effect on their family's well-being.

   h. 39.0% (8,001 people) reported that a further delay would have a negative effect on their employment or professional well-being.

   i. 25.3% (5,198 people) reported that they would not be able to go back to school or finish their degree.

   j. Only 1.1% of respondents (218 people) chose the option "None of the above, I will not be affected."

---

[12] The following percentages sum to more than 100% because respondents were able to choose more than one option.

32. PPSL also reached out by email and phone to a subset of survey respondents to learn more about the harm that further delay will cause them and their families. Declarations from those Post-Class Applicants are attached to Plaintiffs' Opposition as Exhibits 2–35.

**Meetings with the Departments of Education and Justice**

33. Since this Court's order of April 24, 2024, establishing monthly meetings between the Parties (ECF No. 407), at least two PPSL attorneys have attended each monthly meeting in person,[13] and other PPSL attorneys have frequently joined by videoconference as well. My colleagues and/or I have taken contemporaneous notes at each meeting.

34. I have personally reviewed the contemporaneous notes of these meetings to refresh my recollection about conversations relating to Post-Class decisions.

35. On February 27, 2025, PPSL attorneys Rebecca Eisenbrey and Noah Zinner attended the meeting in person. Ms. Eisenbrey asked the representatives of the Department what the then-current staffing level was in the BDB. Ms. Eisenbrey specified that PPSL was concerned about there being enough BDB employees to review Post-Class applications and deliver appropriate decisions. The Department's representatives did not provide a specific response, instead referring to continuing staffing adjustments across the organization.

36. On June 12, 2025, Ms. Eisenbrey and PPSL attorney Nicole Camargo Almeida attended the meeting in person. Ms. Eisenbrey requested data on how many Post-Class Applicants would also qualify for a group discharge.

37. On July 17, 2025, Ms. Eisenbrey and I attended the meeting in person. We again requested data on how many Post-Class Applicants would also qualify for a group discharge, and additionally asked for data showing the Department's progress on issuing Post-Class decisions. The Department and its attorney from the Department of Justice ("DOJ") reported that the Department did not have either set of data available but would share it within a few weeks.

38. On August 21, 2025, Ms. Camargo Almeida and I attended the meeting in person. We

---

[13] There was one exception, in August 2024, when I was unable to attend in person at the last minute due to illness. PPSL attorney Eileen Connor attended that meeting in person.

asked the representatives of the Department whether they had collected the data on Post-Class decisions and group discharge eligibility that the Parties had discussed at their previous meeting. The Department and its attorney from DOJ reported that the Department did not have that data available.

39. On September 25, 2025, Ms. Camargo Almeida and I attended the meeting in person. We asked the representatives of the Department whether they had collected the data on Post-Class decisions and group discharge eligibility that the Parties had discussed at their previous two meetings. The Department and its attorney from DOJ again reported that the Department did not have that data available.

40. On Friday, October 24, 2025, DOJ attorney R. Charlie Merritt emailed PPSL to state that the Department would not be able to hold the October monthly meeting in person due to the lapse in appropriations for the federal government. Ex. J, Email from R. Charlie Merritt dated Oct. 24, 2025. Plaintiffs requested a teleconference with the servicers and available government personnel as a substitute. *Id.*, Email from Rebecca Eisenbrey dated Oct. 24, 2025.

41. The parties held a teleconference with limited government attendance on October 30, 2025. Ms. Eisenbrey, Ms. Camargo Almeida, and I attended for PPSL. At that teleconference, the Department reported that it could not provide any data updates at the meeting due to the lapse in appropriations.

42. On November 6, 2025, at 2:52 p.m. Eastern time, Mr. Merritt emailed PPSL counsel stating that "we will be filing a Rule 60 motion later today in this case, seeking relief from the upcoming January 28, 2026 deadline to issue final decisions on post-class applications." Ex. K, Email from R. Charlie Merritt dated Nov. 6, 2025. He further stated that the Department was "not taking a position here about whether [Paragraph V.D.5] of the settlement agreement is triggered." *Id.*

43. This was the first time that anyone from the Department or DOJ had ever said anything to Plaintiffs' counsel about seeking an extension of the Post-Class deadline. None of Defendants' representatives ever mentioned this possibility in any of the parties' in-person or virtual meetings in this case.

44. I responded to Mr. Merritt's email approximately two hours later, at 4:49 p.m. Eastern, and

informed him of Plaintiffs' position that Section V.D.5 did apply here, a Rule 60 motion was not authorized by the Settlement Agreement in these circumstances, and Plaintiffs did not agree that any extension is warranted. Ex. L, Email from Rebecca Ellis dated Nov. 6, 2025.

45. DOJ did not respond to my email. The Department filed its Motion for Temporary Relief from Judgment at 7:49 p.m. Eastern that same day. *See* ECF 492.

I swear under penalty of perjury that the foregoing is true and correct.


Executed on:   November 20, 2025

MIDDLESEX COUNTY, MASSACHUSETTS


_____

REBECCA C. ELLIS

# EXHIBIT A

1/24/25, 8:41 AM    Education Department Approves $5.8 Billion Group Discharge to Cancel all Remaining Loans for 560,000 Borrowers who Attended …

Case: 26-1136    03/09/2026    DktEntry: 9.2    Page 92 of 288

The Wayback Machine - https://web.archive.org/web/20240123141724/https://www.ed.gov/news/press-releases/education-departmen…

Skip to main content | About Us (https://web.archive.org/web/20240123141724/https://www2.ed.gov/about/landing.jhtml) |
Contact Us (https://web.archive.org/web/20240123141724/https://www2.ed.gov/about/contacts/gen) |
FAQs (https://web.archive.org/web/20240123141724/https://www.ed.gov/answers/) | ⊞ Language Assistance ▾

|  Search... | |
|---|---|

**ARCHIVED INFORMATION**

# Education Department Approves $5.8 Billion Group Discharge to Cancel all Remaining Loans for 560,000 Borrowers who Attended Corinthian

**Then-Attorney General Kamala Harris's lawsuit against Corinthian played key role in Education Department's work to approve loan discharges for borrowers harmed by Corinthian's wrongdoing**

JUNE 1, 2022

**Contact:** Press Office, (202) 401-1576, press@ed.gov (https://web.archive.org/web/20240123141724/mailto:press@ed.gov)

Today, the U.S. Department of Education (Department) announced it will discharge all remaining federal student loans borrowed to attend any campus owned or operated by Corinthian Colleges Inc. (Corinthian) from its founding in 1995 through its closure in April 2015. This will result in 560,000 borrowers receiving $5.8 billion in full loan discharges. This includes borrowers who have not yet applied for a borrower defense (https://web.archive.org/web/20240123141724/https://studentaid.gov/borrower-defense/) discharge, who will have their Corinthian loans discharged without any additional action on their part. The action is the largest single loan discharge the Department has made in history. Providing this targeted relief is part of the Biden-Harris Administration's continued commitment to helping borrowers who are struggling the most by ensuring discharge programs provide borrowers the complete relief to which they are entitled. Today's action brings the total loan relief the Biden-Harris Administration has approved for borrowers to $25 billion since January 2021.

The announcement today builds upon conclusions first reached by the Department of Education in 2015 (https://web.archive.org/web/20240123141724/https://www.ed.gov/news/press-releases/department-education-and-attorney-general-kamala-harris-announce-findings-investigation-wyotech-and-everest-programs) that Corinthian (https://web.archive.org/web/20240123141724/https://www.help.senate.gov/imo/media/for_profit_report/PartII/Corinthian.pdf) engaged in widespread and pervasive misrepresentations related to a borrower's employment prospects, including guarantees they would find a job. Corinthian also made pervasive misstatements to prospective students about the ability to transfer credits and falsified their public job placement rates. Founded in 1995, Corinthian acquired several troubled private for-profit colleges across the country. At its peak in 2010, it enrolled more than 110,000 students at 105 campuses.

Then-California Attorney General Kamala Harris' investigation into Corinthian played a key role in developing findings against the for-profit college chain and the Department's overall work to discharge the loans of borrowers who were harmed by its wrongdoing, a process that has helped cancel the loans of around 100,000 borrowers to date.

"As of today, every student deceived, defrauded, and driven into debt by Corinthian Colleges can rest assured that the Biden-Harris administration has their back and will discharge their federal student loans," said U.S. Secretary of Education Miguel Cardona. "For far too long, Corinthian engaged in the wholesale financial exploitation of students, misleading them into taking on more and more debt to pay for promises they would never keep. While our actions today will relieve Corinthian Colleges' victims of their burdens, the Department of Education is actively ramping up oversight to better protect today's students from tactics and make sure that for-profit institutions – and the corporations that own them – never again get away with such abuse."

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 93 of 288
Case 3:1    6    of 82

## Vice President Kamala Harris's History on Holding Corinthian Colleges Accountable

In 2013, Vice President Kamala Harris sued Corinthian
(https://web.archive.org/web/20240123141724/https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-files-suit-alleged-profit-college-predatory) when she was attorney general of California, alleging that the company intentionally misrepresented to its students about job placement rates and was engaging in deceptive and false advertising and recruitment. Then Attorney General Harris' investigation and lawsuit triggered several other inquiries by the Department and other federal and state regulators as well as actions by the Department that ultimately resulted in Corinthian selling most of its campuses in 2014 and closing the remaining ones in 2015.

In 2015, the Department and then-Attorney General Harris released comprehensive findings
(https://web.archive.org/web/20240123141724/https://www.ed.gov/news/press-releases/department-education-and-attorney-general-kamala-harris-announce-findings-investigation-wyotech-and-everest-programs) showing that Corinthian misrepresented job placement rates in programs across the country. Those were the basis of the first borrower defense approvals against Corinthian. It also led the Department to find that the company misrepresented to borrowers who attended its Everest, Heald College, or WyoTech campuses about their ability to find a job using their Corinthian degree. The Department also later found that Corinthian misrepresented students' ability to transfer credits over the same period at all Everest campuses, except the few that had regional accreditation, the WyoTech campus in Laramie, Wyoming, and for borrowers who enrolled in certain programs at Heald campuses in California. In 2016, then-Attorney General Harris and the state of California obtained a more than $1 billion judgment (https://web.archive.org/web/20240123141724/https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-obtains-11-billion-judgment-against-predatory) against Corinthian, in which the judge found that the company misrepresented job placement rates, its program offerings, whether students could transfer credits, among many other false or misleading actions.

The Department will soon begin notifying students who attended Corinthian of this decision, with the actual discharges following in the months after. Borrowers will not have to take any actions to receive their discharges.

The Department would like to thank the Consumer Financial Protection Bureau, as well as the Offices of the Attorney General in California, Illinois, Massachusetts, Wisconsin, and 15 others who shared information that informed the Department's findings. The Department also acknowledges the extensive work done by many former Corinthian students to raise attention to the problems at the institution and the need for a process to grant relief for those harmed. Finally, the Department would also like to thank the Federal Student Aid Borrower Defense Group and the Administrative Actions and Appeals Service Group in the Department's Federal Student Aid office and the Department's Office of the General Counsel, for their work on the Corinthian findings.

## Continued Commitment to Targeted Relief

Today's action is part of the Department's broader goals to ensure better implementation of the student loan programs to get students and borrowers the benefits to which they are entitled, including loan discharges. These goals also include enacting lasting policies to make loans more affordable and prevent a future debt crisis by holding colleges accountable for leaving students with mountains of debt and without good jobs.

Including this group discharge, the Department has now approved $25 billion in loan forgiveness for 1.3 million borrowers. This includes:

- $7.9 billion for 690,000 borrowers whose institutions took advantage of them through discharges related to borrower defense and school closures.
- $7.3 billion for more than 127,000 borrowers through Public Service Loan Forgiveness (PSLF).
- More than $8.5 billion in total and permanent disability discharges for more than 400,000 borrowers.

The Department also recently announced fixes to long-standing problems in income-driven repayment that will help thousands of borrowers receive forgiveness through that program as well as 40,000 borrowers who receive PSLF.

The Department is also working on new regulations that will permanently improve a variety of the existing student loan relief programs, significantly reduce monthly payments, and provide greater protections for students and taxpayers against unaffordable debts.

**Tags:**    Student Financial Aid (/web/20240123141724/https://www.ed.gov/category/subject/student-financial-aid)
Student Loan Programs (/web/20240123141724/https://www.ed.gov/category/subject/student-loan-programs)
Press Releases (/web/20240123141724/https://www.ed.gov/news/press-releases)

Supp.A.92

1/24/25, 8:41 AM    Education Department Approves $5.8 Billion Group Discharge to Cancel all Remaining Loans for 208,000 Borrowers who Attended …

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 94 of 288

Case 3:19-cv-03674-WHA    Document 624-5    Filed 08/22/25    Page 94 of 82

## How Do I Find…?

- Student loans, forgiveness (https://web.archive.org/web/20240123141724/https://www2.ed.gov/fund/grants-college.html?src=rn)
- Higher Education Rulemaking (https://web.archive.org/web/20240123141724/https://www2.ed.gov/policy/highered/reg/hearulemaking/2023/index.html?src=rn)
- College accreditation (https://web.archive.org/web/20240123141724/https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://web.archive.org/web/20240123141724/https://www.ed.gov/essa?src=rn)
- FERPA (https://web.archive.org/web/20240123141724/https://studentprivacy.ed.gov/?src=rn)
- FAFSA (https://web.archive.org/web/20240123141724/https://fafsa.gov/?src=edgov-rn)
- 1098, tax forms (https://web.archive.org/web/20240123141724/https://www.ed.gov/1098-e?src=rn)
- More… (https://web.archive.org/web/20240123141724/https://www2.ed.gov/about/top-tasks.html?src=rn)

## Information About…

- Elevating Teaching (https://web.archive.org/web/20240123141724/https://www.ed.gov/teaching?src=rn)
- Early Learning (https://web.archive.org/web/20240123141724/https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)
- Engage Every Student (https://web.archive.org/web/20240123141724/https://www.ed.gov/ost?src=rn)
- Unlocking Career Success (https://web.archive.org/web/20240123141724/https://cte.ed.gov/unlocking-career-success/)
- Cybersecurity (https://web.archive.org/web/20240123141724/https://tech.ed.gov/cyberhelp/)

## Search press releases

| Search… | |
|---|---|

## Find By Month

- January 2024 (/web/20240123141724/https://www.ed.gov/news/press-releases/monthly/202401)
- December 2023 (/web/20240123141724/https://www.ed.gov/news/press-releases/monthly/202312)
- November 2023 (/web/20240123141724/https://www.ed.gov/news/press-releases/monthly/202311)
- October 2023 (/web/20240123141724/https://www.ed.gov/news/press-releases/monthly/202310)
- September 2023 (/web/20240123141724/https://www.ed.gov/news/press-releases/monthly/202309)
- August 2023 (/web/20240123141724/https://www.ed.gov/news/press-releases/monthly/202308)
- July 2023 (/web/20240123141724/https://www.ed.gov/news/press-releases/monthly/202307)
- June 2023 (/web/20240123141724/https://www.ed.gov/news/press-releases/monthly/202306)
- May 2023 (/web/20240123141724/https://www.ed.gov/news/press-releases/monthly/202305)
- April 2023 (/web/20240123141724/https://www.ed.gov/news/press-releases/monthly/202304)
- March 2023 (/web/20240123141724/https://www.ed.gov/news/press-releases/monthly/202303)
- February 2023 (/web/20240123141724/https://www.ed.gov/news/press-releases/monthly/202302)
- All Press Releases (/web/20240123141724/https://www.ed.gov/news/press-releases)

*Our mission* is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

1/24/25, 8:41 AM    Education Department Approves $5.8 Billion Group Discharge to Cancel All Remaining Loans for 208,000 Borrowers who Attended …

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 95 of 288

Case 3:19-cv-03674-WHA   Document 485-1   Filed 01/13/25   Page 15 of 82

Student Loans (https://web.archive.org/web/20240123141724/https://www2.ed.gov/fund/grants-college.html?src=ft)

Repaying Loans (https://web.archive.org/web/20240123141724/https://studentaid.gov/manage-loans/repayment?src=ft)

Defaulted Loans (https://web.archive.org/web/20240123141724/https://studentaid.gov/manage-loans/default?src=ft)

Loan Forgiveness (https://web.archive.org/web/20240123141724/https://studentaid.gov/manage-loans/forgiveness-cancellation?src=ft)

Loan Servicers (https://web.archive.org/web/20240123141724/https://studentaid.gov/manage-loans/repayment/servicers?src=ft)


Grants & Programs (https://web.archive.org/web/20240123141724/https://www2.ed.gov/fund/grants-apply.html?src=ft)

Apply for Pell Grants (https://web.archive.org/web/20240123141724/https://fafsa.gov/?src=ft)

Grants Forecast (https://web.archive.org/web/20240123141724/https://www2.ed.gov/fund/grant/find/edlite-forecast.html?src=ft)

Apply for a Grant (https://web.archive.org/web/20240123141724/https://www2.ed.gov/fund/grant/apply/grantapps/index.html?src=ft)


Laws & Guidance (https://web.archive.org/web/20240123141724/https://www2.ed.gov/policy/landing.jhtml?src=ft)

Every Student Succeeds Act (ESSA) (https://web.archive.org/web/20240123141724/https://www.ed.gov/essa?src=ft)

FERPA (https://web.archive.org/web/20240123141724/https://studentprivacy.ed.gov/?src=ft)

Civil Rights (https://web.archive.org/web/20240123141724/https://www2.ed.gov/about/offices/list/ocr/know.html?src=ft)

IDEA Website (https://web.archive.org/web/20240123141724/https://sites.ed.gov/idea/?src=ft)


Data & Research (https://web.archive.org/web/20240123141724/https://www2.ed.gov/rschstat/landing.jhtml?src=ft)

Education Statistics (https://web.archive.org/web/20240123141724/https://nces.ed.gov/?src=ft)

Postsecondary Education Data (https://web.archive.org/web/20240123141724/https://nces.ed.gov/ipeds/?src=ft)

ED Data Express (https://web.archive.org/web/20240123141724/https://eddataexpress.ed.gov/?src=ft)

Nation's Report Card (https://web.archive.org/web/20240123141724/https://nces.ed.gov/nationsreportcard/?src=ft)

What Works Clearinghouse (https://web.archive.org/web/20240123141724/https://ies.ed.gov/ncee/wwc/?src=ft)

Open Data Platform (https://web.archive.org/web/20240123141724/https://data.ed.gov/?src=ft)

COVID Relief Data (https://web.archive.org/web/20240123141724/https://covid-relief-data.ed.gov/?src=ft)


About Us (https://web.archive.org/web/20240123141724/https://www2.ed.gov/about/landing.jhtml?src=ft)

Contact Us (https://web.archive.org/web/20240123141724/https://www2.ed.gov/about/contacts/gen/index.html?src=ft)

ED Offices (https://web.archive.org/web/20240123141724/https://www2.ed.gov/about/offices/list/index.html?src=ft)

Jobs (https://web.archive.org/web/20240123141724/https://www.ed.gov/jobs?src=ft)

Press Releases (https://web.archive.org/web/20240123141724/https://www.ed.gov/news/?src=ft)

FAQs (https://web.archive.org/web/20240123141724/https://www.ed.gov/answers?src=ft)

Recursos en español (https://web.archive.org/web/20240123141724/https://www2.ed.gov/espanol/bienvenidos/es/index.html?src=ft)

Budget, Performance (https://web.archive.org/web/20240123141724/https://www2.ed.gov/about/overview/focus/performance.html?src=ft)

Privacy Program (https://web.archive.org/web/20240123141724/https://www.ed.gov/privacy?src=ft)

Homeroom Blog (https://web.archive.org/web/20240123141724/https://blog.ed.gov/)


 (https://web.archive.org/web/20240123141724/http://www.facebook.com/ed.gov) 

(https://web.archive.org/web/20240123141724/http://www.twitter.com/usedgov) 

(https://web.archive.org/web/20240123141724/https://www.ed.gov/) 

(https://web.archive.org/web/20240123141724/https://www.ed.gov/feed)

Notices (https://web.archive.org/web/20240123141724/https://www2.ed.gov/notices/index.html?src=ft)

FOIA (https://web.archive.org/web/20240123141724/https://www2.ed.gov/policy/gen/leg/foia/foiatoc.html?src=ft)

Privacy Policy (https://web.archive.org/web/20240123141724/https://www2.ed.gov/notices/privacy/index.html?src=ft)

Accessibility (https://web.archive.org/web/20240123141724/https://www2.ed.gov/notices/accessibility/index.html?src=ft)

Security (https://web.archive.org/web/20240123141724/https://www.ed.gov/notices/security/index.html?src=ft)

Information Quality (https://web.archive.org/web/20240123141724/https://www2.ed.gov/policy/gen/guid/infoqualguide.html?src=ft)

1/24/25, 8:41 AM   Education Department Approves $5.8 Billion Group Discharge to Cancel all Remaining Loans for 560,000 Borrowers who Attended …

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 96 of 288
Case 3:19-cv-03674-JCS   Document 336-3   Filed 03/27/24   Page 96 of 82

Inspector General (https://web.archive.org/web/20240123141724/https://www2.ed.gov/about/offices/list/oig/index.html?src=ft)

Whitehouse.gov (https://web.archive.org/web/20240123141724/https://www.whitehouse.gov/)

USA.gov (https://web.archive.org/web/20240123141724/https://www.usa.gov/)

Benefits.gov (https://web.archive.org/web/20240123141724/https://www.benefits.gov/)

Regulations.gov (https://web.archive.org/web/20240123141724/https://www.regulations.gov/)

# EXHIBIT B

1/23/25, 2:00 PM  Biden–Harris Administration Approves $6.1 Billion Group Student Loan Discharge for 317,000 Borrowers Who Attended The Art Insti...

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 98 of 288

The Wayback Machine - https://web.archive.org/web/20241115190700/https://www.ed.gov/about...

🇺🇸 An official website of the United States government   Here's how you know

## U.S. Department of Education

**PRESS RELEASE**

# Biden–Harris Administration Approves $6.1 Billion Group Student Loan Discharge for 317,000 Borrowers Who Attended The Art Institutes

MAY 1, 2024

The Biden-Harris Administration today announced the approval of more than $6.1 billion in automatic student loan relief to nearly 317,000 borrowers who enrolled at any Art Institute campus on or after Jan. 1, 2004, through Oct. 16, 2017. The U.S. Department of Education (Department) found that The Art Institutes and its parent company, Education Management Corporation (EDMC), made pervasive and substantial misrepresentations to prospective students about postgraduation employment rates, salaries, and career services during that time. In October 2017, EDMC sold its remaining Art Institute campuses, and all existing Art Institute campuses closed under separate ownership in September 2023. Today's action brings the total amount of student relief approved by the Biden-Harris Administration to almost $160 billion for nearly 4.6 million borrowers.

"For more than a decade, hundreds of thousands of hopeful students borrowed billions to attend The Art Institutes and got little but lies in return. That ends today—thanks to the Biden-Harris Administration's work with the attorneys general offices of Iowa, Massachusetts, and Pennsylvania," said U.S. Secretary of Education Miguel Cardona. "We must continue to protect borrowers from predatory institutions—and work toward a higher education system that is affordable to students and taxpayers."

Supp.A.97

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 99 of 288
Case: 3:19-cv-03674-WHA    Document 334-5    Filed 11/18/24    Page 19 of 82

The Department independently reviewed evidence provided by the attorneys general offices of Iowa, Massachusetts, and Pennsylvania, which conducted multi-year investigations into, and brought lawsuits against, The Art Institutes and EDMC. The attorneys general of Pennsylvania and Iowa provided materials obtained from investigations into these entities, including internal employment data, admissions training manuals, and the school's employment advertisements. The Massachusetts attorney general provided information obtained during an investigation into the New England Institute of Art—the Massachusetts Art Institute campus—including internal employment verification forms, other internal records of graduate employment outcomes, advertisements, and statements from former students and employees.

Today's announcement is another example of the strong partnerships between the Department and state attorneys general and their shared commitment to protecting federal student loan borrowers from predatory schools.

"The Art Institutes preyed on the hopes of students attempting to better their lives through education," said Federal Student Aid Chief Operating Officer Richard Cordray. "We cannot replace the time stolen from these students, but we can lift the burden of their debt. We remain committed to working with our federal and state partners to protect borrowers."

## About the findings

Based on the evidence, the Department found that The Art Institutes engaged in widespread and pervasive substantial misrepresentations that deceived students about the value they would be receiving from their education:

- The Art Institutes advertised that more than 80 percent of graduates obtained employment related their fields of study within six months of graduation, but the school's own records demonstrate that it inflated advertised employment rates. For example, The Art Institutes counted graduates as employed in-field when the school did not know graduates' job titles, when a graduate's job title was too vague to indicate that they worked in-field, and when a graduate's job title was unrelated to their field of study. The school also excluded some graduates with out-of-field jobs from their

Supp.A.98

1/23/25, 2:00 PM     Biden-Harris Administration Approves $6.1 Billion Group Student Loan Discharge for 317,000 Borrowers Who Attended The Art Insti…

Case: 3:19-cv-03674-WHA    Document 453-1    Filed 12/17/24    Page 20 of 82

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 100 of 288

calculations to inflate their in-field employment rates. When recalculated to account for these issues, The Art Institutes' average in-field employment rate dropped from 82 percent to no higher than 57 percent, 25 percentage points lower than advertised. The true average in-field employment rate was lower than 57 percent because the school also falsified some internal data to make graduates appear to be working in-field when they were not.

- The advertisements promoting The Art Institutes' falsified employment rates also displayed inaccurate average salaries that graduates earned from their in-field positions based on the same flawed data as the employment rates. Testimony from former high-raking school officials supported the findings that school personnel made up graduate earnings and annualized the actual or estimated incomes of graduates working in temporary positions. They also included high-earning outliers in its averages and falsified incomes reported for graduates. For example, according to a former employee, one Art Institute campus included professional tennis player Serena Williams' annual income to "skew the statistics and overinflate potential program salaries." Another former employee described witnessing a coworker use salary.com to determine that a graduate's salary was $25,000, when the graduate reported earning only $8,000 a year.

- The Art Institutes also represented to prospective students that it had partnerships with employers and offered ongoing postgraduation career services. However, the evidence showed that The Art Institutes exaggerated its relationships with employers. In fact, the school had a negative reputation, so companies generally did not want to hire its graduates. Former employees and borrowers also described that graduates did not have access to ongoing career services after leaving school. For example, once students graduated, school staff did not return their phone calls.

The Art Institutes communicated these substantial misrepresentations to prospective students through its website and print materials, and school personnel distributed misleading information to prospective students before and during the admissions process. The school's misconduct harmed borrowers by burdening them with high amounts of debt without the advertised employment opportunities or salaries necessary to pay. Many Art Institute borrowers also dropped out of their programs and defaulted on their loan payments. Even if

1/23/25, 2:00 PM    Biden-Harris Administration Approves $6.1 Billion Group Student Loan Discharge for 317,000 Borrowers Who Attended The Art Insti…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 101 of 288
Case: 3:19-cv-03674-WHA, Document 21-25, Filed 11/05/24, Page 61 of 82

borrowers did complete their programs, they did not receive the promised career services, which hindered their ability to obtain employment.

## Next steps

This group discharge will provide relief automatically to borrowers harmed by The Art Institutes' actions, including borrowers who have not yet applied for borrower defense. The Department will begin notifying eligible borrowers today that they are approved for discharges. Borrowers do not need to take any action. The Department will take immediate steps to pause loans identified for discharge so borrowers do not make further payments. This ensures that they will not face any further financial demands from these loans during the time needed to process their discharges. When their discharges are processed, borrowers will see any remaining loan balances adjusted and credit trade lines deleted. Payments borrowers made to the Department on their related federal student loans will also be refunded.

Borrowers who want to learn more about borrower defense can do so at **StudentAid.gov/borrower-defense**.

