No. 26-1136

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Theresa Sweet, *et al.*,

Plaintiffs-Appellees,

v.

Linda McMahon, Secretary of the United States Department of
Education, and the United States Department of Education,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of California

**OPENING BRIEF FOR APPELLANTS**

BRETT A. SHUMATE
*Assistant Attorney General*

MICHAEL S. RAAB
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ii

INTRODUCTION ........................................................................................................1

STATEMENT OF JURISDICTION ..............................................................................3

STATEMENT OF THE ISSUE....................................................................................4

STATEMENT OF THE CASE......................................................................................4

     A.     Legal and Factual Background..........................................................4

     B.     Procedural Background......................................................................6

SUMMARY OF ARGUMENT..................................................................................... 17

STANDARD OF REVIEW .......................................................................................... 22

ARGUMENT ............................................................................................................... 22

The District Court Abused Its Discretion in Denying the Department's
Motions to Modify the Post-Class Applicant Deadline........................................ 22

     A.     The Equities Strongly Favored Modifying the Post-Class
             Applicant Deadline .............................................................................24

     B.     Relevant Circumstances Materially Changed After the Department
             Agreed to the Settlement ...................................................................37

     C.     The District Court's Additional Reasons for Denying
             Modification Reflect Clear Legal and Factual Errors Constituting
             an Abuse of Discretion .......................................................................43

CONCLUSION ........................................................................................................... 48

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                               **Page(s)**

*Bauer v. DeVos*,
332 F. Supp. 3d 181 (D.D.C. 2018) ................................................................ 5

*California Ass'n of Priv. Postsecondary Sch. v. DeVos*,
344 F. Supp. 3d 158 (D.D.C. 2018) ................................................................ 5

*California ex rel. Becerra v. U.S. EPA*,
978 F.3d 708 (9th Cir. 2020) ...................................................................... 22

*Calvillo Manriquez v. DeVos*,
345 F. Supp. 3d 1077 (N.D. Cal. 2018) ......................................................... 5

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
593 F.3d 923 (9th Cir. 2010) ...................................................................... 26

*Henson v. Fidelity Nat'l Fin., Inc.*,
943 F.3d 434 (9th Cir. 2019) ................................................................. 22, 23

*Horne v. Flores*,
557 U.S. 433 (2009) ............................................................................. 23, 28

*In re U.S. Dep't of Educ.*,
25 F.4th 692 (9th Cir. 2022) ..................................................................... 4, 5

*Kelly v. Wengler*,
822 F.3d 1085 (9th Cir. 2016) .................................................................... 23

*Knudsen v. Commissioner*,
793 F.3d 1030 (9th Cir. 2015) .................................................................... 34

*North Side Lumber Co. v. Block*,
753 F.2d 1482 (9th Cir. 1985) .................................................................... 34

*Norton v. Southern Utah Wilderness All.*,
542 U.S. 55 (2004) .................................................................................. 26

*ONRC Action v. Bureau of Land Mgmt.*,
150 F.3d 1132 (9th Cir. 1998) ................................................................ 27, 36

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) ............................................................... 17, 23, 39, 40

ii

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) ......................................................................... 47

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................................................... 16, 33, 34

**Statutes:**

Administrative Procedure Act,
5 U.S.C. § 706(1) ................................................................................... 26

28 U.S.C. § 1291 ...................................................................................... 4

28 U.S.C. § 1331 ...................................................................................... 3

**Regulations:**

34 C.F.R. § 685.222 (2020) ............................................................................ 5

**Rules:**

Fed. R. App. P. 4(a)(5) ................................................................................ 3

Fed. R. Civ. P. 23 ...................................................................................... 9

Fed. R. Civ. P. 23(b)(2) ............................................................................... 6

Fed. R. Civ. P. 23(c)(1)(C) .......................................................................... 47

Fed. R. Civ. P. 60(b) ................................................................................. 13

Fed. R. Civ. P. 60(b)(5) ............................................................................. 22

Fed. R. Civ. P. 60(b)(6) ............................................................................. 22

**Other Authorities:**

81 Fed. Reg. 39,330 (June 16, 2016) .................................................................. 5

81 Fed. Reg. 75,926 (Nov. 1, 2016) .................................................................... 9

## INTRODUCTION

In 2022, the Department of Education entered into a settlement with a class of student-loan borrowers who assert that they were defrauded by their schools and who had administrative applications for student-loan relief pending. Since then, the Department has almost entirely implemented its settlement obligations with respect to the class members, providing $12 billion in discharges and refunds to nearly 300,000 borrowers.

In addition, the Department agreed to resolve, by January 28, 2026, certain additional applications submitted after the settlement's execution by non-class members who are not plaintiffs in this case, are not bound by the settlement, and have not waived any claims through the settlement. But in the five-month period for such "post-class applications," more than 250,000 applications were submitted—a number that far exceeded the Department's expectations and was more than five times as many applications as have been submitted in any other comparable period since 2020. As a result, the Department was able to meet its January 2026 deadline only for approximately 60,000 of the 250,000 applications. Thus, under the agreement, the Department would be required to provide more than $11 billion in automatic discharges and $600 million in refunds to the remaining applicants.

To avoid that substantial windfall at taxpayer expense, in November 2025, the Department requested under Federal Rule of Civil Procedure 60(b) that the district court extend the deadline by 18 months. The Department explained that, in light of

the unexpectedly large number of post-class applicants, resource constraints prevented it from meeting the original deadline. But because Congress had recently appropriated additional funds to the Department, it had developed a plan to hire hundreds of attorneys (on a combination of permanent and contract bases), which would allow the agency to complete all 250,000 individualized adjudications by July 2027. And in the interim, the borrowers' relevant loans would remain in forbearance, ensuring that they are not required to make any payments.

The district court refused to grant the Department relief in substantial part. Although the court recognized that it had power to modify the deadline (and did not dispute that the Department had met the threshold requirements to invoke Rule 60(b)(5)), it concluded that the harm to the government and the public from providing billions of dollars in automatic relief did not justify the requested modification. And on a second motion for Rule 60(b) relief or for reconsideration, the court again refused to grant the Department relief.

Those decisions were erroneous on all levels. They improperly elevated the interests of the non-class member beneficiaries over the interests of the parties and the public in ensuring that funds are not disbursed to applicants who do not deserve them on the merits—based in substantial part on an erroneous legal conclusion that the post-class applicants were members of the class and thus parties to this case. And they rested on a series of clearly erroneous factual findings and unsupported assumptions—including, for example, the district court's belief that the 40 attorneys

employed in the relevant office could complete 170,000 individualized adjudications in six weeks if only the attorneys were sufficiently industrious and willing to work on Christmas and New Year's Day.

The substantial legal and factual errors in the district court's approach reflect a clear abuse of discretion. With those errors corrected, it is plain that the Department was entitled to a reasonable extension of the deadline. That extension is necessary in light of the unforeseen number of post-class applications. And it is supported by the relevant equitable balancing, because the interests of the government and the public in ensuring that taxpayer funds are only disbursed to those borrowers who are entitled to relief on the merits outweigh any cognizable interests that the non-party post-class applicants have in strict enforcement of the deadline.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the underlying suit under 28 U.S.C. § 1331. The court entered final judgment in that suit on November 16, 2022. ER-139. On December 11, 2025, the district court largely denied the government's motion for relief from the judgment under Rule 60(b). *See* Dkt. No. 508 (minute order); *see also* ER-088-91. On February 9, 2026, the district court extended the deadline for the government to file a notice of appeal from that denial by 14 days, to February 23, 2026. *See* Dkt. No. 526 (minute order); *see also* Fed. R. App. P. 4(a)(5) (permitting such extensions). On February 23, 2026, the district court further extended the deadline to February 25, 2026. *See* Dkt. No. 528 (minute order). On February 24, 2026, the

3

district court entered an order denying the government's second motion for relief under Rule 60(b). *See* ER-009. Also on February 24, 2026, the government filed a timely notice of appeal of both Rule 60(b) denials. *See* ER-093-94. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

The issue presented is whether the district court abused its discretion by largely refusing to modify its final judgment to extend the deadline for the Department to adjudicate post-class applications.