## Unwavering commitment to relief

The Biden-Harris Administration remains committed to using all available tools to deliver the federal student loan relief that borrowers and their families deserve. In total, the Administration has approved almost $160 billion in relief for nearly 4.6 million borrowers, including:

- $49.2 billion for more than 996,000 borrowers through improvements to IDR that addressed longstanding administrative failure and the misuse of forbearance by loan servicers.
- $62.8 billion in forgiveness for almost 876,000 borrowers through fixes to PSLF.
- $4.8 billion for almost 360,000 borrowers on the SAVE Plan. These are borrowers who originally took out smaller loans for their postsecondary studies.
- $28.7 billion for 1.6 million borrowers who were cheated by their schools, saw their institutions precipitously close, or are covered by related court

Supp.A.100

settlements.

- $14.1 billion for more 548,000 borrowers with a total and permanent disability.

---

**CONTACT**

Press Office  |  press@ed.gov  |  (202) 401-1576  |  Office of Communications and Outreach (OCO)

---

Page Last Reviewed: August 6, 2024

## Pay for College

Fill out the FAFSA

529 Plans

Loan Forgiveness

1098 Tax Forms

## Educational Resources

504 Plans

FERPA

IEPs (Individualized Education Program)

## Teaching Resources

Become a Teacher

Professional Resources

School Safety and Security

Teaching Abroad

**Supp.A.101**

1/23/25, 2:00 PM     Biden-Harris Administration Approves $6.1 Billion Group Student Loan Discharge for 35,000 Borrowers Who Attended The Art Insti…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 103 of 288

Case: 3:19-cv-chester/WWW/5CCOalBileGroupGZudent LomIBichadgelu/215,000 BgwierzsVNorAbended The Art Insti…

## File a Report

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Student Privacy Complaint Forms

## About Us

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

## News

Press Releases

Homeroom Blog

Subscriptions

## Site Notices and Privacy Policies

Accessibility Support

## ED Archive

# U.S. Department of Education

     

ES

### Contact Us

1-800-USA-LEARN

Supp.A.102

1/23/25, 2:00 PM    Biden-Harris Administration Approves $6.1 Billion Group Student Loan Discharge for 35,000 Borrowers Who Attended The Art Insti…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 104 of 288

Case 3:19-cv-03674-WHA    Document 600-2    Filed 11/25/25    Page 24 of 82



## www.ed.gov

### An official website of the Department of Education

<u>About Dept of Education</u>         <u>Accessibility Support</u>         <u>No FEAR Act data</u>

<u>Office of the Inspector General</u>         <u>Performance reports</u>         <u>FOIA</u>         <u>Privacy Policy</u>

<u>ED Archive</u>

Looking for U.S. government information and services? **<u>Visit USA.gov</u>**

# EXHIBIT C

1/23/25, 12:00 PM    Biden-Harris Administration Announces Group Discharge for 261,000 Borrowers with Loans from Ashford University | U.S. Depart…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 106 of 288

The Wayback Machine – https://web.archive.org/web/20250115193037/https://www.ed.gov/about…

🇺🇸 An official website of the United States government    Here's how you know

## U.S. Department of Education

HOME  /  ABOUT US  /  NEWSROOM  /  PRESS RELEASES

PRESS RELEASE

# Biden–Harris Administration Announces Group Discharge for 261,000 Borrowers with Loans from Ashford University

## Proposed debarment of former senior Ashford executive also announced

JANUARY 15, 2025

The Biden-Harris Administration today announced the approval of a $4.5 billion group discharge for 261,000 borrowers who attended Ashford University, a largely online institution, from March 1, 2009, through April 30, 2020. The approval is in response to a request from the California Department of Justice based upon evidence it obtained during a successful lawsuit brought against Ashford University LLC and its parent company, Zovio, Inc. (Zovio) around widespread misrepresentations in nine separate areas, including students' ability to obtain needed licensure, transfer credits, the cost and amount of financial aid, and the time it would take to earn a degree. The U.S. Department of Education (Department) also conducted its own separate review of the evidence from California. This discharge brings the total amount of relief approved for borrowers whose schools took advantage of them, closed, or are covered by related court settlements to $34 billion for more than 1.9 million borrowers. Separate from this action, the Department also announced today that it issued a proposed debarment action to Andrew Clark, the founder, President, and CEO of Zovio.

"Numerous federal and state investigations have documented the deceptive recruiting tactics frequently used by Ashford University," said U.S. Under

1/23/25, 12:00 PM    Biden-Harris Administration Announces Group Discharge for 261,000 Borrowers with Loans from Ashford University | U.S. Depart…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 107 of 288

Secretary of Education James Kvaal. "In reality, 90 percent of Ashford students never graduated, and the few who did were often left with large debts and low incomes. Today's announcement will finally provide relief to many students who were harmed by Ashford's illegal actions."

Ashford borrowers approved for a discharge will be sent emails from the Department in the coming days notifying them that the full amount of outstanding balances for their Ashford loans will be discharged. Borrowers will not need to take any further action to receive relief. Nor will they have to make any additional payments on these loans. The discharge covers borrowers even if they have not submitted a borrower defense to repayment application.

In 2022, the California Department of Justice secured a more than $20 million penalty against Zovio and Ashford, and an appeals court upheld the findings of wrongdoing and made a small reduction in the penalty in 2024. The judge's verdict found that Zovio and Ashford "created a high pressure culture in admissions that prioritized enrollment numbers over compliance." The court record includes extensive evidence from Ashford employees about an environment that discouraged providing accurate information to students and documentary evidence that executives were well-aware of the shortcomings. The court determined that the defendants made more than 1 million misleading calls nationwide over more than a decade. The trial record also includes evidence of borrowers seeing their educational dreams dashed when they found out that Ashford never secured the necessary approvals for them to become teachers, social workers, or engage in other similar professions.

"Ashford University made false promises to students about the value of an Ashford degree and the opportunities it would create and instead left students worse off: with mounting debt and searching for a job," said California Attorney General Rob Bonta. "This is unacceptable and illegal. California stopped this fraud when we sued Ashford and held it accountable for its deception. I am proud that California's work taking this case to trial paved the way for the U.S. Department of Education to provide relief today for the hundreds of thousands of Americans who were deceived by Ashford. I commend the Biden Administration and the

Supp.A.106

Department of Education for making sure that students who were scammed into trusting in Ashford have the opportunity for a brighter future they always deserved."

In addition to the California case, Ashford faced numerous lawsuits and investigations at the federal and state level, including from the Department's Inspector General, the Securities and Exchange Commission, the Consumer Financial Protection Bureau, the U.S. Department of Justice, and the Attorneys General of Iowa and North Carolina. Some of these actions resulted in settlements including one with the CFPB requiring Ashford to discharge private loans and pay an $8 million civil penalty.

In 2023 the Department announced the approval of $72 million in borrower defense to repayment discharges for more than 2,300 students who applied for relief from loans they took out to attend Ashford. The discharge being announced today expands on that relief to cover additional borrowers. Those prior approvals as well as the group discharge announced today result from the following widespread misrepresentations:

- Ashford recruiters told students they would be able to work as teachers, social workers, nurses, or drug and alcohol counselors. But Ashford never obtained the necessary state approval and/or accreditation for students to enter these professions, meaning students wasted years of their lives and incurred tens of thousands of dollars of debt for degrees they could not use.
- Ashford recruiters also lied about the cost to attend Ashford, the amount and type of financial aid students would receive, and the amount of debt students would accumulate. For instance, before they had access to borrowers' financial aid award information some recruiters told prospective students that they would not incur out-of-pocket costs, that every Ashford student qualified for Federal Pell Grants, or that loan payments would be $50–$75 per month. Borrowers later discovered these promises were untrue when, for example, they unexpectedly reached lifetime loan limits during their enrollment, unexpectedly incurred out-of-pocket costs, and were forced to withdraw with debt but no degree.
- Ashford recruiters misled students about how long it would take to obtain Ashford degree by stating its bachelor's programs were "accelerated" or b,

Supp.A.107

comparing Ashford's bachelor's programs to traditional four-year schools when, in fact, Ashford's bachelor's degree programs were structured to take five academic years to complete.

- Ashford recruiters misled students about the ability to transfer credits both into Ashford and out of Ashford. Recruiters told students that Ashford would accept previously earned credits, reducing the amount of time and money students would spend completing their degrees. Students would later learn only some of the promised credits actually transferred. Ashford recruiters also promised students that the credits they earned at Ashford would transfer to other universities, when this was not always true.

Outside of the misrepresentations, Ashford had a demonstrated track record of failing to serve students well. Only 10 percent of students graduate from Ashford within 8 years of enrolling and borrowers in their applications described the inability to obtain employment, unexpected financial burdens, and an inability to complete their programs. Data released as part of the rulemaking on financial value transparency and gainful employment also show that Ashford had the second highest number of graduates in programs that failed to provide sufficient financial value. This includes failing to provide sufficient financial value in programs tied to misrepresentations in the California case, such as teaching, social work, and psychology.

The Department congratulates the California Department of Justice for its successful litigation of this case. The Department also thanks the Iowa and North Carolina Attorneys General for the helpful information they provided.

## Proposed Debarment of Former Ashford Executive

Separately, the Department issued a Notice of Proposed Government-Wide Debarment from Federal Procurement and Non-Procurement Transactions to Andrew Clark, the founder, president, and CEO of Zovio, which owned and operated Ashford University. This would stop him from acting as a principal or executive of any institution in connection with the Title IV Program, among other consequences.

Federal regulations permit the Department to suspend or debar individuals, companies, and institutions of higher education whose actions show that they are not responsible and that transacting with them would risk the integrity of the Title IV loan programs or other government funds.

The Department is taking this action because Ashford violated federal regulations regarding making substantial misrepresentations. The evidence from the California litigation, and other sources, which the Department independently reviewed, is mountainous. The conduct of Ashford can be imputed to Mr. Clark because he participated in, knew, or had reason to know of Ashford's misrepresentations. Mr. Clark not only supervised the unlawful conduct, he personally participated in it, driving some of the worst aspects of the boiler-room-style recruiting culture.

The Department will refer this matter to its Office of Hearings and Appeals for a decision on whether to debar Mr. Clark and if so, for what length of time. The Department recommends a debarment period of not less than three years based on the severity of the harm. Mr. Clark has the opportunity to contest the proposed debarment, and the Office of Hearings and Appeals will decide whether and for how long a debarment should be effective.

## An Unparalleled Record of Support for Federal Student Loan Borrowers

Since day one, the Biden-Harris Administration has been committed to helping borrowers who have struggled with the burden of student loan debt and to identifying those who are entitled to targeted relief. In total, the Biden-Harris Administration has approved student loan relief for 5.3 million borrowers. This includes:

- $78.5 billion and more than 1 million borrowers through improvements to Public Service Loan Forgiveness.
- $56.5 billion for more than 1.4 million borrowers through Income-Driven Repayment, including the Saving on a Valuable Education SAVE plan. This includes administrative adjustments to income-driven repayment that brought borrowers closer to forgiveness and addressed longstanding

problems due to past inaccuracies and the misuse of forbearance by loan servicers.

- $18.7 billion for nearly 633,000 borrowers with a total and permanent disability.
- $34 billion for more than 1.9 million borrowers whose schools took advantage of them, closed, or are covered by related court settlements.

In addition to ensuring that student loans are not a barrier to educational and economic opportunity for students and families, the Administration also secured a $900 increase to the maximum Pell Grant award—the largest increase in a decade—and finalized new rules to help protect borrowers from career programs that leave graduates with unaffordable debts and insufficient earnings.

---

**CONTACT**

Press Office  |  press@ed.gov  |  (202) 401-1576  |  Office of Communications and Outreach (OCO)

---

**Office of Communications and Outreach (OCO)**

Page Last Reviewed: January 15, 2025

# Related Content

## U.S. Department of Education's Office for Civil Rights Resolves Complaints Against the University of Washington Alleging Shared Ancestry Discrimination

The Office for Civil Rights announced the University of Washington has entered into a resolution agreement to ensure its compliance with Title VI of the Civil Rights Act of 1964. OCR reviewed reports of incidents of antisemitic and anti-Arab harassment.

JANUARY 15, 2025

## U.S. Department of Education's Office for Civil Rights Announces Finding of Insufficient Evidence Regarding UCLA's Response to Alleged Antisemitic Harassment

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 112 of 288
Case 3:19-cv-00710    Document 580-4    Filed 02/27/25    Page 62 of 82

The Office for Civil Rights resolved on Jan. 13, 2025, a complaint alleging the University of California, Los Angeles (UCLA) failed to respond promptly or effectively to alleged antisemitic harassment of a Jewish student in 2018.

JANUARY 13, 2025

## U.S. Department of Education's Office for Civil Rights Announces Resolution of Shared Ancestry Investigation at Lehigh University

The Office for Civil Rights announced that Lehigh University in Pennsylvania has entered into a resolution agreement to ensure compliance with Title VI of the Civil Rights Act of 1964 when responding to allegations of harassment based on shared ancestry.

JANUARY 13, 2025

### Pay for College

Fill out the FAFSA

529 Plans

Loan Forgiveness

1098 Tax Forms

### Educational Resources

504 Plans

FERPA

IEPs (Individualized Education Program)

### Teaching Resources

Become a Teacher

Professional Resources

School Safety and Security

Teaching Abroad

### File a Report

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Supp.A.111

1/23/25, 12:00 PM    Biden-Harris Administration Announces Group Discharge for 261,000 Borrowers with Loans from Corinthian University | U.S. Depart…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 113 of 288

Case: 19-11-XXXX, XX/XX/XXXX, DktEntry: XX, Page 63 of 82

Student Privacy Complaint Forms

## About Us

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

## News

Press Releases

Homeroom Blog

Subscriptions

## Site Notices and Privacy Policies

Accessibility Support

## ED Archive

# U.S. Department of Education

     

ES

Contact Us

1-800-USA-LEARN



www.ed.gov

**An official website of the Department of Education**

Supp.A.112

1/23/25, 12:00 PM    Biden-Harris Administration Announces Group Discharge for 261,000 Borrowers with Loans from DeVry University | U.S. Depart…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 114 of 288
Case 3:19-cv-03674-WHA    Document 262-1    Filed 07/21/25    Page 34 of 82

About Dept of Education        Accessibility Support        No FEAR Act data

Office of the Inspector General        Performance reports        FOIA        Privacy Policy

ED Archive

Looking for U.S. government information and services? **Visit USA.gov**

Supp.A.113

# EXHIBIT D

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 116 of 288

1/23/25, 5:42 PM    Case 3:19-cv-03674-Williams Approves $130 Million Group Discharge for 7,400 Borrowers from Colorado Locations of CollegeAmeric…

The Wayback Machine - https://web.archive.org/web/20240721162914/https://www.ed.gov/news/press-releases/biden-harris…

Skip to main content | About Us (https://web.archive.org/web/20240721162914/https://www2.ed.gov/about/landing.jhtml) |
Contact Us (https://web.archive.org/web/20240721162914/https://www2.ed.gov/about/contacts/gen) |
FAQs (https://web.archive.org/web/20240721162914/https://www.ed.gov/answers/) | 🔤 Language Assistance ▾

| Search... | |
|---|---|

**ARCHIVED INFORMATION**

# Biden-Harris Administration Approves $130 Million Group Discharge for 7,400 Borrowers from Colorado Locations of CollegeAmerica

**Relief is based upon evidence from Colorado Attorney General Weiser showing widespread misrepresentations by the Center for Excellence in Higher Education**

JULY 25, 2023

**Contact:**   Press Office, (202) 401-1576, press@ed.gov (https://web.archive.org/web/20240721162914/mailto: press@ed.gov)

The Biden-Harris Administration today announced it will deliver $130 million in automatic relief to 7,400 students who enrolled at Colorado-based locations of CollegeAmerica between Jan. 1, 2006, and July 1, 2020. The U.S. Department of Education (Department) found that CollegeAmerica's parent company, the Center for Excellence in Higher Education (CEHE), made widespread misrepresentations about the salaries and employment rates of its graduates, the programs it offered, and the terms of a private loan product it offered. The Department used evidence provided by Colorado Attorney General Phil Weiser, who led a multi-year investigation and lawsuit against CEHE and its leadership. Borrowers will receive this relief regardless of whether they have filed a borrower defense to repayment application.

Today's action is yet another result of the strong partnership between the Department and state attorneys general, whose investigations and lawsuits focused on wrongdoing by predatory schools, have helped deliver billions of dollars in relief to affected student loan borrowers. The Biden-Harris Administration has approved $14.7 billion in relief for 1.1 million borrowers whose colleges took advantage of them or closed abruptly. This includes giving hundreds of thousands of borrowers a fresh start from loans taken out at Corinthian Colleges and ITT Technical Institute. The Department also issued a new, stronger borrower defense regulation (https://web.archive.org/web/20240721162914/https://www.ed.gov/news/press-releases/education-department-releases-final-regulations-expand-and-improve-targeted-debt-relief-programs) that gives borrowers a fairer path to a discharge when their college took advantage of them. Overall, the Biden-Harris Administration has approved more than $116 billion in relief to over 3.4 million borrowers under President Biden's leadership.

"This announcement means a clean slate for thousands of students hurt by CollegeAmerica's widespread misconduct," said the Department's Federal Student Aid Chief Operating Officer Richard Cordray. "The close partnership between the Department of Education and Attorney General Weiser's office made this action possible. We will continue to work to deliver targeted student loan relief to borrowers whose schools take advantage of them."

"I applaud the Department of Education for providing much-deserved relief to the many Coloradans who were mistreated by CollegeAmerica," said Colorado Attorney General Weiser. "CollegeAmerica knowingly took advantage of students by luring them into high-priced, low-quality programs with promises of high-earning potential and job placement that it knew were not attainable. Protecting borrowers from predatory lending and helping Coloradans navigate through student loan burdens will continue to be a priority for our office."

Supp.A.115

Starting in 2012, the Colorado Attorney General investigated the practices of CEHE and its leadership in that state, which culminated in a 2017 bench trial, and a judgment in favor of the state in 2020. The Department had more than 300 trial exhibits, including internal policies, procedures, and emails that CEHE provided to its accreditor, ACCSC. The Colorado Attorney General's Borrower Defense application, which cited to the district court's 2020 opinion, helped point the Department to the most relevant evidence. The Department also reviewed testimony given under oath from 40 witnesses during the trial, including experts, former students, and CEHE officials. The Department reached its conclusions based on its independent review of the Colorado evidence, as well as information from other borrower defense applications. The Colorado CollegeAmerica campuses stopped enrolling new students in 2019 and closed by September 2020. CEHE closed all its remaining campuses in August 2021.

Based on that evidentiary review, the Department concluded that CEHE engaged in the following pervasive and widespread misrepresentations over a multi-year period at the Colorado campuses of CollegeAmerica:

- From 2006 until 2020, CEHE prominently included in its admission and advertising materials that its graduates would earn high salaries. But the included data was misleadingly based on national averages. In fact, internal CEHE data showed Colorado CollegeAmerica campus graduates on average earned just $25,000 five years out of school, less than the salaries of high school graduates publicized by the school.
- From 2009 through 2012, and again in 2015, CollegeAmerica campuses in Colorado advertised inflated and falsified job placement rates of 70 percent, when internal figures showed the actual number was 40 percent. This included counting a business administration graduate working as a produce clerk and a medical specialties graduate working as a waiter as successful placements.
- From 2007 through 2017, CEHE falsely told students that its private loan product was "affordable," when it knew that some years as many as 70 percent of CollegeAmerica borrowers enrolled in the Colorado campuses defaulted. Overall, more than 850 CollegeAmerica students had judgments filed against them by CEHE's debt collectors.
- Starting in 2006 and continuing until 2014, CEHE lied to students of the Colorado CollegeAmerica campuses by telling them that it either offered certain programs or that a given offering would qualify the borrower for employment in a given field. For instance, from 2006 through 2012, CEHE claimed that a medical specialties program would allow students to obtain the certifications to become an X-ray technician, though the school did not even own any X-ray machines.

The Department will begin notifying eligible borrowers in August that they are approved for discharges. Borrowers will see any remaining loan balances zeroed out and credit trade lines deleted. Any payments they made to the Department will be refunded.

The Department invites more states to provide evidence of wrongdoing as Colorado did here to justify relief for students who were harmed. The borrower defense regulations that went into effect on July 1, 2023, include a specific process for states to use to submit group applications. The group application (https://web.archive.org/web/20240721162914/https://studentaid.gov/sites/default/files/borrower-defense-group-application.pdf) that state agencies and legal assistance organizations can use is available on StudentAid.gov.

**Unwavering commitment to relief**
The Biden-Harris Administration remains steadfast in its commitment to use all available tools to deliver promised relief to students, borrowers, and their families. Thus far, more than 3.4 million people have been approved for over $116 billion in loan discharges. The changes that the Administration has made include fixes to ensure that borrowers get relief promised by Congress through income-driven repayment programs, Public Service Loan Forgiveness, and discharges for borrowers with a total and permanent disability. This month, the Department also initiated a rulemaking process aimed at opening an alternative path to provide debt further relief to as many borrowers as possible, as quickly as possible.

**Tags:**   Press Releases (/web/20240721162914/https://www.ed.gov/news/press-releases)

# How Do I Find...?

Supp.A.116

1/23/25, 5:42 PM
Biden-Harris Administration Approves $130 Million Group Discharge for Borrowers from Locations of CollegeAmeric…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 118 of 288

- Student loans, forgiveness (https://web.archive.org/web/20240721162914/https://www2.ed.gov/fund/grants-college.html?src=rn)
- Higher Education Rulemaking (https://web.archive.org/web/20240721162914/https://www2.ed.gov/policy/highered/reg/hearulemaking/2023/index.html?src=rn)
- College accreditation (https://web.archive.org/web/20240721162914/https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://web.archive.org/web/20240721162914/https://www.ed.gov/essa?src=rn)
- FERPA (https://web.archive.org/web/20240721162914/https://studentprivacy.ed.gov/?src=rn)
- FAFSA (https://web.archive.org/web/20240721162914/https://fafsa.ed.gov/?src=edgov-rn)
- 1098, tax forms (https://web.archive.org/web/20240721162914/https://www.ed.gov/1098-e?src=rn)
- More... (https://web.archive.org/web/20240721162914/https://www2.ed.gov/about/top-tasks.html?src=rn)

## Information About...

- Elevating Teaching (https://web.archive.org/web/20240721162914/https://www.ed.gov/teaching?src=rn)
- Early Learning (https://web.archive.org/web/20240721162914/https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)
- Engage Every Student (https://web.archive.org/web/20240721162914/https://www.ed.gov/ost?src=rn)
- Unlocking Career Success (https://web.archive.org/web/20240721162914/https://cte.ed.gov/unlocking-career-success/)
- Cybersecurity (https://web.archive.org/web/20240721162914/https://tech.ed.gov/cyberhelp/)

## Search press releases

Search...

## Find By Month

- July 2024 (/web/20240721162914/https://www.ed.gov/news/press-releases/monthly/202407)
- June 2024 (/web/20240721162914/https://www.ed.gov/news/press-releases/monthly/202406)
- May 2024 (/web/20240721162914/https://www.ed.gov/news/press-releases/monthly/202405)
- April 2024 (/web/20240721162914/https://www.ed.gov/news/press-releases/monthly/202404)
- March 2024 (/web/20240721162914/https://www.ed.gov/news/press-releases/monthly/202403)
- February 2024 (/web/20240721162914/https://www.ed.gov/news/press-releases/monthly/202402)
- January 2024 (/web/20240721162914/https://www.ed.gov/news/press-releases/monthly/202401)
- December 2023 (/web/20240721162914/https://www.ed.gov/news/press-releases/monthly/202312)
- November 2023 (/web/20240721162914/https://www.ed.gov/news/press-releases/monthly/202311)
- October 2023 (/web/20240721162914/https://www.ed.gov/news/press-releases/monthly/202310)
- September 2023 (/web/20240721162914/https://www.ed.gov/news/press-releases/monthly/202309)
- August 2023 (/web/20240721162914/https://www.ed.gov/news/press-releases/monthly/202308)
- All Press Releases (/web/20240721162914/https://www.ed.gov/news/press-releases)

*Our mission* is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

Supp.A.117

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 119 of 288
Case: 3:19-cv-11901, Document: , Filed: , Page 39 of 82

Student Loans (https://web.archive.org/web/20240721162914/https://www2.ed.gov/fund/grants-college.html?src=ft)

Repaying Loans (https://web.archive.org/web/20240721162914/https://studentaid.gov/manage-loans/repayment?src=ft)

Defaulted Loans (https://web.archive.org/web/20240721162914/https://studentaid.gov/manage-loans/default?src=ft)

Loan Forgiveness (https://web.archive.org/web/20240721162914/https://studentaid.gov/manage-loans/forgiveness-cancellation?src=ft)

Loan Servicers (https://web.archive.org/web/20240721162914/https://studentaid.gov/manage-loans/repayment/servicers?src=ft)

Grants & Programs (https://web.archive.org/web/20240721162914/https://www2.ed.gov/fund/grants-apply.html?src=ft)

Apply for Pell Grants (https://web.archive.org/web/20240721162914/https://fafsa.gov/?src=ft)

Grants Forecast (https://web.archive.org/web/20240721162914/https://www2.ed.gov/fund/grant/find/edlite-forecast.html?src=ft)

Apply for a Grant (https://web.archive.org/web/20240721162914/https://www2.ed.gov/fund/grant/apply/grantapps/index.html?src=ft)

Laws & Guidance (https://web.archive.org/web/20240721162914/https://www2.ed.gov/policy/landing.jhtml?src=ft)

Every Student Succeeds Act (ESSA) (https://web.archive.org/web/20240721162914/https://www.ed.gov/essa?src=ft)

FERPA (https://web.archive.org/web/20240721162914/https://studentprivacy.ed.gov/?src=ft)

Civil Rights (https://web.archive.org/web/20240721162914/https://www2.ed.gov/about/offices/list/ocr/know.html?src=ft)

IDEA Website (https://web.archive.org/web/20240721162914/https://sites.ed.gov/idea/?src=ft)

Data & Research (https://web.archive.org/web/20240721162914/https://www2.ed.gov/rschstat/landing.jhtml?src=ft)

Education Statistics (https://web.archive.org/web/20240721162914/https://nces.ed.gov/?src=ft)

Postsecondary Education Data (https://web.archive.org/web/20240721162914/https://nces.ed.gov/ipeds/?src=ft)

ED Data Express (https://web.archive.org/web/20240721162914/https://eddataexpress.ed.gov/?src=ft)

Nation's Report Card (https://web.archive.org/web/20240721162914/https://nces.ed.gov/nationsreportcard/?src=ft)

What Works Clearinghouse (https://web.archive.org/web/20240721162914/https://ies.ed.gov/ncee/wwc/?src=ft)

Open Data Platform (https://web.archive.org/web/20240721162914/https://data.ed.gov/?src=ft)

COVID Relief Data (https://web.archive.org/web/20240721162914/https://covid-relief-data.ed.gov/?src=ft)

About Us (https://web.archive.org/web/20240721162914/https://www2.ed.gov/about/landing.jhtml?src=ft)

Contact Us (https://web.archive.org/web/20240721162914/https://www2.ed.gov/about/contacts/gen/index.html?src=ft)

ED Offices (https://web.archive.org/web/20240721162914/https://www2.ed.gov/about/offices/list/index.html?src=ft)

Jobs (https://web.archive.org/web/20240721162914/https://www.ed.gov/jobs?src=ft)

Press Releases (https://web.archive.org/web/20240721162914/https://www.ed.gov/news/?src=ft)

FAQs (https://web.archive.org/web/20240721162914/https://www.ed.gov/answers?src=ft)

Recursos en español (https://web.archive.org/web/20240721162914/https://www2.ed.gov/espanol/bienvenidos/es/index.html?src=ft)

Budget, Performance (https://web.archive.org/web/20240721162914/https://www2.ed.gov/about/overview/focus/performance.html?src=ft)

Privacy Program (https://web.archive.org/web/20240721162914/https://www.ed.gov/privacy?src=ft)

Homeroom Blog (https://web.archive.org/web/20240721162914/https://blog.ed.gov/)

 (https://web.archive.org/web/20240721162914/http://www.facebook.com/ed.gov) 

(https://web.archive.org/web/20240721162914/http://www.twitter.com/usedgov) 

(https://web.archive.org/web/20240721162914/https://www.ed.gov/) RSS

(https://web.archive.org/web/20240721162914/https://www.ed.gov/feed)

Supp.A.118

1/23/25, 5:42 PM    Biden-Harris Administration Approves $130 Million Group Discharge for Students from Four Locations of CollegeAmeric…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 120 of 288

Case: 3:19-cv-00475-wmc  Document #: 52-3  Filed: 01/23/25  Page 40 of 82

Notices (https://web.archive.org/web/20240721162914/https://www2.ed.gov/notices/index.html?src=ft)

FOIA (https://web.archive.org/web/20240721162914/https://www2.ed.gov/policy/gen/leg/foia/foiatoc.html?src=ft)

Privacy Policy (https://web.archive.org/web/20240721162914/https://www2.ed.gov/notices/privacy/index.html?src=ft)

Accessibility (https://web.archive.org/web/20240721162914/https://www2.ed.gov/notices/accessibility/index.html?src=ft)

Security (https://web.archive.org/web/20240721162914/https://www2.ed.gov/notices/security/index.html?src=ft)

Information Quality (https://web.archive.org/web/20240721162914/https://www2.ed.gov/policy/gen/guid/infoqualguide.html?src=ft)

Inspector General (https://web.archive.org/web/20240721162914/https://www2.ed.gov/about/offices/list/oig/index.html?src=ft)

Whitehouse.gov (https://web.archive.org/web/20240721162914/https://www.whitehouse.gov/)

USA.gov (https://web.archive.org/web/20240721162914/https://www.usa.gov/)

Benefits.gov (https://web.archive.org/web/20240721162914/https://www.benefits.gov/)

Regulations.gov (https://web.archive.org/web/20240721162914/https://www.regulations.gov/)

vote.gov (https://web.archive.org/web/20240721162914/https://vote.gov/)

Supp.A.119

# EXHIBIT E

Case: 26-1136    03/09/2026    DktEntry: 9.2    Page 122 of 288

The Wayback Machine - https://web.archive.org/web/20250117034452/https://www.ed.gov/abou...