## STATEMENT OF THE CASE

### A. Legal and Factual Background

1. "Congress has allowed for the cancellation of federal student loans in certain cases of school misconduct" pursuant to a process known as borrower defense. *In re U.S. Dep't of Educ.*, 25 F.4th 692, 695 (9th Cir. 2022). Borrowers may claim entitlement to relief if their institution engaged in actionable misconduct, such as by providing prospective students with materially false information to induce their attendance.

At a high level of generality, the process usually works as follows: To raise a claim, a borrower submits an administrative application. In adjudicating that application, the Department is generally required first to determine whether the borrower has established that the institution engaged in actionable misconduct. If so, the Department determines what relief is appropriate. Such relief may include

4

forgiving outstanding loan balances and reimbursing the borrower for loan payments already made. *See generally, e.g.*, 34 C.F.R. § 685.222 (2020).

2. Before 2015, the borrower-defense process was "rarely used." 81 Fed. Reg. 39,330, 39,330 (June 16, 2016). That year, however, Corinthian Colleges, Inc., a for-profit company that operated postsecondary schools with a collective enrollment of more than 70,000 students, filed for bankruptcy; that filing resulted in a "flood" of borrower-defense claims submitted by Corinthian students. *See id.* at 39,330-31, 39,335. Over the following four years, the Department revised its regulations twice (in 2016 and 2019) and worked to develop internal processes and infrastructure to allow the consistent and timely adjudication of claims, all while responding to multiple district court decisions, some of which required the implementation of different borrower-defense regulations or enjoined established procedures. *See Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018); *Bauer v. DeVos*, 332 F. Supp. 3d 181 (D.D.C. 2018); *California Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158 (D.D.C. 2018). Throughout that time, the Department was unable to adjudicate applications at the rate that they were being filed and, eventually, paused the issuance of final decisions while it worked to develop a methodology to govern adjudications. *See U.S. Dep't of Educ.*, 25 F.4th at 695-96.

By the time this suit was filed in June 2019, the Department's backlog had grown to more than 210,000 pending applications. *See U.S. Dep't of Educ.*, 25 F.4th at 696. Plaintiffs—a class of borrowers with pending applications—alleged that the

Department had unlawfully withheld, or was unreasonably delaying, adjudications. The district court initially certified a class under Federal Rule of Civil Procedure 23(b)(2) consisting of "[a]ll people who borrowed a Direct Loan or [Family Education] loan to pay for a program of higher education, who have asserted a borrower defense to repayment to the U.S. Department of Education, whose borrower defense has not been granted or denied on the merits, and who is not a class member in" another suit seeking borrower-defense relief in connection with a particular set of schools. ER-142 (quotation omitted).

### B.    Procedural Background

1. Following years of litigation, the government and the plaintiff class reached a settlement in June 2022. That settlement provides a framework for comprehensively addressing the backlog of hundreds of thousands of borrower-defense applications by breaking up applicants into different groups. First, the settlement explains that the relevant "plaintiff class" is those who meet the district court's certified class definition "as of the Execution Date"—that is, the date that the parties signed the agreement. *See* ER-176-77; *see also* ER-174. The settlement divided the class members into two different groups.

Group One comprised approximately 196,000 class members who received federal student loans to attend one of the 151 specific schools, referred to as "Exhibit C" schools. *See* ER-177. Under the settlement, these class members were entitled to both an automatic discharge of their remaining student loans associated with the

6

school as well as a refund of amounts already paid to the Department toward those loans. *See* ER-177-78.

As the parties explained to the district court, the government and plaintiffs agreed to include institutions on Exhibit C that had a large volume of applications and for which there were sufficiently "strong indicia regarding substantial misconduct" to warrant "presumptive relief, for purposes of th[e] settlement." ER-217. But the parties have also explained that actual misconduct for Exhibit C schools was only "in some instances proven," while in others it was merely "credibly alleged." *Id.* Thus, the Department has been clear that inclusion in Exhibit C is not evidence—much less a determination—that a school engaged in misconduct. *See* ER-170. Instead, the Department agreed to provide "presumptive relief" to class members who attended those schools because of "high rate[s] of class members with applications related to the listed schools" and because "[c]learing these claims through provision of expeditious upfront relief will significantly reduce the backlog of pending claims." ER-217, 232.

Group Two comprised the remaining approximately 100,000 class members who did not attend Exhibit C schools. The settlement provided that those class members would receive a streamlined adjudication of their borrower-defense applications with certain presumptions in the borrower's favor, and the settlement required the Department to issue decisions on those adjudications in accordance with a rolling series of deadlines between July 2023 and July 2025. *See* ER-178-82. The

Department has substantially complied with its obligations with respect to both sets of class members, and their claims are not at issue here.

In addition, the settlement provided relief to additional borrowers who "submit[ted] a borrower defense application after the Execution Date (*i.e.*, the date the class closes), but before the Final Approval Date" (that is, the date that the settlement was approved by the district court). *See* ER-182. It is this portion of the settlement that is at issue here.

The settlement agreement is clear that these borrowers—referred to as "post-class applicants" or as "Group Three"—are not class members, are not bound by the settlement, and did not waive any claims through the settlement. *See* ER-174, 176-77, 182, 192. Nonetheless, as part of the settlement, the Department agreed to provide them some limited relief. Specifically, the Department agreed to issue a decision on each post-class application no later than January 28, 2026. *See* ER-182. Under the settlement, if the Department fails to issue "a timely decision" to any post-class applicant, the Department must provide a full discharge and refund. *Id.*

In addition, the Department agreed that, in evaluating those applications, it would "apply the standards in the borrower defense regulations published by the Department on November 1, 2016." ER-182. To receive relief under those standards, an applicant is generally required to establish that the school he attended "made a substantial misrepresentation" that "the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending,

8

the school." 81 Fed. Reg. 75,926, 76,083 (Nov. 1, 2016). Or the applicant may establish that he has obtained "a nondefault, favorable contested judgment" against the school that meets certain criteria or that the school breached a contract with the student. *See id.*

In addition, an applicant who establishes that he is entitled to relief is not necessarily entitled to a full discharge and refund. Instead, the Department is required to "determine[] the appropriate amount of relief." 81 Fed. Reg. at 76,086. For example, for claims based on a substantial misrepresentation, the Department will presumptively award full relief but may reduce the relief based on various considerations, including "the borrower's cost of attendance to attend the school," the "value of the education the borrower received, the value of the education that a reasonable borrower in the borrower's circumstances would have received," the "value of the education the borrower should have expected given the information provided by the institution," and "any other relevant factors." *Id.*; *see also* ER-120.

In November 2022, the district court approved the parties' settlement agreement, as required under Federal Rule of Civil Procedure 23, and entered final judgment. *See* ER-139. As part of the judgment, the court "retain[ed] jurisdiction to monitor and oversee implementation of the settlement." *Id.* Between the time the parties entered into the agreement in June and the court's approval in November, approximately 251,000 post-class claims were submitted—a submission rate that far exceeded the Department's expectations or the rate experienced in any other similar

9

five-month period. ER-113-14. Under the terms of the settlement as originally entered into, the Department was required to issue final decisions on those claims by January 28, 2026.