🇺🇸 An official website of the United States government  Here's how you know

## U.S. Department of Education

HOME  /  ABOUT US  /  NEWSROOM  /  PRESS RELEASES

**PRESS RELEASE**

# Biden–Harris Administration Surpasses 5 Million Borrowers Approved for Student Loan Forgiveness

## Approved discharge amount reaches $183.6 billion

**JANUARY 13, 2025**

The Biden-Harris Administration announced today several additional actions to forgive federal student loans for public servants and borrowers with disabilities, as well as the loans of borrowers who attended colleges that engaged in wrongdoing. Across 28 debt relief actions, including today's, the Administration has announced $183.6 billion in student loan forgiveness for more than 5 million borrowers since taking office.

"Four years ago, President Biden made a promise to fix a broken student loan system. Today, life-changing student debt relief is possible for more than five million borrowers—more than any other administration in history," said U.S. Secretary of Education Miguel Cardona. "Thanks to our tireless and unapologetic efforts to work toward a system that is affordable and accountable to both students and taxpayers, today's announcement includes additional relief for borrowers misled and cheated by their institutions, borrowers with disabilities, as well as additional loan forgiveness for public servants I'm proud of our work to bring relief to these hardworking Americans across the country, and of the Biden-Harris Administration's historic achievements in making the potential of high education possible for more people."

Supp.A.121

Today's announcement is related to several types of discharges. First, the U.S. Department of Education (Department) approved 6,100 borrowers for $465 million through Public Service Loan Forgiveness (PSLF). Second, the Department approved nearly 85,000 borrowers for $1.26 billion in relief based upon borrower defense findings. This includes three new sets of automatic discharges for groups of borrowers who were subject to the same misconduct. Finally, the Department announced an additional $2.5 billion for 61,000 borrowers with a total and permanent disability.

"Identifying 5 million people for student loan forgiveness means the federal government is finally keeping its promises," said U.S. Under Secretary of Education James Kvaal. "People who cannot afford their student loans because they are in public service, have disabilities, were cheated by their college, or who have completed decades of payments are now getting the relief they were promised. These permanent reforms will continue to more and more borrowers every year."

## New PSLF Approvals

Last year, the Department implemented a new approach for processing PSLF applications and approving discharges. Today, the Department approved relief for 6,100 borrowers and $465 million. The total number of borrowers approved for PSLF is now 1,069,000 and $78.46 billion. By contrast, only 7,000 borrowers had received PSLF at the start of the Biden-Harris Administration.

## Additional Approvals for Borrower Defense

The Department approved borrower defense group relief for the following borrowers. Eligible borrowers who attended these institutions will receive relief automatically, regardless of whether they submitted a borrower defense to repayment application. They will begin receiving emails from the Department informing them they have been automatically approved for a full discharge in the coming days. These actions cover:

- 73,600 borrowers and $1.15 billion who attended any school owned by th Center for Excellence in Higher Education (CEHE). This was a Utah-based

Supp.A.122

company that operated CollegeAmerica, Stevens-Henager College, Independence University, and California College San Diego. This action covers borrowers who attended from January 1, 2006, through August 1, 2021. These approvals are based on findings that CEHE engaged in widespread and pervasive misrepresentations related to salaries, employment prospects, and its private loan product. This group announcement is an expansion of the relief announced last year for borrowers attended CEHE's CollegeAmerica campus in Colorado. Both actions were based on the Department's independent review of evidence presented by the Colorado Attorney General at trial.

- 11,000 borrowers and $107 million who attended any location of Drake College of Business from January 1, 2008, through the school's closure on July 31, 2015. Drake was located in New Jersey. Investigations by the Department found that Drake extensively recruited at homeless shelters and other temporary housing facilities and lied to borrowers about the promise of "free stipends" that were actually student loans. Drake also misrepresented the assistance in borrowers obtaining externships and the job placement it provided.

- 280 borrowers and $1.4 million who attended the Criminal Justice Program at Lincoln Technical Institute's campus in Lowell, Massachusetts, from 2010 to 2012 or the Somerville, Massachusetts, campus from 2010 to 2013. Based upon evidence provided by the Massachusetts Attorney General, the Department concluded that Lincoln Tech misled students about its job placement rates in that program at those locations.

In addition to the new approvals, the Department last week emailed all borrowers previously approved for group discharges with a letter reaffirming their entitlement to a full discharge of their remaining balances and a refund of payments made to the Secretary. The email was sent to borrowers whose loans have been fully discharged as well as those that are still in process. Borrowers will also receive a case number, making it easier for them to provide proof of their approval.

## Additional Disability Discharges

The Department today also announced that an additional 61,000 borrowers ⊦ been approved for $2.5 billion in total and permanent disability discharges.

Supp.A.123

Today's total includes borrowers automatically approved for relief through data matches with the Social Security Administration and the U.S. Department of Veteran Affairs, as well as borrowers who applied to the Department. In total, nearly 633,000 borrowers have received $18.7 billion in disability discharges during the Biden-Harris Administration.

## An Unparalleled Record of Support for Federal Student Loan Borrowers

Since day one, the Biden-Harris Administration has been committed to helping borrowers who have struggled with the burden of student loan debt and to identifying those who are entitled to targeted relief. In addition to the amounts described above, the the Biden-Harris Administration has also approved:

- $56.5 billion for more than 1.4 million borrowers through Income-Driven Repayment, including the Saving on a Valuable Education SAVE plan. This includes administrative adjustments to income-driven repayment that brought borrowers closer to forgiveness and addressed longstanding problems due to past inaccuracies and the misuse of forbearance by loan servicers.

In addition to ensuring that student loans are not a barrier to educational and economic opportunity for students and families, the Administration also secured a $900 increase to the maximum Pell Grant—the largest increase in a decade—and finalized new rules to help protect borrowers from career programs that leave graduates with unaffordable debts and insufficient earnings.

A state-by-state breakdown of various forms of student debt relief approved by the Biden-Harris Administration is available here.

---

**CONTACT**

Press Office  |  press@ed.gov  |  (202) 401-1576  |  Office of Communications and Outreach (OC

1/23/25, 1:53 PM	Biden-Harris Administration Surpasses 5 Million Borrowers Approved for Student Loan Forgiveness | U.S. Department of Education

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 126 of 288

**Office of Communications and Outreach (OCO)**

Page Last Reviewed: January 15, 2025

# Related Content

## Biden-Harris Administration Announces Final Student Loan Forgiveness and Borrower Assistance Actions

The Administration leaves office having approved a cumulative $188.8 billion in forgiveness for 5.3 million borrowers across 33 executive actions.

JANUARY 16, 2025

## U.S. Department of Education's Office for Civil Rights Announces Resolution of Complaint Against Emory University Alleging Anti-Muslim and Anti-Palestinian Discrimination

OCR today announced that Emory University in Georgia has entered into a resolution agreement to ensure compliance with civil rights laws involving alleged harassment of students based on national origin (shared Palestinian and/or Muslim ancestry).

JANUARY 16, 2025

## U.S. Department of Education's Office for Civil Rights Reaches Agreement to Resolve Antisemitic Harassment in Howard County Public Schools in Maryland

The Office for Civil Rights announced that Howard County Public Schools in Maryland has entered into a resolution agreement to ensure its compliance with civil rights laws when responding to allegations of harassment based on shared ancestry.

JANUARY 16, 2025

**Pay for College**

Fill out the FAFSA

529 Plans

Loan Forgiveness

Supp.A.125

1/23/25, 1:53 PM        Biden-Harris Administration Surpasses 5 Million Borrowers Approved for Student Loan Forgiveness | U.S. Department of Education

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 127 of 288
Case: 1:19-cv-07576-WFK Document: 4 Filed: 11/25/26 Page 47 of 82

1098 Tax Forms

## Educational Resources

504 Plans

FERPA

IEPs (Individualized Education Program)

## Teaching Resources

Become a Teacher

Professional Resources

School Safety and Security

Teaching Abroad

## File a Report

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Student Privacy Complaint Forms

## About Us

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

## News

Press Releases

Homeroom Blog

Subscriptions

## Site Notices and Privacy Policies

Supp.A.126

1/23/25, 1:53 PM   Biden-Harris Administration Surpasses 5 Million Borrowers Approved for Student Loan Forgiveness | U.S. Department of Education

Accessibility Support

**ED Archive**

# U.S. Department of Education



ES

Contact Us

1–800–USA–LEARN



www.ed.gov

**An official website of the Department of Education**

About Dept of Education          Accessibility Support          No FEAR Act data

Office of the Inspector General          Performance reports          FOIA          Privacy Policy

ED Archive

Looking for U.S. government information and services? **Visit USA.gov**

# EXHIBIT F

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 130 of 288

🇺🇸 An official website of the United States government   Here's how you know

## U.S. Department of Education

HOME  /   ABOUT US  /   NEWSROOM  /   PRESS RELEASES

**PRESS RELEASE**

# Extended Closed School Discharge Will Provide 115K Borrowers from ITT Technical Institute More Than $1.1B in Loan Forgiveness

**AUGUST 27, 2021**

Today, the U.S. Department of Education announced it will make $1.1 billion in closed school discharges available to an additional 115,000 borrowers who attended the now-defunct ITT Technical Institute (ITT). This decision is based on a new review of the problems leading up to ITT's closure. These borrowers did not complete their degree or credential and left ITT on or after March 31, 2008. The Department estimates that 43 percent of these borrowers are currently in default. Today's action brings the total amount of loan discharges approved by the Department since January 2021 to $9.5 billion, affecting over 563,000 borrowers.

This action extends relief to borrowers whose attendance at ITT overlapped with a period during which the institution engaged in widespread misrepresentations about the true state of its financial health and misled students into taking out unaffordable private loans that were allegedly portrayed as grant aid. ITT's malfeasance drove its financial resources away from educating students in order to keep the school in business for years longer than it likely would otherwise have, resulting in debts that are being discharged starting today. Approximately 7,000 of the borrowers covered by today's closed school discharge announcement also have approved borrower defense to repayment claims.

Supp.A.129

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 131 of 288
Case 2:18-cv-00546-CCC-JBC    Document 18    Filed 11/20/18    Page 11 of 82

"For years, ITT hid its true financial state from borrowers while luring many of them into taking out private loans with misleading and unaffordable terms that may have caused borrowers to leave school," said U.S. Secretary of Education Miguel Cardona. "Today's action continues the Department's efforts to improve and use its targeted loan relief authorities to deliver meaningful help to student borrowers. At the same time, the continued cost of addressing the wrongdoing of ITT and other predatory institutions yet again highlights the need for stronger and faster accountability throughout the federal financial aid system."

Under the Higher Education Act and applicable regulations, the Secretary of Education discharges the loans of borrowers and refunds any amounts paid if the borrowers did not complete their program of study because of their school's closure. This applies to borrowers with loans from the William D. Ford Federal Direct Loan Program, the Federal Family Education Loan Program, and the Federal Perkins Loan Program. To be eligible for a closed school discharge, the borrower must not have completed their program or transferred their credits or hours to another school. Discharges are also available to any borrower who withdrew from the institution within a few months of its closing. The Secretary of Education may, however, extend this period based on exceptional circumstances.

After a thorough review of the circumstances leading to ITT's closure and the preceding years of misrepresentations and misconduct, Secretary Cardona is exercising his authority to extend the closed school discharge window to March 31, 2008 for former ITT students. This date was chosen based upon a review of external evidence from the bankruptcy court proceedings for ITT, filings with the U.S. Securities and Exchange Commission (SEC), and from the Consumer Financial Protection Bureau (CFPB). March 31, 2008 is when the company's executives publicly disclosed the start of a financial scheme that kicked off a series of misrepresentations to hide the true nature of the school's finances following a public loss of outside financing, which led to shifting additional costs to students and hindered its ability to invest in delivering quality education to students.

## Next steps for borrowers

Under Department regulations, borrowers who are eligible for a closed school discharge and attended an institution that shut down between November 1, 2013 and July 1, 2020 will receive an automatic discharge as long as they did not enroll in another institution within three years of their school's closure. Eligible borrowers who attended ITT within 120 days of its closure in 2016 received automatic discharges in 2019. The majority of the ITT borrowers covered by today's action did not enroll elsewhere during the three years after ITT's closure and will not need to take any further action to receive a discharge.

Borrowers who enrolled elsewhere but did not complete their program of study may still be eligible for a discharge, but will need to submit an application. Borrowers can access the closed school discharge application by contacting their servicer or visiting StudentAid.gov/closedschoolform and returning a completed application to their servicer.

The Department will begin processing discharges in September 2021 and borrowers will start receiving automatic discharges in the following weeks.

## Continued commitments to helping student loan borrowers

Today's action is another in a series of steps the Department has to support students and borrowers, make higher education more affordable, and improve student loan servicing, including:

- Extending the pause on student loan repayment, interest, and collections through January 31, 2022 and expanding it to include additional borrowers in default. This change helps 41 million borrowers.
- Approving $1.5 billion in borrower defense claims, including extending full relief to approved claims and approving new types of claims.
- Providing $7.1 billion in relief for borrowers eligible for total and permanent disability discharges. This includes $5.8 billion in automatic student loan discharges to 323,000 borrowers and reinstating $1.3 billion in loan discharges for another 41,000 borrowers.
- Helping 30,000 small business owners with student loans seeking help from the Paycheck Protection Program.

- Retroactively waiving student loan interest for 47,000 current and former active-duty military service members.

---

**CONTACT**

Press Office | press@ed.gov | (202) 401-1576 | Office of Communications and Outreach (OCO)

---

**Office of Communications and Outreach (OCO)**

Page Last Reviewed: August 6, 2024

# Related Content

## U.S. Department of Education Announces Final Beta Testing Period for the 2025–26 FAFSA Form

The U.S. Department of Education announced today that it entered the final beta testing period of the 2025–26 Free Application for Federal Student Aid (FAFSA®), Beta 4, which will build on the successful results from the first three beta period.

NOVEMBER 14, 2024

## U.S. Department of Education's Office for Civil Rights Announces Resolution of Title IX Sexual Harassment Investigation of Owasso Public Schools in Oklahoma

U.S. Department of Education's Office for Civil Rights today announced that Owasso Public Schools in Oklahoma entered into an agreement to remedy violations of Title IX of the Education Amendments of 1972 with respect to sexual harassment in its schools.

NOVEMBER 13, 2024

## New Partnership Between U.S. Departments of Agriculture and Education to Expand SNAP Awareness and Access for Eligible College Students

On November 7, USDA and ED announced a joint agreement to strengthen college student access to the Supplemental Nutrition Assistance Program (SNAP).

NOVEMBER 7, 2024

**Supp.A.132**

1/27/25, 3:48 PM    Extended Closed School Discharge Will Provide 115K Borrowers from ITT Technical Institute More than $4.1B in Loan Forgivenes…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 134 of 288

## Pay for College

Fill out the FAFSA

529 Plans

Loan Forgiveness

1098 Tax Forms

## Educational Resources

504 Plans

FERPA

IEPs (Individualized Education Program)

## Teaching Resources

Become a Teacher

Professional Resources

School Safety and Security

Teaching Abroad

## File a Report

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Student Privacy Complaint Forms

## About Us

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

Supp.A.133

1/27/25, 3:48 PM    Extended Closed School Discharge Will Provide 115K Borrowers from Corinthian and ITT Technical Institute Programs $1.1B in Loan Forgivenes…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 135 of 288

## News

Press Releases

Homeroom Blog

Subscriptions

**Site Notices and Privacy Policies**

Accessibility Support

**ED Archive**

# U.S. Department of Education

     

ES

Contact Us

1-800-USA-LEARN



www.ed.gov

**An official website of the Department of Education**

About Dept of Education        Accessibility Support        No FEAR Act data

Office of the Inspector General        Performance reports        FOIA        Privacy Policy

ED Archive

Looking for U.S. government information and services? **Visit USA.gov**

Supp.A.134

# EXHIBIT G

Case: 26-1136  03/09/2026, DktEntry: 9.2, Page 137 of 288
Case: 3:1 Document: 5.2 Filed: 12/03/24 Page: 57 of 82

The Wayback Machine - https://web.archive.org/web/20240608053009/https://www.ed.gov/news/press-releases/education-d…

Skip to main content | About Us (https://web.archive.org/web/20240608053009/https://www2.ed.gov/about/landing.jhtml) |
Contact Us (https://web.archive.org/web/20240608053009/https://www2.ed.gov/about/contacts/gen) |
FAQs (https://web.archive.org/web/20240608053009/https://www.ed.gov/answers/) | 🔤 Language Assistance ▾

| Search... | |
|---|---|

**ARCHIVED INFORMATION**

# Education Department approves $3.9 billion group discharge for 208,000 borrowers who attended ITT Technical Institute

**Department also initiates the formal process to recoup approved borrower defense claims from DeVry University**

AUGUST 16, 2022

**Contact:** Press Office, (202) 401-1576, press@ed.gov (https://web.archive.org/web/20240608053009/mailto: press@ed.gov)

Today, the U.S. Department of Education (Department) announced that it will discharge all remaining federal student loans that borrowers received to attend ITT Technical Institute (ITT) from January 1, 2005, through its closure in September 2016. The decision, which follows Departmental findings based on extensive internal records, testimony from ITT managers and recruiters, and first-hand accounts from borrowers, will result in 208,000 borrowers receiving $3.9 billion in full loan discharges. This includes borrowers who have not yet applied for a borrower defense (https://web.archive.org/web/20240608053009/https://studentaid.gov/borrower-defense/) to repayment discharge. These borrowers will have the federal student loans they received to attend ITT discharged without any additional action on their part.

"It is time for student borrowers to stop shouldering the burden from ITT's years of lies and false promises," said U.S. Secretary of Education Miguel Cardona. "The evidence shows that for years, ITT's leaders intentionally misled students about the quality of their programs in order to profit off federal student loan programs, with no regard for the hardship this would cause.  The Biden-Harris Administration will continue to stand up for borrowers who've been cheated by their colleges, while working to strengthen oversight and enforcement to protect today's students from similar deception and abuse."

The Department also announced that it formally notified DeVry University (DeVry), that it is required to pay millions of dollars for approved borrower defense applications.  DeVry can submit information and arguments for why it should not be required to pay these liabilities or request a hearing before the Department's Office of Hearings and Appeals.

Finally, the Department also announced the approval of discharges for just under 100 borrowers who enrolled in the Medical Assistant or Medical Billing & Coding Program at Kaplan Career Institute's Kenmore Square location in Massachusetts from July 1, 2011 to February 16, 2012 when the institution stopped enrolling new students. These are borrowers identified by Massachusetts Attorney General Maura Healey after an investigation found that the institution repeatedly lied about its job placement rates to borrowers, among other deceptive practices. The location closed in February 2013.

Today's action brings the total amount of loan relief approved by the Biden-Harris Administration to nearly $32 billion for 1.6 million borrowers. This includes $13 billion related to institutions that took advantage of borrowers. It represents the Department's continued commitment to providing debt relief to eligible borrowers.

Supp.A.136

## About the Department's ITT findings

Today's ITT announcement builds on the Administration's previous actions related to ITT , which has resulted in the approval of $1.9 billion in discharges for 130,000 students to date. This includes borrower defense findings that ITT engaged in widespread and pervasive misrepresentations related to the ability of students to get a job or transfer credits, and lying about the programmatic accreditation of ITT's associate degree in nursing. Separately, the Department announced an expanded window for borrowers who attended but did not graduate from ITT to receive closed school discharges.

"ITT defrauded hundreds of thousands of students, as we identified when I was the director of the Consumer Financial Protection Bureau," said Federal Student Aid Chief Richard Cordray. "By delivering the loan relief students deserve, we are giving them the opportunity to resume their educational journey without the unfair burden of student debt they are carrying from a dishonest institution."

The Department's findings around ITT were assisted by significant and extensive work by attorneys general across the country, the Consumer Financial Protection Bureau, and Veterans Education Success. The Department received important evidence from half the country's state offices of attorneys general, led by Colorado and Oregon Attorneys General and supported by significant evidence from the Iowa and New Mexico Attorneys General.

The Department's findings are based on extensive evidence, including internal ITT policies and records; recruitment materials and brochures; recordings of interactions between ITT's representatives and prospective students; testimony from former students, employees, and administrators; investigative files and submissions from congressional investigators and state offices of attorneys general; and the tens of thousands of individual borrower defense applications submitted by former ITT students.

## The Consumer Financial Protection Bureau's (CFPB) Investigation into ITT

The CFPB's work to protect ITT borrowers resulted in action which barred ITT from engaging in predatory private student lending and resulted in $498 million in private student loan cancellation. The CFPB sued ITT in 2014 (https://web.archive.org/web/20240608053009/https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-for-profit-college-chain-itt-for-predatory-lending/), alleging that ITT pressured its students into taking out high-cost private loans even though ITT knew most of its students would ultimately default. In 2019, the CFPB obtained a judgment barring ITT from offering or providing student loans.  The CFPB also obtained judgments against several (https://web.archive.org/web/20240608053009/https://www.consumerfinance.gov/about-us/newsroom/bureau-settles-student-cu-connect-cuso-over-itt-private-loan-program/) entities (https://web.archive.org/web/20240608053009/https://www.consumerfinance.gov/about-us/newsroom/cfpb-multiple-states-enter-settlement-itt-private-loans-owner-assisting-itt-unfair-practices/) for providing substantial assistance to ITT in violation of the Consumer Financial Protection Act by owning and managing ITT's private student loans.

"The automatic loan cancellation announced today will provide life-changing relief that has long been owed to former ITT students," said Rohit Chopra, director of the CFPB. "Far too many Americans are still on the hook for loans they acquired at colleges that profited from deceiving students, and the CFPB will continue to work with the Department of Education to address predatory student loan debt, to protect students, and to hold wrongdoers accountable."

## DeVry Recoupment Action

Yesterday, the Department formally notified DeVry that the institution is liable to the Department for nearly $24 million for approved borrower defense claims. This recoupment effort follows the Department's announcement in February 2022 (https://web.archive.org/web/20240608053009/https://www.ed.gov/news/press-releases/education-department-approves-415-million-borrower-defense-claims-including-former-devry-university-students) that it had approved claims after finding that, from 2008 through 2015, DeVry had repeatedly misled prospective students across the country. DeVry claimed that 90 percent of its graduates who actively seek employment obtained jobs in their field of study within six months of graduation. In fact, the institution's actual job placement rate was around 58 percent. DeVry inflated its job placement rate by including students who found employment prior to graduation and by excluding others who did not conduct a job search in the college's preferred manner.

Supp.A.137

1/24/25, 8:39 AM  Education Department Approves $3.9 billion group discharge for 208,000 borrowers who attended DeVry Technical Institute | U.S. Dep…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 139 of 288

The initial demand relates to the first group of DeVry Direct Loan borrowers whose loan discharges are in process with their servicers. The Department anticipates the number of approved discharge amounts to grow as it continues to adjudicate additional applications from former DeVry students and reserves the right to seek future recovery actions, as warranted.

DeVry will have 20 days from issuance of the demand to submit additional written material or request a hearing on the matter before the Department's Office of Hearings and Appeals. If DeVry does not submit such a request within the required timeframe, the Department will impose the liabilities and require DeVry to pay, or enter an agreement to pay, the amount.

## Kaplan Career Institute Approvals

The Kaplan approval of discharges for roughly 100 borrowers was based upon the Department's independent review of the evidence which primarily came to it in a request from the Office of the Massachusetts Attorney General. The Massachusetts Attorney General conducted a detailed investigation into the school and provided evidence to the Department that established that Kaplan repeatedly lied about its job placement rates to borrowers, telling them upwards of 70 percent of students got jobs, when the actual figure was as low as 25 percent. Kaplan inflated its rates by including temporary and part-time jobs and reported students as having been placed in their field even if the school's internal records indicated they were not. The Massachusetts Attorney General also provided evidence to the Department that Kaplan did not provide promised career services to borrowers.

## Continued Commitment to Targeted Loan Forgiveness

Today's actions are part of the Biden-Harris Administration's broader efforts to ensure better implementation of the student loan programs to get students and borrowers the benefits to which they are entitled, including loan forgiveness. These efforts also include enacting lasting policies to make college more affordable and prevent a future debt crisis by holding schools accountable for leaving students with mountains of debt and without the skills and preparation to find good jobs.

The nearly $32 billion in student loan relief approved to date includes:

- $13 billion for 1 million borrowers whose institutions took advantage of them through discharges related to borrower defense and school closures (https://web.archive.org/web/20240608053009/https://studentaid.gov/announcements-events/closed-school).
- $9.6 billion for 175,000 borrowers through the Public Service Loan Forgiveness (https://web.archive.org/web/20240608053009/https://studentaid.gov/pslf/) Program.
- $9 billion in total and permanent disability (https://web.archive.org/web/20240608053009/https://studentaid.gov/manage-loans/forgiveness-cancellation/disability-discharge) discharges for more than 425,000 borrowers.

The Department is also working on new regulations that will permanently improve a variety of the existing student loan forgiveness programs, significantly reduce monthly payments, and provide greater protections for students and taxpayers against unaffordable debts.