2. After the settlement was finalized, the Department began implementing it. The Department's ability to quickly work through its settlement obligations was substantially constrained, however, by resource limitations. As of the district court's final approval, the Department employed only 33 attorneys in the borrower-defense branch. ER-115. After the settlement, the Department repeatedly requested that Congress appropriate millions of dollars in additional funds to allow the Department to hire the staff necessary to meet the settlement's deadlines. *Id.* But Congress rejected those requests for Fiscal Years 2024 and 2025. *See id.* As a result, although the Department was able to hire some additional attorneys in 2023 and 2024—and secure some attorneys on temporary detail from another agency—the Department "was unable to increase the number of attorneys adjudicating borrower defense applications to the extent needed to meet the deadlines." ER-115-16.

Faced with these resource constraints, the Department initially "prioritized putting processes into place to meet the settlement deadlines" for the nearly 300,000 class members entitled to relief as parts of Group One and Group Two. ER-121; *see also* ER-123-27 (describing the substantial work required to meet the Department's obligations with respect to that relief). Today, the Department has substantially met its obligations to provide those class members relief due under the settlement. *See* ER-

10

106 (reporting that, as of December 1, 2025, the Department had provided complete relief to between 97.9% and 99.7% of class members entitled to such relief whose deadlines had passed).

While it was working to provide relief to hundreds of thousands of class members, the Department also began using the limited additional resources available to start the process of adjudicating post-class applications. At first, the Department was required to "develop new policies and procedures for adjudicating the post-class applications" and to "train[] staff on post-class adjudications." ER-122. But by August 2023, the Department began resolving post-class applications. *Id.*

The Department's ability to issue a large volume of decisions was, however, seriously undermined by the resource-intensive nature of the adjudication process. As explained, the settlement requires the Department to apply the 2016 version of Department regulations in resolving post-class applications. To apply those regulations, the Department must first engage in a "fact-finding" process for each school, through which the Department evaluates any evidence submitted by borrowers in their applications, "any responses the school submits to the Department," any other records that the Department possesses, and "any additional information or arguments that may be obtained by the Department official (such as accreditor records, documentation from the school, court records, or information obtained from law enforcement partners)." ER-118. That process may take a substantial amount of time, both because of the sheer volume of information

11

involved that the Department must collect and review and because the Department's ability to complete its fact-finding may rely on schools' and third parties' producing information in a timely fashion. *See* ER-118-19.

After the Department concludes its fact-finding process with respect to a particular school, the Department then must "adjudicate[] independently on [the] merits" each application associated with that school. ER-119. This individualized process requires the Department to review "the individual claims made by the applicant as well as the evidence gathered during fact-finding to determine whether the" applicant has established an entitlement to relief. *Id.* If the applicant is entitled to relief, the Department then engages in another individualized analysis to determine the appropriate degree of relief. *See* ER-119-20. And if the application is denied, the Department drafts a detailed denial letter to explain the basis for the Department's decision. *See id.*

Notwithstanding its resource limitations and the resource-intense nature of the post-class adjudications, by January 2025, the Department had achieved "a steady pace of approximately 1,500 post-class adjudications per month," ER-122. The Department managed to maintain that steady pace throughout 2025. ER-127.

Although that pace reflected the Department's diligent efforts, it would have left the Department able to adjudicate only approximately 60,000 of the 250,000 post-class applications before the deadline. *See* ER-127-28. And the Department understood that it was unlikely to receive the many-years-long extension of the

12

January 2026 deadline from the district court that would have been necessary to allow it to adjudicate all 250,000 post-class applications, at least as constrained by the then-existing resource limitations.

The Department's limitations changed, however, in July 2025, when Congress "appropriated an additional $1 billion for" the Department's Federal Student Aid office. ER-129. That substantial appropriation freed up resources that the Department intended to use to hire hundreds of additional contract and permanent attorneys "to adjudicate the post-class applications" and thereby markedly increase the Department's pace of adjudications. *See* ER-129-31. But the Department quickly ran into a significant problem: because the process of awarding such a contract and then onboarding and training the contract attorneys would take months, the Department did not believe that it could begin using that increased capacity before the January 2026 deadline. *See* ER-130-31. Instead, the Department estimated that "the new attorneys could begin adjudicating applications" by approximately July 2026 and that the Department could adjudicate all 200,000 outstanding post-class applications by July 2027. *See id.*

3. Against that backdrop, in November 2025, the Department moved for partial relief from the judgment under Federal Rule of Civil Procedure 60(b); that motion requested that the district court extend the deadline for post-class applications until July 28, 2027. *See* Dkt. No. 492, at 1. The Department explained that because the court had retained jurisdiction to enforce the settlement agreement as part of its final

13

judgment, the court retained equitable authority to modify the settlement as like any other court order. *See id.* at 9-10.

Moreover, the Department explained that the equities warranted modification of the deadline. Although the Department had worked diligently in the face of severe resource constraints to process hundreds of thousands of class member and post-class applications—and had provided substantially all of the relief required to hundreds of thousands of class members—the Department estimated that it would only adjudicate approximately 60,000 of the 250,000 post-class applications before the deadline. *See* Dkt. No. 492, at 17-18. And, the Department explained, the drain on the public fisc of the failure to adjudicate the remaining applications was staggering: the Department estimated that providing full relief would entail forgiving $11.8 billion in outstanding student-loan balances and providing $640 million in refunds, all without any determination that the applicants were entitled to relief. *See id.* at 18; *see also* ER-123.

Conversely, the Department explained, because of Congress's recent additional appropriation, the Department had developed a plan to hire hundreds of additional attorneys on a permanent or contract basis and thereby finish adjudicating the post-class applications by July 2027. Dkt. No. 492, at 20-21. And although that modified deadline did not comport with the settlement agreement's original deadline, it would still ensure a relatively timely decision on the merits for each post-class applicant—and, in the meantime, those applicants' relevant student loans would remain in forbearance such that the applicants did not have to make payments. *See id.* at 21.

14

The district court largely denied the motion. Although the court agreed that it had equitable authority to modify the deadline and although the court recognized the harm to the public and the taxpayers that would ensue if the Department were forced to provide relief to applicants who were not entitled to it on the merits, the court believed that there was a "huge equity working in favor of the class" in having the applications adjudicated by the settlement's deadline. *See* ER-088. In addition, the court suggested its belief that the Department could have implemented a process for adjudicating the full group of post-class applicants within the timeframe provided in the settlement and that, if the Department believed that infeasible, it could have "raised this problem" with the court "a long time ago." ER-083-88. Moreover, the court said that it believed that the Department could adjudicate most of the remaining 200,000 applications—those related to students who attended so-called "Exhibit C" schools (that is, the schools whose students would be entitled to automatic relief if they were class members)—in the six weeks before the deadline. ER-088-89. The court did, however, extend the settlement deadline to April 15, 2026, for the remaining (approximately 19,000) post-class applicants. *See* ER-091; *see also* ER-101.

The Department moved again for relief under Rule 60(b) or for reconsideration of the district court's denial. *See* Dkt. No. 514, at 1. In that motion, the Department focused on two primary errors in the court's denial. First, the Department explained that the court had erred in treating post-class applicants as class members—and that, in fact, the post-class applicants are not parties to the suit, were not bound by the

15

judgment, and are not properly given full weight in the equitable balancing. *See id.* at 14-17; *cf. Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Second, the Department explained that the court had erred in concluding, without support in the record, that the Department's approximately 40 attorneys could adjudicate 170,000 applications in six weeks. *See* Dkt. No. 514, at 17-21.