**Tags:**
Student Loan Programs (/web/20240608053009/https://www.ed.gov/category/subject/student-loan-programs)
Borrower Defense (/web/20240608053009/https://www.ed.gov/category/keyword/borrower-defense)
Press Releases (/web/20240608053009/https://www.ed.gov/news/press-releases)

# How Do I Find…?

- Student loans, forgiveness (https://web.archive.org/web/20240608053009/https://www2.ed.gov/fund/grants-college.html?src=rn)

Supp.A.138

1/24/25, 8:39 AM   Education Department Approves $3.9 billion Group Discharge for 208,000 Borrowers who attended the former ITT Technical Institute | U.S. Dep…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 140 of 288

Case: 3:19-cv-13-LVB   Document-1-2   Filed-11/11/22   Page 60 of 82

- Higher Education Rulemaking (https://web.archive.org/web/20240608053009/https://www2.ed.gov/policy/highered/reg/hearulemaking/2023/index.html?src=rn)
- College accreditation (https://web.archive.org/web/20240608053009/https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://web.archive.org/web/20240608053009/https://www.ed.gov/essa?src=rn)
- FERPA (https://web.archive.org/web/20240608053009/https://studentprivacy.ed.gov/?src=rn)
- FAFSA (https://web.archive.org/web/20240608053009/https://fafsa.gov/?src=edgov-rn)
- 1098, tax forms (https://web.archive.org/web/20240608053009/https://www.ed.gov/1098-e?src=rn)
- More... (https://web.archive.org/web/20240608053009/https://www2.ed.gov/about/top-tasks.html?src=rn)

# Information About...

- Elevating Teaching (https://web.archive.org/web/20240608053009/https://www.ed.gov/teaching?src=rn)
- Early Learning (https://web.archive.org/web/20240608053009/https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)
- Engage Every Student (https://web.archive.org/web/20240608053009/https://www.ed.gov/ost?src=rn)
- Unlocking Career Success (https://web.archive.org/web/20240608053009/https://cte.ed.gov/unlocking-career-success/)
- Cybersecurity (https://web.archive.org/web/20240608053009/https://tech.ed.gov/cyberhelp/)

# Search press releases

| Search... | |
|---|---|

# Find By Month

- May 2024 (/web/20240608053009/https://www.ed.gov/news/press-releases/monthly/202405)
- April 2024 (/web/20240608053009/https://www.ed.gov/news/press-releases/monthly/202404)
- March 2024 (/web/20240608053009/https://www.ed.gov/news/press-releases/monthly/202403)
- February 2024 (/web/20240608053009/https://www.ed.gov/news/press-releases/monthly/202402)
- January 2024 (/web/20240608053009/https://www.ed.gov/news/press-releases/monthly/202401)
- December 2023 (/web/20240608053009/https://www.ed.gov/news/press-releases/monthly/202312)
- November 2023 (/web/20240608053009/https://www.ed.gov/news/press-releases/monthly/202311)
- October 2023 (/web/20240608053009/https://www.ed.gov/news/press-releases/monthly/202310)
- September 2023 (/web/20240608053009/https://www.ed.gov/news/press-releases/monthly/202309)
- August 2023 (/web/20240608053009/https://www.ed.gov/news/press-releases/monthly/202308)
- July 2023 (/web/20240608053009/https://www.ed.gov/news/press-releases/monthly/202307)
- June 2023 (/web/20240608053009/https://www.ed.gov/news/press-releases/monthly/202306)
- All Press Releases (/web/20240608053009/https://www.ed.gov/news/press-releases)

*Our mission* is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

Supp.A.139

1/24/25, 8:39 AM    Education Department Approves $3.9 billion Group Discharge for 208,000 Borrowers Who Attended the Corinthian Colleges Institute | U.S. Dep…

Case: 26-1136    03/09/2026    DktEntry: 9.2    Page 141 of 288

## Student Loans (https://web.archive.org/web/20240608053009/https://www2.ed.gov/fund/grants-college.html?src=ft)

Repaying Loans (https://web.archive.org/web/20240608053009/https://studentaid.gov/manage-loans/repayment?src=ft)

Defaulted Loans (https://web.archive.org/web/20240608053009/https://studentaid.gov/manage-loans/default?src=ft)

Loan Forgiveness (https://web.archive.org/web/20240608053009/https://studentaid.gov/manage-loans/forgiveness-cancellation?src=ft)

Loan Servicers (https://web.archive.org/web/20240608053009/https://studentaid.gov/manage-loans/repayment/servicers?src=ft)

## Grants & Programs (https://web.archive.org/web/20240608053009/https://www2.ed.gov/fund/grants-apply.html?src=ft)

Apply for Pell Grants (https://web.archive.org/web/20240608053009/https://fafsa.gov/?src=ft)

Grants Forecast (https://web.archive.org/web/20240608053009/https://www2.ed.gov/fund/grant/find/edlite-forecast.html?src=ft)

Apply for a Grant (https://web.archive.org/web/20240608053009/https://www2.ed.gov/fund/grant/apply/grantapps/index.html?src=ft)

## Laws & Guidance (https://web.archive.org/web/20240608053009/https://www2.ed.gov/policy/landing.jhtml?src=ft)

Every Student Succeeds Act (ESSA) (https://web.archive.org/web/20240608053009/https://www.ed.gov/essa?src=ft)

FERPA (https://web.archive.org/web/20240608053009/https://studentprivacy.ed.gov/?src=ft)

Civil Rights (https://web.archive.org/web/20240608053009/https://www2.ed.gov/about/offices/list/ocr/know.html?src=ft)

IDEA Website (https://web.archive.org/web/20240608053009/https://sites.ed.gov/idea/?src=ft)

## Data & Research (https://web.archive.org/web/20240608053009/https://www2.ed.gov/rschstat/landing.jhtml?src=ft)

Education Statistics (https://web.archive.org/web/20240608053009/https://nces.ed.gov/?src=ft)

Postsecondary Education Data (https://web.archive.org/web/20240608053009/https://nces.ed.gov/ipeds/?src=ft)

ED Data Express (https://web.archive.org/web/20240608053009/https://eddataexpress.ed.gov/?src=ft)

Nation's Report Card (https://web.archive.org/web/20240608053009/https://nces.ed.gov/nationsreportcard/?src=ft)

What Works Clearinghouse (https://web.archive.org/web/20240608053009/https://ies.ed.gov/ncee/wwc/?src=ft)

Open Data Platform (https://web.archive.org/web/20240608053009/https://data.ed.gov/?src=ft)

COVID Relief Data (https://web.archive.org/web/20240608053009/https://covid-relief-data.ed.gov/?src=ft)

## About Us (https://web.archive.org/web/20240608053009/https://www2.ed.gov/about/landing.jhtml?src=ft)

Contact Us (https://web.archive.org/web/20240608053009/https://www2.ed.gov/about/contacts/gen/index.html?src=ft)

ED Offices (https://web.archive.org/web/20240608053009/https://www2.ed.gov/about/offices/list/index.html?src=ft)

Jobs (https://web.archive.org/web/20240608053009/https://www.ed.gov/jobs?src=ft)

Press Releases (https://web.archive.org/web/20240608053009/https://www.ed.gov/news/?src=ft)

FAQs (https://web.archive.org/web/20240608053009/https://www.ed.gov/answers?src=ft)

Recursos en español (https://web.archive.org/web/20240608053009/https://www2.ed.gov/espanol/bienvenidos/es/index.html?src=ft)

Budget, Performance (https://web.archive.org/web/20240608053009/https://www2.ed.gov/about/overview/focus/performance.html?src=ft)

Privacy Program (https://web.archive.org/web/20240608053009/https://www.ed.gov/privacy?src=ft)

Homeroom Blog (https://web.archive.org/web/20240608053009/https://blog.ed.gov/)

 (https://web.archive.org/web/20240608053009/http://www.facebook.com/ed.gov) 

(https://web.archive.org/web/20240608053009/http://www.twitter.com/usedgov) 

(https://web.archive.org/web/20240608053009/https://www.ed.gov/) 

(https://web.archive.org/web/20240608053009/https://www.ed.gov/feed)

Supp.A.140

1/24/25, 8:39 AM  Education Department Approves $3.9 billion group discharge for 208,000 borrowers who attended Ashford University | U.S. Dep…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 142 of 288

Case: 3:19-cv-...  Page 62 of 82

Notices (https://web.archive.org/web/20240608053009/https://www2.ed.gov/notices/index.html?src=ft)

FOIA (https://web.archive.org/web/20240608053009/https://www2.ed.gov/policy/gen/leg/foia/foiatoc.html?src=ft)

Privacy Policy (https://web.archive.org/web/20240608053009/https://www2.ed.gov/notices/privacy/index.html?src=ft)

Accessibility (https://web.archive.org/web/20240608053009/https://www2.ed.gov/notices/accessibility/index.html?src=ft)

Security (https://web.archive.org/web/20240608053009/https://www2.ed.gov/notices/security/index.html?src=ft)

Information Quality (https://web.archive.org/web/20240608053009/https://www2.ed.gov/policy/gen/guid/infoqualguide.html?src=ft)

Inspector General (https://web.archive.org/web/20240608053009/https://www2.ed.gov/about/offices/list/oig/index.html?src=ft)

Whitehouse.gov (https://web.archive.org/web/20240608053009/https://www.whitehouse.gov/)

USA.gov (https://web.archive.org/web/20240608053009/https://www.usa.gov/)

Benefits.gov (https://web.archive.org/web/20240608053009/https://www.benefits.gov/)

Regulations.gov (https://web.archive.org/web/20240608053009/https://www.regulations.gov/)

vote.gov (https://web.archive.org/web/20240608053009/https://vote.gov/)

# EXHIBIT H

Case: 26-1136  03/09/2026  DktEntry: 9.2  Page 144 of 288
Case 3:1... Document Approves $238 Million Group Discharge for 28,000 Marinello Schools of Beauty Borrowers Based on Borrow…  64 of 82

The Wayback Machine - https://web.archive.org/web/20240719142306/https://www.ed.gov/news/press-releases/education-d…

Skip to main content | About Us (https://web.archive.org/web/20240719142306/https://www2.ed.gov/about/landing.jhtml) |
Contact Us (https://web.archive.org/web/20240719142306/https://www2.ed.gov/about/contacts/gen) |
FAQs (https://web.archive.org/web/20240719142306/https://www.ed.gov/answers/) | 🄰🄰 Language Assistance ▾

| Search... | |
|---|---|

**ARCHIVED INFORMATION**

# Education Department Approves $238 Million Group Discharge for 28,000 Marinello Schools of Beauty Borrowers Based on Borrower Defense Findings

**Actions mark first time Biden-Harris Administration has discharged debt of a group of borrowers based on borrower defense findings**

APRIL 28, 2022

**Contact:**   Press Office, (202) 401-1576, press@ed.gov (https://web.archive.org/web/20240719142306/mailto: press@ed.gov)

Today, the Department of Education announced it will deliver relief to tens of thousands of borrowers harmed by pervasive and widespread misconduct at Marinello Schools of Beauty. Borrowers who enrolled in the schools from 2009 through its closure in February 2016 will receive loan discharges based on borrower defense findings. These 28,000 borrowers will receive loan discharges totaling approximately $238 million. This group discharge will provide relief to borrowers who enrolled at Marinello during this period, including those who have not yet applied for a borrower defense discharge.

While the Department continues its work to review borrower defense claims, it is also bringing on four key hires in the Federal Student Aid (FSA) Office of Enforcement with significant federal, congressional, and state oversight experience.

"Marinello preyed on students who dreamed of careers in the beauty industry, misled them about the quality of their programs, and left them buried in unaffordable debt they could not repay," said U.S. Secretary of Education Miguel Cardona. "Today's announcement will streamline access to debt relief for thousands of borrowers caught up in Marinello's lies. At the Department of Education, we will continue to strengthen oversight and enforcement for colleges and career schools that engaged in misconduct and uphold the Biden-Harris Administration's commitment to helping students who have been harmed."

This Marinello group discharge reflects the Department's findings that the school engaged in pervasive and widespread misconduct that negatively affected all borrowers who enrolled at Marinello during the covered time period. These findings led the Department to approve individual borrower defense claims last summer. This group discharge will facilitate relief to additional borrowers harmed by Marinello's actions, including many who have not yet applied for borrower defense. It is the first group discharge for defrauded borrowers to be approved since 2017, after the prior administration did not approve any group claims or new findings.

Today's actions bring the total amount of approved relief based on borrower defense findings during the Biden-Harris Administration to approximately $2.1 billion for 132,000 borrowers.

To date, the Department had approved approximately 300 borrower defense claims at Marinello under findings reached last July that Marinello made widespread, substantial misrepresentations about the instruction that would be offered at its campuses across the country. The Department found that the schools failed to train students in key elements of a

1/24/25, 8:43 AM    Education Department Approves $238 Million Group Discharge for 28,000 Marinello Schools of Beauty Borrowers Based on Borrow…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 145 of 288

cosmetology program, such as how to cut hair. It also found that Marinello left students without instructors for weeks or months at a time as part of a pattern of failing to provide the education it promised.

As a result, students would have found it extremely difficult to pass necessary state licensing tests and receive the promised return on their educational investment. Not only did Marinello fail to teach its students, class-action lawsuits filed in Nevada and California alleged that the school used salons as profit centers and exploited students as a source of unpaid labor.

The Department has continued to analyze the evidence related to Marinello and concluded that the misconduct was so widespread across all the school's campuses over a period of years that all borrowers who attended between 2009 and the schools' closures in 2016 are entitled to full student loan.

The Department's Marinello findings stem primarily from the agency's investigative work that began in 2015 and that resulted in the Department removing the school from the federal student aid programs.

At all times relevant to the findings, Marinello was owned by B&H Education Inc. (B&H), which was a Delaware corporation. The leaders of B&H included Rashed Elyas as president, Mike Flecker as chief financial officer, and Nancy Alpough as financial aid administrator. Department records also identify the following individuals as board members at some point during the period of these borrower defense findings: Nagui Elyas, Erik Brooks, Bob Pan, Tomer Yosef-Or, Brent Stone, James Goodman, Daniel Neuwirth, Anna Keeling, James Rich, Frank Lincoln, and Gerald Taylor.

The Department will soon begin notifying students who attended Marinello of their approvals for discharge, with discharges following in the months after. Borrowers will not have to take any additional actions to receive their discharges.

### New Hires in the Office of Enforcement

Holding schools accountable is a priority for the Biden-Harris Administration, and FSA has made four key new hires to bolster its Enforcement Office's leadership team.

**Dawn Bilodeau** has joined FSA as the Enforcement Office's senior advisor for policies and oversight after more than 20 years at the Department of Defense, which included roles as the senior advisor to the assistant secretary of defense for readiness and the director of Defense Voluntary Education Programs. Dawn twice received the Secretary of Defense Medal for Exceptional Civilian Service, and in 2020, she received the Council of College and Military Educators President's Award.

**Christopher J. Madaio** joins FSA as the Enforcement Office's director of investigations. Christopher joins FSA from Veterans Education Success, where he served as the vice president for legal affairs. Prior to that, Christopher served for nearly six years as an assistant attorney general in the Consumer Protection Division of Maryland's Office of the Attorney General, where he led multi-state investigations into large institutions of higher education and secured significant relief for students victimized by misconduct.

**Brad Middleton** will join FSA as the Enforcement Office's senior advisor for strategy. For the last 14 years, Brad has served on the staff of U.S. Sen. Richard J. Durbin of Illinois, including serving as his education policy director since 2013. During his time in the Senate, Brad has focused on institutional accountability and providing student loan debt relief for defrauded borrowers.

**Nina Schichor** joins FSA as the Enforcement Office's director of borrower defense following nearly five years at the National Labor Relations Board and seven years at the Consumer Financial Protection Bureau (CFPB). Most recently, Nina served as senior litigation counsel in the CFPB's Office of Enforcement, where she led teams to conduct investigations into student-related businesses and obtained substantial relief for students harmed by violations of federal consumer financial law.

### Continued commitment to targeted relief

Including today's actions, the Department has now approved more than $18.5 billion in loan discharges for more than 750,000 borrowers. This includes:

- $6.8 billion in for more than 113,000 borrowers through Public Service Loan Forgiveness (PSLE).

Supp.A.144

1/24/25, 8:43 AM    Education Department Approves $238 Million Group Discharge for 28,000 Marshall Schools of Higher Borrowers Based on Borrow…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 146 of 288

- More than $8.5 billion in total and permanent disability discharges for more than 400,000 borrowers.
- Last week the Department also announced fixes to long-standing problems in income-driven repayment that will help thousands of borrowers receive forgiveness through that program as well as 40,000 borrowers receive PSLF.

The Department is also working on new regulations that will improve a variety of the existing student loan relief programs and provide greater protections for students and taxpayers.

**Tags:**    Press Releases (/web/20240719142306/https://www.ed.gov/news/press-releases)

# How Do I Find...?

- Student loans, forgiveness (https://web.archive.org/web/20240719142306/https://www2.ed.gov/fund/grants-college.html?src=rn)
- Higher Education Rulemaking (https://web.archive.org/web/20240719142306/https://www2.ed.gov/policy/highered/reg/hearulemaking/2023/index.html?src=rn)
- College accreditation (https://web.archive.org/web/20240719142306/https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://web.archive.org/web/20240719142306/https://www.ed.gov/essa?src=rn)
- FERPA (https://web.archive.org/web/20240719142306/https://studentprivacy.ed.gov/?src=rn)
- FAFSA (https://web.archive.org/web/20240719142306/https://fafsa.ed.gov/?src=edgov-rn)
- 1098, tax forms (https://web.archive.org/web/20240719142306/https://www.ed.gov/1098-e?src=rn)
- More... (https://web.archive.org/web/20240719142306/https://www2.ed.gov/about/top-tasks.html?src=rn)

# Information About...

- Elevating Teaching (https://web.archive.org/web/20240719142306/https://www.ed.gov/teaching?src=rn)
- Early Learning (https://web.archive.org/web/20240719142306/https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)
- Engage Every Student (https://web.archive.org/web/20240719142306/https://www.ed.gov/ost?src=rn)
- Unlocking Career Success (https://web.archive.org/web/20240719142306/https://cte.ed.gov/unlocking-career-success/)
- Cybersecurity (https://web.archive.org/web/20240719142306/https://tech.ed.gov/cyberhelp/)

# Search press releases

Search...

# Find By Month

- July 2024 (/web/20240719142306/https://www.ed.gov/news/press-releases/monthly/202407)
- June 2024 (/web/20240719142306/https://www.ed.gov/news/press-releases/monthly/202406)
- May 2024 (/web/20240719142306/https://www.ed.gov/news/press-releases/monthly/202405)
- April 2024 (/web/20240719142306/https://www.ed.gov/news/press-releases/monthly/202404)
- March 2024 (/web/20240719142306/https://www.ed.gov/news/press-releases/monthly/202403)
- February 2024 (/web/20240719142306/https://www.ed.gov/news/press-releases/monthly/202402)
- January 2024 (/web/20240719142306/https://www.ed.gov/news/press-releases/monthly/202401)
- December 2023 (/web/20240719142306/https://www.ed.gov/news/press-releases/monthly/202312)
- November 2023 (/web/20240719142306/https://www.ed.gov/news/press-releases/monthly/202311)
- October 2023 (/web/20240719142306/https://www.ed.gov/news/press-releases/monthly/202310)

Supp.A.145

1/24/25, 8:43 AM    Education Department Approves $238 Million Group Discharge for 28,000 Marinello Schools of Beauty Borrowers Based on Borrow…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 147 of 288
Case: 3:1:…

- September 2023 (/web/20240719142306/https://www.ed.gov/news/press-releases/monthly/202309)
- August 2023 (/web/20240719142306/https://www.ed.gov/news/press-releases/monthly/202308)
- All Press Releases (/web/20240719142306/https://www.ed.gov/news/press-releases)

*Our mission* is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

## Student Loans (https://web.archive.org/web/20240719142306/https://www2.ed.gov/fund/grants-college.html?src=ft)

Repaying Loans (https://web.archive.org/web/20240719142306/https://studentaid.gov/manage-loans/repayment?src=ft)

Defaulted Loans (https://web.archive.org/web/20240719142306/https://studentaid.gov/manage-loans/default?src=ft)

Loan Forgiveness (https://web.archive.org/web/20240719142306/https://studentaid.gov/manage-loans/forgiveness-cancellation?src=ft)

Loan Servicers (https://web.archive.org/web/20240719142306/https://studentaid.gov/manage-loans/repayment/servicers?src=ft)

## Grants & Programs (https://web.archive.org/web/20240719142306/https://www2.ed.gov/fund/grants-apply.html?src=ft)

Apply for Pell Grants (https://web.archive.org/web/20240719142306/https://fafsa.gov/?src=ft)

Grants Forecast (https://web.archive.org/web/20240719142306/https://www2.ed.gov/fund/grant/find/edlite-forecast.html?src=ft)

Apply for a Grant (https://web.archive.org/web/20240719142306/https://www2.ed.gov/fund/grant/apply/grantapps/index.html?src=ft)

## Laws & Guidance (https://web.archive.org/web/20240719142306/https://www2.ed.gov/policy/landing.jhtml?src=ft)

Every Student Succeeds Act (ESSA) (https://web.archive.org/web/20240719142306/https://www.ed.gov/essa?src=ft)

FERPA (https://web.archive.org/web/20240719142306/https://studentprivacy.ed.gov/?src=ft)

Civil Rights (https://web.archive.org/web/20240719142306/https://www2.ed.gov/about/offices/list/ocr/know.html?src=ft)

IDEA Website (https://web.archive.org/web/20240719142306/https://sites.ed.gov/idea/?src=ft)

## Data & Research (https://web.archive.org/web/20240719142306/https://www2.ed.gov/rschstat/landing.jhtml?src=ft)

Education Statistics (https://web.archive.org/web/20240719142306/https://nces.ed.gov/?src=ft)

Postsecondary Education Data (https://web.archive.org/web/20240719142306/https://nces.ed.gov/ipeds/?src=ft)

ED Data Express (https://web.archive.org/web/20240719142306/https://eddataexpress.ed.gov/?src=ft)

Nation's Report Card (https://web.archive.org/web/20240719142306/https://nces.ed.gov/nationsreportcard/?src=ft)

What Works Clearinghouse (https://web.archive.org/web/20240719142306/https://ies.ed.gov/ncee/wwc/?src=ft)

Open Data Platform (https://web.archive.org/web/20240719142306/https://data.ed.gov/?src=ft)

COVID Relief Data (https://web.archive.org/web/20240719142306/https://covid-relief-data.ed.gov/?src=ft)

## About Us (https://web.archive.org/web/20240719142306/https://www2.ed.gov/about/landing.jhtml?src=ft)

Contact Us (https://web.archive.org/web/20240719142306/https://www2.ed.gov/about/contacts/gen/index.html?src=ft)

ED Offices (https://web.archive.org/web/20240719142306/https://www2.ed.gov/about/offices/list/index.html?src=ft)

Jobs (https://web.archive.org/web/20240719142306/https://www.ed.gov/jobs?src=ft)

Press Releases (https://web.archive.org/web/20240719142306/https://www.ed.gov/news/?src=ft)

Supp.A.146

1/24/25, 8:43 AM    Education Department Approves $238 Million Group Discharge for 28,000 Marinello Schools of Beauty Borrowers Based on Borrow…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 148 of 288

Case: 1:19-cv-11441-WGY, Document #: 7-2, Filed: 08/21/25, Page 68 of 82

FAQs (https://web.archive.org/web/20240719142306/https://www.ed.gov/answers?src=ft)

Recursos en español (https://web.archive.org/web/20240719142306/https://www2.ed.gov/espanol/bienvenidos/es/index.html?src=ft)

Budget, Performance (https://web.archive.org/web/20240719142306/https://www2.ed.gov/about/overview/focus/performance.html?src=ft)

Privacy Program (https://web.archive.org/web/20240719142306/https://www.ed.gov/privacy?src=ft)

Homeroom Blog (https://web.archive.org/web/20240719142306/https://blog.ed.gov/)

 (https://web.archive.org/web/20240719142306/http://www.facebook.com/ed.gov) 

(https://web.archive.org/web/20240719142306/http://www.twitter.com/usedgov) 

(https://web.archive.org/web/20240719142306/https://www.ed.gov/) 

(https://web.archive.org/web/20240719142306/https://www.ed.gov/feed)

Notices (https://web.archive.org/web/20240719142306/https://www2.ed.gov/notices/index.html?src=ft)
FOIA (https://web.archive.org/web/20240719142306/https://www2.ed.gov/policy/gen/leg/foia/foiatoc.html?src=ft)
Privacy Policy (https://web.archive.org/web/20240719142306/https://www2.ed.gov/notices/privacy/index.html?src=ft)
Accessibility (https://web.archive.org/web/20240719142306/https://www2.ed.gov/notices/accessibility/index.html?src=ft)
Security (https://web.archive.org/web/20240719142306/https://www2.ed.gov/notices/security/index.html?src=ft)
Information Quality (https://web.archive.org/web/20240719142306/https://www2.ed.gov/policy/gen/guid/infoqualguide.html?src=ft)
Inspector General (https://web.archive.org/web/20240719142306/https://www2.ed.gov/about/offices/list/oig/index.html?src=ft)
Whitehouse.gov (https://web.archive.org/web/20240719142306/https://www.whitehouse.gov/)
USA.gov (https://web.archive.org/web/20240719142306/https://www.usa.gov/)
Benefits.gov (https://web.archive.org/web/20240719142306/https://www.benefits.gov/)
Regulations.gov (https://web.archive.org/web/20240719142306/https://www.regulations.gov/)
vote.gov (https://web.archive.org/web/20240719142306/https://vote.gov/)

Supp.A.147

# EXHIBIT I

Case: 26-1136  03/09/2026, DktEntry: 9.2, Page 150 of 288

1/24/25, 8:37 AM    Case: 3:1 Education 1202rtmbnt Approves $1.5 billion in Dekt Relief for 79,000 BorkowersiWho Atfender Westwood College | U.S. Departme…

The Wayback Machine - https://web.archive.org/web/20240718080405/https://www.ed.gov/news/press-releases/education-d…

| Search... | |
|---|---|

**ARCHIVED INFORMATION**

# Education Department Approves $1.5 billion in Debt Relief for 79,000 Borrowers Who Attended Westwood College

**Approval assisted by significant evidence from Colorado and Illinois attorneys general**

AUGUST 30, 2022

**Contact:**   Press Office, (202) 401-1576, press@ed.gov (https://web.archive.org/web/20240718080405/mailto: press@ed.gov)

Today, the U.S. Department of Education (Department) announced that it will discharge all remaining federal student loans for borrowers who enrolled in any location of Westwood College (including enrollment in Westwood's online program) between January 1, 2002 through November 17, 2015 when it stopped enrolling new borrowers in advance of its 2016 closure. The Department has analyzed the evidence related to Westwood and concluded that the school engaged in widespread misrepresentations about the value of its credentials for attendees' and graduates' employment prospects such that all borrowers who attended during the period described above are entitled to a full loan discharge. This finding is based on extensive internal records, evidence from Westwood employees and administrators, and testimony recounting borrowers' first-hand experiences.

This action will result in $1.5 billion in discharges for 79,000 borrowers, regardless of whether they have applied for a borrower defense discharge. Relief will be granted without any additional actions by the borrowers.

"Westwood College's exploitation of students and abuse of federal financial aid place it in the same circle of infamy occupied by Corinthian Colleges and ITT Technical Institute," said Under Secretary James Kvaal. "Westwood operated on a culture of false promises, lies, and manipulation in order to profit off student debt that burdened borrowers long after Westwood closed. The Biden-Harris Administration will continue ramping up oversight and accountability to protect students and taxpayers from abuse and ensure that executives who commit such harm never work at institutions that receive federal financial aid again."

## About the Westwood Findings

Today's announcement is based upon several findings reached by the Department in the last two years about Westwood's conduct, which had previously resulted in the approval of $130 million in borrower defense discharges for approximately 4,000 borrowers. These findings include that Westwood routinely misled prospective students by grossly misrepresenting that its credentials would benefit their career prospects and earning potential—specifically by promising prospective students that they would be employed in their field within six months after graduation and that a Westwood degree would make them "employable for the rest of [their lives]." In fact, Westwood's marketing materials inflated the salary outcomes of its graduates and misrepresented national earnings data of college graduates as if they were data for Westwood graduates. Westwood also presented grossly inflated job placement rates. And the institution gave

Supp.A.149

students a false "employment pledge" guaranteeing students that it would help pay their bills if they could not find a job within six months of graduating. Not only was that empty guarantee a key feature of a scheme to mislead students into taking out loans to enroll at Westwood, but the Department found no evidence that the school ever followed through on that promise.

Westwood's criminal justice programs at its Illinois campuses highlight the lengths the school went to in its practice of misleading students. Westwood promised students in that program that they could expect jobs with law enforcement in Illinois, including the Chicago Police Department or the Illinois State Police Department, and even included those false claims in statewide television ads. However, Westwood never had the regional accreditation necessary to meet the state employment requirements during the time Westwood was open or for city positions from 2004 to 2010. As a result, it was impossible for Westwood students to achieve those employment goals.

These Westwood findings are based upon Department review of important evidence provided by the attorneys general of Colorado and Illinois, including sworn statements from former students and employees, admissions call recordings, multi-media advertising, and Westwood's internal communications, policies, and trainings.