The district court denied the Department's second motion.[1] The court concluded that although the settlement expressly carved post-class applicants out of the plaintiff class, those applicants were properly treated as plaintiffs for purposes of the equitable analysis because, in approving the settlement, the court had considered the post-class applicants as part of the Rule 23 analysis. *See* ER-007. And the court generally emphasized its belief that, for many of the same reasons given in the previous order denying the first Rule 60(b) motion, it would not be equitable to grant the requested extension. *See* ER-007-09.

4. The Department appealed the denial of the two Rule 60(b) motions and moved in this Court for a stay pending appeal of the January 2026 deadline. This Court denied that motion. In reaching that result, the Court stated that modification of a consent decree ordinarily "should not be granted where a party relies upon events that actually were anticipated at the time it entered into [the] decree." Order 6 (Mar.

---

[1] At the end of 2025, the district court who was originally assigned to this case retired; the case was reassigned to a new district court after resolution of the first Rule 60(b) motion and before the second. *See* ER-005-06.

16

25, 2026) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 385 (1992)). Against the backdrop of that principle, the Court stated that the Department could not identify any "changed circumstances that render it inequitable to apply" the settlement agreement and that the Department knew the size of the post-class applicant group "by February 27, 2023." *Id.* at 6-7. The Court thus denied the stay motion, although it also ordered that the merits resolution of the appeal be expedited. *See id.* at 7.

## SUMMARY OF ARGUMENT

As the district court correctly recognized, a court may properly modify its final judgment—including a settlement agreement incorporated into a final judgment—in certain situations, including where circumstances have materially changed and continued enforcement of the original judgment is no longer equitable or where extraordinary circumstances otherwise justify relief. And as the court also did not dispute, the threshold requirements for modification are met in this case, because a combination of unforeseen circumstances has resulted in the settlement's post-class applicant provisions being substantially more burdensome than anticipated for the Department and more costly than anticipated for the taxpayer.

Nonetheless, the district court largely denied the government's request to modify the final judgment by extending the time within which the Department must adjudicate post-class applications. The court did so because it believed that modification was not supported by the equities. That conclusion, however, rested on legal errors and clearly erroneous factual findings. With those errors corrected, it is

17

clear that the equities support modifying the judgment. The court's orders should be reversed.

**A.** The relevant equities strongly support modifying the post-class application deadline to provide the Department with additional time to adjudicate those applications on the merits. On the one side of the balance, the harm to the government and the taxpayer from enforcement of the deadline is clear: the government will be required to provide billions of dollars in discharges and hundreds of millions of dollars in refunds to borrowers whose entitlement to relief on the merits has not been established. That substantial windfall at taxpayer expense is only more inequitable in this case, because the settlement provides borrowers with substantially more relief than they ever would have been entitled to on their claims. Indeed, the only proper relief on those claims, which generally allege that the Department has unreasonably delayed adjudicating applications, would be an order requiring the Department to engage in adjudications—not an order requiring the Department to grant any applications or otherwise provide full relief to applicants whose claims have not been adjudicated.

Conversely, there are not equally strong equities weighing against modification of the deadline. Plaintiffs themselves—that is, the class members as defined by the settlement agreement—have already received most of the relief to which they are entitled (relief that, as explained, goes well beyond the relief they could have properly

18

received on their underlying claims), and the requested modification would not affect the provision of the remainder of their relief.

Nor can the post-class applicants' asserted interests in enforcement of the settlement provide a firm ground for denying the government's motion. For one, those post-class applicants are not class members, and the Supreme Court has recently made clear that a district court's equitable authority is not concerned with providing relief to such non-parties. Regardless, even if the post-class applicants were treated as class members, their interest in receiving automatic relief—rather than in receiving decisions on the merits of their applications on a rolling basis over the next 18 months, with their loans remaining in forbearance in the meantime—could not outweigh the government's and the public's interest in avoiding a windfall to applicants who may not deserve relief on the merits.

**B.** In addition, relevant circumstances have changed since the Department entered into the agreement in June 2022. The combined effect of those changes has been to substantially increase the burden on the Department—and the cost to the taxpayer—associated with the settlement's post-class applicant provisions.

The Department received many more post-class applications than it could have anticipated. The post-class period was open for less than five months; in that time, more than 250,000 applications were received. By comparison, the Department has received less than 50,000 applications in any other comparable period since 2020. That five-fold increase substantially increased the burdens on the Department of

implementing the post-class applicant provisions of the settlement, as well as the consequences for the public fisc of enforcing the post-class deadline.

Moreover, although it is not relevant to the changed-circumstances inquiry, the Department acted reasonably to attempt to solve the problem once it realized the magnitude of the post-class applications. The Department quickly and repeatedly requested additional funds from Congress to allow it to meet its obligations under the settlement. And although Congress delayed in providing the requested funds, the Department promptly moved for relief in district court once it received an additional appropriation and developed a plan to adjudicate the post-class applications with only an 18-month extension.

In addition to the unexpectedly large number of post-class applications, the district court also materially altered the relevant landscape by requiring the Department to provide more relief to those applicants than is contemplated in the settlement. Under the settlement, a borrower who is entitled to full relief (as, for example, are post-class applicants whose applications are not resolved by the deadline) is entitled only to a refund and discharge for amounts related to the loans he received to attend the school for which he has sought relief. The borrower is not entitled to any relief with respect to loans that he received to attend other institutions. Many borrowers, however, have consolidated loans associated with multiple institutions into a single terminal loan. And over the Department's objection, the court has required that the Department provide such post-class applicants entitled to full relief with a

20

complete refund and discharge of all of the debt associated with the entire consolidated loan—even if some or most of the underlying loans relate to schools for which the borrower has not claimed relief. The Department has estimated that the financial effect of this overbroad relief is that it will be required to disburse billions of additional dollars in discharges and refunds beyond what post-class applicants would be entitled to under the terms of the settlement.

**C.** Finally, the district court's additional reasons for denying relief do not withstand scrutiny. Although the court seemed to believe that the Department could meet the deadline by adjudicating 170,000 applications in six weeks, that belief has no support in the record. In addition, the court's apparent understanding that the Department could more easily process post-class applications related to Exhibit C schools—where the Department has previously identified indicia of fraud— misunderstands the relevant process. Even where there have been previous findings of liability (which is not true for many Exhibit C schools), those findings do not enable to the Department to short-circuit the school-wide fact-finding process or the individualized consideration of each application required under the relevant regulations. And the court's belief that the post-class applicants constitute members of the class was legally erroneous; the parties' settlement agreement—which unambiguously carves post-class applicants out of the class—was incorporated into the final judgment and thereby supersedes the earlier class definition that may have encompassed post-class applicants.

21

## STANDARD OF REVIEW

This Court "review[s] for an abuse of discretion the district court's decision to deny a Rule 60(b) motion." *California ex rel. Becerra v. U.S. EPA*, 978 F.3d 708, 713 (9th Cir. 2020) (quotation omitted). A district court "necessarily abuse[s] its discretion" when its denial "rest[s] upon an erroneous view of the law" or "on a clearly erroneous finding of material fact." *Henson v. Fidelity Nat'l Fin., Inc.*, 943 F.3d 434, 443 (9th Cir. 2019) (quotation omitted).

## ARGUMENT

### THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING THE DEPARTMENT'S MOTIONS TO MODIFY THE POST-CLASS APPLICANT DEADLINE

As the district court properly did not dispute, courts retain authority following the entry of final judgment to modify the judgment in certain circumstances. These include if applying the judgment "prospectively is no longer equitable," Fed. R. Civ. P. 60(b)(5), or for "any other reason that justifies relief," Fed. R. Civ. P. 60(b)(6).