"Strong partnerships between the Department and state attorneys general enable us to uncover the actions of dishonest institutions, like Westwood College," said Federal Student Aid Chief Richard Cordray. "Thanks to the valuable assistance of Attorneys General Phil Weiser of Colorado and Kwame Raoul of Illinois, we are delivering loan relief to all Westwood students who put their trust in an institution that decided to take advantage of them."

Westwood College was owned by Alta College, Inc. (Alta), which was located in Colorado. In 2002, Alta was acquired by Housatonic Partners, a private equity firm located in California and Massachusetts. Major executives at Alta included co-founder Kirk Riedinger and George Burnett. Earlier this year, Burnett was named the president of the University of Phoenix but left that position after the Department raised questions (https://web.archive.org/web/20240718080405/https://www.documentcloud.org/documents/22051302-education-department-inquiry-to-george-burnett) about his involvement at Westwood.

Including today's announcement, the Department has now approved $14.5 billion in discharges for nearly 1.1 million borrowers whose colleges took advantage of them.

# Continued Commitment to Address the Burden of Growing College Costs

Today's actions are part of the Biden-Harris Administration's broader efforts to tackle the growing cost of college, including by better implementing federal student loan relief programs.

Last week, the Department announced targeted student debt cancellation of up to $20,000 for individuals with loans held by the Department. The cancellation is available to borrowers with incomes under $125,000 for individuals or $250,000 for families. Borrowers who received a Pell Grant and meet the income thresholds are eligible for $20,000 in debt cancellation, while others can receive $10,000 in debt cancellation. This action will help address the financial harms of the pandemic by smoothing the transition back to repayment and helping borrowers at highest risk of delinquencies or default once payments resume. Borrowers can learn more about how to apply for this relief by visiting www.studentaid.gov/debtrelief (https://web.archive.org/web/20240718080405/https://studentaid.gov/debt-relief-announcement/).

Additionally, the Department announced initial details of a proposed rule to create a new income-driven repayment plan that will substantially reduce future monthly payments for lower- and middle-income borrowers. This proposed rule is part of the Department's efforts to make long-term improvements to existing student loan forgiveness programs and provide greater protections for students and taxpayers against unaffordable debts.

While the Department works to implement this broad-based assistance, it remains committed to providing support for borrowers through other targeted relief programs. To date, those efforts have resulted in nearly $34 billion in approved loan discharges for close to 1.7 million borrowers.

Supp.A.150

Further, the Department has already taken action to strengthen institutional accountability so that students are not left with mountains of debt and little payoff, particularly from fraudulent institutions. The Department has re-established the office of enforcement within Federal Student Aid that conducts investigations into institutions of higher education. The Department is also holding responsible the accreditation agencies that oversee academic quality at institutions. On August 19, Deputy Secretary Cindy Marten reaffirmed a decision (https://web.archive.org/web/20240718080405/https://www.ed.gov/news/press-releases/us-department-education-terminates-federal-recognition-acics-enhances-federal-aid-program-participation-requirements-acics-accredited-colleges) to terminate federal recognition of the Accrediting Council for Independent Colleges and Schools (ACICS). As a result, colleges currently accredited by the ACICS will now be required to fulfill additional operating conditions for continued participation in the federal student aid programs. ACICS had accredited Westwood, ITT Technical Institute, and many branches of Corinthian Colleges prior to their closure.

The Department will also propose future rules to hold career programs accountable for leaving their graduates with mountains of unaffordable debt and poor job prospects—a rule the last Administration rolled back. In the coming months, the Department will announce new actions to hold accountable institutions that have contributed to the student debt crisis including publishing lists of the worst actors.

**Tags:**    Student Financial Aid (/web/20240718080405/https://www.ed.gov/category/subject/student-financial-aid)
Student Loan Programs (/web/20240718080405/https://www.ed.gov/category/subject/student-loan-programs)
Press Releases (/web/20240718080405/https://www.ed.gov/news/press-releases)

# How Do I Find...?

- Student loans, forgiveness (https://web.archive.org/web/20240718080405/https://www2.ed.gov/fund/grants-college.html?src=rn)
- Higher Education Rulemaking (https://web.archive.org/web/20240718080405/https://www2.ed.gov/policy/highered/reg/hearulemaking/2023/index.html?src=rn)
- College accreditation (https://web.archive.org/web/20240718080405/https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://web.archive.org/web/20240718080405/https://www.ed.gov/essa?src=rn)
- FERPA (https://web.archive.org/web/20240718080405/https://studentprivacy.ed.gov/?src=rn)
- FAFSA (https://web.archive.org/web/20240718080405/https://fafsa.gov/?src=edgov-rn)
- 1098, tax forms (https://web.archive.org/web/20240718080405/https://www.ed.gov/1098-e?src=rn)
- More... (https://web.archive.org/web/20240718080405/https://www2.ed.gov/about/top-tasks.html?src=rn)

# Information About...

- Elevating Teaching (https://web.archive.org/web/20240718080405/https://www.ed.gov/teaching?src=rn)
- Early Learning (https://web.archive.org/web/20240718080405/https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)
- Engage Every Student (https://web.archive.org/web/20240718080405/https://www.ed.gov/ost?src=rn)
- Unlocking Career Success (https://web.archive.org/web/20240718080405/https://cte.ed.gov/unlocking-career-success/)
- Cybersecurity (https://web.archive.org/web/20240718080405/https://tech.ed.gov/cyberhelp/)

# Search press releases

Search...

1/24/25, 8:37 AM    Education Department Approves $1.5 billion in Debt Relief for 79,000 Borrowers Who Attended Ashford College | U.S. Departme…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 153 of 288

# Find By Month

- July 2024 (/web/20240718080405/https://www.ed.gov/news/press-releases/monthly/202407)
- June 2024 (/web/20240718080405/https://www.ed.gov/news/press-releases/monthly/202406)
- May 2024 (/web/20240718080405/https://www.ed.gov/news/press-releases/monthly/202405)
- April 2024 (/web/20240718080405/https://www.ed.gov/news/press-releases/monthly/202404)
- March 2024 (/web/20240718080405/https://www.ed.gov/news/press-releases/monthly/202403)
- February 2024 (/web/20240718080405/https://www.ed.gov/news/press-releases/monthly/202402)
- January 2024 (/web/20240718080405/https://www.ed.gov/news/press-releases/monthly/202401)
- December 2023 (/web/20240718080405/https://www.ed.gov/news/press-releases/monthly/202312)
- November 2023 (/web/20240718080405/https://www.ed.gov/news/press-releases/monthly/202311)
- October 2023 (/web/20240718080405/https://www.ed.gov/news/press-releases/monthly/202310)
- September 2023 (/web/20240718080405/https://www.ed.gov/news/press-releases/monthly/202309)
- August 2023 (/web/20240718080405/https://www.ed.gov/news/press-releases/monthly/202308)
- All Press Releases (/web/20240718080405/https://www.ed.gov/news/press-releases)

*Our mission* is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

Student Loans (https://web.archive.org/web/20240718080405/https://www2.ed.gov/fund/grants-college.html?src=ft)

Repaying Loans (https://web.archive.org/web/20240718080405/https://studentaid.gov/manage-loans/repayment?src=ft)

Defaulted Loans (https://web.archive.org/web/20240718080405/https://studentaid.gov/manage-loans/default?src=ft)

Loan Forgiveness (https://web.archive.org/web/20240718080405/https://studentaid.gov/manage-loans/forgiveness-cancellation?src=ft)

Loan Servicers (https://web.archive.org/web/20240718080405/https://studentaid.gov/manage-loans/repayment/servicers?src=ft)

Grants & Programs (https://web.archive.org/web/20240718080405/https://www2.ed.gov/fund/grants-apply.html?src=ft)

Apply for Pell Grants (https://web.archive.org/web/20240718080405/https://fafsa.gov/?src=ft)

Grants Forecast (https://web.archive.org/web/20240718080405/https://www2.ed.gov/fund/grant/find/edlite-forecast.html?src=ft)

Apply for a Grant (https://web.archive.org/web/20240718080405/https://www2.ed.gov/fund/grant/apply/grantapps/index.html?src=ft)

Laws & Guidance (https://web.archive.org/web/20240718080405/https://www2.ed.gov/policy/landing.jhtml?src=ft)

Every Student Succeeds Act (ESSA) (https://web.archive.org/web/20240718080405/https://www.ed.gov/essa?src=ft)

FERPA (https://web.archive.org/web/20240718080405/https://studentprivacy.ed.gov/?src=ft)

Civil Rights (https://web.archive.org/web/20240718080405/https://www2.ed.gov/about/offices/list/ocr/know.html?src=ft)

IDEA Website (https://web.archive.org/web/20240718080405/https://sites.ed.gov/idea/?src=ft)

Data & Research (https://web.archive.org/web/20240718080405/https://www2.ed.gov/rschstat/landing.jhtml?src=ft)

Education Statistics (https://web.archive.org/web/20240718080405/https://nces.ed.gov/?src=ft)

Postsecondary Education Data (https://web.archive.org/web/20240718080405/https://nces.ed.gov/ipeds/?src=ft)

Supp.A.152

1/24/25, 8:37 AM    Education Department Approves $1.5 billion in Debt Relief for 79,000 Borrowers Who Attended Ashford College | U.S. Departme…

Case: 26-1136, 03/09/2026, DktEntry: 9.2, Page 154 of 288

ED Data Express (https://web.archive.org/web/20240718080405/https://eddataexpress.ed.gov/?src=ft)

Nation's Report Card (https://web.archive.org/web/20240718080405/https://nces.ed.gov/nationsreportcard/?src=ft)

What Works Clearinghouse (https://web.archive.org/web/20240718080405/https://ies.ed.gov/ncee/wwc/?src=ft)

Open Data Platform (https://web.archive.org/web/20240718080405/https://data.ed.gov/?src=ft)

COVID Relief Data (https://web.archive.org/web/20240718080405/https://covid-relief-data.ed.gov/?src=ft)

## About Us (https://web.archive.org/web/20240718080405/https://www2.ed.gov/about/landing.jhtml?src=ft)

Contact Us (https://web.archive.org/web/20240718080405/https://www2.ed.gov/about/contacts/gen/index.html?src=ft)

ED Offices (https://web.archive.org/web/20240718080405/https://www2.ed.gov/about/offices/list/index.html?src=ft)

Jobs (https://web.archive.org/web/20240718080405/https://www.ed.gov/jobs?src=ft)

Press Releases (https://web.archive.org/web/20240718080405/https://www.ed.gov/news/?src=ft)

FAQs (https://web.archive.org/web/20240718080405/https://www.ed.gov/answers?src=ft)

Recursos en español (https://web.archive.org/web/20240718080405/https://www2.ed.gov/espanol/bienvenidos/es/index.html?src=ft)

Budget, Performance (https://web.archive.org/web/20240718080405/https://www2.ed.gov/about/overview/focus/performance.html?src=ft)

Privacy Program (https://web.archive.org/web/20240718080405/https://www.ed.gov/privacy?src=ft)

Homeroom Blog (https://web.archive.org/web/20240718080405/https://blog.ed.gov/)

 (https://web.archive.org/web/20240718080405/http://www.facebook.com/ed.gov) 

(https://web.archive.org/web/20240718080405/http://www.twitter.com/usedgov) 

(https://web.archive.org/web/20240718080405/https://www.ed.gov/) 

(https://web.archive.org/web/20240718080405/https://www.ed.gov/feed)

Notices (https://web.archive.org/web/20240718080405/https://www2.ed.gov/notices/index.html?src=ft)
FOIA (https://web.archive.org/web/20240718080405/https://www2.ed.gov/policy/gen/leg/foia/foiatoc.html?src=ft)
Privacy Policy (https://web.archive.org/web/20240718080405/https://www2.ed.gov/notices/privacy/index.html?src=ft)
Accessibility (https://web.archive.org/web/20240718080405/https://www2.ed.gov/notices/accessibility/index.html?src=ft)
Security (https://web.archive.org/web/20240718080405/https://www2.ed.gov/notices/security/index.html?src=ft)
Information Quality (https://web.archive.org/web/20240718080405/https://www2.ed.gov/policy/gen/guid/infoqualguide.html?src=ft)
Inspector General (https://web.archive.org/web/20240718080405/https://www2.ed.gov/about/offices/list/oig/index.html?src=ft)
Whitehouse.gov (https://web.archive.org/web/20240718080405/https://www.whitehouse.gov/)
USA.gov (https://web.archive.org/web/20240718080405/https://www.usa.gov/)
Benefits.gov (https://web.archive.org/web/20240718080405/https://www.benefits.gov/)
Regulations.gov (https://web.archive.org/web/20240718080405/https://www.regulations.gov/)
vote.gov (https://web.archive.org/web/20240718080405/https://vote.gov/)

Supp.A.153

# EXHIBIT J

| | |
|---|---|
| **From:** | Rebecca Eisenbrey |
| **To:** | Merritt, Robert C. (CIV); Rebecca Ellis; Noah Zinner; Nicole Almeida |
| **Subject:** | Re: Sweet status |
| **Date:** | Monday, October 27, 2025 9:39:15 AM |

Thanks, Charlie. Yes, we'd like to have the regular servicer meeting by telephone (or Zoom).

**From:** Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>
**Sent:** Monday, October 27, 2025 9:34:17 AM
**To:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Rebecca Ellis <REllis@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>
**Subject:** RE: Sweet status

Hi Becca,

Let me look into this and get back to you soon.  To be clear, you want to have, via telephone, the kind of discussion we typically have with servicers during the monthly meetings?

Thanks,
Charlie

**From:** Rebecca Eisenbrey <REisenbrey@ppsl.org>
**Sent:** Friday, October 24, 2025 3:27 PM
**To:** Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>; Rebecca Ellis <REllis@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>
**Subject:** [EXTERNAL] RE: Sweet status

Hi Charlie,

We understand that our in-person meeting with ED this month cannot go forward due to the shutdown. However, we are very concerned about the growing number of unresolved complaints from class members regarding incomplete settlement relief. In an attempt to address those complaints, we would like to go forward with our call with the servicers – with Christian and any other non-furloughed ED or DOJ employees – so that we can explain the trends that we've seen and try to resolve more systemic issues. If this isn't something that you could help to set up, would you object to us reaching out to the servicers to do so ourselves?

Many thanks,

Becca

**From:** Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>

**Sent:** Friday, October 24, 2025 2:34 PM
**To:** Rebecca Ellis <REllis@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>
**Subject:** Sweet status

Counsel,

I wanted to touch base about our next in-person meeting in this case.  Given the continuing lapse in appropriations, I wanted to confirm your understanding that, as has been the case with the weekly Ombudsman meetings, we will not be able to have an in-person meeting at ED this month.  We will revisit this issue and schedule a meeting as soon as appropriations are restored, and it is our hope that, assuming appropriations are restored, we would be able to have the meeting in advance of the December 11 status conference, consistent with past practice.

We appreciate your patience while we navigate these difficult circumstances.

Thanks,
Charlie

**R. Charlie Merritt**
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-8098
Email: robert.c.merritt@usdoj.gov

# EXHIBIT K

| From: | Merritt, Robert C. (CIV) |
|---|---|
| To: | Rebecca Ellis; Rebecca Eisenbrey; Noah Zinner; Nicole Almeida |
| Cc: | Holland, Liam C. (CIV) |
| Subject: | Sweet v. McMahon (N.D. Cal.) |
| Date: | Thursday, November 6, 2025 2:52:34 PM |

Counsel,

I hope you're doing well. I wanted to give you a heads up that we will be filing a Rule 60 motion later today in this case, seeking relief from the upcoming January 28, 2026 deadline to issue final decisions on post-class applications. That motion will explain that the Department will not be able to issue final decisions on all post-class applications by the current deadline and the reasons why. It will also seek a specific extension of 18 months and include a plan for meeting the new deadline.

We know that the Settlement Agreement contains a provision, Paragraph V.D.5, which sets forth a process for the parties to meet and confer about whether "extraordinary circumstances beyond Defendants' control prevent Defendants from fully performing" a settlement obligation and to attempt to negotiate an appropriate extension. We think Rule 60 provides an independent basis to seek relief from the post-class decision deadline and are not taking a position here about whether this provision of the settlement agreement is triggered. But in the interest of good faith negotiations, we wanted to let you know that the Department will not meet that deadline, for reasons that will be set forth in our Rule 60 motion, and see if you would be willing to negotiate an appropriate extension of that deadline. We are happy to set up a time to discuss as needed.

Also, I am copying my colleague, Liam Holland, on this email – he will be working on this case moving forward.

Best,
Charlie

**R. Charlie Merritt**
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-8098
Email: robert.c.merritt@usdoj.gov

# EXHIBIT L

| | |
|---|---|
| **From:** | Rebecca Ellis |
| **To:** | "Merritt, Robert C. (CIV)"; Rebecca Eisenbrey; Noah Zinner; Nicole Almeida |
| **Cc:** | Holland, Liam C. (CIV) |
| **Subject:** | RE: Sweet v. McMahon (N.D. Cal.) |
| **Date:** | Thursday, November 6, 2025 4:49:00 PM |

Charlie,

Thank you for letting us know. As I'm sure you expected, we disagree that Rule 60 is an appropriate vehicle here. The Settlement Agreement, paragraph V.A, specifically states that "the Court shall retain jurisdiction only to review claims set forth in this Section V, and only in the manner explicitly provided in Section V." *See also id.* paragraph V.E ("The Court relinquishes jurisdiction over all claims, causes of actions, motions, suits, allegations, and other requests for relief in this Action that are not expressly stated in this Paragraph V."). If the government is going to claim in a Rule 60 motion that there are circumstances justifying relief from the post-class deadline, that would by definition constitute alleged "extraordinary circumstances" that trigger the dispute resolution process in paragraph V.D.5 of the Settlement.

As I'm sure you also expected, if the government were to invoke the paragraph V.D.5 process, Plaintiffs would vigorously dispute that any delay in meeting the post-class deadline is "reasonable" or that any circumstances leading to such delay are or were "beyond Defendants' control." Nor would we agree that any extension is warranted, given that Defendants have had over 3 years to adjudicate these applications; Defendants have repeatedly represented to the Court in hearings throughout the past year that the process is on track; and the Court has reminded Defendants in no uncertain terms that the obligation to meet the post-class deadline is "already an order." Tr. 6/26/2025 at 13:14-17.

We look forward to discussing this issue at the December 11 hearing.

Best,
Becca

**From:** Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>
**Sent:** Thursday, November 6, 2025 2:52 PM
**To:** Rebecca Ellis <REllis@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>
**Cc:** Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** Sweet v. McMahon (N.D. Cal.)

Counsel,

I hope you're doing well.  I wanted to give you a heads up that we will be filing a Rule 60 motion later today in this case, seeking relief from the upcoming January 28, 2026

Supp.A.160

deadline to issue final decisions on post-class applications.  That motion will explain that the Department will not be able to issue final decisions on all post-class applications by the current deadline and the reasons why.  It will also seek a specific extension of 18 months and include a plan for meeting the new deadline.

We know that the Settlement Agreement contains a provision, Paragraph V.D.5, which sets forth a process for the parties to meet and confer about whether "extraordinary circumstances beyond Defendants' control prevent Defendants from fully performing" a settlement obligation and to attempt to negotiate an appropriate extension.  We think Rule 60 provides an independent basis to seek relief from the post-class decision deadline and are not taking a position here about whether this provision of the settlement agreement is triggered.  But in the interest of good faith negotiations, we wanted to let you know that the Department will not meet that deadline, for reasons that will be set forth in our Rule 60 motion, and see if you would be willing to negotiate an appropriate extension of that deadline.  We are happy to set up a time to discuss as needed.

Also, I am copying my colleague, Liam Holland, on this email – he will be working on this case moving forward.

Best,
Charlie

**R. Charlie Merritt**
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-8098
Email: robert.c.merritt@usdoj.gov

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs*, | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF ALICE ZAFIRIS** |
| *Defendants*. | |

I, Alice Zafiris, state as follows:

1.      I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.      I live in Arlington, Virginia.

3.      I am 40 years old.

4.      I borrowed federal student loans in order to attend Argosy University.

5.      The Department accepted my Borrower Defense application early in the morning on June 23, 2022. I had been trying to submit my application for about two weeks before that but could not because of issues with the Department's website. I understand that means that I am currently considered a Post-Class Applicant under the *Sweet v. McMahon* Settlement. On January 7, 2025, I notified the Department that I tried to submit my application multiple times leading up to the June 22, 2022 *Sweet* class inclusion deadline, and that as a result I should be moved into the class. However, the Department has yet to let me know whether they will approve my request.

6.      If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.      When the Department of Education told me in writing that it would decide my Borrower Defense to Repayment application by January 28, 2026, I believed them. That date became something to hold onto — an end point after years of uncertainty. I built my expectations, and honestly, parts of my life, around that promise. Delaying this decision by an additional 18 months, as the Department has requested, is not simply a bureaucratic adjustment; it is a direct act that will continue to cause severe, escalating, and unnecessary harm to me and my family.

8.      My loans now total $403,214.99, up from the $252,587 I borrowed for a degree from a school that no longer exists. My loans are in forbearance, but interest keeps accruing month after month while my application sits untouched. Each passing month without a decision turns a promise into a larger and more painful number. The settlement's deadline wasn't just administrative — it was a lifeline. Asking for an 18-month extension is asking the Court to stretch that lifeline into a longer rope I'm forced to keep climbing.

9.      Since June 23, 2022, my application portal has shown the same stagnant status: "2.10 – Ready for EU Review." Nothing has changed. I've become almost compulsive about checking for updates, refreshing the page far more than I'd like to admit. On the plus side, I've apparently developed an unexpected new skill in reading website backend code — not exactly the professional growth I had in mind, but it's what happens when you're desperate for any sign of progress.

10.     The financial impact is already real. My debt-to-income ratio is so distorted that I couldn't be added to the mortgage when my husband and I bought our home. It's a small thing on paper — a missing signature — but it felt like an erasure: my role as a partner and provider sidelined by a debt born from a degree I pursued to help others.

11.     We've also put off starting our family and delayed IVF because it would be financially reckless to take that step while this unresolved debt keeps growing in the background.

1    Time doesn't pause while I wait for the Department to act — it just keeps moving forward

2    without me.

3          12.    The emotional toll has been equally heavy. The ongoing uncertainty has led to

4    panic, anxiety, and sleepless nights. I lie awake doing mental math, calculating interest,

5    wondering how much longer this will drag on. It seeps into everything — my relationships, my

6    work, even my ability to imagine a future without dread.

7          13.    To hear the Department describe borrowers like me as receiving a "windfall" is

8    profoundly demoralizing. There is nothing windfall-like about years of waiting, mounting debt,

9    and living in constant financial instability. We are not opportunists; we are people who believed

10   the settlement meant what it said.

11         14.    Granting another extension would only deepen the harm that's already been done.

12   It would mean more interest, more uncertainty, and more sleepless nights wondering if this

13   process will ever end. I'm asking the Court to hold the Department to its commitment — to issue

14   decisions by January 28, 2026, or grant the relief owed if that doesn't happen. It's the only way

15   to make this right and allow people like me to finally move forward.

16         15.    This week brought the most painful consequence yet — my father passed away on

17   Sunday night and I am unable to apply for a low-interest funeral loan to pay for the services

18   because of my debt to income ratio. I'm having to take out a much higher interest rate loan with

19   a shadier creditor in order to pay for this. It's insult to injury. A dagger in my grieving heart.

20         16.    I have been waiting far too long. The Department of Education has must be held

21   to the January 28, 2026 deadline. The continued harm from delay is unacceptable.

22   I swear under penalty of perjury that the foregoing is true and correct.

23

24       Executed on:   <u>November 20, 2025</u>

25              ARLINGTON, VIRGINIA

26

27   
      Alice Zafiris (Nov 20, 2025 10:43:03 EST)

28         ALICE ZAFIRIS

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs*, | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF SHERRI MAINHART** |
| *Defendants*. | |

I, Sherri Mainhart, state as follows:

1.      I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.      I live in Brunswick, Georgia.

3.      I am 52 years old.

4.      I borrowed federal student loans in order to attend Kaplan University (now Purdue University Global). I attended in 2012-2014 and 2015-2016.

5.      Kaplan's misleading financial advisors promised that I would have enough funding to obtain a bachelor's degree. But in the end I did not complete my degree because I maxed out my federal aid. Kaplan representatives told me it would be another $40,000 to finish my degree.

6.      Kaplan fed me a fairytale of financial freedom, independence and prosperity. That was false. I now have over $54,000 in debt, no degree, and the "school" isn't even recognized by most employers.

7. I later enrolled at Louisiana State University through my employer, but out of the supposed 114 credits I had earned through Kaplan, LSU said only approximately 26 credits would transfer because most were Kaplan's own created courses and basically were not legitimate.

8. I applied for Borrower Defense on October 2, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

9. If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

10. My debt-to-income ratio is being negatively impacted because of this albatross of a loan. My credit score doesn't improve regardless of what I do because of this loan. When I had to buy a car in 2023 (because my old car had its engine explode and then the transmission failed), I was told by multiple dealerships that I didn't qualify to purchase a used car because of my credit. I had to get a loan for the least expensive new Honda I could find, and the payment ended up being $509 per month.

11. My credit score is going down right now because every month interest gets added to my student loan balance. In another 18 months, my credit score will be non-existent.

12. I am currently only able to rent undesirable housing because of my credit. My current rental has mold and dampness issues. The roof was leaking in several places and the landlord just put another roof over the old roof, trapping mold in between the layers. I am a breast cancer survivor and suffer from fibromyalgia. Living with mold and dampness is detrimental to my health.

13. In the past, I was able to own a home on my own, but I sold it to move closer to family when my health was doing poorly. Now I can't afford to get comparable housing to what I used to have.

14. I also am being treated for depression and anxiety, and my credit and current living arrangement are huge contributors to those conditions.

15. My daughter has become a successful professional, but I worry constantly about the effect my financial situation might have on her.

2

16.    Waiting until January of 2026 was already a ridiculously long time to wait for a decision on a school that failed to provide what they promised. I strongly oppose extending the deadline.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:    19/11/2025
    GLYNN COUNTY, GEORGIA


    SHERRI MAINHART

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs*, | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF BETH HUEGEL** |
| *Defendants*. | |

I, Beth Heugel, state as follows:

1.      I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.      I live in Columbia, South Carolina.

3.      I am 35 years old.

4.      I borrowed federal student loans in order to attend the The Art Institute of Philadelphia.

5.      I applied for Borrower Defense on August 27, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.      If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.      I have already been waiting for over three years for a decision. I did my part by filing my application when instructed, and the Department must now be held to its promise.

1

8.      Delaying this decision by an additional 18 months, as the Department has requested, is not simply a bureaucratic adjustment; it is a direct act that will continue to cause severe, escalating, and unnecessary harm to me and my family.

9.      **Credit and Repayment Anxiety:** Extending this deadline by 18 months would cause severe and irreversible financial harm to me and my family. As the sole income earner for my family, this ongoing situation is creating unbearable financial and emotional stress, pushing me dangerously close to bankruptcy, and I can't tell if I need to file or not because I'm getting mixed information from my servicer, AidVantage, and from the Department. More than a year ago, I received a notice from the Department saying that all of my loans from the Art Institute would be discharged. However, when I try to check in on my account to find out why I still have a balance, AidVantage and the Department each tell me to contact the other. I even have sent in multiple disputes to the credit bureaus, and each time AidVantage confirms that I owe the full-balance of the debt. If I am forced to live with the financial uncertainty of my outstanding loan balance for another 18 months, it will destroy the ounce of stability I've worked so hard to build, and remove any chance of me reclaiming financial independence until at least my mid 40s.

10.      **My Credit is Compromised:** My debt-to-income ratio is unmanageable, and because AidVantage continues to report incorrect loan information to the credit bureau, my credit score unpredictably drops by up to 50 points. This is weighing down my credit and prevents me from refinancing my other debts with a lower interest rate or qualifying for a home. I am currently applying for mortgage loans, and the mortgage broker has told me that my student loan balance will limit my ability to get a loan. In August, I was initially approved for a mortgage and even picked out a house, but the lender revoked its approval because my loans were still appearing on my credit report. Even though I explained that my loans had been discharged, AidVantage would not send the paperwork the lender requested.