Rule 60(b)(5)'s "malleable standard for modifying an injunction" reflects "the courts' traditional authority, inherent in the jurisdiction of the chancery, to modify or vacate the prospective effect of their decrees." *California ex rel. Becerra v. U.S. EPA*, 978 F.3d 708, 713 (9th Cir. 2020) (quotation omitted). In general, a party seeking to modify an injunction under Rule 60(b)(5) is required to establish that "a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest"; if such a showing is made, however, "a court

22

abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes." *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quotation omitted); *see also Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992) (making clear that modification of a consent decree may be warranted "when enforcement of the decree without modification would be detrimental to the public interest").

In addition, Rule 60(b)(6) permits a district court to modify a judgment "whenever such action is appropriate to accomplish justice." *Henson v. Fidelity Nat'l Fin., Inc.*, 943 F.3d 434, 443 (9th Cir. 2019) (quotation omitted). To establish an entitlement to relief under that provision, a movant "must show extraordinary circumstances justifying the reopening of a final judgment"; if those circumstances are shown, the court should grant relief "whenever, under all the surrounding circumstances, such action is appropriate in the furtherance of justice." *Id.* at 443-44 (quotation omitted).

The district court did not dispute that Rule 60(b) permits the court to modify terms in a settlement that has been approved by the court and incorporated into the final judgment, as happened here. *See Kelly v. Wengler*, 822 F.3d 1085, 1094-98 (9th Cir. 2016). Nor did the court dispute that the threshold requirements for relief under Rule 60(b)(5) or Rule 60(b)(6) were met—and indeed granted relief in part by extending the deadline for a small subset of post-class applications by three months. Nonetheless, the court largely declined to exercise its authority to extend the post-class application

23

deadline, because the court believed that the equities did not support such an extension.

That decision was incorrect on all levels. The equities strongly support modification of the post-class deadline. Absent modification, enforcing the deadline will work a substantial harm on the government and the public by requiring the government to provide billions of dollars in relief to applicants who may not be entitled to that relief on the merits. And conversely, neither the parties to this case—which do not, properly construed, include the post-class applicants—nor the post-class applicants have sufficient countervailing equities in strict enforcement of the deadline to overcome that harm. Beyond that, circumstances have changed since the Department entered into the settlement agreement in 2022, including an unanticipated explosion in the rate of applications and the district court's unexpectedly ordering the Department to provide relief beyond that required by the settlement. And the court's specific reasons for denying relief rest on clear legal and factual errors that reflect an abuse of discretion.

## A. The Equities Strongly Favored Modifying the Post-Class Applicant Deadline

1. The harm to the government and the public from enforcement of the January 2026 post-class deadline is manifest. At the time the Department moved for relief, the Department estimated that it would be able to adjudicate approximately 60,000 of the post-class applications before the deadline—but that more than 190,000

would remain unadjudicated. ER-128; *see also* ER-096 (confirming, after the deadline, that the Department's predictions were generally accurate). The Department estimated that providing full relief for those 190,000 applications would entail the provision of approximately $11.8 billion in discharges and $640 million in refunds. ER-128.[2]

Each applicant would receive that relief even though no determination has been made that the applicant has facially stated a claim for relief—much less that the applicant has provided evidence sufficient to support the claim or that the applicant would be entitled to full, rather than partial relief, even if the claim were proven. That multi-billion-dollar potential windfall to post-class applicants at taxpayer expense plainly harms the government and the public. And the harm of the strict enforcement of the settlement's deadline is particularly evident given that Congress has recently appropriated substantial additional funds to the Department that will allow the Department to complete within a reasonable timeframe the individualized adjudications necessary to ensure that relief only flows to applicants who have proven their claims.

---

[2] The total financial effect of strict enforcement of the deadline was mitigated only slightly by the district court's determination to provide a brief extension for approximately 10% of the remaining post-class applications. *See* ER-096 (stating that providing relief for the applicants whose deadline was not extended would entail more than $11 billion in discharges and refunds).

25

The government's and the public's interests in favor of modification are underscored by the sweeping relief contemplated by the settlement agreement, which goes far beyond relief that plaintiffs (much less the post-class applicants) could have properly received on their claims. As explained, the gravamen of plaintiffs' claims from the beginning of this suit has been that the Department unreasonably delayed acting on borrower-defense claims. *Cf.* 5 U.S.C. § 706(1) (allowing a plaintiff to bring suit seeking to "compel agency action unlawfully withheld or unreasonably delayed"). But relief for such a claim is strictly circumscribed. For one, § 706(1) can only provide a remedy where a plaintiff can establish "that an agency failed to take a *discrete* agency action that it is *required to take*," in circumstances where "the agency's legal obligation is so clearly set forth that it could traditionally have been enforced through a writ of mandamus." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010) (quotation omitted). And even where a plaintiff can make such a showing, § 706(1) permits "a court only to compel an agency" to "take action upon a matter, without directing *how* it shall act." *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (quotation omitted); *see also* ER-142 (explaining that plaintiffs originally sought only "an order compelling the Department to start granting or denying their borrower defense[]" applications (quotation omitted)).[3]

---

[3] Plaintiffs eventually requested that the district court enter an order requiring the government "to show cause, within thirty days of the Court's ruling on [summary judgment], why each and every class member's [borrower-defense] application should

*Continued on next page.*

26

But the settlement agreement provides relief to the post-class applicants that goes well beyond those circumscribed parameters. For one, at the time that the parties executed the settlement, the post-class applicants had not even filed applications yet—and, even by the time the district court approved the settlement, their applications had by definition been pending for less than six months. But the relevant statute and regulations contain no express deadline requiring the Department to act on borrower-defense applications within any specific timeframe, much less to act on them within six months. Thus, at the time that the parties entered into the settlement agreement (and at the time that the court approved it), there was no plausible argument that the post-class applicants could have made out any failure on the Department's part to adjudicate their claims in a timely fashion—much less a failure rising to the level of a complete abdication of a statutory duty, as would be required to obtain relief under § 706(1). *See ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir. 1998).

Moreover, even if the post-class applicants had a plausible entitlement to relief under § 706(1) at the time of the settlement, the agreement goes well beyond whatever relief they could have obtained. In addition to agreeing to act on the post-class

---

not be granted immediately." Dkt. No. 245, at 1. Such relief would have plainly exceeded the bounds of appropriate § 706(1) relief, and plaintiffs' previous unsupported request for that relief does not alter the relevant point that the settlement agreement provides relief that goes far beyond what plaintiffs could have properly received on the merits of their claims.

applicants' borrower-defense applications by the January deadline, the settlement reflects an agreement to provide complete relief—effectively, an agreement to fully grant each application—if the Department fails to meet the January deadline. But as explained, § 706(1) would have provided no basis for any district court order effectively requiring the Department to grant applications, rather than an order simply requiring adjudication by a particular date.

As the Supreme Court has explained, it is particularly important for district courts to take "a flexible approach" to Rule 60(b) motions in the context of settlement agreements with public officials, who "sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law" and "may thereby improperly deprive future officials of their designated legislative and executive powers." *Horne*, 557 U.S. at 448-50 (quotation omitted); *see also id.* at 450 ("[C]ourts must remain attentive to the fact that federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate federal law or does not flow from such a violation." (alteration and quotation omitted)). And the problems inherent in such overbroad concessions are only "heightened" when a "court decree has the effect of dictating" how Congress and the Executive Branch expend "limited funds." *Id.* at 448.[4]

---

[4] In *Horne*, the consent decree at issue bound state officials, not federal officials, and the Supreme Court thus expressed its concerns about such a decree dictating "state or local budget priorities" in terms of federalism. 557 U.S. at 448. The

*Continued on next page.*

28

Those concerns are evident in the context of this case. As explained, the settlement agreement provides far more relief to the post-class applicants than they would have been entitled to on any § 706(1) claims, even if they were parties who had asserted such claims. As a result of that agreement—and the unexpectedly large number of post-class applicants—the Department has expended significant resources for more than three years in an attempt to process post-class applications (and class members' own applications) on a timeline that is not required by any statute or regulation, even in the face of severe resource constraints.