11.      **Anxiety of Repayment Uncertainty:** I am concerned about being placed back into repayment. Even though I believe my loans are supposed to be discharged, they are still showing on my AidVantage account, and they are still listing a due date even though the payment is listed as zero. Given the lack of competency that I've seen from the Department and

my servicer on my loans, I am very reasonably worried that something will go wrong and they will tell me that I have to start repaying my loans again. If that happens, I will not be able to do it. It will be a financial disaster for me. I would have no options.

12.    **The Personal and Emotional Burden:** The strain my student loan discharge delay is putting on me is drastically impacting my health. Calls to the Department and to AidVantage to try to get accurate and complete information on my loans regularly causes me to experience panic attacks. The debt that I am in as a result of going to this predatory school has caused me life-long harm. Because employers have no respect for my Art Institute degree, I have been forced to take a series of low-paying, unreliable, and extremely physically and emotionally taxing jobs. My Art Institute degree was so disrespected within my community that I even had to move far away in order to find employment. The financial strain of my student loans keeps me stuck in these jobs, and also has forced me to take out additional debt in order to meet my family's basic expenses. Finally completing my student loan discharge would take a big burden off my shoulders and will also allow me to pay off some of my other outstanding debts.

13.    **Impact on My Family's Well-Being:** I have had to move far from my family because I couldn't afford the cost of living given my income and debts. My financial uncertainty means that I'm unable to move closer or even to visit them. This is extremely painful to me.

14.    I have been waiting far too long. The Department of Education must be held to the January 28, 2026 deadline. The continued harm from delay is unacceptable.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:   November 19, 2025

COLUMBIA, SOUTH CAROLINA

Beth Huegel (Nov 19, 2025 11:46:29 EST)

BETH HUEGEL

DE Supp. AT 173

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al*

        *Plaintiffs*,

   v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

        *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF ERIN WILLIAMS**

I, Erin Williams, state as follows:

1.     I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.     I live in Murfreesboro, Tenneessee.

3.     I am 42 years old.

4.     I borrowed federal student loans in order to attend the Art Institute of Pittsburgh to get a Bachelor's of Science in Graphic Design and an Associate's degree in Web Design and Interactive Media.

5.     I applied for Borrower Defense on August 25, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.     If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.     The Department of Education insists that I need to wait on Borrower's Defense, even though a portion of my debt should have been automatically discharged and refunded

1

through group discharge. No action was taken despite complaints to the DOE, my servicer, and even one to the CFPB.

8.      I declined forbearance when I signed my Borrower's Defense application to continue working towards income-based-repayment forgiveness. This decision was made prior to the DOE's press release that confirmed the school as fraudulent. I am now stuck with my loans in repayment and they continue to accumulate interest. My husband is the breadwinner in our household and we cannot file taxes jointly because of my IBR repayment plan. As a result, we cannot receive the tax benefits of being married and we are financially stuck until this is resolved. Meanwhile, the full amount of accruing debt continues being reported to the credit agencies. This entire process has caused great emotional harm as well as financial. An extension would only prolong the uncertainty and all financial implications that go along with it.

9.      I currently do not have an income and I am trying to keep my husband's income safe. My debt-to-income ratio is astronomical. We have a modest house that had to be purchased in my husband's name only. We didn't even try to include my income at the time. I own nothing in my own name. We kept my name off of all major purchases due to fear because of this debt and the need to protect all assets. The only thing I own in life other than a few personal belongings is a massive amount of debt. What I need the most is a life and the ability to help my husband financially because everything is on him. At the same time, neither one of us wants to pay for fraud. I do not trust the DOE at all.

10.      My 2008-2010 Art Institute Degree should be already flagged for discharge and out of repayment. Even after filing complaints and sending proof, they refuse. I have to wait on Borrower's Defense for all of the debt, which completely goes against the press release for the group discharge. I simply do not trust the DOE to make any repayments and further tie up financials. We aren't even sure what I have paid already will ever be refunded. I cannot move forward with life until a Borrower's Defense decision is made.

11.      Ever since the Art Institute discharge was announced and the fraud was confirmed by the DOE, I haven't known what to do. I have grave concerns that the degrees that I worked so hard for and put so much money towards are useless. I struggled to find work out of graduation

due to this school and I seriously doubt it will be easier since the group discharge has been announced and the school was striped of accreditation years ago.

12. I am not against paying honest debt that has accrued. However, the balance is not even correct. They haven't even released the portion of my debt that was supposed to be automatically removed so I do not have any trust left. I certainly am not going to pay them more until this is resolved. The DOE tells me I need to wait on Borrower's Defense but now they are trying to push that deadline back even further.

13. While starting over at life at 42 years old is far from ideal, I deserve to have that opportunity. This is literally a noose around my neck. I do not feel free to move on with my life in any way shape or form until the DOE is held accountable. My husband is forced to cover bills for everything and I am stuck in limbo waiting for an opportunity to have a future free from burden. For this reason, this extension should be denied. They are constantly trying to shirk accountability towards fraudulent debt, whether it be in the form of group discharges or Borrower's Defense Applications. They should not be allowed to get away with this. The DOE expects borrower accountability while they themselves hold no liability.

14. I have approximately $84,887.41 in outstanding federal student loans related to my attendance at The Art Institute of Pittsburgh.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: November 18, 2025

RUTHERFORD, TENNEESSEE

*Erin Williams*
_____

ERIN WILLIAMS

3

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

       *Plaintiffs*,

   v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

       *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF KIMBERLY
O'NEILL**

I, Kimberly Oneill, state as follows:

1.     I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.     I live in Springfield, Ohio.

3.     I am 41 years old.

4.     I borrowed federal student loans in order to attend Kaplan College (now known as Purdue University Global) to get a Bachelor's degree in Business.

5.     I have approximately $49,000 in outstanding federal student loans related to my attendance at Kaplan College (now known as Purdue University Global).

6.     I applied for Borrower Defense on October 6, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

7.     I am writing today about how disgraceful the Department of Education is being. Many of us, including myself, were pressured or misled into attending colleges that engaged in predatory practices. I was not prepared to be exploited by a predatory school or lender. I was promised job opportunities and income levels that never materialized. Instead, after graduating, I

1

struggled financially, fell behind on my bills, lost my home, and ultimately had to file for bankruptcy. I had to rebuild my life from the ground up. Now, with this proposed extension, I fear I may be forced into bankruptcy again.

8.   A major and immediate hardship I face is my inability to purchase a reliable vehicle. My debt-to-income ratio—driven almost entirely by my student loans and the continually accruing interest—is preventing me from qualifying for an auto loan. My credit score has been severely damaged by this debt, and without a dependable car, I cannot meet essential daily needs. I rely on transportation to get to work and, even more critically, to take my son to his necessary medical appointments following his battle with cancer. The lack of a reliable vehicle puts our safety, stability, and health at risk. This is not a luxury—it is a necessity for our survival and wellbeing.

9.   If this extension is approved, the added 18 months of interest alone would exceed the amount I already owe, making it impossible to improve my credit enough to purchase a car anytime soon. This extension would lock me into another year and a half of being unable to secure reliable transportation for my family. It would mean choosing between essential bills, struggling to cover basic needs, and risking my son's access to medical care.

10.   Many borrowers like me have waited years for a resolution. The Department of Education had more than enough time to complete its work. The harm caused by these delays should not continue falling on borrowers who were deceived and financially devastated by predatory institutions. For many of us, reliable transportation is the key to maintaining employment, caring for our children, and rebuilding our lives. This extension directly prevents that.

11.   The ongoing stress has taken a significant toll on my mental health. The idea of extending this burden even further is overwhelming. This decision will not affect just one person—it will impact thousands who are already struggling. We want to move forward. We want to rebuild our credit. We want to regain stability and work toward a better future. But with debt that grows uncontrollably and prevents basic necessities like transportation, that future is slipping out of reach.

12.     For these reasons, I respectfully request that this extension be denied. The continued accrual of interest, the prolonged financial instability, and the inability to secure essential transportation create a hardship too great to ignore.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:   November 18, 2025

CLARK COUNTY, OHIO

_____

KIMBERLY O'NEILL

3

# EXHIBIT 7

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al*

      *Plaintiffs,*

    v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

      *Defendants.*

Case No.: 19-cv-03674-WHA

**DECLARATION OF DR. LAUREN
BARTHOLOMEW**

I, Dr. Lauren Bartholomew, state as follows:

1.    I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.    I live in Collegeville, Pennsylvania.

3.    I am 42 years old.

4.    I borrowed federal student loans in order to attend Argosy University to obtain a Doctorate in Psychology. Argosy lied about the accreditation of my graduate program—we were told that the program would be APA accredited by the time our internship was done, but this was not true. Since graduating I've also become aware that Argosy's owner, EDMC (the same ownership as the Art Institutes), was hiking the price of our program in order to line executives' pockets.

5.    I applied for Borrower Defense on June 28, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.    If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

1

7.     The requested extension would be catastrophic to my life, my family, and my ability to contribute meaningfully to my community.

8.     **Undue Financial Hardship:** The burden of my student loan debt has created severe financial hardship that affects every aspect of my daily life. Each month, my loan payments both consume a significant portion of my income and remain in default status while prevent me from meeting basic needs such as paying my own rent without family financial assistance and receiving all the medical care I need due to cost.

9.     The promised date of January 28, 2026, represents not merely relief but a lifeline. I have structured my financial planning around this deadline, making decisions about rent, healthcare, and family obligations based on the reasonable expectation that this matter would finally be resolved. An 18-month delay would mean nearly two more years of continued financial strain.

10.    This is not simply an inconvenience—it represents 18 more months of choosing between loan obligations and necessities, 18 more months of financial insecurity, and 18 more months of my life placed on hold while the Department fails to fulfill its obligations under the settlement agreement.

11.    My father is retirement age, but he is still working in order to help support me financially. I want my father to be able to enjoy his retirement.

12.    **Inability to Achieve Basic Financial Stability:** The existence of my student loan debt has made it impossible for me to achieve fundamental markers of financial stability that most Americans take for granted. I cannot purchase a home for my family. My debt-to-income ratio, burdened by these loans, disqualifies me from obtaining a mortgage. I have been forced to continue renting, paying over $2,600 in rent money that could be building equity and stability for my future but instead enriches a landlord while I remain trapped in a cycle of financial impermanence. My health insurance is almost $800 per month.

13.    Similarly, I am unable to obtain financing for a reliable vehicle. The lease on my current vehicle is coming to a close soon, and with rising costs of living I am uncertain if I will be able to afford to lease or purchase a new vehicle. The inability to secure reasonable auto

2

financing leaves me vulnerable to transportation emergencies that could jeopardize my employment, and will cause undue strain in getting to and from doctors' appointments that keep my many chronic health conditions in check.

14.     The discharge of these loans would immediately improve my creditworthiness and debt-to-income ratio, opening doors that have been closed to me for years. An 18-month extension keeps those doors locked.

15.     **Barriers to Further Education and Professional Development:** Perhaps most significantly, my existing student loan debt prevents me from pursuing additional education that would not only benefit my career but also address a critical public health need in my community. I am seeking to pursue education in clinical psychopharmacology, which would enable me to become a prescriber and help address the severe shortage of mental health prescribers in my state.

16.     The mental health crisis in our nation, and particularly in my state, is well-documented. Wait times for psychiatric care are measured in months, not days. People in crisis cannot access the medication management they desperately need. I want to be part of the solution.

17.     I am prepared to undertake the training necessary to serve my community in this critical capacity. However, I cannot pursue this additional education while carrying my current student loan debt. No responsible financial aid office would approve additional loans given my existing debt burden. No lender would extend me credit for educational purposes. I am effectively barred from advancing my education and serving a vital public need because of loans taken out for a program that failed to provide the promised career outcomes—part of the very reason I am entitled to discharge under the borrower defense process.

18.     The January 28, 2026, deadline represents the moment when I can finally move forward. I can apply to programs, secure necessary funding, and begin the training that will allow me to prescribe medication and provide desperately needed mental health services. An 18-month delay doesn't just postpone my personal goals, it extends the time that patients in my community

DECLARATION

go without adequate access to care. Every month of delay is another month where people suffer because there aren't enough prescribers to meet the demand.

19.     **Effects on My Physical and Mental Health:** I have multiple severe chronic health issues. When I was 14, I was diagnosed with Lyme disease, which I found out in my 20s was chronic. A doctor told me that treatment would not be covered by insurance and would cost over $100,000, so I had to decline the treatment. When I was 17, I was diagnosed with intermediate uveitis (swollen cells in the retina), which causes cataracts and glaucoma. I've had 8 eye surgeries and have to get medication injected directly into my eyeballs. The stress from having my student loans hanging over my head exacerbates my physical health conditions.

20.     These loans have caused me so many sleepless nights. I constantly feel as though I am teetering on the edge of financial ruin and subsequent potential homelessness. I don't have family that could take me in if I lost my housing.

21.     I feel terrified because I have essentially no money saved in retirement. I have avoided getting married partly because of my debt.

22.     I feel like I was sold a bill of goods about the American dream, where if you go to school and work hard you will be successful. Argosy promised that I would be able to pay off my student loans quickly with money I could earn with their degree. Instead, I live paycheck to paycheck despite being a doctor. I just want a little house with a yard for my dog, but at this rate I will never own a home because of my debt-to-income ratio. According to society, I made all the right choices, always played by the rules, and yet I ended up in this impossible position.

23.     **The Department's Failure Should Not Become My Burden:** The Department of Education has had years to process these applications. The settlement agreement provided clear deadlines and expectations. The post-class discharge date of January 28, 2026, was established precisely because the Department failed to meet its obligations to process applications in a timely manner. Now, the Department seeks to extend its own deadline—to reward its own failure with more time—while transferring the consequences of that failure onto borrowers like me who have waited patiently and structured our lives around the agreed-upon timeline.

4

24.     I have already waited over three years for this relief. I have already endured the financial hardship, the deferred dreams, the inability to build stability. The settlement agreement acknowledged that this wait has been unfair and provided a remedy. To grant the Department's request for an extension would effectively nullify that remedy for 18 additional months and signal that the Department's administrative convenience outweighs the real, documented harm being inflicted on borrowers.

25.     I respectfully urge this Court to deny the Department of Education's motion for an extension. The January 28, 2026, deadline is not arbitrary—it represents a hard-fought agreement that recognized the harm caused by the Department's delays. I am one of thousands of post-class members whose lives hang in the balance. For me, an 18-month extension means continued severe financial hardship; continued inability to purchase a home or secure vehicle financing; continued barriers to pursuing education in clinical psychopharmacology; continued inability to help address the mental health crisis in my community; continued punishment for the Department's failure to fulfill its obligations.

26.     The Department made promises under the settlement agreement. Those promises must be kept. I respectfully ask this Court to hold the Department accountable to the deadline it agreed to and to allow me and thousands of other borrowers to finally move forward with our lives. Thank you for your consideration.

I swear under penalty of perjury that the foregoing is true and correct.


Executed on:  11-18-25

MONTGOMERY COUNTY, PENNSYLVANIA


*L Bartholomew, Psy.D*

DR. LAUREN BARTHOLOMEW

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs*, | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF MELONEY GARRETT** |
| *Defendants*. | |

I, Meloney Garrett, state as follows:

1.      I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.      I live in Port Murray, New Jersey.

3.      I am 48 years old.

4.      I borrowed federal student loans in order to attend Ashford University and Arizona State University.

5.      I applied for Borrower Defense on August 30, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.      If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.      **The Financial Fallout: Credit and Repayment Anxiety:** I have been waiting for three years for a decision. I was a victim of false promises about my employment prospects that caused me to enroll in a predatory school, and that led me to take on a large amount of student loan debt. One of the colleges I attended, Ashford University, is no longer is in existence.

Among other things, its promise of lifetime employment assistance was a sham. I am conscientious about paying my debts and keeping my balances manageable. However, while I have been waiting for years for a decision on my borrower defense applications, my student loan balance has been accruing massive amounts of interest. I am a single parent and have to plan not only for my own financial future, but also for my family's. My son is enrolling in college next year, and until I have certainty about how much I will need to repay on my loans, I can't know how much I'll be able to borrow to support his education. It feels terrible for me to not know whether I will be able to fully support him.

8.    **My Credit is Compromised:** The loans tied up in this defense claim remain on my credit report. Because my federal student loan debt is accruing interest while I wait for a decision on my application, it is having an ever increasing impact on my debt-to-income ratio. This negatively impacts my ability to get affordable credit. I currently need to buy a new car, and worry that I will pay even higher interest as a result of my inflated debt-to-income ratio. I believe that this harm to my credit causes me to pay more for auto insurance, since this is one of the factors that applies to its cost. I also need to ensure my credit and debt-to-income ratio is in good standing so that I am able to get a loan to support my son's college dreams.

9.    **Anxiety of Repayment Uncertainty:** I am concerned about being placed back into repayment. I am a single parent working for a non-profit and the delay in getting a decision on my application leaves me completely in the dark about how much I will have to repay, when I will have to repay it, and what repayment options I will have—especially given the drastic changes in student loan repayment plans. Living with this uncertainty and being unable to plan for the future is a source of constant stress for me.

10.    **The Personal and Emotional Burden:** The long delay on ED's decision on my borrower defense application put me in a years-long state of anxiety. The uncertainty over my student loan debt is always on my mind, especially as I work with my son to figure out how he will pay for college and how I will be able to support him. For more than three years I have lived with financial uncertainty. The thought of waiting another 18 months is overwhelming.

11.     **Professional and Employment Roadblocks:** I am worried that I will not be able to apply for a different job if I need to, because some jobs consider the amount of debt that you have in hiring.

12.     I have been waiting far too long. The Department of Education must be held to the January 28, 2026 deadline. The continued harm from delay is unacceptable.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:   11/19/25

PORT MURRAY, NEW JERSEY

MELONEY GARRETT

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al*

      *Plaintiffs*,

    v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

      *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF NINA MECHAM**

I, Nina Mecham, state as follows:

1.    I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.    I live in Fort Myers, Florida.

3.    I am 55 years old and am suffering from my third benign brain tumor. Surgery on an earlier tumor caused damage to my vision that forced me to leave a career in law enforcement.

4.    I borrowed federal student loans in order to attend King's College to get a certificate in Secretarial Sciences.

5.    I applied for Borrower Defense on September 14, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.    I took out approximately $10,000 in federal student loans to attend King's College, and because of interest my outstanding loan balance is now approximately $50,000.

7.    If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

8. The stress of this debt has followed me for decades; it never goes away. No matter how hard I work or how carefully I budget, the fear of how I will ever afford to begin repaying it is always present.

9. I earn an income that falls below the poverty line, yet it is still considered "too much" to qualify for food assistance or other support, leaving me stuck in a constant financial strain with no safety net.

10. Having this loan on my credit report impacts every part of my life: it affects job opportunities, rental applications, and my ability to move forward.

11. In 2021 I tried to buy a home, but because of my debt-to-income ratio I was denied a loan. I am a home appraiser and I can't afford to buy. I also can't afford to go back to school to get the degree I would need to advance in my career.

12. The certificate I received from King's College cost thousands of dollars, but it never opened a single door or generated income anywhere near enough to repay the loans they encouraged me to take.

13. The weight of this debt has kept me trapped, not because of poor choices, but because of a predatory institution that failed to provide the education it promised.

14. I relied on getting a decision on my Borrower Defense application by January 28, 2026. A further delay would mean another 18 months of living without a future.

15. I ask the Court to enforce the January 28 deadline for all Post-Class borrowers. I am just one person, but we all have the same desire to end this and have closure.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: _18/11/2025_____

LEE COUNTY, FLORIDA

*Nina P. Mecham*

NINA MECHAM

2

# EXHIBIT 10

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al*

     *Plaintiffs,*

  v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

     *Defendants.*

Case No.: 19-cv-03674-WHA

**DECLARATION OF STACEY BARTON**

I, Stacey Barton, state as follows:

1.     I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.     I live in Livingston, Louisiana.

3.     I am 41 years old.

4.     I borrowed federal student loans in order to attend Ashford University to get a degree in Social Sciences.

5.     I applied for Borrower Defense on August 28, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.     I have an outstanding student loan balance of approximately $212,000 from my time at Ashford University.

7.     If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

8.     My husband and I live in an RV with our two boys and have been trying to buy a home. We have money for a down payment, and we found a home and made an offer. We were

1

unable to close on that home because of our debt-to-income ratio, which is high because of my student loans. The home is now back on the market, and yesterday I saw that a sale is pending.

9.      The stress from my loans and the lack of clarity is preventing me from living. I check the studentaid.gov website every day to see if there is any change or relief. I've been depressed. I've been crying and have lost weight because of the stress.

10.     My husband and I have been discussing divorce because of the strain my outstanding loans have placed on our marriage. He is a disabled veteran who served 12 years in the military but a back injury from an IED explosion in Iraq caused his early retirement. We can't use his VA benefits to get a VA loan because of my student loans.

11.     I relied on getting a decision on my Borrower Defense application by January 28, 2026. A further delay would put more strain on me, my husband, and our boys.

12.     I ask the Court to enforce the January 28 deadline for all Post-Class borrowers. I am just one person, but we all have the same desire to end this and have closure.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: ___19/11/2025___

LIVINGSTON PARISH, LOUISIANA

_Stacey Barton_
Stacey Barton (Nov 19, 2025 12:12:32 CST)

STACEY BARTON

# EXHIBIT 11

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs*, | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF STEPHANIE DIMASO** |
| *Defendants*. | |

I, Stephanie DiMaso, state as follows:

1.      I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.      I live in New Berlin, Wisconsin.

3.      I am 40 years old.

4.      I borrowed federal student loans in order to attend Chamberlain University to get a Bachelor's degree in 2012.

5.      I applied for Borrower Defense on July 15, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.      If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.      I submitted my Borrower Defense application over three years ago. During this time, my student loan has continued to accrue a substantial amount of interest, significantly increasing my overall balance and deepening my financial hardship.

1

8. The Department of Education has had more than a sufficient amount of time to review and process these applications. Meanwhile, as borrowers, we have been required to comply with every changing rule, policy, and deadline issued by the Department, often at great personal cost. It is only fair that the Department be held to the same standard of accountability and adhere to the deadlines it has established for itself.

9. As a single parent, this prolonged delay has had devastating consequences on my financial stability and mental well-being. The burden of this unresolved debt has prevented me from qualifying for a mortgage, continuing my education, and saving for retirement. I have been forced to put my life on hold while the government continues to change the rules surrounding student loans on a near constant basis. I live in constant fear of how I will continue to provide for my son and secure a stable future for both of us.

10. The Department's inaction, coupled with the compounding interest and lack of clear communication, has created an unfair and overwhelming hardship.

11. I have approximately $31,000 in outstanding federal student loans related to my attendance at the University of Phoenix.

12. I believe I am owed a substantial refund of the money I paid on these loans.

13. I relied on getting a decision on my Borrower Defense application by January 28, 2026. Moving the deadline now only prolongs the harm to me and my family's wellbeing.

14. I ask the Court to enforce the January 28 deadline for all Post-Class borrowers. I am just one person, but we all have the same desire to end this and have closure.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: __11/20/2025__

WAUKESHA COUNTY, WISCONSIN

_Stephanie DiMaso_

STEPHANIE DIMASO

2

# EXHIBIT 12

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs,* | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF MARK GOMEZ** |
| *Defendants.* | |

I, Mark Gomez, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Dallas, Texas.

3. I am 63 years old.

4. I borrowed federal student loans in order to attend DeVry University between 2005 to 2008. I earned a degree in Technical Management.

5. Before I went to DeVry, I suffered a workplace accident in 2001. Because of my injuries, I was out of the job market, and my doctor advised me not to go back to school for in-person classes. Someone from DeVry told me that I could do a degree online, but it turned out that online classes were much more expensive than in-person classes. I still pursued the degree, hoping that after I graduated and finished treatment for my injuries I would be able to earn more. DeVry agents claimed that I would get a great job and make great money with my degree, maybe doubling or tripling my income, but that was a lie. Instead, the opposite happened—I became very under-employed, sometimes even below the poverty line, even with my college degree. I

1

worked hard and got good grades, but the jobs I got after earning my degree actually paid less than what I was earning before my accident.

6.    When my loans were in repayment, I faced a choice between making student loan payments or being out in the street. At the time, the loan servicers were offering deferments like candy. I took deferments and forbearances, or sometimes made minimum payments, because I couldn't afford the full payments, but it meant that my balance was swelling. Meanwhile, the pay increases I'd hoped for didn't come. At the same time, I started hearing in the news about DeVry having a patchy reputation and being involved in predatory lending. I worried no one would hire me with that on my resume.

7.    I applied for Borrower Defense on November 9, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

8.    If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

9.    The loan payments for my DeVry loans were always larger than my income could support. Furthermore, multiple extensions and deferments simply bloated the amount owed. Remaining in an under-employed state for the majority of my post-graduation years aggravated my inability to repay. That placed the balances and payments too far out of range for any income I was earning.

10.    This bloating balance over the years is holding my credit score down. My ability to get credit, including mortgage loans in earlier years when houses were more affordable, has always been impeded by the DeVry loans. Lately I have tried to explain to lenders that it might get forgiven, but that doesn't help my credit score or access to credit. The increasing, aging debt looks bad to lenders on my credit report even though I'm not delinquent and made payments over the years (the loans are in borrower defense forbearance now).

11.    In 2021, I finally found a better-paying job. But this year my company did a round of layoffs, and now I have been unemployed for almost six months. I'm worried that due to my age it will be really difficult to find another good job.

12.    Meanwhile, my wife has become disabled, and I am now near retirement age.

2

13.     I experience constant stress from wondering what's going to happen with my borrower defense application. I feel very disillusioned knowing that my case is sitting there and people are just doing nothing about it. No updates on my status, no additional information, nothing. Not a day goes by that I don't wake up and wonder if this is going to fall on my head.

14.     If the Department of Education says I have to pay the entire balance, I worry that I'd become homeless. I could never repay it at this point. The balance has more than doubled from what it was when I graduated, and is now close to the amount I bought my first house for in 1999. This has an impact on my health, mind, and soul. I want to pay bills and do what I can, but this is way out of reach.

15.     Meanwhile, DeVry gets to keep its money even though I didn't see any of the benefits I was promised. Now I believe that I could have done just as well for myself without all this debt.

16.     I was looking forward to this coming year because I knew my borrower defense deadline was coming up. Now the Department is trying to take that away.

17.     These schools have already been found to have used unscrupulous practices, and I am just one of many who fell victim to these schools. Please resolve these cases now so we can get on with our lives.


I swear under penalty of perjury that the foregoing is true and correct.


Executed on:   20/11/2025

        DALLAS COUNTY, TEXAS


        *Mark Gomez*
        Mark Gomez (Nov 20, 2025 11:04:11 CST)

        MARK GOMEZ

# EXHIBIT 13

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs*, | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF CONTESSA TRACY** |
| *Defendants*. | |

I, Contessa Tracy, state as follows:

1.      I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.      I live in Laurel, Maryland.

3.      I am 34 years old.

4.      I borrowed federal student loans in order to attend Argosy University to get a Doctorate degree in Clinical Psychology

5.      I applied for Borrower Defense on June 25, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.      I have an outstanding student loan balance of approximately $280,000 from my time at Argosy University. I have a mixed consolidation loan that also includes debt from other schools, including the Chicago School of Professional Psychology, with an outstanding balance of around $340,000.

7.      If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

1

8.      For more than three years I have lived under financial and emotional strain directly caused by ongoing delays. Granting an extension would deepen that harm and have serious long-term consequences.

9.      As a service member, I made a commitment to serve my country and I have continued to uphold that commitment while also carrying the weight of unresolved student loan issues tied to an institution that misled students and misused federal aid funds.

10.     Because my application remains in limbo, I am not receiving credit toward Public Service Loan Forgiveness. This means that every month of delay pushes my financial future further out of reach and traps me in debt that would be forgiven if the Department honored the timelines promised under this settlement.

11.     The harm is not abstract. It affects my livelihood, my family's stability, and my military career. Prolonged student loan debt and the resulting credit impacts have direct implications for security clearance reviews, financial reliability assessments, and future assignments. Service members are expected to maintain strong financial readiness, yet the Department's delay places me at continued risk through no fault of my own.