Throughout that time, the Department has made significant progress. When the district court originally approved the settlement, the borrower-defense program had "devolved into an impossible quagmire," with "approximately 443,000 borrowers [who had] pending borrower-defense applications." ER-150. Under the court's previous view of a reasonable adjudication pace, the court estimated that "it would take the Department *more than twenty-five years* to get through the backlog." *Id.* But the Department has now nearly finished adjudicating applications and processing relief for nearly 300,000 class members, has managed to achieve a steady pace of adjudicating post-class applications, and has developed a plan to finish within five

---

separation-of-powers problems that arise when a federal court decree effectively dictates how the Legislative and Executive Branches must appropriate or spend funds are no less concerning than the federalism-based problems discussed in *Horne.*

years of the settlement's approval—a marked improvement on the 25-year timeline that the district court previously estimated.

But that progress has come at a significant cost to the Department's own policy discretion and has resulted in demands on Congress's power of the purse. Throughout the last four years, the Department has been forced to prioritize complying with the settlement agreement over expending its resources on other potential policy priorities. And to have any possibility of meeting the deadline, the Department was required to request substantial additional appropriations from Congress—appropriations that Congress was unwilling to provide for multiple years. All of those constraints operated against the backdrop of the threat that the Department would be required to provide billions of dollars in relief to applicants who have not demonstrated any entitlement to that relief on the merits.

In short, the settlement agreement provides post-class applicants with far more relief than they would have been entitled to on their claims and has, as a result, significantly constrained the Department's discretion for years as it has labored to make progress on implementing the settlement. Particularly now that the Department has remedied the quagmire that previously existed, the government and public have a strong interest in loosening the constraints on the Department's properly held discretion and in avoiding the windfall that strict enforcement of the agreement would provide to post-class applicants at taxpayers' expense.

30

2. Conversely, plaintiffs' interests weighing against modification of the deadline are minimal. The class members—as defined by the settlement agreement—have already received nearly all the relief to which they are entitled under the agreement. *See* ER-106 (reporting that, as of December 1, 2025, the Department had provided complete relief to between 97.9% and 99.7% of class members entitled to such relief whose deadlines had passed).

Indeed, that relief goes well beyond whatever the class members may have been entitled to on the merits of their claims. As explained, proper relief on plaintiffs' § 706(1) claim would have been limited to an order requiring the Department to adjudicate plaintiffs' applications within a particular timeframe. But the settlement agreement goes well beyond that, providing much more generous relief to all class members. For approximately two-thirds of the class, the agreement required the Department to provide class members full discharges and refunds, without any further inquiry into whether the class member had established an entitlement to relief on the merits. *See* ER-177. And even for the remaining class members, the Department agreed not only to adjudicate their applications on a defined timeline but also to provide full discharges and refunds so long as the application in question "states a claim that, if presumed to be true, would assert a valid basis for borrower defense relief," ER-178-79—without regard to whether the assertions in the application are in fact true or supported by any evidence. And any borrower whose application failed to state a claim on its face was entitled to the opportunity to revise

31

and resubmit his application, at which point it would again be adjudicated only to determine if it stated a claim. ER-179-80.

As the district court commented in approving the settlement, the terms of the agreement reflected "a grand slam home run for class members." ER-159. Although the class members had "originally sued just to get a decision one way or another on their applications," the majority of them were entitled to "total forgiveness" under the settlement. *Id.* And as a result of the agreement's exceptionally generous standards for relief, the Department has already provided more than $12 billion in discharges and refunds to class members—an amount that will only grow as the Department finishes implementing its obligations with respect to the class members (implementation that is not affected by the Department's motion to modify the post-class applicant deadline).

Thus, the class members themselves have already received substantial relief under the settlement agreement. Against that backdrop, any equitable interest that the class members retain in continuing to enforce the settlement's obligations with respect to post-class applicants cannot outweigh the government's and the public's interests in avoiding a windfall to those applicants who may not be entitled to relief on the merits.

3. Nor can the post-class applicants' interests in receiving automatic relief under the settlement outweigh the countervailing interests in an extension. For one, the settlement agreement makes clear that the post-class applicants are not class

32

members in this suit. As a result, the district court's equitable balancing does not properly take account of their particular interests.

It is plain from the face of the settlement agreement that the post-class applicants are not class members and are therefore not plaintiffs in this suit. The settlement makes clear that the "Class is closed as of the Execution Date" (that is, before the post-class applicants submitted borrower-defense applications). ER-177. In discussing treatment of post-class applications, the settlement reiterates that post-class applications are those submitted "after the Execution Date (*i.e.*, the date the class closes)," ER-182—and, thus, that post-class applicants are not members of the class even if the Department has agreed to provide them relief under the settlement. And consistent with post-class applicants' status as third-party beneficiaries, rather than parties to the settlement, the agreement further provides only that "the Class Members"—not the post-class applicants—"waive, release, and forever discharge Defendants" from covered claims. ER-192.

Because post-class applicants are not class members, the district court's exercise of its equitable authority to modify the settlement was not properly concerned with their interests. As the Supreme Court has recently explained, a federal court's "equitable authority is not freewheeling" but is instead constrained by the "sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (quotation omitted). One important limitation on that equitable authority is that "suits in equity" are "brought

33

by and against individual parties," and such "party-specific principles" "permeate our understanding of equity." *Id.* at 842, 844. Thus, "courts generally may administer complete relief *between the parties*" but may not extend relief beyond what is necessary to "offer complete relief *to the plaintiffs before the court.*" *Id.* at 851-52 (quotation omitted). In light of those principles, the district court was required to grant the Department's requested modification, because the government's and public's interest in avoiding the disbursement of billions of dollars in automatic relief outweighs any interest that the actual plaintiffs in this suit—who, again, do not include the post-class applicants—have in ensuring that third parties receive that relief.

Indeed, the district court's erroneous approach to the post-class applicants as parties to this case runs deeper than denying the Department's motion to modify the deadline. In general, settlement agreements are contracts and any breach of those agreements is subject to ordinary contractual remedies, *see Knudsen v. Commissioner*, 793 F.3d 1030, 1035 (9th Cir. 2015)—which, in the case of contracts with the government, generally does not include an action for specific performance in district court, *see North Side Lumber Co. v. Block*, 753 F.2d 1482, 1484-86 (9th Cir. 1985).

But here, the district court purported to retain jurisdiction to enforce the settlement agreement in its entirety, allowing the parties to effectively seek a specific-performance injunction notwithstanding those ordinary limitations. That approach may have some validity with respect to plaintiffs, who could at least assert an entitlement to an injunction on their underlying claims (though not, as explained, an

34

injunction providing anywhere near the relief provided through the settlement). But it cannot be permissible with respect to non-parties like the post-class applicants. Those non-parties did not have underlying claims pending before the district court at the time it entered final judgment. Especially in light of *CASA*, there was thus no substantive basis for the district court to enter an injunction providing those non-parties relief.

Instead, to the extent that the non-party post-class applicants have any enforceable right to adjudications by the agreement's deadline, that right must necessarily flow from the agreement, rather than from any underlying substantive claim. It is thus a contractual right that is not properly subject to enforcement in district court through injunctive relief.