12.     Beyond military-specific consequences, the continued accrual of interest, degradation of my credit profile, and inability to plan for long-term financial goals—such as purchasing a home, supporting family needs, or investing in retirement—are burdens I carry every day.

13.     Borrowers in the Post-Class attended schools that engaged in predatory practices and mishandled federal student funds. To now face further delay feels like a continuation of the same misconduct and financial exploitation we initially suffered. We should not be subjected to additional harm or what feels like ongoing institutional negligence.

14.     The Department's extension request would compound years of damage that borrowers, particularly public servants and service members, have already endured. Borrowers have waited long enough.

15.     I relied on getting a decision on my Borrower Defense application by January 28, 2026. Further delay is not just inconvenient, it is emotionally distressing, financially destructive,

2

and professionally consequential. Justice delayed is truly justice denied for those of us who trusted both our institutions and our government's promise of relief.

16.    I ask the Court to enforce the January 28 deadline for all Post-Class borrowers. Justice delayed is truly justice denied for those of us who trusted both our institutions and our government's promise of relief.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:  __19/11/2025_____

　　　　　　PRINCE GEORGE'S COUNTY, MARYLAND

　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　Contessa Tracy ( Nov 19, 2025 15:56:38 EST )

　　　　　　　　　　　　　CONTESSA TRACY

# EXHIBIT 14

<table>
<tr><td></td></tr>
</table>

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs,* | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF SEAN SANDERS** |
| *Defendants.* | |

I, Sean Sanders, state as follows:

1.  I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.  I live in Merritt Island, Florida.

3.  I am 56 years old.

4.  I borrowed federal student loans in order to attend the University of Phoenix.

5.  I applied for Borrower Defense on September 6, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.  If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.  I have already been waiting for over three years for a decision. I did my part by filing my application when instructed, and the Department must now be held to its promise.

8.  Delaying this decision by an additional 18 months, as the Department has requested, is not simply a bureaucratic adjustment; it is a direct act that will continue to cause severe, escalating, and unnecessary harm to me and my family.

1

9.      **The Financial Fallout: Credit and Repayment Anxiety:** The most persistent source of anxiety is the financial instability this delay maintains.

10.     **My Credit is Compromised:** The loans tied up in this defense claim remain on my credit report. This unresolved debt is actively negatively affecting my credit score and debt-to-income ratio. Every day this debt remains in limbo, I am prevented from moving forward financially. Securing favorable rates on things like a mortgage, car loan, or even renting an apartment is harder, more expensive, or outright impossible. This delay means I must accept a compromised financial standing for another 18 months.

11.     **Constant Fear of Repayment:** Although my loans are currently protected, the proposal to push the deadline further leaves me in constant concern about being placed back into repayment. If the Department fails to properly manage its accounts during this extended waiting period, I could suddenly face demands for repayment, accrued interest, and the risk of default, which would completely upend my family's financial stability.

12.     **The Personal and Emotional Burden:** The uncertainty surrounding the *Sweet* settlement has been an ongoing mental health crisis for my family.

13.     **Stress and Anxiety Will Continue:** Waiting this long—now potentially for over four years—has created significant stress, anxiety, and other negative impacts on my mental and emotional health. This is the burden of financial and legal limbo. I cannot make long-term plans or feel secure about my future until this massive cloud of debt is resolved. An 18-month extension is a mandate to keep suffering this emotional distress.

14.     **Impact on My Family's Well-Being:** My stress is not isolated. The financial anxiety and lack of stability inevitably have a negative effect on my family's well-being. Part of the reason for the end of my previous marriage was the strain on my finances. My family deserves to move past the harm caused by my school's fraudulent actions, and every delay prolongs the hardship and limits opportunities for my family members.

15.     **Professional and Employment Roadblocks:** The unresolved debt limits my ability to advance my career and support my family.

DECLARATION

Supp.A.211

16.     **Impediment to Career Growth:** I am currently a special agent with NASA, where I maintain a security clearance. In my field, or for certain job roles, the existence of large, unresolved debt can be a factor in hiring, security clearance, or professional licensing. I have to report any unresolved debt to my employer. This delay ensures that this potential negative effect on my employment or professional well-being remains a reality.

17.     **Inability to Plan:** I need financial certainty to plan major life moves, like relocating for a new job or promotion that might require securing new housing or taking on other debt. By extending the deadline, the Department is blocking my ability to make crucial career and life decisions for the foreseeable future.

18.     I have been waiting far too long. The Department of Education has must be held to the January 28, 2026 deadline. The continued harm from delay is unacceptable.


I swear under penalty of perjury that the foregoing is true and correct.


Executed on:    11/18/2025

BREVARD COUNTY, FLORIDA


SEAN SANDERS

3

# EXHIBIT 15

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al*<br><br>     *Plaintiffs*,<br><br>     v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br>     *Defendants*. | Case No.: 19-cv-03674-WHA<br><br><br><br>**DECLARATION OF AKRAM JABER** |

I, Akram Jaber, state as follows:

1.  I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.  I live in Greenville, South Carolina.

3.  I am 41 years old.

4.  I borrowed federal student loans in order to attend ITT Technical Institute. I graduated from ITT in 2005 with an associate's degree.

5.  I applied for Borrower Defense on October 31, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.  If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.  A delay in the decision on my borrower defense application would have a serious impact on my financial stability and overall well-being. The uncertainty surrounding my student loans has already strained my credit, debt-to-income ratio, and my ability to plan for major expenses. Buying a home is out of the question and has been since I've had these loans, because

of my debt-to-income ratio. Buying a car is more difficult because the loans put me into a higher range of interest rates. Having these loans still on my credit report hurts my credit score and makes it harder and more expensive to qualify for credit.

8.      I am worried about being placed back into repayment and the risk of wage or tax refund garnishment, which would directly threaten my family's stability—especially as I recently had a baby and am supporting my household. I want to be able to provide stability for my child. Being in a rental home, where things can always change (such as the landlord raising the rent or selling the property), isn't the amount of stability that I want for my baby.

9.      The ongoing delay also creates stress and anxiety that affects both my mental and physical health. The constant uncertainty is exhausting, especially the fear of being put back into repayment and having to come up with hundreds or thousands of dollars on short notice. I have even suffered physical symptoms from the stress, including high blood pressure, headaches, and trouble sleeping.

10.     We already have a lot of monthly bills to cover. With a new baby, every dollar matters, and the uncertainty keeps us from planning things. Even just knowing I might have to start paying these loans again makes me feel like I'm always on the edge and may have to choose which bills to pay first. I've already put off medical and dental care and some baby expenses because of my fears of having even more debt. The uncertainty is constantly in the back of my mind, and it's exhausting. I worry about it almost every day—whether I'll suddenly owe payments I can't afford, or my wages will be garnished. It affects my sleep, my mood, and my ability to enjoy time with my family.

11.     The delay also affects my employment and professional opportunities, since my credit standing limits important financial decisions I need to make. Until a decision is made, I cannot move forward with plans to return to school and complete my bachelor's degree. I am currently working in the field of healthcare IT, and a lot of employers require a bachelor's degree at minimum. I also worry about background checks or credit checks for jobs, and the stress makes it harder to focus sometimes.

12.    Overall, the delay keeps me in a constant state of uncertainty, preventing me from improving my financial future and creating stability for my family. The longer this drags on, the harder it is to plan anything. I can't know if I'm going to suddenly owe hundreds of dollars each month. If the court allows more delay, it means more months or years of living in limbo, which keeps hurting my credit, my finances, and my family's stability.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:    19/11/2025

GREENVILLE COUNTY, SOUTH CAROLINA

AKRAM JABER

# EXHIBIT 16

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al*

       *Plaintiffs*,

    v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

       *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF ALEXANDRA
STRONG**

I, Alexandra Strong, state as follows:

1.     I am submitting this declaration in relation to the above-captioned case. I am over
the age of eighteen. The statements contained herein are true and accurate to the best of my
knowledge.

2.     I live in Saginaw, Texas.

3.     I am 31 years old.

4.     I borrowed federal student loans in order to attend Remington College to get a
Associates degree in Graphic Design in 2015.

5.     I applied for Borrower Defense on July 20, 2022. I understand that means that I
am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.     If the Department of Education is allowed to delay the Post-Class deadline by
another 18 months, I will suffer harm as described below.

7.     A delay in the post-class decision deadline would significantly impact my mental,
emotional, and physical well-being. The uncertainty would increase my stress and anxiety,
making it difficult to focus and manage daily responsibilities. Physically, prolonged stress tends

Supp.A.218

to worsen my existing health issues, which would further affect my ability to stay productive and stable.

8.    This delay would also place added strain on my family. They rely on me for both emotional and practical support, and the ongoing uncertainty about my academic path would create additional pressure and disrupt our sense of stability.

9.    Most importantly, a postponed decision will put at risk my ability to return to school and pursue a genuine, fully accredited degree. I have structured my plans, finances, and personal commitments around this timeline. Any postponement would interfere with my academic progression and potentially delay my long-term goals.

10.    In short, the lack of clarity and extended waiting period would create real and meaningful hardship across my mental health, physical health, family life, and educational future.

11.    I have approximately $17,119 in outstanding federal student loans related to my attendance at Remington College.

12.    I believe I am owed a refund of $12,881.

13.    I relied on getting a decision on my Borrower Defense application by January 28, 2026. Moving the deadline now only prolongs the harms to my credit and the financial stress and anxiety that is negatively impacting me.

14.    I ask the Court to enforce the January 28 deadline for all Post-Class borrowers. I am just one person, but we all have the same desire to end this and have closure.

I swear under penalty of perjury that the foregoing is true and correct.


Executed on:    _____11/18/2026_____

TARRANT COUNTY, TEXAS


_Alexandra Strong_
ALEXANDRA STRONG

DECLARATION

2

Supp.A.219

# EXHIBIT 17

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

      *Plaintiffs*,

    v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

      *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF CHANDY NILES**

I, Chandy Niles, state as follows:

1.     I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.     I live in Cibolo, Texas.

3.     I am 46 years old.

4.     I borrowed federal student loans in order to attend Ashford University. I began my program there in 2006 and graduated in 2010 with a bachelor's degree in Organizational Management.

5.     I applied for Borrower Defense on August 1, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.     This week, I logged onto my Federal Student Aid online portal and saw that some of my student loans from Ashford had been discharged. I believe this is because my loans from 2009 and 2010 were eligible for group discharge based on the school's misconduct. But my understanding is that the earlier loans from 2006 to 2008 are not covered by the Ashford group discharge. Those loans still show as outstanding on my FSA portal.

1

7.     If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

8.     My husband retired from the military at the end of 2021. Before he retired, I was raising my children and fostering two adults with disabilities in Texas while he was stationed in Colorado. We bought a house in Texas in April 2022. This is the first home I have ever owned.

9.     I have been waiting to have the foundation on my home repaired because I will be unable to afford the payment of my student loans and pay for the house repair at the same time. I have been waiting for a decision so I can plan accordingly. It is creating a lot of anxiety.

10.     The loans are also affecting my credit because interest keeps getting added to the balance. At one point, my student loans disappeared from my credit report, but then they reappeared with even more interest added, which caused my credit score to go down.

11.     I lost my son to suicide 2 years ago. My stepfather passed on the day of my son's funeral and then my husband lost his brother and father within the next six months. Unfortunately, my husband also lost his job not long after his father passed.

12.     Although 2023 and 2024 were the worst years ever, we have worked hard to try to catch back up and learn to live a "new normal." We are still working to get caught up and currently have two sons in college and one graduating high school.

13.     It's difficult to encourage my 17, 19, and 20 year old stepsons that college is important when they see the struggles we are now facing with paying back high student loans, a degree from a college that is not reputable, and now not even a decision date we can depend on to develop a plan of action for possibly repairing our home that is literally cracking in half. That's an entirely different stress as a parent that they need to understand.

14.     We are trying to make a plan of action for our lives after every terrible tragedy that we have been through and we simply need to be given answers by deadlines that we were promised.

15.     I made my payments when I was supposed to even when I couldn't afford it, and I feel I am owed the same respect. Our home needs to be repaired and we need to heal as a family.

2

16.     Please do not add one more stress or burden to our lives at this point. Stick to the deadline we were given so that we can also continue to move forward as we were promised. The anxiety and stress we live with daily is already overwhelming, but the waiting to see if we will have another bill is horrible for a debt that should be removed.

17.     It's been a long three years and the government's lack of planning is not our fault. We have had to still plan accordingly. Please hold them to the same standard that we have been held to.

I swear under penalty of perjury that the foregoing is true and correct.


Executed on:  _11-18-2025_

GUADALUPE COUNTY, TEXAS


CHANDY NILES

# EXHIBIT 18

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al*

    *Plaintiffs*,

    v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

    *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF JENNIFER
MCMILLIAN**

I, Jennifer McMillian, state as follows:

1.    I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.    I live in Leeds, Alabama.

3.    I am 43 years old.

4.    I borrowed federal student loans in order to attend Walden University to get a Bachelor's degree in Criminal Justice.

5.    I applied for Borrower Defense on July 23, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.    If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.    A delay in the post-class decision deadline is not a minor inconvenience; it is the continuation of harm. It means my life remains paralyzed in uncertainty. Financially, I am unable to make critical, long-term decisions like saving for a home or retirement, because the possibility of a massive debt burden still looms over my entire future.

1

DECLARATION

8.      The hardship caused by the unresolved debt is acute: my family relies on Section 8 housing and Medicaid for my children, and I am currently without my own health insurance coverage. Every day this decision is delayed, my family's financial foundation feels more unstable.

9.      More importantly, the delay perpetuates the psychological burden. It forces me to constantly carry the anxiety of the original fraud, preventing me from closing this difficult chapter. I simply need clarity—not just to plan my finances, but to finally achieve a sense of closure and healing so I can define a future that isn't perpetually held in limbo by past misrepresentation.

10.      I have approximately $64,251.30 in outstanding federal student loans related to my attendance at Walden University.

I swear under penalty of perjury that the foregoing is true and correct.


Executed on:   November 18, 2025

ST. CLAIR, ALABAMA


JENNIFER MCMILLIAN

2                                      DECLARATION

# EXHIBIT 19

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs*, | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF LYNDSAY PELCHAT** |
| *Defendants*. | |

I, Lyndsay Pelchat, state as follows:

1.     I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.     I live in Sioux City, Iowa.

3.     I am 48 years old.

4.     I borrowed federal student loans in order to attend University of Phoenix.

5.     I applied for Borrower Defense on August 3, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.     If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.     **The Financial Fallout: Credit and Repayment Anxiety:** Delays in this decision will have a profound impact on my life in numerous ways. First and foremost, the anxiety of carrying debt that continues to accrue massive amounts of interest is unbearable. This uncertainty prevents me from planning for retirement by contributing to my 401(k), or taking other steps that will help me be financially secure. I enrolled in these predatory schools as a single mom in order

to build a future for my family. None of the promises my school made to me to get me to enroll turned out to be true. Instead I've been left with overwhelming debt that caused me to be unable to support my own children's educational dreams, continue my own education, or plan my future. Until I know whether I'll have to repay these predatory loans, I am stuck in limbo.

8. **My Credit is Compromised:** The loans tied up in this defense claim remain on my credit report. These loans affect my debt-to-income ratio, and even though I am good standing on my accounts, I believe that the ever-increasing balance on my student loans will keep me from accessing affordable credit and improving my financial well-being.

9. **Constant Fear of Repayment:** The stress will only intensify because I know that I can be subjected to extreme collection measures like tax offset or wage garnishment if the Department of Education ( ED ) defaults my loan while I am waiting for a decision. If this happens, ED will not not give me the leniency that it is asking for with its request for even more delay.

10. **The Personal and Emotional Burden:** The uncertainty of these outstanding, predatory loans has kept me in a state of shame, fear, and guilt. It is a wound that doesn't heal. It has kept me from being able to save for emergencies. I worry about being able to support my family if they need help. I worry about not being able to support myself if I lose my job or if I am no longer able to work. I worry that the debt keeps me in a state of being stuck because I am afraid to make financial commitments until this is resolved. The worry, shame, fear, and guilt have taken a toll on my health and well being.

11. **Stress and Anxiety Will Continue:** This situation fills me with guilt and anxiety, emotions made worse by the realization that I was deceived by a predatory, for-profit school that exploited my hopes of building a better life as a single mother to two dependents. The shame, stress, and frustration surrounding this entire experience have only been exacerbated by ED's request for an extension. The Department previously stated they were on track to meet the original deadline, and now their failure to do so feels like yet another betrayal. I have been holding my breath, putting off major life decisions, and delaying my ability to help my family, community, and invest in my future while waiting for this long-anticipated resolution.

12. **Impact on My Family's Well-Being:** This ongoing burden also affects my family. I am unable to support them financially in the ways I would like because of this ever-increasing debt. The total cost of my student loans now far exceeds what I originally borrowed, despite making timely payments.

13. **Professional and Employment Roadblocks:** I am unable to pursue further education due to the risk of compounding this unresolved debt. I have always aspired to earn my master's degree, and while my employer offers partial assistance, they do not cover the full cost. I am hesitant to take out additional loans or enroll in classes until this matter is resolved. I am concerned that if forced into the job market due to a company layoff or economic downturn, that my degree from the University of Phoenix will be viewed negatively and I will be overlooked as an applicant, furthering the anxiety and stress related to this settlement.

14. I have been waiting far too long. The Department of Education has must be held to the January 28, 2026 deadline. The continued harm from delay is unacceptable.

I swear under penalty of perjury that the foregoing is true and correct.


Executed on:   November 19, 2025____

SIOUX CITY, IOWA


_____

LYNDSAY PELCHAT

# EXHIBIT 20

1
2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

3      THERESA SWEET, *et al*                    Case No.: 19-cv-03674-WHA

4                    *Plaintiffs*,

5            v.

6      LINDA MCMAHON, in her official capacity
7      as Secretary of the United States Department
       of Education, and the UNITED                  **DECLARATION OF MARGO RUTLAND**
8      STATES DEPARTMENT OF EDUCATION

9                    *Defendants*.

10
11
12

13          I, Margo Rutland, state as follows:

14          1.      I am submitting this declaration in relation to the above-captioned case. I am over

15     the age of eighteen. The statements contained herein are true and accurate to the best of my

16     knowledge.

17          2.      I live in Robbinsdale, Minnesota.

18          3.      I am 47 years old.

19          4.      I borrowed federal student loans in order to attend National American University

20     to get a Bachelor's degree in Information Technology with a minor in Management Information

21     Systems.

22          5.      I applied for Borrower Defense on July 9, 2022. I understand that means that I am

23     a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

24          6.      If the Department of Education is allowed to delay the Post-Class deadline by

25     another 18 months, I will suffer harm as described below.

26          7.      I am the caretaker of my mother and grandson.

27
28

                                                   1

8.    The stress of the large student loan balance impacted my credit score and my ability as a single parent over the last 21 years to rent apartments, pay for reliable car repairs, or get loans.

9.    Now the time is coming for me to try and repay the loans, and it is 21 years later and there is no way I can afford to pay back the monthly payment required without worrying about being garnished or my credit impacted because I cannot afford to live.

10.    I take care of my mom with cancer and I am raising my grandson, I have no room for additional stress and anxiety because of the uncertainty of prolonging the discharge of debt. I took the loans in good faith and the legal system said my debt would be discharged in good faith within a certain time frame.

11.    I also have mold remediation that drained my savings and I had to demolish and remediate my basement. I cannot get a loan to repair this issue in my home because of the student loans causing my debt-to-income ratio to be too high. This has created a huge financial stress not being able to fix the issue.

12.    My kids were 18 months, three, and five years old when I graduated, they are all now adults. I was baited in by National American University as a single parent with promises that I would be able to get a great job, I was promised job placement assistance. My loans and repayment were not explained to me, and so when I graduated and a single parent of three kids, I was never able to make enough to afford the repayments. At times I would get calls from the collections department until I could get my loans back in deferment.

13.    I  have approximately $53,579.18 in outstanding federal student loans related to my attendance at National American University.

//
//
//
//
//
//

I swear under penalty of perjury that the foregoing is true and correct.


Executed on:  November 18, 2025

HENNEPIN, MINNESOTA


*Margo Rutland*

MARGO RUTLAND

# EXHIBIT 21

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al*

   *Plaintiffs*,

  v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

   *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF RICHARD
HANCOCK**

I, Richard Hancock, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Arlington, Texas.

3. I am 44 years old.

4. I borrowed federal student loans in order to attend ITT Technical Institute to get an associate's degree in Computer Networking Systems Technology.

5. The program I attended at ITT Tech was nothing like what was advertised; I ended up teaching some of the classes instead of learning because one professor wasn't qualified to do his job.

6. I applied for Borrower Defense on June 30, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

7. If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

8.    I originally took out approximately $23,000 in federal student loans to attend ITT Tech and I have paid almost $30,000 towards my balance since 2002, but because of accruing interest I still owe over $20,000.

9.    I have been trying for decades to pay these loans off through all kinds of hardships and I have nothing to show for it. When my loans were in repayment, I sometimes couldn't afford to eat, and I missed payments on other debts.

10.    I am currently back in school working to get a meaningful degree. I avoided taking out federal student loans and am paying for my tuition out of pocket because I did not want to increase my student loan balance.

11.    In addition to taking classes, I am working 60 to 80 hours a week to support myself. The uncertainty about my obligation to repay my student loans is incredibly stressful. It would be a massive relief to get a decision and know if I can get out from under this debt.

12.    I relied on getting a decision on my Borrower Defense application by January 28, 2026. This nightmare needs to end.

13.    I ask the Court to enforce the January 28 deadline for all Post-Class borrowers. I am just one person, but we all have the same desire to end this and have closure.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:  _18/11/2025_

TARRANT COUNTY, TEXAS

_Richard Hancock_
Richard Hancock (Nov 18, 2025 16:45:21 CST)

RICHARD HANCOCK

2

DISupp-AT237

# EXHIBIT 22

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs,* | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF ELIZABETH LAHREN** |
| *Defendants.* | |

I, Elizabeth Lahren, state as follows:

1.      I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.      I live in Sequim, Washington.

3.      I am 66 years old.

4.      I borrowed federal student loans in order to attend Argosy University to get a Master's degree in Counseling Psychology.

5.      I applied for Borrower Defense on October 7, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.      If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.      I have heart disease due to all the stress that I endured due to the lies Argosy University made to prospective students. I took out loans to pay my bills because Argosy stated they would provide a PAID Practicum. LIARS! I had to work for free. I'm 66 years old and still paying for the loans I took out to pay bills while doing a free practicum. Antioch was the better

1

DECLARATION

Supp.A.239

school but I chose Argosy University for the paid Practicum. I would not have chosen Argosy had they not lied to me. This debt is killing me. I'm trying to pay off the loans I took out for living expenses. Retirement is not possible. I'm sick and angry that they lied and took advantage of me. I could not afford to transfer to Antioch when I found out I'd been lied to. This is outrageous.

8.      Working part-time is not an option for me at age 66 due to the ongoing payments. I was told I could stop paying the loan payments, but the interest continues to accrue. Forcing me to wait another year continues to force me to work full time until the decision is finally made to give me relief. It's already been 15 years since I learned that Argosy trapped me into applying to their school for my education due to their lies.  I've been paying emotionally, physically, mentally ever since. Extending the decision for another year causes me further health issues.

9.      I  have approximately $15,199.00 in outstanding federal student loans related to my attendance at Argosy University.

I swear under penalty of perjury that the foregoing is true and correct.


Executed on:  November 17, 2025

CLALLAM COUNTY, WASHINGTON


ELIZABETH LAHREN

DECLARATION
Supp.A.240

# EXHIBIT 23

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al*

     *Plaintiffs*,

  v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

     *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF FEDERICO GARZA**

I, Federico Garza, state as follows:

1.    I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.    I live in Kalamazoo, Michigan.

3.    I am 48 years old.

4.    I borrowed federal student loans in order to attend the ITT Technical Institute.

5.    I applied for Borrower Defense on June 24, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.    If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.    I have already been waiting for over three years for a decision. I did my part by filing my application when instructed, and the Department must now be held to its promise.

8.    Delaying this decision by an additional 18 months, as the Department has requested, is not simply a bureaucratic adjustment; it is a direct act that will continue to cause severe, escalating, and unnecessary harm to me.

1

9.    **The Financial Fallout: Credit and Repayment Anxiety:** This debt from the predatory for-profit school ITT Technical Institute has followed me for decades. This debt and my struggle to repay it has been a constant source of anxiety for me. When I've received notices from the Department of Education ("ED") about this debt and how much I owe my anxiety peaks and I am preoccupied with worry about how I will repay it.

10.    **My Credit is Compromised:** The loans connected to my defense claim remain on my credit report. The only current negative reporting on my credit report has been student loan debt from ITT, and I have been denied credit on numerous occasions as a result. This has set me back years in terms of reaching my life goals of owning a home and going back to school. Although I was finally just recently able to buy a home, I believe that my student loan debt is still affecting my ability to refinance in order to lower my monthly payments.

11.    **Constant Fear of Repayment:** I have struggled for years to keep up on my high student loan payments. At times, I was unable to make my payments and ED put me into default. This resulted in my tax returns being seized, and I am extremely worried that ED will put me back into collections and will contact my employer to garnish my wages. This would be extremely embarassing to me and is one of my main sources of ongoing anxiety.

12.    **The Personal and Emotional Burden:** The continued delay directly harms me financially by increasing a debt that I should not legally or equitably be required to bear. My situation is further complicated by the fact that I attended ITT Technical Institute, an institution whose misconduct has been widely documented, including findings of predatory recruitment and lending practices that misled students about the value of the education provided, the transferability of credits, program accreditation, and employment outcomes. These were core issues that led me to file Borrower Defense in the first place. Every additional month of delay prolongs both the financial damage and the psychological burden created by carrying a debt originating from a school now known for systematic abuses of its students.

13.    **Professional and Employment Roadblocks:** I am unable to pursue further education due to the risk of compounding this unresolved debt. I only had so much money to dedicate for my education and all of it went to go to a predatory school that did nothing to

2

advance my career or opportunities. While this debt remains unresolved, there is no way for me to take advantage of other educational opportunities.

14.    **Stress and Anxiety Will Continue:** I filed my Borrower Defense application 1,244 days ago. During this extended period of uncertainty, my federal student loan has continued to accrue interest, increasing my outstanding balance despite the fact that I have long asserted that my loans are the product of misconduct. After more than three years of waiting, I remain without final resolution, without relief, and with a growing loan balance that continues to accumulate solely because the adjudication of these claims has been repeatedly delayed.

15.    I have been waiting far too long. The Department of Education has must be held to the January 28, 2026 deadline. The continued harm from delay is unacceptable.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:  <u>11/19/2025</u>

KALAMAZOO, MICHIGAN



FEDERICO GARZA

# EXHIBIT 24

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al*

     *Plaintiffs*,

    v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

     *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF TIFFANY KOBS**

---

I, Tiffany Kobs, state as follows:

1.    I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.    I live in Littleton, Colorado.

3.    I am 35 years old.

4.    I borrowed federal student loans in order to attend the University of Phoenix to get a Bachelor's Science degree in Management.

5.    I applied for Borrower Defense on November 12, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.    If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.    I have approximately $30,000 in outstanding federal student loans related to my attendance at the University of Phoenix. I have no other federal student loan debt.

8.    My degree from the University of Phoenix is viewed unfavorably, and having that name attached to my résumé has actually hurt my chances of getting jobs.

9.      For the past three years, I have been in a very stressful sitation, constantly wondering if next month I'll suddenly be required to make payments again, or if the loans will finally be gone for good.

10.     The financial uncertainty has taken a real toll. I don't know whether to keep budgeting for payments or if I can start using that money to better myself, like going back to school or building a more stable future.

11.     My car is more than ten years old and I havn't replaced it because I worry that I wouldn't be able to afford car payments if I have to restart payments on my student loans.

12.     I have put off having children because I am worried about adding the cost of childbirth and the cost of childcare to my oustanding debt.