Regardless, even if the post-class applicants did have enforceable interests in the January deadline that were entitled to full equitable consideration, their interests in avoiding the modest extension requested by the Department could not outweigh the government's and public's interests in avoiding a multi-billion-dollar windfall. For one, even under the extension requested, post-class applicants will receive decisions in a relatively timely fashion. By definition, the post-class applicants did not file their administrative claims until after the parties executed the settlement in June 2022, and it is not inherently unreasonable for the Department to require five years to adjudicate more than 250,000 applications, particularly given the substantial individualized analysis that each application requires and the extreme backlog that existed as of 2022.

35

Indeed, as explained, plaintiffs have not identified any statutory or regulatory requirement that the Department act on the applications in any particular time (much less within the few years that the January 2026 deadline required). *Cf. ONRC Action*, 150 F.3d at 1137 (explaining that relief for agency action unreasonably delayed is only appropriate when an agency's "recalcitrance is in the face of clear statutory duty or is of such a magnitude that it amounts to an abdication of statutory responsibility" (quotation omitted)).

In addition, as explained, the Department has already resolved nearly 25% of the post-class applications, and even under the requested extension, post-class applicants will continue to receive determinations on a rolling basis, with all post-class applicants entitled to receive a decision in the relatively near future. And in the interim, the post-class applicants' loans would remain in forbearance—a status that the post-class applicants have already benefitted from for years—ensuring that the applicants are not required to make payments pending adjudication of their applications. Finally, because the post-class applicants have not waived any claims as part of the settlement, those applicants need not rely on the settlement to protect their interests; instead, they may be entitled to pursue their own claims in their own suit if they believe that they have a statutory or regulatory right to a decision on a faster timeline.

36

**B.** **Relevant Circumstances Materially Changed After the Department Agreed to the Settlement**

In addition to the equities favoring modification of the post-class application deadline, relevant factual and legal circumstances have changed since the Department agreed to the settlement in June 2022. The Department received many more post-class applications than it could have expected. And the district court ordered the Department to provide even more generous relief than contemplated in the settlement. As a result of these changes, the Department's burdens under the agreement—and the ultimate liability to the taxpayer—markedly increased.

1. After it agreed to the settlement, the Department experienced an unprecedented volume of borrower-defense applications during the post-class period, which substantially increased the burdens of the settlement—and the consequences to the taxpayers of missing the post-class deadline—beyond what the Department had anticipated. The post-class application period was open for less than five months, from June 23, 2022, through November 15, 2022. *See* ER-113. During that period, the Department received more than 251,000 borrower-defense applications. *Id.* By contrast, in every other five-month period between 2020 and 2025, the Department received an average of less than 35,000 applications—and in no five-month period did the Department receive more than 48,000 applications. *See id.* In other words, during the post-class period, the Department received seven times as many applications as during an average five-month period and five times as many applications as during the

37

busiest other five-month period in recent years. Thus, "[b]ased on historical experience," the "Department could not have anticipated the high number of applications received during the" post-class period. ER-114.

The unanticipated number of applications substantially increased the burden of adjudicating the post-class applications. Resolving each post-class application requires the Department to engage in an individualized review of the application "to determine whether the borrower establishes a borrower defense by a preponderance of the evidence." ER-119. And once that individualized determination is made, the Department must engage in further individualized work either to determine the amount of appropriate relief or to "draft[] a detailed denial letter describing each allegation made, the legal standard applied to the allegation, and why the allegation did not meet the legal standard." ER-119-20.

Engaging in that individualized inquiry for 250,000 applications, rather than 35,000 or 50,000, plainly requires substantially more time and resources, increasing the burden of resolving the post-class applications well beyond what was anticipated as of June 2022. Indeed, as explained, the Department resolved approximately 60,000 post-class applications before the January deadline, which is thousands more applications than the Department received in any other five-month period since 2020. Thus, had the Department received the anticipated number of post-class applications, it is likely that the Department would have been able to adjudicate all, or nearly all, of the applications before the deadline.

And the effects of the unanticipated surge in applications during the post-class period only compound when it comes to the financial consequences of missing the deadline. As explained, the Department estimated that full settlement relief on the unresolved applications would total more than $12 billion in refunds and discharges. That financial effect is many times what the Department would have anticipated when it believed there would be many fewer post-class applications, even if the Department had been unable to adjudicate all, or even any, of those applications by the deadline.

Moreover, although the stay opinion noted that the Department was aware of the size of the post-class applicant group "by February 27, 2023, over three years ago," Order 7 (Mar. 25, 2026), the Department's awareness by February 2023 is not relevant to the changed-circumstances inquiry. As the Supreme Court has explained, that inquiry focuses on whether "a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 385. "If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree," then modification ordinarily "should not be granted" based on those anticipated changes. *Id.* Here, the parties executed the settlement agreement on June 22, 2022, before the opening of the post-class period, and there can be no serious doubt that the Department did not anticipate at that time that it would eventually receive 250,000 post-class applications. There is thus no concern that the Department entered into the agreement with a lack

39

of "good faith" or did not "ma[k]e a reasonable effort to comply with the decree" such that modification would be unwarranted. *Id.*

And although the Department's awareness of the size of the post-class applicant pool as of 2023 might be relevant to the equitable balancing—even if not to the changed-circumstances inquiry—the Department did not unreasonably delay seeking modification. Once the Department appreciated the scope of the problem, it quickly sought additional funds from Congress to enable it to hire additional staff and thereby meet its obligations under the settlement. Thus, in March 2023, the "Department requested $21.0 million" in the President's Fiscal Year 2024 budget request "for additional staffing needed to provide decisions" on the post-class applications by the settlement's deadline. ER-115. And when Congress failed to provide the requested funding for Fiscal Year 2024, the Department "requested $56 million" in the Fiscal Year 2025 budget "to hire hundreds of attorneys to adjudicate these applications." *Id.* Plaintiffs can hardly fault the Department for initially seeking to acquire from Congress the additional resources necessary to meet the settlement deadlines, rather than immediately moving to modify those deadlines.

Nor was it unreasonable for the Department to forgo seeking modification after Congress denied the Fiscal Year 2024 and 2025 requested appropriations but before Congress appropriated additional funds in July 2025. At that point, in light of its then-current resource limitations, the Department was able to adjudicate approximately 1,500 post-class applications per month, or approximately 18,000 per

year. *See* ER-127-28. At that pace, it would have taken the Department more than 10 additional years to adjudicate the post-class applications that remained pending as of the January deadline. And it is clear that it would have been futile for the Department to ask plaintiffs to agree to—or to ask the district court to order—that long extension.

The relevant circumstances changed, however, once Congress appropriated additional funds in July 2025. As explained, that additional funding enabled the Department to develop a plan—detailed in declarations of high-level Department officials to the district court, *see, e.g.*, ER-100-02, 129-31—to hire hundreds of additional attorneys and thereby adjudicate all of the remaining post-class applications by July 2027—requiring a more modest 18-month extension. And there has been no suggestion that the Department unreasonably delayed seeking modification of the settlement once it had secured the additional funding and developed the detailed plan required to support the modification request.

2. The financial effect of the unexpectedly large number of post-class applications was further amplified by the district court's ordering the Department to alter its methodology for providing full settlement relief to go beyond what the settlement agreement itself contemplated. Under the terms of the settlement, any class member or post-class applicant who is entitled to "Full Settlement Relief" (as are, for example, the post-class applicants whose applications were not resolved by the January 2026 deadline, ER-182) must receive a discharge and refund of "Relevant Loan Debt"—that is, a discharge and refund for "loans associated with the school

41

that is the subject of" the relevant borrower-defense application. ER-175-76. The settlement does not, however, entitle any such borrower to relief that extends to loans that the borrower may have received to attend other schools.