13.     To add to the stress, I don't even know what my monthly payment would be if my student loan payments restarted. My income has changed since I entered forbearance and the available income-based repayment plans are all different.

14.     I relied on getting a decision on my Borrower Defense application by January 28, 2026. Any more delay would keep me stuck in the same stressful, uncertain place.

15.     I ask the Court to enforce the January 28 deadline for all Post-Class borrowers. I am just one person, but we all have the same desire to end this and have closure.


I swear under penalty of perjury that the foregoing is true and correct.


Executed on:   <u>18/11/2025</u>

ARAPAHOE COUNTY, COLORADO




TIFFANY KOBS

DSuppRA1247

# EXHIBIT 25

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al*

     *Plaintiffs*,

    v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

     *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF DANIELLE
DESORMIER**

I, Danielle Desormier, state as follows:

1.    I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.    I live in Spokane, Washington.

3.    I am 45 years old.

4.    I borrowed federal student loans in order to attend Ashford University to get a Bachelor's degree and a Master's degree in Business Administration.

5.    I applied for Borrower Defense on June 23, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.    I took out approximately $80,000 in federal student loans to attend Ashford University. Because of interest, my outstanding balance is currently approximately $120,000. I do not have any other federal student loans.

7.    If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

1

8.     **Credit Damage and Restricted Opportunities:** Continued reporting of these loans will further harm my credit score. Poor credit prevents me from making essential purchases, such as reliable transportation or housing, and limits access to necessary financial resources.

9.     **Educational Disruption:** I am currently enrolled in a doctoral program. Resuming repayment obligations would make it financially impossible for me to complete my degree, jeopardizing even more years of academic and professional investment.

10.     **Emotional and Health Impact:** The uncertainty and financial strain caused by this delay will significantly increase my stress levels, negatively affecting my health. This stress also impacts my household, including my 100%-disabled veteran husband, whose well-being depends on our financial stability.

11.     I relied on getting a decision on my Borrower Defense application by January 28, 2026. Delaying the post-class decision deadline would perpetuate the harm that the *Sweet v. Cardona* settlement was intended to remedy.

12.     I ask the Court to enforce the January 28 deadline for all Post-Class borrowers. I am just one person, but we all have the same desire to end this and have closure.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:   18/11/2025

SPOKANE COUNTY, WASHINGTON

*Danielle Desormier*

DANIELLE DESORMIER

# EXHIBIT 26

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs*, | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF ERICA EACOTT** |
| *Defendants*. | |

I, Erica Eacott, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Oceanside, California.

3. I am 53 years old.

4. I borrowed federal student loans in order to attend the University of Phoenix to get a B.S. degree in Health Administration.

5. I applied for Borrower Defense on June 28, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6. If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7. I submitted my Borrower Defense application to the Department of Education on June 28, 2022, explaining that the University of Phoenix engaged in widespread

1

misrepresentation at the time of my enrollment. The Department itself confirmed in 2023
that these claims of promising job placement assistance, strong employer networks, and
lucrative career prospects were false and part of a deliberate nationwide scheme to induce
students to enroll in costly programs.

8. These assurances were pivotal in my decision to attend, despite the high tuition. I
believed the school would help secure employment that justified the expense. Instead, I
graduated with over $40,000 in federal student loan debt and no meaningful job
prospects.

9. For over a decade, my federal student loan debt has cast a shadow over every major
decision in my life: where I live, what opportunities I pursue, and what I can provide for
my children. My debt has limited my ability to save for retirement and even to move
closer to family.

10. I respectfully urge the Court to deny this request. The Department had ample time and
resources to comply with the settlement and chose not to. This case arose because the
Department failed its legal duty to timely address borrower defense claims. Since then, it
has made voluntary staffing and resource reductions that directly undermine its ability to
meet obligations. Granting an extension would reward noncompliance and perpetuate
harm to borrowers who have already suffered from fraudulent conduct.

11. For years, I have waited for the Department to adjudicate my application, hoping for
relief from a burden that never should have existed. The consequences of further delay
are severe and measurable. Interest continues to accrue on these loans, compounding
financial harm. Even if relief is ultimately granted, borrowers will endure additional
months of uncertainty, anxiety, and despair. In my own family, this unresolved debt
affects whether my youngest child can afford college next year and whether we can ever
retire. These are not abstract harms. They are daily realities for thousands of families.

2

12. I have approximately $43,000 in outstanding consolidated federal student loans. Most of these loans are from the University of Phoenix, as I only borrowed approximately $5,000 for community college before I attended the University.

13. I relied on getting a decision on my Borrower Defense application by January 28, 2026. I respectfully ask the Court to deny the Department's request for an extension and require timely compliance with the settlement agreement, so that the post-class group can finally receive the relief promised.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: _November 19, 2025_

SAN DIEGO COUNTY, CALIFORNIA

ERICA EACOTT

3

# EXHIBIT 27

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs*, | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF LACRICIA LEE** |
| *Defendants*. | |

I, Lacricia Lee, state as follows:

1.     I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.     I live in Las Vegas, Nevada.

3.     I am 37 years old.

4.     I borrowed federal student loans in order to attend Kaplan University/Purdue Global and United Education Institute ("UEI").

5.     I applied for Borrower Defense on June 23, 2022. I tried to apply earlier than that but I got an error message on the online application. I understand that the date of my application means that I am currently considered a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.     If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.     I have already been waiting for over three years for a decision. I did my part by filing my application when instructed, and the Department must now be held to its promise.

8.     Not knowing whether I will have to repay my student loan debt has been devastating for me. I am currently earning minimum wage as the sole earner for my family, including my husband and two sons. My husband has been undergoing cancer treatment for the past two years and isn't able to work. He is very ill, and I am his sole caregiver. As a result I have to have a job where I can work from home.

9.     I wanted to go to school so I could have a job that I love, set an example for my kids, and make a decent living. Kaplan University and UEI promised me that they would help me achieve all of my goals, but both of these schools left me with nothing but debt.

10.    I still want to get an education and am trying to work towards a degree that will give my family some stability but my uncertainty about my student loan debt from these two predatory schools is a constant source of worry.

11.    I have very little debt other than my student loans, but my family and I live paycheck to paycheck and I am never able to get ahead or save money for emergencies. My family was homeless for nearly a year before we found housing in March 2025 and I am scared of what will happen if my student loans go back into repayment. I worry that I will start getting collection calls. Every week, I worry that I will have my paycheck garnished. Every year I wonder whether my tax return will be taken.

12.    Waiting this long for —now potentially for over four years—has created significant stress, anxiety, and other negative impacts on my mental and emotional health. This is the burden of financial and legal limbo. I cannot make long-term plans or feel secure about my future until this massive cloud of debt is resolved. An 18-month extension is a mandate to keep suffering this emotional distress.

13.    My family and I have suffered enough. Finding out for certain whether my student loans from these schools that took advantage of me and my desire to improve my life would lift a great weight off of me. It would not solve all of the hardships we are facing, but it would help us in our struggle to overcome them. It is cruel and uneccessary for the Department to delay this relief for yet another year and a half.

14.    I have been waiting far too long. The Department of Education has must be held to the January 28, 2026 deadline. The continued harm from delay is unacceptable.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:   November 19, 2025____

LAS VEGAS, NEVADA

Lacricia Lee (Nov 19, 2025 13:19:48 PST)

LACRICIA LEE

3

# EXHIBIT 28

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

LINDA MCMAHON, *et al*

        *Plaintiffs*,

    v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

        *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF SUMMER HARDY**

I, Summer Hardy, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Bloomington, Indiana.

3. I am 40 years old.

4. I borrowed federal student loans in order to attend Le Cordon Bleu Institute of Culinary Arts.

5. I applied for Borrower Defense on June 23, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6. If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7. I am disappointed to hear that there is any possibility that this would be delayed for even a day longer. Our family was hit twice by this predatory school. My husband attended and took out private student loans for part of his funding and at one point we were paying $1,600

1

a month just for his private loan portion. Add on his federal loans and my federal loans and we were drowning in debt with young kids.

8.      I missed the filing deadline for my borrower defense application by one day and have had to wait two additional years for my decision because of 24 hours. I have paid faithfully every single month at a cost of over $6,000 to date since I applied because I didn't want it to affect my parents since they took the loans out for me. I have spent numerous hours on the phone and I have sent emails trying to get this school reported and get our loans discharged. We have sold our house and close on it next Wednesday and the only reason we did it was to pay off his private student loan because there was no other hope of getting out from under it.

9.      We should be debt-free for the first time ever come January if my loan is discharged, and we would finally be able to plan for the future for our kids, one of whom suffered along with us the whole time he lived at home, one is graduating in the spring, and another is in 4th grade.

10.     We have sacrificed enough over the last 20 years at the hand of a fraudulent and predatory school and our family has paid the price. I have written to the Ombudsman, the President, Oprah and Maury over the years trying to bring the much needed attention this deserves. This is the one break we can get and we deserve it. Please don't make us wait any longer.

11.     I have approximately $30,000 in outstanding federal student loans related to my attendance at Le Cordon Bleu Institute of Culinary Arts.

I swear under penalty of perjury that the foregoing is true and correct.


Executed on:   November 18, 2025

        MONROE COUNTY, INDIANA

        _____

        SUMMER HARDY

2

# EXHIBIT 29

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al*

   *Plaintiffs*,

  v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

   *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF STEPHEN DECOTEAU**

I, Stephen DeCoteau, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Upper Marlboro, Maryland.

3. I am 39 years old.

4. I borrowed federal student loans in order to attend the University of Phoenix. I attended from August 2012 to February 2014, and graduated with a Master's degree in Administration of Justice Systems and Criminology.

5. I applied for Borrower Defense on July 28, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6. If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7. In 2023, my wife and I were trying to purchase a home. When the bank ran my credit, my student loan came up, and because of my debt-to-income ratio, it turned out that I

DECLARATION

1

Supp.A.263

1    couldn't have my name alone on the mortgage. In order to purchase the home, we had to use my

2    wife's credit as well.

3        8.      In June 2024, my father passed away. Between a small inheritance from him and

4    our own savings, my wife and I finally had enough money to pay off my loans. But my borrower

5    defense application was still pending, and I could not get any information from Federal Student

6    Aid (FSA) about the status of my application.

7        9.      I contacted my federal loan servicer, Aidvantage, and the customer service

8    representative told me that even if I paid off the loan, the payment could still be refunded if I got

9    an approval of my borrower defense application. This assurance was one of the reasons why my

10    wife and I decided to use our savings to pay off my loan, which we did in May 2025.

11       10.     Another reason why we paid the loan was that if I didn't either start making

12    payments or pay it off entirely, then interest would be applied and my balance would get even

13    bigger, making my credit problems worse.

14       11.     A third reason was that I lost my job in January 2025 and I was afraid of the loans

15    accruing interest and sending me further into debt while I wasn't working. My wife was

16    diagnosed with breast cancer in July 2024, went through chemotherapy from August to

17    December 2024 and had surgery in January 2025. It's a strain for her to be the only one of us

18    that's working, and I didn't want to burden her further with my debt.

19       12.     A delay in the post-class deadline would be devastating news that would do

20    substantial harm to me and my family. It is important for us to know whether I will be eligible to

21    get my payments refunded so that we can make plans for our life. Any funds would make a big

22    difference to alleviate this anxiety and fear.

23       13.     Further delay would put a lot more strain on my wife for supporting our family

24    while I look for work. I've been applying to jobs left and right, but it's a very difficult hiring

25    environment right now. On top of that, my wife and a the majority of her department were

26    transferred to another company based overseas, and her position is contractually based for a

27    specified transition project of approximately 6 months to a year. After that, her future with the

28    company is uncertain.

DECLARATION              2                        Supp.A.264

14.     I have tried so many times over the past few months to get any information about the status of my borrower defense application—sending messages to studentaid.gov, making at least 6 calls to FSA and my servicer, and sending at least 9 emails. But since submitting my application, I've never received any real information from FSA or Aidvantage. All they will say is that it's "pending." Whichever number I call or office I email, I'm told to try asking someone else. Once, I got an email from FSA signed by someone named "Frank" (no last name), but when I tried to contact that office again and asked for "Frank," I was told they had no idea who I was talking about. All of the information I have about borrower defense and the *Sweet* case has come from the news and social media.

15.     It is just not reasonable for the Department to go 3 years with no updates and then ask for an extension, while I was saving up money to pay my loans.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:     11/19/2025

PRINCE GEORGE'S COUNTY, MARYLAND

STEPHEN DECOTEAU

DECLARATION

3

Supp.A.265

# EXHIBIT 30

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs,* | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF ALLYSE ROBERTS** |
| *Defendants.* | |

I, Allyse Roberts, state as follows:

1.      I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.      I live in Andover, Minnesota.

3.      I am 32 years old.

4.      I borrowed federal student loans in order to attend the Le Cordon Bleu College of Culinary Arts in Minneapolis.

5.      I applied for Borrower Defense on August 3, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.      If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.      I have already been waiting for over three years for a decision. I did my part by filing my application when instructed, and the Department must now be held to its promise.

8.      Delaying this decision by an additional 18 months, as the Department has requested, will cause serious and unnecessary harm to me and my family.

1

9.     **Credit and Repayment Anxiety:** The most persistent source of anxiety is the financial instability this delay maintains. The predatory recruitment practices of Le Cordon Bleu and the delay in a decision on my application for relief has had far reaching consequences throughout my life. I went to Le Cordon Bleu because I needed to provide for my one year old daughter and because they told me that they would help me find a good paying job afterwards. These promises were completely false, and the school closed a few years after I completed the program. My experience with the school was personally devastating and left me with nothing but debt. I have struggled to repay these loans ever since. These student loans have hung over my head for years and destroyed my credit. When I learned in 2022 that I could apply for a borrower defense discharge of my student loans I felt like I could breathe for the first time in a long time. I thought I could focus on saving and improving my credit so that my husband and I could finally buy a home. I am still waiting for this weight to be lifted off my shoulders so that I can work on building my life rather than surviving it. Recently, my husband's cancer recurred and he is now unable to work. The uncertainty of my outstanding student loans only adds to the stress and anxiety we are experiencing from my husband's illness. Facing the possibility that I may be the sole provider for my two children is overwhelming. It is uneccesary and unfair for the Department of Education to place more of a weight on me at this time by delaying the its decision on my student loan relief for eighteen more months.

10.     **My Credit is Compromised:** I have been waiting for a decision on this application for over three years. Because of the damage my student loans have done to my credit, I haven't been able to buy a house. We have been forced to live with my in-laws, which has strained family relationships and drastically affected my mental health.

11.     **Constant Fear of Repayment:** I worry about being placed back into repayment and what I will do if that happens. In the summer of 2023, the Department of Education sent me an email that talked about my borrower defense application but also said that I would have to start making payments again. This was incredibly anxiety inducing, because we were living paycheck to paycheck and could not afford any additional expenses. Although I didn't have to make payments at that time, I am constantly worried that my loans are going to go into collection

while I am waiting for a decision on my application. The Department is currently listing all of my loans in default, when before they were not, and I don't know why this is the case, or whether this puts me at risk of collections.

12.     **The Personal, Emotional, and Familial Burden:** The uncertainty surrounding the *Sweet* settlement and its effect on my living situation has caused intense familial issues and nearly ruined our family relationships. My husband and I do not have a safe or calm space to rest ever because of this tension and it has negatively affected my and my husband's health. After being cancer free for 15 years, my husband's cancer has now returned.

13.     I have been waiting far too long. The Department of Education has must be held to the January 28, 2026 deadline. The continued harm from delay is unacceptable.


I swear under penalty of perjury that the foregoing is true and correct.



Executed on:   November 19, 2025____

            ANDOVER, MINNESOTA


            _____
            Allyse Roberts (Nov 19, 2025 15:26:57 CST)

            ALLYSE ROBERTS

# EXHIBIT 31

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs*, | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF DAWNELLE BOLES** |
| *Defendants*. | |

I, Dawnelle Boles, state as follows:

1.     I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.     I live in Evansville, Indiana.

3.     I am 50 years old.

4.     I borrowed federal student loans in order to attend the ITT Technical Institute to get a Bachelor's degree in Media/Marketing and Electrical Engineering.

5.     I applied for Borrower Defense on August 27, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.     I  have approximately $19887.66 in outstanding federal student loans related to my attendance at the ITT Technical Institute.

7.     To the best of my recollection, around 2014, my tax refund was garnished in the amount of $3320.00 for my ITT Technical Institute debt.

8.     I believe I will receive a refund of $3320.00 from when my tax refund was garnished.

1

9.      I relied on getting a decision on my Borrower Defense application by January 28, 2026. Delaying this decision will cause me harm as described below.

10.     My poor credit previously forced me into three months of homelessness in 2023, when I could not rent an apartment because my credit score. I had to live in hotels until a family member could co-sign for me to rent an apartment.

11.     A delay will hurt my credit score even further. I will not be able to qualify for a loan unless the ITT debt is removed from my credit report. I have tried four different lenders for a home loan, and it always comes back to the same issue—my debt-to-income ratio.

12.     I am also owed a refund from when I was garnished many times when my loans were in repayment. Yet, despite attending a school where the Department has recognized widespread fraud, I am still waiting for the Department to make a decision and provide me a refund. I find this ridiculous and unfair.

13.     Navigating this situation has been extremely challenging. I have called multiple companies and departments since 2021 trying to get a resolution, but nothing has helped. I have filed complaints with the Better Business Bureau, with various government agencies, and with my federal representatives. I have spent hours on the phone going in circles and getting misinformation or no information at all.

14.     I ask the Court to enforce the January 28 deadline for all Post-Class borrowers. I am just one person, but we all have the same desire to end this and have closure.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: _____11/19/2025_____


Dawnelle Boles (Nov 19, 2025 21:55:28 CST)

DAWNELLE BOLES

WARRICK COUNTY, INDIANA

2

# EXHIBIT 32

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al* <br><br> *Plaintiffs*, <br><br> v. <br><br> LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION <br><br> *Defendants*. | Case No.: 19-cv-03674-WHA <br><br><br><br><br><br> **DECLARATION OF TERRI COMPTON** |

I, Terri Compton, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Phoenix, Arizona.

3. I am 61 years old.

4. I borrowed federal student loans in order to attend University of Phoenix to get a Bachelor's degree in Business Administration with an emphasis in Project Management.

5. I applied for Borrower Defense on August 2, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6. If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7. I retired from employment with the City of Phoenix, but returned to work in 2023 due to the high cost of health insurance and rising costs in general. In order to "really retire" and be able to afford healthcare I must also prepare for rising costs.

8.  I have health issues, but continue working because I'm afraid that student loan payments will come due. The stress of having this repayment lingering only adds to my health issues. Flare ups from my autoimmune disease are triggered by stress. I need to retire. I want to go into retirement knowing exactly where I stand financially as my income will be fixed.

9.  I don't understand how the extension of time is necessary especially for my particular situation. I attended University of Phoenix during the time of the predatory determination and was also part of the Federal Trade Commission settlement. It should not take so long for student aid to make a determination on my request.

10.  I have approximately $42,000 in outstanding federal student loans related to my attendance at the University of Phoenix.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:  November 18, 2025

MARICOPA COUNTY, ARIZONA

TERRI COMPTON

# EXHIBIT 33

1

2

3    THERESA SWEET, *et al*                      Case No.: 19-cv-03674-WHA

4            *Plaintiffs*,

5        v.

6    LINDA MCMAHON, in her official capacity
7    as Secretary of the United States Department
     of Education, and the UNITED
8    STATES DEPARTMENT OF EDUCATION

9            *Defendants*.

10

11

12

13       I, Michelle Reed, state as follows:

14       1.      I am submitting this declaration in relation to the above-captioned case. I am over

15   the age of eighteen. The statements contained herein are true and accurate to the best of my

16   knowledge.

17       2.      I live in Dacula, Georgia.

18       3.      I am 51 years old.

19       4.      I have cancer and I rent a room in a shared home/apartment with some relatives.

20       5.      I borrowed federal student loans in order to attend the Art Institute of Pittsburgh

21   to get an Bachelor's Degree in 2009. I was only able to get an Associate's Degree.

22       6.      I applied for Borrower Defense on September 2, 2022. I understand that means

23   that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

24       7.      If the Department of Education is allowed to delay the Post-Class deadline by

25   another 18 months, I will suffer harm as described below.

26       8.                                  For over 20 years, my inflated student loan

27   balances have pushed my debt-to-income ratio above rental thresholds. Landlords see the

28   tradelines and either demand large deposits and fees or deny the application. Mortgage lenders

                                                1

reach the same conclusion, so I have had to pay more than I should for lodging. Since covid and the housing market crash, affordable independent housing remains out of reach. I now have been reduced to living in a small bedroom at a relative's home, which strains both our households. Each month of delay preserves the inflated balance and deepens the burden on my family and my financial options. I have been told repeatedly, if my debt-to-income ratio was lower, my rates and fees would be much lower, making it affordable.

9.        I was diagnosed in 2018 before learning about Borrowers Defense and the *Sweet* case. I lived in my own home and was living paycheck to paycheck. My circumstances changed during covid, and by 2021, I was homeless. Can you imagine trying to fight cancer while being homeless? I am grateful to my relatives for letting me rent a room from them, but it's not all perfect and we still struggle. I went from a three bedroom home all to myself to a single tiny bedroom in a shared living space. Since then we have managed, but my cancer keeps coming back and doctors say it is from the stress. I need stability, privacy, and my own space to manage treatment and recovery. Uncertainty spikes stress, worsens symptoms, and disrupts care planning. Years of collection threats preceded my Borrower Defense application, including demands for unaffordable monthly payments and tax refund offsets. I fear this will return someday, and it adds to the trauma of it all.

10.        Payments are paused, yet compounding interest accrues and reports to credit bureaus every single month. Extending the deadline increases the risk of new servicing errors and fresh shocks. My original $32,000 has ballooned over two decades, often above $80,000 and at times over $100,000. Every additional month traps me in the highest APR tiers, worsens my credit, and blocks any chance to build savings, or even pay my growing medical debt.

11.        The Art Institue's fraudulent practices left me unprepared for the workforce. The school is closed, and the degree carries no weight with employers. Screening by degree excludes me from roles above entry level, especially at my age. I remain in a low-wage job with no path to advancement. Each month of delay extends lost earnings and blocks progress. I have applied to many job positions for over twenty years that

would help me advance in my career and earn better pay. Although I have had my current job for the last fourteen years, I have had no advancement opportunities due to my degree. I could never return to school or have my credits transferred due to the Art Institute's fraudulent practices. I feel that I have been trapped in my situation and now it is too late to switch careers or start over. My next step is full Total and Permanent Disability since I qualify. I continue to work to survive because I will be worse off on government assistance, particularly financially.

12.     I have approximately $17,037.56 in outstanding federal student loans related to my attendance at The Art Institute of Pittsburgh.

13.     To the best of my recollection, around 2012 and 2013 my tax refund was garnished in the amount of $4,631 for my Art Institute loans.

14.     I believe I am owed a refund of $4,631 from when my tax refund was garnished.

15.     I relied on getting a decision on my Borrower Defense application by January 28, 2026. Moving the deadline now prolongs twenty years of damage to my housing, health, and finances.

16.     I ask the Court to enforce the January 28 deadline for all Post-Class borrowers. I am just one person, but we all have the same desire to end this and have closure.


I swear under penalty of perjury that the foregoing is true and correct.


Executed on:   November 18, 2025

GWINNETT COUNTY, GEORGIA

*Michelle Reed*

MICHELLE REED

# EXHIBIT 34

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al* | Case No.: 19-cv-03674-WHA |
| *Plaintiffs*, | |
| v. | |
| LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION | **DECLARATION OF BRITTNEY HARDY** |
| *Defendants*. | |

I, Brittney Hardy, state as follows:

1.      I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2.      I live in Mobile, Alabama.

3.      I am 36 years old.

4.      I borrowed federal student loans in order to attend Virginia College to get an Associate's degree in Applied Science in Surgical Technology.

5.      I applied for Borrower Defense on June 24, 2022. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6.      If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

7.      I've been suffering with uncertainty for over three years now. It has negatively affected my credit score and my debt-to-income ratio. I needed to purchase a car to travel to work and this unfair debt has brought down my credit score. Now I'm suffering with a higher interest rate and I believe it's only going to be a domino effect.

1

8.     I'm 36 years old and my anxiety has me hesitant to purchase my first home because I don't know if I would even qualify due to this lingering debt. I'm afraid repayment will start anytime in the near future and the interest rate on these loans are astronomical. I cannot afford to pay these loans, as well as the interest rate due to a school that knowingly committed fraudulent activities.

9.     I would also like to go back to school, but I have to start all over as a first time freshman because the school never informed me that their credits do not transfer. Now I have to get in more debt which does not make logical sense.

10.     While I was in school, I was battling cancer. I had to take some time off school to get radiation treatments. My school forced me to retake classes I passed with an A, putting me in more debt. I look at myself in the mirror daily and my mastectomy scars and radiation burns make me feel insecure. It disgusts me to think of how I was deceived by a school that received government funding while I was fighting for my life. Meanwhile, the government doesn't seem to care about me.

11.     I also had to deal with rampant deception from instructors at my school. One instructor constantly asked students to donate for supplies, but we never saw where the money went. I was also dealing with the premature birth of my son while I was in school. Battling the school and dealing with my critically ill child was unbearably stressful. When my son passed away four years later, I struggled to pay for his funeral and navigated dealing with that and my crippling student loan debt.

12.     I  have approximately $86,001.60 in outstanding federal student loans related to my attendance at the Virginia College

13.     I believe I am owed a significant refund for amounts I paid toward this loan.

14.     I relied on getting a decision on my Borrower Defense application by January 28, 2026.

15.     I ask the Court to enforce the January 28 deadline for all Post-Class borrowers. I am just one person, but we all have the same desire to end this and have closure.

1    I swear under penalty of perjury that the foregoing is true and correct.

2

3         Executed on: _____

4                   MOBILE COUNTY, ALABAMA

5

6

7

8                   BRITTNEY HARDY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 35

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al*

     *Plaintiffs,*

     v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

     *Defendants.*

Case No.: 19-cv-03674-WHA

**DECLARATION OF ANGELA NOCOM**

I, Angela Nocom, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Saint Johns, Florida.

3. I am 58 years old.

4. I borrowed federal student loans in order to attend Chamberlain University to get a Bachelor's degree in Nursing Science, although I originally went to become a nurse practitioner. I later attended DeVry University to get a Master's degree in Business Administration.

5. I applied for Borrower Defense on October 2, 2022, for Chamberlain and on October 4, 2022, for DeVry. I understand that means that I am a Post-Class Applicant under the *Sweet v. McMahon* Settlement.

6. If the Department of Education is allowed to delay the Post-Class deadline by another 18 months, I will suffer harm as described below.

1

7.    My school loans are currently in forbearance and the interest alone is astronomical! I am anxious over the amount of the student loans and my credit has been negatively affected due to the amount owed related to these fraudulent schools. I have taken more than a $40,000 cut in pay recently and the amount of these loans has been detrimental to my health and my wellbeing. These fraudulent loans have already caused me undue hardship and depression. I have grandchildren that I am taking care of and the burden of these student loans prohibits me from getting financial help due to my debt-to-income ratio being negatively affected. I need relief from the fraud that I have already suffered.

8.    I was persuaded to do online school due to my husband being in active duty and I was caring for our three kids. Chamberlain never intended to help me become a nurse practitioner. There were many requirements that I paid for out-of-pocket, and when it came time to get a preceptor to supervise me during clinical rotations, the school never approved one for me even though they met all the qualifications listed. The counselors at DeVry assured me the degree would set me up financially, even when I informed them of my concerns finding a job due to my age. They assured me that the degree was all I needed. I have applied to over 400 jobs and have never been able to get a job with my degrees. They are useless. I have been "in a review process" for over three years, we need to know something by now. My loans have been in deferment and if I need to pay these loans I will need to get a second job, as my husband is disabled from the military.

9.    I have approximately $156,265.81 in outstanding federal student loans related to my attendance at DeVry University and Chamberlain University.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:  November 20, 2025

ST. JOHNS COUNTY, FLORIDA

_____

2

Supp.A.286

Email: a.nocom@yahoo.com

ANGELA NOCOM

Supp.A.287