Nonetheless, when the Department began to process relief for Group One class members—that is, those class members entitled to full relief because they attended one of the Exhibit C schools—it encountered difficulties in circumstances where class members had consolidated eligible and ineligible loans together into a single consolidation loan. As a result of the problems that the Department encountered when it tried to disentangle the eligible and ineligible portions of those consolidated loans, it was unable to effectuate full relief for a minority of the Group One class members by the relevant deadline. Because the Department had missed the deadline for effectuating relief, the Department proposed implementing—and the district court ultimately adopted—a "terminal loan methodology" for Group One class members with consolidated loans. Under that methodology, the Department agreed to provide full discharges of, and refunds of payments on, debt associated with the current consolidated loan, including debt that was ultimately linked to loans that were not related to the class member's borrower-defense application. *See generally* ER-135-36.

Although the Department agreed to this overbroad relief for Group One class members in light of the particular circumstances of those class members, the Department's agreement was limited to Group One class members. Nonetheless, the

42

district court later ordered the Department to implement the same methodology for the Group Two class members and the post-class applicants. *See* Dkt. No. 451 (minute order); *see also* ER-137-38.

As a result of those orders, the Department is required to provide relief to post-class applicants that goes far beyond the relief that it anticipated (and agreed to) at the time that it entered into the settlement. The Department has estimated that application of the terminal loan methodology, rather than application of the more limited relief contemplated by the agreement, will lead to an additional "approximately $4.5 billion in discharges and approximately $194 million in refunds." ER-128. Those billions of dollars in additional relief—relating to loans for which applicants have not even claimed an entitlement to relief—were not contemplated at the time that the Department entered the settlement agreement. Particularly in combination with the unexpectedly large number of post-class applicants, this change in circumstances has resulted in a substantial increase in the financial effect to the government and the taxpayers in enforcing the original settlement deadline.

> **C.      The District Court's Additional Reasons for Denying Modification Reflect Clear Legal and Factual Errors Constituting an Abuse of Discretion**

1. As an initial matter, in denying the Department's original motion to modify the deadline, the district court relied on its belief that the Department could—in the "six weeks" between the hearing and the deadline—adjudicate approximately 170,000 remaining post-class applications. ER-088; *see also* ER-088-89 ("I think it can be done.

43

Don't tell me holidays. . . . You can take Christmas off, maybe New Year's Day off. But Government employees should work. When I worked for the Government, I worked on Christmas Day and New Year's Day. So it's possible to get this job done[.]").

But that belief is belied by the record. At the time of the hearing, the borrower-defense branch had fewer than 40 attorneys. And evaluating each application requires multiple levels of individualized analysis—including collecting evidence from a variety of sources about the school in question, reviewing that evidence along with the allegations and evidence in the application, weighing the relevant evidence, making a determination about entitlement to relief, making an additional individualized determination about the appropriate extent of any relief, and drafting (if necessary) a detailed denial letter. It is inconceivable—and controverted by the record—to think that 40 attorneys could produce 170,000 individualized decisions in six weeks, regardless whether they worked on Christmas and New Year's Day. And to the extent that the district court's conclusion was premised on the belief that such a result was possible, that conclusion was clearly erroneous.

2. Moreover, the district court's belief that the Department could easily adjudicate the post-class applications associated with Exhibit C schools—which the court characterized as "highly suspect" and "the schools that the attorney generals in various states have already singled out as fraudulent," ER-089—was erroneous, on multiple levels.

For one, the district court seemed to misunderstand the criteria that the parties employed to select Exhibit C schools. Although "in some instances" those schools had engaged in misconduct that had been "proven" (including by, for example, liability findings in suits brought by state attorneys general), many other schools were included on Exhibit C without such findings. ER-217. For example, other schools were selected based on "credibly alleged"—but not proven—misconduct and based on the large volume of applications associated with the school. *Id.* The Department has thus been clear that inclusion on Exhibit C does not reflect any finding that a particular school engaged in misconduct. *See* ER-170.

Regardless, even for schools with some history of proven misconduct, that history cannot substitute for the substantial work required under the 2016 regulations that the Department must apply in adjudicating the post-class applications. As an initial matter, under those regulations, the Department must first engage in "fact-finding" for each school, a process that requires the Department to evaluate all of the evidence in its possession (or submitted by outside parties, such as law enforcement partners or the school itself) and to make findings with respect to any misconduct that the school engaged in. *See* ER-118-19. Even previous liability findings cannot short-circuit that process, both because the Department must consider any countervailing information (such as information submitted by the school) and also because the Department must determine whether the school engaged in additional misconduct beyond whatever misconduct was at issue in previous specific proceedings.

45

And after the Department engages in that fact-finding process, it still must "adjudicate[] independently on [the] merits" each application associated with that school to determine whether each specific applicant has established an entitlement to relief (and, if so, to determine the appropriate amount of relief). ER-119-20. Again, generalized school-based findings of misconduct cannot short-circuit that required individualized process. Indeed, even with respect to a school with a proven history of substantial misconduct, a given applicant may not be able to establish an entitlement to borrower-defense relief if he (for example) attended at a time when no such misconduct occurred, enrolled in a particular program at the school with no associated misconduct, or cannot establish that he relied on any fraudulent statements in choosing to take out loans to attend the school.

3. Finally, in denying the Department's second Rule 60(b) motion, the district court held that the post-class applicants were in fact members of the class, even though the settlement agreement plainly reflects the parties' agreement to close the class as of the date of the settlement and thereby exclude the post-class applicants from the class. In reaching that conclusion, the court stated that the parties' agreed upon class limitation was "rejected" by the court in its approval of the settlement, because the court considered the post-class applicants in assessing the fairness of the settlement to the class. *See* ER-007; *see also* ER-160-61 (noting that the class definition adopted by the district court at the outset of the case did not have a temporal cutoff).

46

The district court's understanding of the status of the post-class applicants was legally erroneous. Although the class was temporally open-ended when it was originally certified, the parties' settlement agreement expressly modifies the scope of the certified class by closing the class as of the date that the settlement was executed. That agreement was then incorporated in the final judgment, thereby superseding the preliminary certification—consistent with this Court's recognition that class certification orders are "inherently tentative" and "may be altered or amended before final judgment." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018) (quotation omitted); *see also* Fed. R. Civ. P. 23(c)(1)(C) (permitting such amendments). Notwithstanding the court's desire to ensure that the post-class applicants were treated fairly by the settlement, the court did not (and cited no authority to support the idea that the court could) override the parties' agreement in this respect.

Moreover, the district court's understanding—that the relevant class continues to be defined by the court's original class certification order, which does not include a cut-off date—would have extremely anomalous consequences. So construed, the class certification order would encompass hundreds of thousands of borrowers who have filed borrower-defense applications since the court's approval of the settlement in November 2022. Those borrowers received no relief in the settlement, and no party has ever understood them to be encompassed within the class. But if the original class certification order were truly the operative order, those borrowers would nonetheless

47

constitute plaintiffs in this action and would be precluded from bringing their own claims if they wished to do so. That cannot be correct.

## CONCLUSION

For the foregoing reasons, the district court's denials in large part of the government's motions seeking an extension of the post-class applicant deadline to July 28, 2027, should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

MICHAEL S. RAAB

 *s/ Sean R. Janda*
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

April 2026

48

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

*s/ Sean R. Janda*

Sean R. Janda

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,622 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda